**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF ARKANSAS, SAVE AR DEMOCRACY, BONNIE HEATHER MILLER and DANIELLE QUESNELL. <br><br> *Plaintiffs,* <br><br> v. <br><br> COLE JESTER, in his official capacity as Secretary of State of Arkansas, <br><br> *Defendant*. | Case No. _____ |

**COMPLAINT**

Plaintiffs League of Women Voters of Arkansas, Save AR Democracy, Bonnie Heather Miller, and Danielle Quesnell (collectively, "Plaintiffs"), for their Complaint against Defendant Cole Jester, in his official capacity as Arkansas Secretary of State ("Defendant"), state and allege as follows:

**INTRODUCTION**

1.      This is an action to enforce rights at the very core of protected political speech: the constitutionally protected right of Arkansas citizens to consider and vote on an initiated act or an initiated constitutional amendment (collectively referred to as a "measure") concerning critical issues of state government. The ability of Arkansas citizens, enshrined in this State, to place a measure on the ballot has become impossible due to the substantial and severe burdens that the Arkansas General Assembly recently imposed on that process. While the degradation of the initiative and referendum process by the Arkansas General Assembly began with the 89th session

1

in 2013, the most recent legislative session amounts to a complete assault on the rights of Arkansas citizens to place citizen initiatives before the Arkansas electorate. The General Assembly now has enacted at least ten Acts that in some way impact the initiative and referendum process (collectively, the "Unconstitutional Acts"), in order to ensure that no Arkansas citizen can exercise their constitutional right to employ measures to make laws. This is not a partisan issue: all citizens of this State have availed themselves of the right to put issues to the voters. Such direct democracy has been a hallmark of Arkansas life since 1910. The Unconstitutional Acts, however, individually and cumulatively result in a severe burden on the initiative and referendum process that effectively prohibits measures from ever reaching the general election ballot. Plaintiffs therefore bring this action to preserve the sacrosanct rights of Arkansas citizens to direct democracy by challenging the Unconstitutional Acts as violating the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983, and rights guaranteed by Article 5, Section 1 of the Arkansas Constitution.

2.      The First Amendment guarantees all citizens freedom of speech and the right to petition the Government for a redress of grievances. Article 5, Section 1 of the Arkansas Constitution provides that "[t]he Legislative power of the people of this State shall be vested in a General Assembly, but **the people reserve unto themselves the power to proposed legislative measures, laws and amendments to the Constitution**, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill." (Emphasis added.)

3.      Under the Arkansas Constitution, "[n]o law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions, nor to prohibit the circulation or petitions, nor in any manner interfering with the freedom of the people in procuring

petitions; but laws shall be enacted prohibiting and penalizing perjury, forgery, and all other felonies or fraudulent practices, in the securing of signatures or filing of petitions. . . . No legislation shall be enacted to restrict, hamper or impair the exercise of the rights herein reserved to the people."

4.      The circulation of petitions is "core political speech" and the "First Amendment protection for such interaction… is 'at its zenith." *Buckley v. Am. Cost. L. Found., Inc.*, 525 U.S. 182, 196 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988). The Arkansas General Assembly has so restricted the ways in which election petitions may be circulated to place measures on the ballot that it infringes upon the core political speech of Arkansas citizens in violation of the First Amendment to the Constitution of the United States and Article 5, Section 1 of the Arkansas Constitution.

5.      The Arkansas Constitution preserves this core political speech by enshrining it in Article 5, Section 1, of our Constitution. There is only one way to restrict that right: by Constitutional Amendment. The Unconstitutional Acts are an unlawful effort to circumvent Article 5 despite the clear and persistent will of the citizens of this State to preserve their ability to propose ballot measures for consideration by the voting public.

6.      Ballot measures are a crucial aspect of citizen participation in government. Arkansas citizens have long treasured their right to the initiative and referendum process. In 2020, the Arkansas General Assembly referred to the people a proposed constitutional amendment known as Issue 3 that would have made substantial changes to the initiative and referendum process. The voters of Arkansas rejected this measure, voting 56% against. In 2022, the Arkansas General Assembly again referred to the people a proposed constitutional amendment known as

Issue 2 that would have made substantial changes to the initiative and referendum process. The Arkansas voters again rejected this measure, voting 59% against.

7.    The Arkansas General Assembly seeks to dismantle the initiative and referendum process embedded in the Arkansas Constitution through the Unconstitutional Acts:

- Act 274 of 2025 requires that the person signing the petition read the ballot title in the presence of the canvasser or that the canvasser read the ballot title out loud to the person. The canvasser is then required to certify that this has occurred and if the person signs the petition without having read or been read the ballot title, the canvasser is guilty of a crime.

- Act 240 of 2025 requires that the canvasser view the photo identification of the person signing the petition prior to their signing the petition and prohibits a person from signing the petition if he/she does not have a photo identification. It is a crime if a canvasser allows a person to sign without viewing the photo identification.

- Act 218 of 2025 requires that a canvasser cannot accept a signature on a petition without disclosing that petition fraud is a criminal offense. It is a crime if the canvasser fails to provide that notification.

- Act 453 of 2025 requires that a paid canvasser be "domiciled" in the state.

- Act 241 of 2025 requires that the canvasser file an affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas law regarding canvassing in the procurement of signatures. If no affidavit is filed, then the signatures collected by that canvasser shall not be counted.

- Act 241 of 2025 prevents a canvasser who has filed this affidavit from collecting signatures during the time the Secretary of State is counting signatures to determine if a measure is entitled to a cure period.

8.      These laws interfere, restrict, hamper, and impair the freedom of the people in circulating and procuring petitions. The laws do not facilitate the operation of the initiative and referendum process. These laws infringe upon the core political speech of Arkansas citizens in violation of the First and Fourteenth Amendments to the United State Constitution and the specific restrictions imposed by Article 5, Section 1 of the Arkansas Constitution.

9.      The restrictions that the Unconstitutional Acts impose on canvassing apply only to statewide measures involving the initiative and referendum process; they do not apply to countywide or municipal measures. The restrictions also do not apply to other types of petitioning in Arkansas—for example, they do not apply to candidates—nor do they apply to parties trying to qualify for the ballot. There is, in short, no legitimate reason for these restrictions to limit petitioning for initiatives and referendum and not for other petitions. Accordingly, this Court should prohibit Defendant from enforcing the Unconstitutional Acts.

## PARTIES

10.      Plaintiff League of Women Voters of Arkansas ("LWVAR" or "the League") is a nonpartisan, nonprofit, membership organization, and is the Arkansas state affiliate of the League of Women Voters ("LWV"). LWVAR was first incorporated in 1920 shortly after the Nineteenth Amendment to the United States Constitution was ratified which gave women the right to vote. Since its inception, LWVAR has actively supported many nonpartisan political policies such as the abolition of the poll tax, high school funding, women's prison reforms, and environmental reforms. LWVAR encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy on issues. LWVAR is dedicated to promoting civic engagement and protecting democracy.

11.     LWVAR has approximately 300 members located in counties across the State of Arkansas. LWVAR and its members actively participate in the initiative and referendum process. Specifically, in 2020, LWVAR was a member of the ballot question committee Arkansas Voters First, Inc., which sought to place a proposed constitution amendment on the ballot for the November 2020 general election to establish an Independent Redistricting Commission. That same year, LWVAR was also a member of the ballot question committee Protect AR Rights that sought to defeat a constitutionally referred amendment to restrict the right of the people to participate in the initiative and referendum process. In 2022, LWVAR was on the ballot question committee Protect AR Constitution, which led the effort to defeat a referred constitutional amendment to raise the threshold to pass an initiated constitutional act or amendment to 60%. In 2024, LWVAR was a member of the ballot question committee Arkansas Period Poverty Project, which sought to qualify an initiated act to the November 2024 general election ballot to remove the sales tax from feminine hygiene products and diapers.

12.     Currently, LWVAR is a member of Save AR Democracy and has registered as a ballot question committee itself for the 2026 general election. LWVAR has participated and wishes to continue to participate in the initiative and referendum process in Arkansas. LWVAR cannot qualify a measure for the ballot without the use of paid canvassers. The statutes sought to be declared unconstitutional have and will substantially restrict the ability of LWVAR and its members to participate in the initiative and referendum process.

13.     LWVAR has standing to bring this action both on its own in furtherance of its organizational goals and because its members would otherwise have standing to sue in their own right. The interests that this action seeks to protect are central to the LWVAR's purpose of promoting government that is representative, accountable, responsive, and that ensures

opportunities for effective and inclusive voter participation in government decision-making. Neither the claims asserted nor the relief requested in this action require the participation of individual members, although Plaintiff Miller has also brought individual claims in this action.

14.    Plaintiff Save AR Democracy ("SARD") is an Arkansas ballot question committee responsible for the organization of the signature-gathering effort to certify a proposed constitutional amendment to the November 3, 2026, general election ballot, and to support its passage by Arkansas voters.

15.    Plaintiff Bonnie Heather Miller is the president of the LWVAR, and a member of the SARD and the LWVAR ballot question committees. Ms. Miller is a resident and registered voter in the State of Arkansas who has and wants to serve as a canvasser, as well as to recruit others to do the same for the initiatives she supports.

16.    Plaintiff Danielle Quesnell is the president of the League of Women Voters of Benton County, and a member of the SARD ballot question committee. Ms. Quesnell is a resident and registered voter in Benton County, Arkansas. In 2024, Ms. Quesnell was a paid canvasser for one initiative and a volunteer canvasser for three other initiatives. Ms. Quesnell desires to continue to be both a paid and volunteer canvasser.

17.    Defendant Cole Jester is the Arkansas Secretary of State and the chief elections officer in the State of Arkansas. He is sued in his official capacity. Defendant Jester is charged under the Arkansas Constitution with receiving initiative and referendum petitions, determining the sufficiency of signatures and certifying the measures for the ballot.

## JURISIDCTION AND VENUE

18.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

19.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the First and Fourteenth Amendments to the United States Constitution.

20.     Plaintiffs' claims under Article 5, Section 1 of the Arkansas Constitution are within this Court's pendent jurisdiction to hear "all other claims that are so related . . . that they form part of the same case or controversy," 28 U.S.C. § 1367(a), and that "arise[] from the same set of operative facts." *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966).

21.     This Court has personal jurisdiction over the Secretary of State, the sole Defendant who is sued in his official capacity only.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim have occurred in this district. Plaintiff Miller resides in this district and wishes to collect or sign petition signatures in this district, and Plaintiff SARD has its office in this district and collects signatures in this district.

23.     This Court has authority to enter declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

## STAUTORY BACKGROUND

### A.  Article 5, Section 1 of the Arkansas Constitution

24.     When Article 5, Section 1 of the Arkansas Constitution was referred by the Arkansas General Assembly to the voters of Arkansas, it overwhelmingly passed in 1910 as Amendment 7.

25.     Article 5, Section 1 of the Arkansas Constitution governs the initiative and referendum process in Arkansas and sets forth the process by which a measure can qualify for the ballot. The petition must contain a certain number of signatures of registered voters. For an

initiated constitutional amendment, the petition must contain 10% of the voters who voted in the last gubernatorial election; for an initiated act that number is 8%, and for a referendum, that number is 6%. Petitions must be filed from at least fifteen of the counties, with petitions bearing signatures of not less than one-half of the designated percentage of voters of such county.[1] Each part of the petition must have attached to it an affidavit stating that all signatures on the petition were made in the presence of the affiant, and that to the best of the affiant's knowledge and beliefeach signature is genuine, and that the person signing is a legal voter and no other affidavit or verification shall be required to establish the genuineness of such signatures. Article 5, Section 1 contains no other requirements or restrictions on the process of the circulation of petitions.

26.     The Arkansas Constitution includes a specific process for amending the Constitution. The current Constitution, fifth in the history of the State, was adopted in 1874. The Constitution has a mechanism—Article XIX—for amending the Constitution through a legislative or citizen-initiated amendment put to the voters for approval. The mechanism works: the Constitution has been amended 104 times, most recently on November 5, 2024, when voters approved two amendments. The voters in this State also know how to preserve their Constitutional rights, as they did in defeating Issue 2 in 2022 and Issue 3 in 2020.

27.     It is beyond cavil that the voters of the State can only change the ballot initiative and referendum process ingrained in the Arkansas Constitution by amending Article 5. There is no other Constitutional option. And it is equally clear that the voters of this State do not want to change the ballot initiative and referendum process.

---

[1] In 2023, the General Assembly changed the number of counties from which petitions must be from at least *fifteen* to at least *fifty* when it enacted Act 236. LWVAR is currently challenging the constitutionality of that statute in the Circuit Court of Pulaski County, Arkansas.

28.     Nevertheless, in 2013, the General Assembly began enacting restrictions on the circulation of initiative and referendum petitions with the passage of Act 1413. The most significant changes involved additional regulations imposed on paid canvassers. Coupled with these restrictions were laws requiring the disqualification of signatures under certain circumstances. *See* Ark Code Ann. § 7-9-601 and Ark. Code Ann. § 7-9-126.

29.     In every session since 2013, the Arkansas General Assembly has added more restrictions on paid canvassers and reasons to disqualify a signature. Ark Code Ann. § 7-9-601 was amended by Act 1219 of 2015, Act 1104 of 2017, Act 376 of 2019 and Act 951 of 2021. Ark. Code Ann. § 7-9-126 was amended by Act 1219 of 2015, Act 376 of 2019, Act 194 of 2023 and Act 236 of 2023.

### B.  The Unconstitutional Acts

30.     Most recently, the Arkansas General Assembly enacted a series of statutes that effectively eliminate the initiative and referendum process through onerous and unconstitutional restrictions.

31.     Ark. Code Ann. § 7-9-601 governs the hiring and training of paid canvassers. The statute requires that, before collecting signatures on a statewide initiative petition or statewide referendum petition, the sponsor of the initiative shall provide the canvasser with a copy of the most recent edition of the Secretary of State's initiative and referenda handbook and explain to the canvasser the Arkansas law applicable to obtaining signatures on an initiative or referendum. In addition, the sponsor must provide a complete list of all canvassers' names and current residential addresses to the Secretary of State along with a signed statement, taken under oath, stating that the person has not plead guilty to a "disqualifying offense."

32.     Ark. Code Ann. §7-9-103(a)(4) provides that a person may not act as a canvasser on a statewide petition if the information required under Ark. Code Ann. §7-9-601 is not filed with the Secretary of State *before* that person solicits a signature. This places a significant hurdle on the sponsor's ability to begin canvassing. Further, the names and address of the canvassers and the signed statement are public records and subject to disclosure pursuant to the Arkansas Freedom of Information Act. The potential public disclosure of canvassers' information creates a significant barrier to a sponsor's ability to hire canvassers and limits the pool of available canvassers. For example, in June 2024, the opponents of one of the measures being circulated obtained the canvasser lists and published them on their website, subjecting those individuals to personal harassment and doxxing.

33.     In 2022, the United States Court of Appeals for the Eighth Circuit upheld a preliminary injunction against a law with almost identical pre-circulation disclosure requirements, finding that such requirements were intrusive, burdensome, and unconstitutional. *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022)

34.     Ark. Code Ann. § 7-9-601(d) also prohibits paid canvassers who have a "disqualifying offense" from collecting signatures. The list of "disqualifying offense[s]" is exhaustive and includes all felonies and 15 other listed offenses. Because there is no time limit for the offense, an individual who was convicted of a simple misdemeanor offense 40 years ago would still be prohibited from collecting signatures on a petition. Ark. Code Ann. § 7-9-601(f) provides that signatures collected in violation of this section shall *not* be counted by the Secretary of State for any purpose. Preventing individuals from collecting signatures who fall within the expansive list of "disqualifying offenses" further reduces the pool of potential canvassers, at minimum

eliminating hundreds of potential canvassers. This creates a burden on the Plaintiffs' core political speech that is not narrowly tailored to achieving any compelling state interest.

35.     Ark. Code Ann. § 7-9-601(g)(1) provides that it is unlawful for a person to pay or offer to pay, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition or statewide referendum petition. This is commonly known as the pay-per-signature ban. A violation of the pay-per-signature ban results in all signatures being declared void and not counted and is a Class A misdemeanor which, under § 7-9-601(d), also disqualifies the canvasser from any future canvassing. The prohibition of pay-per-signature further reduces the pool of potential canvassers and is a burden on the Plaintiffs' core political speech. The ban is not narrowly tailored to achieve any compelling state interest.

36.     Ark. Code Ann. § 7-9-103(a)(6) provides that a person may not act as a canvasser unless he is a resident of this State. Act 453 of 2025 provides that, in addition to being a resident of this State, a canvasser also must be individually domiciled in this State. The residency and domicile prohibition applies to both paid canvassers *and* volunteer canvassers. This restriction severely limits who can be canvassers. Preventing non-residents and residents who are not domiciled in the State from collecting signatures further reduces the pool of potential canvassers, creating a burden on the Plaintiffs' core political speech that is not narrowly tailored to achieve any compelling state interest.

37.     Plaintiffs do not dispute that the General Assembly can fashion protections to avoid fraud in the electoral process when there is evidence of fraud and when the protections are narrowly tailored to address the fraud and do not place a burden on voters. *See Initiative & Referendum Inst. V, Jaeger*, 241 F.3d 614, 616-7 (8th Cir. 2001). The residency requirement of Ark. Code Ann. § 7-9-103(a)(6), particularly when considered in connection with the other severe restrictions placed

on canvassers in Arkansas, is similar to the invalidated residency requirement in Nebraska, which failed to pass Constitutional muster because the increased cost, limited resources, and reduction of available pool of circulators imposed on the electorate by operation of the statute was an undue burden not narrowly tailored to achieve the stated legislative end. *See Citizens in Charge v Gale*, 810 F. Supp. 2d 916, 926–27 (D. Neb. 2011).

38.     There is no evidence of such fraud in Arkansas to warrant the General Assembly's aggressive restriction on First Amendment speech. According to the Heritage Foundation, there have been just five criminal convictions related to election fraud in Arkansas over the last 20 years.[2]

39.     Ark. Code Ann. § 7-9-113(a)(2)(a) provides that "[f]or measures proposed by the petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication." The Arkansas Constitution provides for initiatives without taxing the costs on the petition sponsor, and all such publication costs of the general election have always been borne by the State and not the petition sponsor. This statute is a severe burden on the Plaintiffs' core political speech and does not serve any compelling state interest.

40.     Publication costs can be prohibitively significant. In 2022, Responsible Growth Arkansas, the sponsor of the initiative to legalize marijuana, was required to pay $86,733.06 in publication costs to the Secretary of State. In 2024, Local Voters in Charge, the sponsor of an initiative to remove the casino license in Pope County, was required to pay $57,890.57 in publication costs to the Secretary of State. The reimbursement of these election publication costs

---

[2] The Heritage Foundation, *Election Fraud Cases*, https://electionfraud.heritage.org/search?state=ar (last visited April 14, 2025).

to the Secretary of State has a chilling effect on a sponsor since a sponsor may be unable to afford the significant added costs imposed by this Unconstitutional Act.

41.    Act 218 of 2025, Act 240 of 2025, Act 241 of 2025 and Act 274 of 2025, individually and cumulatively, impose severe burdens on the Plaintiffs' ability to petition and engage in core political speech. These regulations are not narrowly tailored and do not advance any compelling state interest. They were designed and enacted to interfere with Arkansas citizens' right to petition by making the process of petitioning significantly more difficult if not outright impossible.

42.    Act 218 requires that a canvasser, before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense. If the canvasser fails to do this, they are guilty of a criminal offense.

43.    Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition, and submit an affidavit to this effect which, if false, carries criminal penalties.

44.    Act 274 of 2025 requires that, prior to signing a petition, a person must read the ballot title or have the ballot title read to them. According to the testimony of the Secretary of State's office at the public hearing on Act 274, the time to listen or read any ballot title could take up to eight minutes. If a canvasser accepts a signature on the petition in violation of this requirement, then the canvasser is guilty of a misdemeanor.

45.    These three acts, individually and cumulatively, impose significant barriers on sponsors' ability to recruit canvassers—who may not want to risk potential criminal penalties resulting from an inadvertent failure to comply with the acts' arduous and technical rules—and

canvassers' ability to gather signatures. These Unconstitutional Acts impose severe burdens on the Plaintiffs' core political speech and are not narrowly tailored to advance a compelling state interest.

46.    Act 241 of 2025 requires that a canvasser file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. Signatures shall not be counted by the Secretary of State until this affidavit is filed. This affidavit requirement imposes a severe burden on the Plaintiffs' core political speech and is not narrowly tailored to advance a compelling state interest.

47.    In addition to requiring the affidavit, Act 241 of 2025 states that "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1."

48.    Under Article 5, Section 1, signatures on initiative petitions are due to be filed with the Arkansas Secretary of State four months prior to the election. When petitions are turned in, the Secretary of State has 30 days to count the signatures to determine if the sponsor should be certified for the ballot or if they are entitled to a cure period. If the sponsor has turned in 75% of the needed signatures, the Arkansas Constitution entitles them to an additional 30 days to cure the deficiency. Current practice, which is not prohibited by the Arkansas Constitution, is that sponsors can and do continue to collect signatures while the Secretary of State is in the process of counting the signatures. Act 241 outlaws that practice. Prohibiting the collecting of signatures during this period imposes a severe burden on the Plaintiffs' core political speech and is not narrowly tailored to advance a compelling state interest.

49.      Acts 218, 240, 241, and 274 all passed with an identical emergency clause. The clause provided in relevant part, "[i]t is found and determined by the General Assembly of the State of Arkansas that the process for citizens to propose initiated acts and amendments to the Arkansas Constitution is critical to a well-functioning democracy in this state; that it is of utmost importance that the integrity of the initiative process be strengthened through this act so that petitioners and voters maintain a high degree of confidence in the soundness of their right to legislate as citizens of Arkansas; and that this act is immediately necessary because any delay in the implementation of this act would disrupt the initiative process for the 2026 general election, which would have a detrimental effect on the public, health and safety of Arkansas." It is important to place this statement in context: Arkansas already has laws criminalizing, prohibiting and penalizing perjury, forgery, and all other felonies or fraudulent practices, in the securing of signatures or filing of petitions, (*see* Ark. Code Ann. § 5-55-601 (offense of petition fraud is a class D felony)), and there is no evidence that these protections are inadequate to assure integrity in the ballot and referendum initiative process in Article 5. Even if the General Assembly's rationale were accepted as true (it is not), the stated reasoning is not sufficient to impose such severe restrictions on core political speech expressly protected by Article 5, and is not narrowly tailored to advance any compelling state interest.

## NEED FOR RELIEF

50.      The Unconstitutional Acts, individually and collectively, place a severe burden on Ms. Miller and Ms. Quesnell's First and Fourteenth Amendment rights by making it more difficult for voters to engage with political issues and candidates, receive political messages and education, associate with voter engagement groups for the purpose of political activity, and gain access to the ballot. The Unconstitutional Acts, individually and collectively, place a severe burden on the

LWVAR and SARD's First Amendment rights by making it more difficult for them to engage with, associate with, and educate voters on ballot measures. Ballot measures also are a means for citizens to associate around common political views, to elicit political change, and to gain access to the ballot. The burdens imposed by the Unconstitutional Acts confound the ability of the citizens of Arkansas to effect the changes in Government guaranteed to them by the United States and Arkansas Constitutions.

51.    Plaintiffs seek to secure signatures for ballot measures for upcoming Arkansas elections, including gathering signatures to certify a proposed Constitutional amendment to the November 3, 2026, general election ballot.

52.    The Plaintiffs seek to secure signatures for ballot measures for the upcoming Arkansas General Election. LWVAR and SARD wish to organize volunteer signature collection efforts and hire paid canvassers. Individually, the laws challenged in this Complaint severely impact that ability of the Plaintiffs to collect signatures, both paid and volunteer. Cumulatively, the laws effectively prohibit Plaintiffs' ability to do so.

53.    The number of signatures required for an initiated constitutional amendment is 10% of the total votes cast for Governor in the last gubernatorial election. For an initiated act, the number is 8% and for a referendum, the number is 6%. For 2026, the number of signatures of registered voters needed for a proposed constitutional amendment is 90,704, for an initiated act 72,563, and for a referendum 54,422. The collection of signatures in Arkansas is not an easy process. Despite canvassers' best efforts to only obtain signatures of registered voters, approximately 75% of signatures are typically from registered voters. (Only 65% of individuals eligible to register to vote in Arkansas are registered to vote.) This means that a sponsor must collect many more signatures than just 90,704. While collecting signatures, the sponsor must also

take into consideration the numerous laws enacted by the General Assembly that disqualify even a registered voter's signature for technical reasons. A reasonable signature goal for a sponsor on an initiated constitutional amendment is 140,000 gross signatures. In addition to the overall total, current Arkansas law requires that a certain minimum number of those signatures come from at least fifty of the seventy-five counties.

54.     To collect signatures, a sponsor needs both volunteer and paid canvassers. There are not enough volunteers in Arkansas for LWVAR and SARD to collect the required number of signatures on a petition. Therefore, it is necessary for the League to use paid canvassers and out-of-state volunteers to collect these signatures.

55.     Historically, most professional paid canvassers came from outside of Arkansas. The use of out-of-state canvassers was banned by Act 951of 2020. Most professional paid canvassers are paid by the signature and not by the hour. Act 951 of 2020 prohibited pay-by-signature compensation. In addition, Act 951 of 2020 substantially increased the number of disqualifying criminal offenses, which further reduced the pool of paid canvassers. The General Assembly passed Act 951 of 2020 to restrict the people's ability to collect signatures. Limiting the pool of paid canvassers to residents of Arkansas willing to work by the hour substantially reduces the pool of potential canvassers to circulate petitions.

56.     Requiring sponsors to file the names and addresses of paid canvassers during the circulation process subjects those individuals to potential harassment and has a chilling effect on the number of individuals willing to work as paid canvassers and reduces the pool of paid canvassers. Similarly, disqualifying offenses also substantially reduce the number of individuals eligible to work as paid canvasser. Requiring payment by the hour also reduces the number of individuals willing to work on signature campaigns and reduces the ability of the sponsor to

motivate paid signatures to collect valid signatures. All substantially impact the ability of the sponsor to collect signatures.

57.     The process of canvassing involves interacting with potential signers in public venues. There is a limited amount of time for a canvasser to obtain a potential signer's signature. The more time it takes to interact, the less likely someone is to sign. In 2024, the only requirement imposed on a canvasser was to ask the individual (i) if they were a registered voter and (ii) if they wanted to sign the petition. The canvasser also had to be able to explain the petition if asked.

58.     Act 218 requires the canvasser to disclose to the potential signer that "petition fraud" is a criminal offense; Act 240 requires a canvasser to view the person's photo identification before allowing that person to sign the petition; Act 274 requires that prior to signing the petition, the signer must read the entire ballot title or have the entire ballot title read to them. Canvassers have a limited amount of time with a potential signer to convince them to sign a petition. Act 218, Act 240, and Act 274 require disclosures that substantially increase the time required to obtain a signature and, therefore, will significantly reduce the number of signatures a canvasser is able to obtain. Additionally, these restrictions interfere with individual Plaintiffs Miller and Quesnell's right to sign petitions. They have signed petitions in the past when they were not in possession of a photo identification and/or did not have a substantial amount of time in a public place to allow a canvasser to inform them about petition fraud, to produce their photo identification, and to listen or read a ballot title for up to eight minutes.

59.     Current law in Arkansas requires a sponsor turn in their petitions 120 days prior to the election, which is on or about July 4th of each year. When a sponsor turns in their petitions, the petition for an initiated constitutional amendment in 2026 must have 90,704 facially valid signatures. When turned in, the Secretary of State has 30 days to count and validate the signatures

to determine if there are 90,704 signatures from registered voters. If there are not 90,704 registered voters, but there are are 68,028 (75% of the total needed), the Secretary of State is required to give the sponsor 30 additional days to collect additional signatures. Act 241 prohibits an individual who has acted as a canvasser from collecting signatures during the period that the Secretary of State is counting the petitions. Sponsors typically do collect signatures during the time when the Secretary of State is counting signatures. Prohibiting canvassers from collecting signatures during this period substantially hinders sponsors' ability to collect the requisite of signatures and serves no purpose. Act 241 does not prohibit the sponsor from hiring new canvassers to collect signatures during this 30-day period, but only those who had previously acted as a canvasser. There is no legitimate reason for this distinction.

60.    The requirement that the sponsor pay for the election publication cost imposes a substantial unknown financial burden on the ballot question committee. The potential liability for significant costs, even after the election, has a chilling effect on sponsors' decisions to pursue an initiative or not.

## COUNT I

## UNDUE BURDEN ON BALLOT ACCESS AND RIGHTS TO FREEDOM OF SPEECH AND ASSOCIATION UNDER THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION

61.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

62.    Plaintiffs' rights to petition, speech, and association are protected by the First and Fourteenth Amendments to the United States Constitution. The circulation of petitions, including the petition for the Proposed Amendment, is "'core political speech,' for which First Amendment protection is 'at its zenith.'" *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 186 (1999) (*quoting Meyer v. Grant,* 486 U.S. 414, 422 (1988)).

63.    Arkansas' petition signature requirements preclude Plaintiffs' ability to gain access to the ballot and organize in support of measures, and violate their First and Fourteenth Amendment rights.

64.    When analyzing the constitutionality of petition requirements, a Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review…" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).

65.    The burden on Plaintiffs' core constitutional rights to engage in political speech is severe, operating to freeze the political status quo and effectively exclude all measures from the ballot. Thus, the challenged Unconstitutional Acts are subject to strict scrutiny.

66.    The petition signature requirements from which Plaintiffs seek relief cannot survive strict scrutiny, as they are not narrowly tailored to serve a compelling governmental interest.

67.    Defendant has no cognizable interest in effectively barring the proposed measures from the ballot.

68.    The requirements of Ark. Code Ann. § 7-9-601, Ark. Code Ann. § 7-9-126, Ark. Code Ann. § 7-9-103, Ark. Code Ann. § 7-9-113(a)(2)(A), and Acts 153, 154, 218, 240, 241, 273, 274, and 453 of 2025, are not narrowly tailored to serve a compelling, or even legitimate, state

interest, nor are they sufficiently important to justify the significant burdens on Plaintiffs' First and Fourteenth Amendment rights .

**COUNT II**

**VIOLATIONS OF ARTICLE 5, SECTION 1 OF THE
ARKANSAS CONSTITUTION**

69.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

70.     Article 5, Section 1 of the Arkansas Constitution provides that "[n]o law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions, nor to prohibit the circulation or petitions, nor in any manner interfering with the freedom of the people in procuring petitions; but laws shall be enacted prohibiting and penalizing perjury, forgery, and all other felonies or fraudulent practices, in the securing of signatures or filing of petitions."

71.     Article 5, Section 1 of the Arkansas Constitution further provides, "[t]his section shall be self-executing, and all of it provisions shall be treated as mandatory, but laws may be enacted to facilitate its operation. No legislation shall be enacted to restrict, hamper or impair the exercise of the rights herein reserved to the people."

72.     The Unconstitutional Acts place a significant and unnecessary burden on Plaintiffs and similarly situated voters.

73.     The Unconstitutional Acts are not narrowly tailored to advance a compelling state interest.

74.     On their face, the Unconstitutional Acts violate Article 5, Section 1 of the Arkansas Constitution.

WHEREFORE, the Plaintiffs respectfully request that the Court enter an order:

a.     That Ark. Code Ann. § 7-9-601 violates the First and Fourteenth Amendments to

the United States Constitution.

    b.  That Ark. Code Ann. § 7-9-103(a)(6) violates the First and Fourteenth Amendments to the United States Constitution.

    c.  That Ark. Code Ann. § 7-9-126(4) violates the First and Fourteenth Amendments to the United States Constitution.

    d.  That Ark. Code Ann. § 7-9-113(a)(2)(A) violates the First and Fourteenth Amendments to the United States Constitution.

    e.  That Act 218 of 2025, Act 240 of 2025, Act 241 of 2025 and Act 274 of 2025, individually and cumulatively, violate the First and Fourteenth Amendments to the United States Constitution.

    f.  That Ark. Code Ann. § 7-9-601, Ark. Code Ann. § 7-9-103(a)(6), Ark. Code Ann. § 7-9-126(4), Ark. Code Ann. § 7-9-113(a)(2)(A), Act 218 of 2025, Act 240 of 2025, Act 241 of 2025 and Act 274 of 2025, cumulatively in connection with the other statutory regulations enacted by the Arkansas General Assembly, violate the First and Fourteenth Amendments to the United States Constitution.

    g.  That Act 218 of 2025, Act 240 of 2025, Act 241 of 2025 and Act 274 of 2025, individually and cumulatively, violate Article 5, Section 1 of the Arkansas Constitution.

Respectfully submitted,

  /s/ *David Couch*
_____

David A. Couch
PO Box 7530
Little Rock, AR 72227
(501) 661-1300
david@davidcouchlaw.com

*Attorneys for the Plaintiffs*

Michael Dockterman (*pro hac vice* forthcoming)
Cara Lawson (*pro hac vice* forthcoming)
Steptoe LLP
227 W. Monroe, Suite 4700
Chicago, IL 60606
(312) 577-1300
mdockterman@steptoe.com
clawson@steptoe.com

*Attorneys for Plaintiff League of Women Voters of Arkansas*