IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF ARKANSAS, INC, SAVE AR DEMOCRACY, and BONNIE HEATHER MILLER and DANIELLE QUESNELL<br><br>*Plaintiffs,*<br><br>v.<br><br>COLE JESTER, in his official capacity as Secretary of State of Arkansas,<br><br>*Defendant.* | Case No. 5:25-cv-05087-TLB |

**MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs League of Women Voters of Arkansas ("LWVAR"), Save AR Democracy ("SARD"), Bonnie Heather Miller, and Danielle Quesnell (collectively, "Plaintiffs") submit this memorandum in support of their Motion for Temporary restraining Order and Preliminary Injunction.

## I.    INTRODUCTION

The constitutionally protected right of Arkansas citizens to consider and vote on constitutional amendments or other actions initiated directly by voters (collectively referred to as a "measure" or "measures") is a crucial part of their participation in state government at the very core of protected political speech. The ballot measure process allows citizens to propose statutes or constitutional amendments and collect signatures to place their proposals on the ballot for voters to decide. Measures can include an initiated state statute, initiated constitutional amendment, or a veto referendum. Over one-half of the States allow citizen-

1

initiated ballot measures: 18 allow for initiated constitutional amendments, 21 allow for initiated state statutes, and 2 states allow for veto referendums. These measures allow citizens to bring key political questions directly to the electorate for consideration and decision at the ballot box.

The essential step in a successful measure—and a healthy democracy—is engaging with and educating voters. In Arkansas, this engagement is largely completed through petition circulators or canvassers who contact voters, often by going door-to-door, to request their consideration—up or down—of proposed measures. Ballot measures are deeply embedded in Arkansas, are specifically authorized by the Arkansas Constitution, and have been used by Arkansas citizens to propose ballot measures since at least 1925. But this critical component of Arkansas citizens' free speech is under serious attack. The Arkansas General Assembly recently imposed substantial and severe burdens on the ballot measure process. Specifically, Ark. Code Ann. § 7-9-601, Ark. Code Ann. § 7-9-126, Ark. Code Ann. § 7-9-103, Ark. Code Ann. § 7-9-113(a)(2)(A), and Acts 153, 154, 218, 240, 241, 273, 274, and 453 of 2025 (together, the "Unconstitutional Acts") severely restrict the constitutional rights of Arkansas citizens and Plaintiffs to initiate and pursue measures and burden direct democracy.

Plaintiffs are currently gathering signatures to give Arkansans the opportunity to qualify ballot question committees. Both LWVAR and SARD are working on a proposed initiated constitutional amendment and a proposed initiated act for the November 3, 2026, general election. The deadline for signature collection is July 6, 2026. But the Unconstitutional Acts, individually and collectively, so significantly impair Plaintiffs' ability to gather signatures that the July 6 deadline will likely be impossible to meet. Time is Plaintiffs' enemy. Each day that passes with the Unconstitutional Acts in effect makes it more and more difficult to meet the deadline; every day is critical. Accordingly, Plaintiffs seek a temporary restraining

order and will move for a preliminary injunction to preserve this crucial citizen right in Arkansas, and will respectfully ask the Court to grant their motions to stop Defendant Jester from enforcing these Unconstitutional Acts and to protect Plaintiffs' constitutional rights during the pendency of this litigation.

## II.    FACTUAL BACKGROUND

### A.    Arkansas's Constitutional Protection for the Initiative and Referendum Process.

Article 5, Section 1 of the Arkansas Constitution provides that "[t]he Legislative power of the people of this State shall be vested in a General Assembly, but the people reserve unto themselves the power to proposed legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill." Arkansas citizens have consistently voted to preserve their right to the initiative and referendum process. In 2020, the Arkansas General Assembly referred to the people a proposed constitutional amendment known as Issue 3 that would have made substantial changes to the initiative and referendum process. The voters of Arkansas rejected this measure, voting 56% against. In 2022, the Arkansas General Assembly again referred to the people a proposed constitutional amendment known as Issue 2 that would have made substantial changes to the initiative and referendum process. The Arkansas voters again rejected this measure, voting 59% against. The will of the people clearly favors ballot measures and rejects efforts to burden the initiative and referendum process.

### B.    The Arkansas General Assembly Begins Restricting the Circulation of Initiative and Referendum Petitions.

The regulation of paid canvassers in Arkansas first began with the passage of Act 1413 of 2013. In part, that Act required a petition sponsor to provide a complete list of all paid

canvassers' names and current residential addresses to the Secretary of State before a canvasser collected signatures. Act 1413 also required that the canvasser provide to the sponsor a signed statement taken under oath that the person had not pleaded guilty or *nolo contendere* or been found guilty of a criminal offense involving a violation of the election laws, fraud, forgery or identification theft in any state. The statute was codified as Ark. Code. Ann. § 7-9-601.

In 2015, the Arkansas General Assembly amended Ark. Code Ann. § 7-9-601 with Act 1219 of 2015. Act 1219 expanded the crimes that would prevent an individual from being a canvasser to a felony criminal offense or a violation of the election laws, fraud, forgery, or identification theft in any state of the United States, the District of Columbia, Puerto Rico, Guam, or any other United States protectorate. Act 1219 also added the requirement that the sponsor obtain, at its own cost, a current state and criminal background check on every paid canvasser from the Arkansas State Police.

In 2017, the Arkansas General Assembly again amended Ark. Code Ann. § 7-9-601 with Act 1104 of 2017. This Act required that a final list of paid canvassers with their names and current residential addresses and a signature card for each paid canvasser must be submitted upon filing the petition with the Secretary of State.

In 2019, the Arkansas General Assembly again amended Ark. Code Ann. § 7-9-601 with Act 376 of 2019. This Act required that the signed statement that the canvasser had not plead guilty or *nolo contendere* or been found guilty to a felony criminal offense or a violation of the election laws, fraud, forgery, or identification theft in any state of the United States, the District of Columbia, Puerto Rico, Guam, or any other United States protectorate, which previously only had to be provided to the sponsor, must now be filed with the Secretary of State prior to the canvasser soliciting any signatures.

In 2021, with Act 951 of 2021 the Arkansas General Assembly amended Ark. Code

Ann. § 7-9-601 to create a list of "disqualifying offenses" that would prohibit an individual from becoming a paid canvasser. They are:

   (a) A felony:
   (b) A violation of the election laws;
   (c) Fraud;
   (d) Forgery;
   (e) Counterfeiting;
   (f) Identity theft;
   (g) A crime of violence, including assault, battery, or intimidation;
   (h) Harassment;
   (i) Terroristic threatening;
   (j) A sex offense, including sexual harassment;
   (k) A violation of drug and narcotics laws;
   (l) Breaking and entering;
   (m) Trespass;
   (n) Destruction or damage of property;
   (o) Vandalism;
   (p) Arson; or
   (q) A crime of theft, including robbery, burglary, or simple theft or larceny.

In addition to expanding the list of crimes preventing an individual from being a paid canvasser, the General Assembly also made it unlawful for a person to pay or offer to pay a person, or receive payment, based on the number of signatures obtained on a statewide initiative petition or statewide referendum petition. Act 951 of 2021 further amended Ark. Code Ann. § 7-9-103(a) to require that all canvassers be a citizen of the United States and a resident of Arkansas. Each of these restrictions has made it harder for citizens to place paramount issues directly before the citizens of this State.

   **C.    The Arkansas General Assembly Enacts The Unconstitutional Acts.**

   Erosion of citizen access to the ballot process has now crossed the line of Constitutional protection. Now, under new statutes passed by the Arkansas General Assembly, there are even more onerous restrictions on the initiative and referendum process that deprive Arkansas citizens of their Constitutional rights and of the due process guaranteed them as citizens of the United States.

Ark. Code Ann. § 7-9-601 requires that, before collecting signatures on a statewide initiative petition or statewide referendum petition, the sponsor of the initiative shall provide the canvasser with a copy of the most recent edition of the Secretary of State's initiative and referenda handbook and explain to the canvasser the Arkansas law applicable to obtaining signatures on an initiative or referendum. In addition, the sponsor must provide a complete list of all canvassers' names and current residential addresses to the Secretary of State along with a signed statement, taken under oath, stating that the person has not plead guilty to a "disqualifying offense."

Ark. Code Ann. §7-9-103(a)(4) provides that a person may not act as a canvasser on a statewide petition if the information required under Ark. Code Ann. §7-9-601 is not filed with the Secretary of State *before* that person solicits a signature.

Ark. Code Ann. § 7-9-601(g)(1) provides that it is unlawful for a person to pay or offer to pay, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition or statewide referendum petition. This is commonly known as the pay-per-signature ban. A violation of the pay-per-signature ban results in *all* signatures being declared void and not counted and is a Class A misdemeanor which, under § 7-9-601(d), also disqualifies the canvasser from *any* future canvassing.

Ark. Code Ann. § 7-9-103(a)(6) provides that a person may not act as a canvasser unless he is a resident of this State. Act 453 of 2025 provides that, in addition to being a resident of this State, a canvasser also must be individually domiciled in this State. The residency and domicile prohibition applies to both paid canvassers and volunteer canvassers.

Ark. Code Ann. § 7-9-113(a)(2)(a) provides that "[f]or measures proposed by the petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication." Historically, publication costs of the general election were borne by the State and not the petition sponsor

6

consistent with the Arkansas Constitution's provision for initiatives without taxing the costs on the petition sponsor.

Act 218 of 2025 requires that a canvasser, before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense. If the canvasser fails to do this, they are guilty of a criminal offense.

Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition, and submit an affidavit to this effect which, if false, carries criminal penalties.

Act 274 of 2025 requires that, prior to signing a petition, a person must read the ballot title or have the ballot title read to them. According to the testimony of the Secretary of State's office at the public hearing on Act 274, the time to listen to or read any ballot title could take up to eight minutes. If a canvasser accepts a signature on the petition in violation of this requirement, then the canvasser is guilty of a misdemeanor.

Act 241 of 2025 requires that a canvasser file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. Signatures shall not be counted by the Secretary of State until this affidavit is filed. Act 241 of 2025 also states that "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1." Under Article 5, Section 1, signatures on initiative petitions are due to be filed with the Arkansas Secretary of State four months prior to the election. When petitions are turned in, the Secretary of State has 30 days

7

to count the signatures to determine if the sponsor should be certified for the ballot or if they are entitled to a cure period. If the sponsor has turned in 75% of the needed signatures, the Arkansas Constitution entitles them to an additional 30 days to cure the deficiency. Current practice, which is not prohibited by the Arkansas Constitution, is that sponsors can and do continue to collect signatures while the Secretary of State is in the process of counting the signatures. Act 241 outlaws that practice.

The restrictions that the Unconstitutional Acts impose on canvassing apply only to statewide measures involving the initiative and referendum process; they do not apply to countywide or municipal measures. The restrictions also do not apply to other types of petitioning in Arkansas—for example, they do not apply to candidates—nor do they apply to parties trying to qualify for the ballot. They do undermine the provisions of the Arkansas and United States Constitutions enshrining ballot measures and assuring free speech, the right to petition the government and Plaintiffs' ability to initiate ballot measures and educate the citizenry about important issues of government.

### D. Plaintiffs' Circulation of an Initiated Constitutional Amendment and Proposed Initiated Act for the 2026 Election.

Plaintiff LWVAR is a nonpartisan, nonprofit, membership organization, and is the Arkansas state affiliate of the League of Women Voters. LWVAR encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy on issues. Miller Decl. at ¶¶ 1-5. LWVAR has approximately 400 members located in counties across the State. *Id.* at ¶ 2. Its members actively participate in the initiative and referendum process. *Id.* at ¶¶ 1-5.

Currently, LWVAR is a member of Plaintiff SARD and has registered as a ballot question committee itself for the 2026 general election. *Id.* at ¶ 10. SARD is an Arkansas ballot

question committee responsible for the organization of the signature-gathering effort to certify a proposed constitutional amendment to the November 3, 2026, general election ballot, and to support its passage by Arkansas voters. *Id.*; Quesnell Decl. ¶ 3. Plaintiff Bonnie Heather Miller is the president of the LWVAR, and a member of the SARD and the LWVAR ballot question committees. *See generally*, Miller Decl. Plaintiff Danielle Quesnell is the president of the League of Women Voters of Benton County, and a member of the SARD ballot question committee. *See generally*, Quesnell Decl. Ms. Miller and Ms. Quesnell are residents and registered voters in the State of Arkansas who have served as canvassers in the past, and want to canvass and recruit others to canvass for LWVAR and SARD's proposed initiated constitutional amendment and proposed initiated act. LWVAR and SARD also wish to organize volunteer signature collection efforts and hire paid canvassers for the same.

**E.    The Restrictions Imposed by The Unconstitutional Acts Impair Plaintiffs' Ability to Canvass and Gather Signatures.**

The Unconstitutional Acts have restricted Plaintiffs' ability to engage with, associate with, and educate voters on ballot measures, as well as to collect signatures through paid and volunteer canvassers. Miller Decl. at ¶ 11; Quesnell Decl. at ¶ 4. The Unconstitutional Acts have prohibitively restricted the pool of available canvassers. Many folks inside and outside Arkansas who previously circulated petitions in Arkansas are now unable or unwilling to participate in canvassing because of these laws:

- "I have not collected signatures this year because I've been waiting to see what happens with the new laws." Rickman Decl. at ¶ 4.

- "Although I am an experienced canvasser, I am not permitted to be a paid canvasser in Arkansas due to a felony conviction when I was 15 years old. This felony conviction is over 30 years old, and my voting rights have been restored." Cruz Decl. at ¶ 3.

- "Under the new state laws, volunteering as a canvasser feels legally risky and personally intimidating. Many of the requirements are complex, technical, and

easy to misinterpret. . . . These risks are a serious deterrent to people like me who want to help." Stuart Decl. at ¶¶ 5-6.

- "[T]he requirements for initiative and referendum petitions have become so strict that even a minor, good-faith mistake by a canvasser can result in criminal charges and disqualified signatures." Evans Decl. at ¶ 8.

- "Under the new rules, I am deeply concerned that volunteer participation will drop and that signature collection will slow down dramatically." Cobb Decl. at ¶ 7.

- "I want to keep participating, but these new burdens make it feel more like a legal trap than a civic opportunity." Spencer Decl. at ¶ 10.

- "The cumulative impact of these requirements, . . . has made it extraordinarily difficult for volunteers like me to meaningfully participate in the initiative process." Thompson Decl. at ¶ 7.

- "These new rules discourage participation at every level. They make it harder for voters to sign, for volunteers to canvass, and for ordinary Arkansans to use the referendum process at all." McClane Decl. at ¶ 10.

- "If the law that allows them to publish my name stays in place, I will have to seriously reconsider whether I can keep canvassing due to concerns over my safety." White Decl. at ¶ 5.

- "The Arkansas only resident restriction has stopped us from being able to help in Arkansas in the same way we have helped in other states. Ultimately, this restriction has prevented our volunteers from exercising their first amendment right to core political speech and from assisting others in Arkansas in doing the same." Fahey Decl. at ¶ 12.

## III.    LEGAL STANDARD

The District Court considers four factors to determine whether to issue a temporary restraining order or a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc.*

10

*v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (cleaned up). If the moving party seeks a preliminary injunction against implementation of a state statute, the moving party must show that it "is likely to prevail" on the merits of its claims. *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). Here, Plaintiffs meet all four *Dataphase* factors for the issuance of a temporary restraining order and preliminary injunction.

## IV.    ARGUMENT

### A.    Plaintiffs Are Likely to Prevail on the Merits of Their Claims.

#### 1.    *Strict Scrutiny Applies.*

The circulation of petitions is "core political speech" and the "First Amendment protection for such interaction… is 'at its zenith." *Buckley v. Am. Cost. L. Found., Inc.* 525 U.S. 182, 196 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). The principle set forth in *Buckley* is that petition circulators are entitled to collect signatures without unconstitutional infringement on their First Amendment rights. When analyzing the constitutionality of petition laws, this Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

When a petition law "imposes a severe burden on the ability to engage in political speech, strict scrutiny applies." *SD Voice v. Noem*, 60 F.4th 1071, 1080 (8th Cir. 2023). "A severe burden is one that goes 'beyond the merely inconvenient.'" *Id.* (internal citations omitted). "Under strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest,'[] rather than a means substantially related to a

sufficiently important interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607, 141 S. Ct. 2373, 2383, 210 L. Ed. 2d 716 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478, 134 S. Ct. 2518, 189 L.Ed.2d 502 (2014)). "A statute compelling disclosure of information to the government related to political activity is typically subject to 'exacting scrutiny.'" *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (8th Cir. 2022). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608, 141 S. Ct. 2373, 2383, 210 L. Ed. 2d 716 (2021).

Here, the burden on Plaintiffs' core constitutional rights to engage in political speech is severe, operating to freeze the political status quo and effectively exclude all measures from the ballot. Thus, the Unconstitutional Acts are subject to strict scrutiny. But the petition requirements from which Plaintiffs seek relief also do not survive less exacting scrutiny because they are not narrowly tailored to serve the government's asserted interest. The Arkansas General Assembly has so restricted the ways in which petitions may be circulated to place measures on the ballot in Arkansas that it infringes upon the core political speech of Arkansas citizens and Plaintiffs in violation of the First Amendment to the Constitution of the United States. So the Unconstitutional Acts do not pass muster under either level of scrutiny.

### 2. *The Unconstitutional Acts Violate the First Amendment.*

#### a. *The Statutes Requiring Disclosure of Canvassers' Personal Information Violate the First Amendment.*

Ark. Code Ann. § 7-9-601 (a)(2)(C) and Ark. Code Ann. § 7-9-601 (a)(2)(D), compel pre-petition circulation disclosure of personal information about paid petition canvassers, making them subject to potential harassment. Ark. Code Ann. § 7-9-126(4)(A) provides that

all signatures collected by any paid canvasser prior to their name being provided to the Secretary of State are not to be counted for any purpose. Ark. Code Ann. § 7-9-103(a)(4) provides that no person may act as a paid canvasser unless if the sponsor has not provided the required information under § 7-9-601 to the Secretary of State prior to the circulation of a petition and Ark. Code Ann. § 7-9-103(c)(5) makes it a crime to accept or pay money acting as a canvasser, sponsor or agent to any person whose name was not included on the sponsor's list that was submitted to the Secretary of State.

Each of these statutes relates to the disclosure of personal information including the canvasser's "name and current residential address prior to circulation of a petition." The names and address of the canvassers and the signed statement are now public records and subject to public disclosure pursuant to the Arkansas Freedom of Information Act. The potential disclosure of canvassers' information creates a significant barrier to a sponsor's ability to hire canvassers and impermissibly limits the pool of available canvassers. For example, in June 2024, the opponents of one of the measures being circulated obtained the canvasser lists and published them on their website, subjecting those individuals to personal harassment and doxxing all intended to deter petition canvassers from bringing ballot measures to the electorate (and effectively doing so). *See*, White Decl. at ¶ 5.  The pre-circulation disclosure requirements in these statutes are almost identical to those that the Eighth Circuit has already found to be intrusive, burdensome, and unconstitutional. *Dakotans for Health v. Noem*, 52 F.4th 381, 391 (8th Cir. 2022). This Court should do the same.

        b.   *The Statute Prohibiting Citizens with "Disqualifying Offenses" From Paid Canvassing Violates the First Amendment.*

Ark. Code Ann. § 7-9-601(d) prohibits paid canvassers who have a "disqualifying offense" from collecting signatures. The list of "disqualifying offense[s]" is exhaustive and

includes all felonies and 15 other listed offenses. Ark. Code Ann. § 7-9-601(f) provides that signatures collected in violation of this section shall not be counted by the Secretary of State for any purpose. There is no time limitation for when the "disqualifying offense" occurred. Thus, an individual who was convicted of a simple misdemeanor offense 40 years ago would still be prohibited from collecting signatures on a petition. For example, Lee Evans would like to be a paid canvasser, but cannot because he was convicted of shoplifting in 1998 and marijuana possession in 2002 (both misdemeanor convictions). Evans Decl. at ¶¶ 4-5. Any argument that these are reasonable restrictions melts before the artificial distinction that disqualifies him from collecting signatures for measures, but allowing him to collect signatures for candidates and new political parties seeking ballot access. *Id.* Similarly, Amy Cruz was convicted of a felony nearly 30 years ago when she was still a minor. Cruz Decl. ¶ 3. Although her voting rights have been restored in Arkansas, she is prohibited from paid canvassing under this statute. *Id.*

Barring citizens from collecting signatures on petitions for offenses that occurred 30 or more years ago and that have no relation to any type of conduct involved in canvassing constitutes an unreasonable restriction on that citizen's right to circulate petitions, reducing the LWVAR and SARD's ability to collect signatures because it reduces the pool of canvassers available. The restrictions serve no legitimate governmental purpose, but even if they did, they are not narrowly tailored. Absent evidence to the contrary, paid circulators do not pose a greater risk to the integrity of the petition process and are not more likely to accept a false signature than a volunteer. Restrictions like these that "discriminate against paid circulators for reasons unrelated to legitimate state interests" violate those individuals' rights to free speech. *See Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022).

c.  *The Pay-Per-Signature Ban Violates the First Amendment.*

Ark. Code Ann. § 7-9-601(g)(1) provides that it is unlawful for a person to pay or offer to pay, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition or statewide referendum petition. A violation of the "pay-per-signature ban" results in all signatures being declared void and not counted and is a Class A misdemeanor which, under § 7-9-601(d), also disqualifies the canvasser from any future canvassing. Most professional paid canvassers are paid by the signature and will not come to States where canvassers are paid by the hour. Thus, the prohibition of pay-per-signature was intended to and actually will further reduce the pool of potential canvassers, burdening Plaintiffs' core political speech. And there is no evidence that paid circulators who are paid by the signature are more likely to commit fraud than an individual who is paid by the hour. The pay-per-signature ban is not narrowly tailored to achieve any compelling state interest.

Applying either federal or state law, the remainder of Ark. Code Ann. § 7-9-601 is incapable of functioning independently and cannot be fully operative as a law and as a result the entire statute should be stricken. In *McGhee v. Arkansas State Board of Collection Agencies*, the Arkansas Supreme Court explained that to determine whether the invalidity of part of an act is fatal to the entire legislation, the Court must look to (1) whether a single purpose is meant to be accomplished by the act and (2) whether the sections of the act are interrelated and dependent upon each other. 375 Ark. 52, 289 S.W.3d 18 (2008).[1] Ark. Code Ann. § 7-9-601 is a comprehensive statute that regulates paid canvassers in Arkansas. None of

---

[1] Under federal law, "[b]efore severing a provision and leaving the remainder of a law intact, the Court must determine that the remainder of the statute is capable of functioning independently and thus would be fully operative as a law." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 628, 140 S. Ct. 2335, 2352, 207 L. Ed. 2d 784 (2020) (cleaned up).

the restrictions are applicable to volunteer canvassers and none of the regulations apply to volunteer canvassers. As discussed above, there is no reason why paid canvassers should be treated differently than a volunteer with respect to any of the matters set forth in Ark. Code Ann. § 7-9-601. *See Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022). Further, Ark. Code Ann. § 7-9-601 does not contain a severability clause. Thus, the statute is unconstitutional in its entirety. *See Thurston v. Safe Surgery Arkansas*, 2021 Ark. 55, 23–24, 619 S.W.3d 1, 16 (2021).

### d. *The Residency and Domicile Requirements Violate the First Amendment.*

Ark. Code Ann. § 7-9-103(a)(6) provides that a person may not act as a canvasser unless he is a resident of this State. Act 453 of 2025 provides that, in addition to being a resident of this State, a canvasser also must be individually domiciled in this State. This residency and domicile prohibition applies to both paid canvassers *and* volunteer canvassers, severely limiting who can canvass in Arkansas and creating a burden on Plaintiffs' core political speech that is not narrowly tailored to achieve any compelling state interest. *See Citizens in Charge v Gale*, 810 F. Supp. 2d 916, 926–27 (D. Neb. 2011).

Preventing non-residents and residents who are not domiciled in the State from collecting signatures further reduces the pool of potential canvassers. For example, Katie Fahey, Executive Director of The People and The People Foundation, is a resident of the State of Michigan. Fahey Decl. at ¶ 1. The People is an organization that helps groups and individuals who works with and mobilizes volunteers across the country to come to States to help with petition circulation. *Id.* at ¶¶ 4-8. The residency restriction is the only thing preventing Ms. Fahey and her organization from coming to help the Plaintiffs circulate their measure in Arkansas. *Id.* at ¶ 8. Kellie Cobb is a resident of Fort Smith. Cobb Decl. at ¶ 1. She

has previously canvassed with college student volunteers, many of whom were from nearby states but were living in Arkansas for school or, in the case of a border town like Fort Smith, lived in a neighboring state. *Id.* at ¶¶ 2-4, 12. Although they spend most of their year in Arkansas, these students can no longer petition in Arkansas because of the residency and domicile requirement. *Id.* at ¶ 12. The same could be said for the thousands of out-of-state students going to college within Arkansas.

e.   *Act 218 of 2025, Act 240 of 2025, and Act 274 of 2025 Violate the First Amendment.*

Act 218 requires that a canvasser, before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense. If the canvasser fails to do this, the canvasser is guilty of a criminal offense. Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition and submit an affidavit to this effect which, if false, carries criminal penalties. Act 274 of 2025 requires that, prior to signing a petition, a person must read the ballot title or have the ballot title read to them. If a canvasser accepts a signature on the petition in violation of this requirement, then the canvasser is guilty of a misdemeanor. These three new laws, individually and collectively, significantly restrict the canvassing process in Arkansas. They were designed and enacted to interfere with Arkansas citizens' right to petition by making the process of petitioning significantly more difficult if not outright impossible. They also violate the right to free speech, burdening an open discussion of political issues. The accompanying declarations of Amy Cruz, Bonnie Miller, Danielle Quesnell, Johnny Rickman, Kellie Cobb, Kristin Stuart, Lee Evans, Rachel Spencer, Sarah Thompson and Veronica McClane detail the practical impact and severe burden on individuals' free speech that was created by these new laws.

f.   *Act 241 of 2025 Violates the First Amendment.*

17

Act 241 of 2025 requires that a canvasser file an affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. The affidavit serves no purpose but to intimidate a canvasser. And it is effective. *See, e.g.*, Thompson Decl. at ¶¶ 6-7. Arkansas already has laws criminalizing, prohibiting and penalizing perjury, forgery, and all other felonies or fraudulent practices, in the securing of signatures or filing of petitions, (*see* Ark. Code Ann. § 5-55-601 (offense of petition fraud is a class D felony)), and there is no evidence that these protections are inadequate to assure integrity in the ballot and referendum initiative process in Article 5. The Act states that the signatures shall not be counted by the Secretary of State until *after* this affidavit is filed. The addition of the affidavit and its strict compliance requirements is a transparent effort to give the Secretary of State a reason not to count signatures of registered voters who exercised their constitutional right to sign the petition. The affidavit requirement imposes a severe burden on the Plaintiffs' core political speech and is not narrowly tailored to advance a compelling state interest.

And an even greater prohibition lurks in the Act. Act 241 of 2025 states that "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1." In other words, once a canvasser turns in a list of supporting citizens, the canvasser must await further action by the Secretary of State before collecting additional signatures. Specifically, after the petitions are turned in to the Secretary of State, and while the Secretary of State is verifying the signatures on the petitions to see if they met the threshold for certification or qualify for a 30-day cure

period, the person who collected signatures and filed the affidavit cannot collect any more signatures until the Secretary of State determines that the sponsor is entitled to a cure. Prohibiting canvassers from collecting signatures during this period substantially hinders sponsors' ability to collect the requisite of signatures and serves no purpose. Nor does this lurking provision make sense: individuals who had not previously collected signatures and therefore had not filed an affidavit could collect signatures, but those who had previously acted as a canvasser could not. There is no legitimate reason for this distinction.[2] Act 241's clear purpose is to disrupt the canvassing process. It serves no legitimate state interest at all.

### g. *The Statute Requiring the Petition Sponsor to Cover Publication Costs Violates the First Amendment.*

Ark. Code Ann. § 7-9-113(a)(2)(a) provides, in contravention of express provisions of the Arkansas Constitution, that "[f]or measures proposed by the petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication." The Arkansas Constitution provides for initiatives without taxing the costs on the petition sponsor, and all such publication costs of the general election have always been borne by the State and not the petition sponsor. Publication costs can be prohibitively significant. In 2022, Responsible Growth Arkansas, the sponsor of the initiative to legalize marijuana, was required to pay $86,733.06 in publication costs to the Secretary of State. Miller Decl. at ¶12. In 2024, Local Voters in Charge, the sponsor of an initiative to remove the casino license in Pope County, was required to pay $57,890.57 in publication costs to the Secretary of State. *Id.* These publication costs will inhibit the

---

[2] The Arkansas Supreme Court previously struck down a similar requirement because it acted "as an unwarranted restriction on the right to circulate a petition" and "violated the rights to petition and liberty of speech granted in Article 2, §§ 4 and 6 of the Constitution of the State of Arkansas." *McDaniel v. Spencer*, 2015 Ark. 94, 14-15, 457 S.W.3d 641, 652-53 (2015), *as revised* (Mar. 11, 2015).

publication of petitions when the petition's sponsor is unable to afford the significant added costs imposed by this Unconstitutional Act, chilling access to the mechanisms provided in Article V of Arkansas' Constitution and effectively operating as a poll tax. *Id.* There is no evidence that this statute serves a legitimate state interest, let alone a compelling one.

### B.    Without an Injunction, Plaintiffs Will Suffer Irreparable Harm.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Get Loud Arkansas v. Thurston*, 748 F. Supp. 3d 630, 664 (W.D. Ark. 2024) (quoting *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024)). An injunction is appropriate when the harm that plaintiffs will suffer without it is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016) (quoting *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)).

Here, Plaintiffs have no adequate remedy at law. Their injuries cannot be compensated by damages—a lost vote is a lost vote and disqualified signature means that citizens of Arkansas have lost the opportunity to present political issues to the electorate—and there is no other way to restore this Constitutional right other than by enjoining the Unconstitutional Acts. Absent an injunction, Plaintiffs will not be able to gather the requisite number of signatures prior to the July 3, 2026 deadline and their proposed measure will not be on the November 2026 general election ballot for Arkansas citizens to vote on. This is quintessential irreparable injury: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Unconstitutional Acts must be enjoined.

### C.    The Balance of the Equities and the Public Interest Weigh Heavily In

Favor of Granting Injunctive Relief.

The threat of irreparable harm to Plaintiffs if injunctive relief is not granted substantially outweighs any potential injury to Defendant Jester from the issuance of the injunction because Defendant Jester is not—and could not be—injured by an order requiring him to abide by the First Amendment. If the laws are not enjoined, there will be no remedy for the suppression of Plaintiffs' constitutionally protected speech because there will be insufficient time to gather enough signatures to meet the deadline for the 2026 general election. However, in the unlikely event that this Court finds any of the Unconstitutional Acts are constitutional, Defendant's remedy—removal of any invalid signatures from the electoral count—will still be available. Because "'the State has no interest in enforcing laws that are unconstitutional' . . . , an injunction preventing the State from enforcing unconstitutional acts 'does not irreparably harm the State.'" *Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 936 (E.D. Ark. 2021) (internal citation omitted).

Similarly, it is in the public interest that laws which violate the First Amendment be enjoined. *See Libertarian Party of Arkansas v. Thurston*, 632 F. Supp. 3d 855, 908 (E.D. Ark. 2022), *judgment entered*, No. 4:19-CV-00214-KGB, 2023 WL 6392672 (E.D. Ark. Sept. 29, 2023). Access to the ballot is a paramount emolument of citizenship. The balance of the equities and the public interest weigh in favor of granting Plaintiffs relief.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for temporary restraining order and preliminary injunction and enjoin Defendant Cole Jester from enforcing the Unconstitutional Acts during the pendency of this litigation.

Respectfully submitted,

/s/ *David A. Couch*
_____

David A. Couch
PO Box 7530
Little Rock, AR 72227
(501) 661-1300
david@davidcouchlaw.com

*Attorneys for the Plaintiffs*


Michael Dockterman (*pro hac vice* forthcoming)
Cara Lawson (*pro hac vice* forthcoming)
Steptoe LLP
227 W. Monroe, Suite 4700
Chicago, IL 60606
(312) 577-1300
mdockterman@steptoe.com
clawson@steptoe.com

*Attorneys for Plaintiff League of Women Voters of Arkansas*