IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS,
SAVE AR DEMOCRACY, BONNIE HEATHER
MILLER, and DANIELLE QUESNELL                                    Plaintiffs

and

PROTECT AR RIGHTS and FOR AR KIDS                    Intervenor-Plaintiffs


v.                          Case No. 5:25-cv-05087-TLB


COLE JESTER, Arkansas Secretary of State,
in his official capacity                                              Defendant

and

TIM GRIFFIN, Arkansas Attorney General,
in his official capacity                              Intervenor-Defendant

## COMPLAINT IN INTERVENTION

1.  Under the Arkansas Constitution, "[t]he people reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly." Ark. Const. art. 5, § 1.

2.  Using this power, Arkansans engage in two forms of expression: "expression of a desire for political change and a discussion of the merits of the proposed change," which are "core political speech" protected by the First Amendment. *Meyer v. Grant*, 486 U.S. 414, 421–422 (1988).

1

3.   The State may only impede this speech if it can show that doing so is necessary to achieve a compelling government interest. At the very least, any restrictions on Arkansans' direct democracy activity must be reasonable, nondiscriminatory, and actually further an important regulatory interest.

4.   Nevertheless, the Arkansas General Assembly has repeatedly sought to restrict, impede, and burden the people's ability to use the initiative-and-referendum process guaranteed to them by the Arkansas Constitution. Most recently, during the 2025 legislative session, the General Assembly passed, and Governor Sanders signed, a flurry of new laws—thirteen in total—regulating, restricting, and impeding the initiative-and-referendum process. Together with various preexisting laws, several of these new laws—both individually and collectively—unconstitutionally infringe upon Intervenor-Plaintiffs' First and Fourteenth Amendment rights. As a result, Intervenor-Plaintiffs bring this lawsuit seeking a declaratory judgment, a preliminary injunction, and permanent injunctive relief to protect against severe and irreparable injury to these fundamental constitutional rights.

5.   Intervenor-Plaintiffs challenge the following provisions:

a.   *First*, even before a sponsor may begin to collect signatures to qualify a measure for the ballot, they now must comply with Act 602 of 2025, which requires that the Attorney General certify that the measure is written at an eighth-grade reading level, as determined by a machine-generated test. Notably, Act 602 applies *only* to citizen-initiated measures—not to

constitutional amendments that the General Assembly refers to the people.

b. *Second*, Intervenor-Plaintiffs challenge several laws that restrict the pool of canvassers who may collect signatures. This includes the requirement, passed by the General Assembly in 2021, mandating that canvassers be Arkansas residents. Ark. Code Ann. § 7-9-103(a)(6). It also includes the amendment to this section in Act 453 of 2025, which adds a restriction on paid canvassers for statewide measures only. In addition to being "residents" of Arkansas, these canvassers now must also be "domiciled" here, meaning they must not only presently reside in Arkansas, but have the intent to remain here. The new restriction is punishable by a fine of $2,500 for each canvasser hired in violation of these rules. Individually and collectively, these restrictions impermissibly limit the pool of canvassers who may collect signatures, violating Intervenor-Plaintiffs' First Amendment rights.

c. *Third*, and relatedly, Intervenor-Plaintiffs challenge a 2013 law that also limits the pool of canvassers, and makes them vulnerable to harassment, by requiring the submission and public disclosure of the name and residential address of every paid canvasser before they can begin collecting signatures. Sponsors are required to submit this information to the Secretary of State, and it is available under the Arkansas Freedom of Information Act. Ark. Code Ann. § 7-9-601(a)(2)(C).

d. *Fourth*, Intervenor-Plaintiffs challenge new cumbersome and time-consuming requirements dictating how canvassers engage with potential signers, enacted by the General Assembly in 2025 in three separate Acts. Under Act 274, canvassers are now required to read the ballot title out loud or wait as the signer reads the ballot title to themselves in the canvasser's presence. Under Act 218, they must also inform signers that "petition fraud is a criminal offense." And, under Act 240, they must "verify" the signer's identity by reviewing a photo ID. Failure to comply with any one of these new requirements is punishable as a crime. Separately and together, these new requirements directly chill and interfere with canvassers' core First Amendment protected speech and reduce the number of voters that sponsors are able to reach. Acts 274 and 240 are also unconstitutionally vague. These three laws serve no practical purpose and are expressly designed to make the process of collecting signatures more burdensome.

e. *Fifth*, Intervenor-Plaintiffs challenge a 2023 law that imposes unconstitutional geographical requirements on the signatures that sponsors must collect to qualify a measure for the ballot. Specifically, it mandates that sponsors must collect a specified number of signatures from fifty of Arkansas's seventy-five counties (for constitutional amendments, five percent of the voters who participated in the last gubernatorial election in that county). Ark. Code Ann. § 7-9-126(e). This

requirement severely burdens sponsors' ability to make the ballot, in violation of the First Amendment.

f.  *Sixth*, Intervenor-Plaintiffs challenge a new restriction that applies when canvassers for initiative measures submit their signatures for verification. Under Act 241, they must now submit an additional affidavit verifying their compliance with the law—though other types of canvassers need not similarly verify their legal compliance. After submitting this affidavit, the canvasser is prohibited from collecting more signatures until the Secretary of State determines the sufficiency of the signatures submitted with an initiative petition. This restriction precludes sponsors and canvassers from preparing for a "cure period"—that is, an additional timeframe for collecting signatures if the state determines that the initial submission is insufficient—imposing yet another unconstitutional hurdle to ballot access, in violation of the First Amendment.

g.  *Seventh*, Intervenor-Plaintiffs challenge a new restriction, Act 273, that permits the Secretary of State to discount *all* signatures collected by a canvasser if he finds, by a preponderance of the evidence, that the canvasser violated certain Arkansas laws, including the vague requirements to "verify" a signer's identity and to watch a canvasser read the entirety of a ballot title. This restriction applies to initiative canvassers only, not to other types of canvassers, though the State's interest in policing each type of canvassing is seemingly the same.

6.  In addition to violating the First Amendment, both independently and as imposed collectively, several of these provisions are unconstitutionally vague.

7.  Furthermore, Act 602 violates the Fourteenth Amendment's Equal Protection Clause.

8.  The Court should enjoin Defendants from enforcing each of the challenged provisions.

<u>JURISDICTION AND VENUE</u>

9.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Intervenor-Plaintiffs' claims arise under the Constitution of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

10.  Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Intervenor-Plaintiffs' claims occur in this district. Intervenor-Plaintiffs collect signatures in this district and engage in speech in this district in their advocacy for the ballot measures they support.

<u>PARTIES</u>

11. Intervenor-Plaintiff For AR Kids is a ballot question committee ("BQC") organized under Arkansas law in December 2023. It was initially organized to place the "Educational Rights Amendment of 2024" on the November 2024 ballot. After collecting 70,113 signatures in 2024 using exclusively volunteer canvassers—20,591 short of the minimum to qualify for the November 2024 ballot—For AR Kids received the Attorney General's approval for the similar "Educational Rights

6

Amendment of 2026" and is currently collecting signatures in support of that measure.

12.  Intervenor-Plaintiff Protect AR Rights is a BQC formed under Arkansas law in May 2025. It is organized to place a measure on the November 2026 ballot to reform the direct-democracy process in Arkansas.

13.  Defendant Cole Jester is the Arkansas Secretary of State. He is sued in his official capacity. He is responsible for determining whether petition signatures are sufficient under Arkansas law, for disqualifying petition signatures that do not adhere to Arkansas law, for certifying initiated measures for the ballot, and for otherwise administering Arkansas law concerning initiatives and referenda.

14.  Defendant Tim Griffin is the Arkansas Attorney General. He is sued in his official capacity. He is responsible for applying Act 602 of 2025, requiring proposed ballot titles to be written at an eighth-grade reading level.

<u>FACTS</u>

**A.  The process for presenting constitutional amendments and initiated acts.**

15.  Arkansas law permits voters to initiate ballot measures. Voters may initiate legislative acts, which are the equivalent of statutes, and constitutional amendments. This process is distinct from the referred-amendment process, by which the General Assembly may send proposed constitutional amendments to the ballot.

16.  Article 5, Section 1 of the Arkansas Constitution prohibits "[u]nwarranted [r]estrictions" on the people's direct-democracy powers. The legislature cannot pass

laws "in any manner interfering with the freedom of the people in procuring petitions." It can, however, enact laws to prohibit and penalize "perjury, forgery, and all other felonies or other fraudulent practices, in the securing of signatures or filing of petitions." *Id.*

17. Article 5, Section 1 of the Arkansas Constitution establishes the basic rules behind the initiative-and-referendum process.[1] For statewide initiatives,[2] the state Constitution establishes the following relevant process:

    a. Initiated acts may be proposed by eight percent of legal voters, while initiated constitutional amendments may be proposed by ten percent of legal voters. The total number of legal voters is determined by how many people voted in the election for the office of governor in the last election. For the 2026 election cycle, this rule requires sponsors of an initiated constitutional amendment, such as Intervenor-Plaintiffs For AR Kids and Protect AR Rights, to submit 90,704 valid signatures.

    b. Additionally, the Constitution requires the sponsor to present petitions from fifteen counties in the state, "bearing the signature of not less than one-half of the designated percentage of the electors of such county." For

---

[1] "Initiative" refers to acts or constitutional amendments that are voted upon directly by the people. "Referendum" refers to votes by the people to repeal acts enacted by the General Assembly—a rarer process than initiative. The process for presenting initiatives and referenda differs in some respects, but all the restrictions challenged here apply to both. For simplicity, the complaint uses the term "initiative."

[2] The state Constitution also provides for initiative and referendum at the municipal and county level. This complaint focuses on statewide initiatives, except insofar as municipal and county initiatives bear on its claims.

example, for Washington County to count toward this requirement during
the 2026 election cycle, the sponsor of an initiated constitutional
amendment would have to submit 3,533 valid Washington County
signatures.

c. Initiative petitions must be submitted to the Secretary of State at least
four months before the election at which the initiative measure is to be
voted on. For the 2026 election, signatures are due on July 3, 2026.

d. The Secretary of State determines whether the sponsor has submitted
petitions containing sufficient signatures from legal voters. If the
Secretary of State determines that the sponsor has submitted an
insufficient number of signatures, he must notify the sponsor and provide
30 days in which to correct the deficiency *if* the petitions originally
submitted contain 75 percent of the total required signatures and 75
percent of the required number of signatures from fifteen counties.[3] This
thirty-day period is commonly referred to as the "cure period."

18. Arkansas statutes set forth additional requirements and processes for
initiatives. A non-exhaustive summary of the requirements and processes (which
are not challenged in this action) is as follows:

a. Before collecting signatures for a petition, the sponsor must submit to the
Attorney General the full text, the ballot title, and the popular name for
the proposed measure. The Attorney General has ten days to respond by

---

[3] The 75-percent requirement was added by Amendment 93 in 2014.

9

either (1) certifying the measure; (2) editing and certifying "a more suitable and correct ballot title and popular name"; or (3) rejecting the submission as "misleading" and ordering resubmission.[4] Ark. Code Ann. § 7-9-107.

b. Only registered Arkansas voters are eligible to sign petitions and have their signatures counted toward the signature requirements. Ark. Code Ann. § 7-9-103(a)(1).

c. Petitions are circulated in "parts"—a page containing space for signatures—and each part must contain an affidavit stating, among other things, that the signatures were made in the canvasser's presence and that each signature comes from a registered voter to the best of the canvasser's knowledge. Ark. Code Ann. § 7-9-108(b). When submitting signatures, the canvasser must provide a second affidavit, referred to as a "verification," that restates the points in the "part" affidavit; that affirms that the popular name, ballot title, and text were affixed to the signature sheet at all times; and that states the canvasser's current residence. Ark. Code Ann. § 7-9-109(a).

d. The petition must also contain instructions to canvassers and signers and information about criminal penalties connected to the law governing

---

[4] Effective later this year, the Attorney General must also reject a measure that "conflicts with the United States Constitution or a federal statute." Act 154 of 2025. Plaintiffs do not challenge that additional requirement here. From 2019 to 2022, when the Arkansas Supreme Court held its role in the process unconstitutional, the State Board of Election Commissioners performed the certification discussed in this paragraph. *See Armstrong v. Thurston*, 2022 Ark. 167.

initiatives. "The instructions on penalties shall be in larger type than the other instructions." Ark. Code Ann. § 7-9-108(c).

e. The Secretary of State must verify submitted signatures and must discount petitions or signatures for a number of reasons, including issues as mundane as the legibility of a voter's penmanship. Ark. Code Ann. §§ 7-9-111; 7-9-126(b), (c). Sponsors and canvassers strive to collect many more signatures than are ultimately required to hedge against the inevitable disqualification of some signatures during the Secretary of State's counting process.

19. If the Secretary of State declares that the sponsor of the initiated measure submitted a sufficient number of valid signatures, then the measure will be placed on the ballot—assuming it withstands any independent legal challenge to the sufficiency of the signatures or the sufficiency of ballot title, which the Arkansas Supreme Court typically addresses weeks before the election without deference to the Attorney General's earlier decision that the ballot title was adequate.

**B. The challenged initiative restrictions.**

20. Direct democracy allows the people to exercise their retained right to legislative power, in circumvention of the General Assembly and its parochial interests.

21. Arkansans tend to vote for statewide, citizen-initiated ballot measures. Since 2000, fifteen citizen-initiated measures have appeared on the ballot; nine of those have passed.

11

22.  The Arkansas General Assembly has responded to the success of direct democracy by imposing restrictions on the initiative process during nearly every legislative session since 2013. The initial round of restrictions focused on regulating paid canvassers. Over the past twelve years, restrictions on paid canvassers have become increasingly more onerous and have proliferated to impede the speech of all canvassers, including unpaid volunteers.

23. Since the General Assembly began imposing new restrictions on the process in 2013, it has been relatively rare for initiated measures to make the ballot. Since 2013, there have been seventy-two citizen-initiated measures that have received the initial approval required to begin signature collection. Only seven of these made the ballot, a success rate of less than ten percent. In no year during this period did more than two citizen-initiated measures make the ballot.

    a.  Even discounting the pandemic year of 2020, where failure was probably inevitable and none of the twenty proposed measures made the ballot, the success rate barely tops thirteen percent.

    b.  While the predominant reason that ballot measures failed during this period was insufficient signatures after counting or failure to submit signatures at all—presumably because the sponsor was unable to collect enough—the Arkansas Supreme Court during the post-2013 period struck down three ballot measures for problems with ballot title language. Even counting these as successful canvassing efforts—and

again discounting the pandemic year—the success rate was only

nineteen percent.

24. Increasingly, Arkansas's restrictions on initiatives have crossed over from

protecting legitimate government interests—if ever they did so—into violating the

First Amendment rights of those seeking political change through initiated acts.

25. Intervenor-Plaintiffs accordingly challenge the following restrictions on the

initiative process.

### *The Reading-Level Requirement*

26. Act 602 of 2025 prohibits the Attorney General from certifying a proposed

ballot title with a reading level above eighth grade as determined by the Flesch-

Kincaid Grade Level formula as it existed on January 1, 2025.

27. Act 602 was enacted with an emergency clause and is currently in effect.[5]

28. Act 602 applies only to initiated measures, not to constitutional amendments

referred by the legislature.

29. Act 602 does not apply retroactively to ballot titles that the Attorney General

certified before the effective date of the Act.

30. The Flesch-Kincaid Grade Level formula is a mechanistic readability

formula based on average sentence and word length. It is a rigid test that analyzes

only sentence length and word length to determine readability. Specifically, the

formula is: 0.39 x (words/sentences) + 11.8 x (syllables/words) – 15.59. The Flesch-

---

[5] Act 602 is currently codified at Ark. Code Ann. § 7-9-107(g). Part of a second new law, Act 153, is also codified at that subsection, and several other new laws (Acts 154, 272, and 768) are scheduled to be codified at that subsection when they become effective on August 5, 2025.

Kincaid Grade Level formula draws criticism from educators because it does not consider other important factors, such as whether the text uses words that are familiar to readers or whether the sentences are clearly written. For example, a measure may well have a higher "grade level" score because it contains multisyllabic words, regardless of how elementary and common those words are.

31. The Reading-Level Requirement is in inherent tension with other aspects of Arkansas law that require ballot titles to sufficiently communicate the content of the initiated measure. Ballot titles must impartially summarize the initiative's text and give voters a fair understanding of the issues presented. *Becker v. Riviere*, 270 Ark. 219, 226 (1980). They must further include any information that qualifies as an "essential fact which would give the voter serious ground for reflection." *Bailey v. McCuen*, 318 Ark. 277, 285 (1994). And they must communicate their content in a way that is not "misleading." Ark. Code Ann. § 7-9-107. Measures that fail these tests are subject to rejection by the Attorney General or, even if the Attorney General approves them, the Arkansas Supreme Court after submission of a sufficient number of signatures.

32. Protect AR Rights cannot comply with the preexisting content requirements for ballot titles while also writing its ballot title at an eighth-grade reading level as determined by the Flesch-Kincaid Grade Level formula.

33. Application of the Flesch-Kincaid Grade Level formula to other measures exhibits the unlikelihood that any measure can satisfy this requirement. For example, the legislature has referred three constitutional amendments to the people

for the 2026 election. None has ballot-title language that comes remotely close to an eighth-grade reading level under the Flesch-Kincaid Grade Level formula.

    a. SJR11, regarding the people's right to bear arms, reads at grade level 38 under the formula.

    b. SJR15, concerning economic development districts, reads at grade level 28.3 under the formula.

    c. HJR1018, concerning a prohibition on non-citizen voting, reads at grade level 33.7 under the formula.

34. Many other recent constitutional amendments of apparent simplicity also fail to read at an eighth-grade level under the Flesch-Kincaid Grade Level formula.

    a. The ballot title for Amendment 103, which allows lottery proceeds to pay for scholarships at vocational-technical schools, reads at grade level 20.1 under the formula.

    b. The ballot title for Amendment 96, which allows the governor to retain her powers when out of state, reads at grade level 12.3 under the formula.

    c. The ballot title for Amendment 88, which provides a constitutional right to hunt, fish, trap, and harvest wildlife, also reads at grade level 12.3 under the formula.

35. Act 602 severely burdens sponsors' political speech and their interest in expression geared toward political change by making it next to impossible to gain approval for their ballot measures.

### *The Canvassing Regulations (Acts 218, 241, and 274)*

36. During the 2025 legislative session, the General Assembly passed three separate statutes that limit and constrain canvassers' ability to interact with voters, and that are plainly designed to impede the petition process: (1) Act 218, the Crime-Notification Requirement[6]; (2) Act 240, the ID Requirement[7]; and (3) Act 274, the Reading Requirement.[8]

37. All three of the Canvassing Regulations were enacted with an emergency clause and are all currently in effect.

### *The Crime-Notification Requirement (Act 218)*

38. Act 218 requires canvassers to provide petition signers a verbal warning that "petition fraud is a criminal offense" before allowing them to sign. If a verbal warning is impossible, the canvasser must provide a separate written notification.

39. Act 218 applies only to canvassing for initiative and referendum signatures. It does not apply to other forms of political canvassing, such as petitioning for signatures to get an independent political candidate or a new political party on the ballot.

---

[6] Codified at Ark. Code Ann. §§ 7-9-103(a)(7) (substantive requirement) and 7-9-103(c)(10) (criminal penalty). The criminal penalty associated with Act 274 is also codified at § 7-9-103(c)(10).

[7] Codified at Ark. Code Ann. § 7-9-109(g).

[8] Codified at Ark. Code Ann. §§ 7-9-103(a)(1)(A) (substantive requirement), 7-9-103(c)(10) (criminal penalty), and 7-9-109(a) (amendment to verification that each canvasser must submit to reflect compliance with substantive requirement). The criminal penalty associated with Act 218 is also codified at § 7-9-103(c)(10).

40. Act 218 does not define "petition fraud." Act 218 does not require canvassers to explain how "petition fraud" is a "criminal offense" or any criminal penalties associated with this offense.

41. Act 218 will deter potential signers from signing initiative petitions, thus burdening a sponsor's ability to present its measure to the voters.

42. Act 218 interferes in the conversation between canvasser and potential signer and will cause some potential signers to disengage from conversation about the measure altogether.

43. Act 218 forces canvassers and sponsors to deliver a message that is not consistent with the message they want to deliver and that detracts from their ability to engage in expression about their initiated measure.

44. Under Act 218, a canvasser who fails to provide the required warning that petition fraud is a criminal offense is guilty of a class A misdemeanor.

45. Act 218 contains no mens rea requirement and no defense for a canvasser who negligently or mistakenly fails to provide the required warning.

46. The criminal provision of Act 218 deters canvassers from agreeing to collect signatures, further limiting sponsors' ability to engage potential signers in discussion about political change and to place their measures on the ballot for consideration by the voters.

47. Act 218 is not necessary to serve any government interest. Arkansas law already requires that petitions contain notices of criminal penalties associated with violation of laws related to canvassing.

### *The ID Requirement (Act 240)*

48. Act 240 requires canvassers to view a potential signer's photo identification "to verify the identity" of the potential signer before collecting their signature. If the canvasser "cannot verify the identity" of the potential signer, she may not collect the potential signer's signature.

49. Act 240 specifies that "photo identification" includes the documents permitted under Ark. Code Ann. § 7-1-101(40), which defines "verification of voter registration." Under that statute, signers must present a document that was issued by the United States, the State of Arkansas, or an accredited Arkansas postsecondary educational institution; that includes the person's name and photo; and that, if expired, expired "no more than four (4) years before the date of election in which the voter seeks to vote." The statute does not explain how the expiration provision should apply to expired licenses in the context of collecting petition signatures.

50. Act 240 applies only to canvassing for initiative and referendum signatures. It does not apply to other forms of political canvassing, such as petitioning for signatures to get an independent political candidate or a new political party on the ballot.

51. The requirement to examine photo identification impedes canvassers' expression in at least two ways:

a. The requirement prolongs the interaction between each canvasser and individual voter, reducing the number of signers that each individual canvasser can reach.

b. The requirement makes it more difficult for individuals to sign, thus reducing the canvasser's ability to engage signers and the sponsor's ability to present their message of political change to the voters. This requirement is unlike the requirement to present ID at the ballot box. Voting occurs at specified times, and voters know (or should know) that they must present ID to vote. Interactions between canvassers and signers are typically random and will occur when the signer may not have ID on their person. Moreover, voters may be unwilling to share their identification with an unknown person circulating a petition. People without ID—or who are unwilling to share it—will disengage from interaction with canvassers because they cannot sign the petition.

52. Act 240 does not inform sponsors or canvassers what it means to "verify" a person's identity through photo ID. It is unclear, for example, whether a person who presents an ID with a name (such as a maiden name) that does not match their current name or an address that does not match their current address can be "verified" for the purpose of this section.

53. Act 240 also contains a criminal penalty provision, though one that is more convoluted than the one in Act 218. Act 240 provides that a canvasser who signs the verification at Ark. Code Ann. § 7-9-109(a) but who "does not comply" with the ID

Requirement "makes a false statement on a petition verification form." In turn, the code contains two distinct, and apparently inconsistent, criminal penalties for knowingly making a false statement on a petition verification form. Under Ark. Code Ann. § 7-9-103(c)(7), it is a class A misdemeanor for a canvasser to "knowingly make[] a false statement on a petition verification form." Under Ark. Code Ann. § 7-9-109(d), it is a class D felony for a canvasser to "knowingly make[] a false statement on a petition verification form required by this section."

54. The criminal penalties for a class A misdemeanor and class D felony differ substantially. Class A misdemeanors carry a maximum sentence of one year; class D felonies carry a maximum sentence of six years. Ark. Code Ann. § 5-4-401.

55. Act 240 leaves potential canvassers unsure of how to "verify" a signer's identity and uncertain of their criminal exposure if they run afoul of the Act.

56. The criminal provision of Act 240 deters canvassers from agreeing to collect signatures, further limiting sponsors' ability to engage potential signers in discussion about political change and to place their measures on the ballot for consideration by the voters.

57. Act 240 is not necessary to serve any government interest. The law already contains a procedure for verifying that the signatures submitted belong to registered voters. *See, e.g.*, Ark. Code Ann. § 7-9-111(b). Additionally, to prevent the submission of signatures that will be thrown out, Intervenor-Plaintiffs check signer registrations through the Secretary of State's "Voter View" tool, which is a more accurate verification method than photo ID.

## *The Reading Requirement (Act 274)*

58. Act 274 requires that a person may only sign a petition "[a]fter reading the ballot title of the petition in the presence of a canvasser or having the ballot title read aloud to him or her in the presence of a canvasser."

59. The time it takes to read a ballot title can be significant. For instance, it takes approximately two minutes and forty-five seconds to read For AR Kids' ballot title at a normal pace.

60. Act 274 impedes the expression of canvassers and sponsors by significantly increasing the time it takes to interact with signers and obtain a petition signature. It reduces their ability to engage in expression about the measure and reduces the likelihood of presenting the message of political change to the voters for consideration.

61. The Reading Requirement serves no legitimate purpose. No law requires legislators to read a bill before they vote on it. And no law requires voters to read the text of a proposed ballot measure before voting on it.

62. Many petition signers are informed about ballot measures before they sign. They can read the measure on their own time without having to read it or have it read to them in front of a canvasser. For those who are not informed about a measure before encountering a canvasser, the canvasser can explain it to them. Canvassers must already do so accurately or run the risk of conviction for a class A misdemeanor. Ark. Code Ann. § 7-9-103(c)(6).

63. Act 274 makes it a class A misdemeanor for a canvasser to "knowingly accept[] a signature when the person signing the petition has not read the ballot title of the petition in the presence of the canvasser or the ballot title of the petition has not been read aloud to the person in the presence of the canvasser."

64. Act 274 further amends the verification requirement of Ark. Code Ann. § 7-9-109(a) to require the canvasser to verify that "each signer read the ballot title of the petition or had the ballot title of the petition read to the signer in my presence."

65. As noted above, a canvasser who knowingly makes a false statement on a petition verification form is subject to a class A misdemeanor or a class D felony.

66. Act 274 does not provide any meaningful guidance about how to determine whether a signer has actually read the entirety of a ballot title to themselves in the canvasser's presence.

67. The criminal provision of Act 274 deters canvassers from agreeing to collect signatures, limiting sponsors' ability to engage potential signers in discussion about political change and from placing their measures on the ballot for consideration by the voters.

68. To the extent that a canvasser will still agree to collect signatures, given the vagueness of the provision and the threat of criminal penalty, many will feel compelled to read the entire ballot title to the potential signer.

69. Act 274 further diminishes the ability to have meaningful conversations with potential signers about the measure and advocate for its support. When canvassers interact with potential signers, they generally have a short amount of time to

22

engage them. Potential signers may be reluctant to have a long conversation that could delay them from the rest of the day's activities. Act 274 artificially increases the amount of time that a canvasser will likely need to spend with a signer to persuade them to sign while directly impeding their ability to have a persuasive conversation. It does this by requiring that some portion of that conversation be consumed with either the canvasser or the potential signer reading the ballot title in full, rather than spending that limited time conversing about the content of the measure in a more natural and persuasive manner, with an organic back and forth. In doing so, it further impedes protected First Amendment rights.

### *The In-State Requirements (Act 453 and Ark. Code Ann. § 7-9-103(a)(6))*

70. Under Ark. Code Ann. § 7-9-103(a)(6), passed in 2021, all canvassers, whether volunteer or paid, must be Arkansas residents.

71. Act 453 of 2025 imposes the additional requirement that paid canvassers (and only paid canvassers) be "[d]omiciled in the state if acting as a paid canvasser for a statewide initiative petition or statewide referendum petition." Sponsors are strictly liable for failing to comply with Act 453 and are liable for a $2,500 fine for each hired paid canvasser who is not domiciled in Arkansas.

72. Act 453 will go into effect on August 4, 2025.[9]

73. Though the statute does not define "residence," the Arkansas Supreme Court has said the primary consideration is whether a place is an "established abode, fixed permanently for a time for business or other purpose, although there may be an

---

[9] To be codified at Ark. Code Ann. §§ 7-9-103(a)(7), (d).

intent existing all the while to return at some time or other to the true domicile."
*Krone v. Cooper*, 43 Ark. 547, 551 (1884).

74. As Act 453 notes, domicile requires "actual residence plus the intent to remain in a particular place." *Leathers v. Warmack*, 341 Ark. 609, 618 (2000). A person may only have one domicile and must have a "bona fide intention" of making Arkansas "a fixed and permanent place of abode." *Id.*

75. The residence requirement significantly limits the number of canvassers available to spread sponsors' message of political change and to get an initiated measure on the ballot.

76. The domicile requirement limits the pool of available canvassers even further. For example, it prevents student volunteers living out of state from working as paid canvassers, even if those students originally came from Arkansas.

77. Notably, the residency or domicile of those who *circulate* petitions has no bearing on whether a proposal will become law. A measure cannot qualify for the ballot unless the requisite number of Arkansas voters sign the petition. And, of course, the measure will not be enacted into law unless a majority of Arkansans approve it on the ballot.

## The Pre-Collection Disclosure Requirement (Ark. Code Ann. § 7-9-601(a)(2)(C) and related provisions)

78. Under Ark. Code Ann. § 7-9-601(a)(2)(C), paid canvassers may not begin collecting signatures until the measure's sponsor has submitted their names and residential addresses to the Secretary of State.

79. Additionally, under Ark. Code Ann. § 7-9-126(b)(4), signatures collected by a canvasser shall not be counted if the sponsor did not comply with § 7-9-601(a)(2)(C).

80. The information submitted under § 7-9-601(a)(2)(C) is subject to public disclosure through the Arkansas Freedom of Information Act ("FOIA").

81. Paid canvassers may be subject to harassment during the signature-collection period by persons who obtain their personal information to oppose their efforts.

82. Such harassment has occurred. In June 2024, opponents of the proposed Arkansas Abortion Amendment obtained registration information for paid canvassers through FOIA and publicly posted their full names and hometown. The list was initially posted on the Family Council's main website and then was moved to the website for its political action committee, Family Council Action Committee. Some canvassers reported feeling intimidated and changing their canvassing practices because of this exposure.

### *The Fifty-County Requirement (Ark. Code Ann. § 7-9-126(e))*

83. In 2023, the General Assembly passed a law requiring sponsors of initiated measures to obtain signatures in fifty of the state's seventy-five counties. Ark. Code Ann. § 7-9-126(e).

84. This law requires that sponsors obtain "the signature of at least one-half (1/2) of the designated percentage of the electors of each" of the fifty counties. This means that for initiated acts, the sponsor must obtain signatures from four percent of the number of voters in each county who participated in the last gubernatorial

election. For initiated constitutional amendments, the sponsor must obtain signatures from five percent of the number of voters in each county who participated in the last gubernatorial election.

85. The Fifty-County Requirement applies to the "cure period" as well as to the final count of signatures. If the sponsor does not submit the required number of signatures from all fifty counties by the initial deadline, they are not entitled to the cure period. Ark. Code Ann. § 7-9-126(f).

86. The Fifty-County Requirement seriously impinges on sponsors' First Amendment rights by making it more burdensome to place initiatives on the ballot and make them a focus of statewide discussion.

### *The Additional Affidavit Requirement and Post-Affidavit Canvassing Pause (Act 241)*

87. Act 241 of 2025 requires canvassers to file a "true affidavit" with the Secretary of State "certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas law regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle." The affidavit is not required if the canvasser has died or is medically incapacitated. The Secretary of State may not count signatures until receiving this affidavit.

88. Act 241 was enacted with an emergency clause and is currently in effect.[10]

---

[10] Codified at Ark. Code Ann. §§ 7-9-111(j)–(k).

89. The Act 241 affidavit is distinct from the affidavit required by Ark. Code Ann. § 7-9-108(b) and the verification required by Ark. Code Ann. § 7-9-109(a). Canvassers must submit all three.

90. Act 241 further provides that once a canvasser submits the required affidavit, she "shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Art. 5, § 1."

91. In plainer terms, this sentence means that a canvasser who turns in a batch of signatures for the initial signature count by the Secretary of State may not collect signatures in anticipation of the "cure period" that the Arkansas Constitution guarantees. Rather, the canvasser must wait for the Secretary of State to certify that the measure actually qualifies for the cure period.

92. As a practical matter, few ballot measures qualify for the ballot after the initial count of signatures. The cure period is essential to satisfying the signature-collection threshold.

93. Act 241 reduces the number of canvassers who can associate with the sponsor and collect signatures by creating a blackout period for experienced canvassers between submission of signatures and qualification for the cure period.

94. As a result of Act 241, sponsors of initiated measures will forfeit a valuable period—typically about thirty days, *see* Ark. Code Ann. § 7-9-111(a)—in which to

collect additional signatures. This forfeiture will place a significant burden on sponsors' abilities to place measures on the ballot.

### The Signature-Exclusion Provision

95. Act 273 of 2025 provides that the Secretary of State "shall not count signatures collected and witnessed by a canvasser if the Secretary of State finds by a preponderance of the evidence that the canvasser has violated Arkansas laws regarding canvassing, perjury, forgery, or fraudulent practices in the procurement of petition signatures or any provision of the Arkansas Constitution applicable to the collection of signatures on an initiative or referendum petition during the current election cycle."

96. Act 273 was enacted with an emergency clause and is currently in effect.[11]

97. The upshot of the law is that the Secretary of State will exclude every single signature that a canvasser collects if he concludes, after some undefined process, or perhaps after no process at all, that it is more likely than not that the canvasser ever violated any canvassing law during the current election cycle, no matter how technical the violation or vague the provision at issue.

98. To cite the ID requirement as an example, Act 273 would allow the Secretary of State to unilaterally conclude that a canvasser did not "verify" a particular signer's ID—whatever "verify" may mean—and thus to cancel every signature that canvasser collected, even if the canvasser *did* verify every other signer's ID.

---

[11] Codified at Ark. Code Ann. § 7-9-103(e). Part of a separate new law, Act 153, is also codified at that subsection.

99. To cite the Reading Requirement as another example, Act 273 would allow the Secretary of State to unilaterally conclude that a canvasser did not allow a signer a sufficient amount of time to actually read the entirety of the ballot title to herself, and thus to cancel every signature that canvasser collected, even if the canvasser *did* read the ballot title to every other signer.

100. The Secretary of State does not have similar authority to cancel the signatures collected by a canvasser for independent candidates or new political parties based on his finding, by a preponderance of the evidence, that the canvasser violated a law.

## C. Intervenor-Plaintiffs' efforts to place their measures on the ballot.

### *For AR Kids*

101. For AR Kids first attempted to place an initiated constitutional amendment on the ballot during the 2024 election cycle.

102. For AR Kids received the Attorney General's approval for its 2024 ballot title on March 1, 2024, after the Attorney General had rejected two previous attempts. For AR Kids began collecting signatures the following week.

103. During the 2024 campaign, For AR Kids used only volunteer canvassers. Approximately 200 to 300 regular volunteer canvassers collected a total of 70,113 raw signatures—that is, signatures that may or may not have survived the verification process—before the deadline of July 5, 2024.

104. In order to comply with the Fifty-County Requirement, For AR Kids focused on a broad campaign that attempted to collect signatures from many

counties. While For AR Kids succeeded in obtaining the requisite number of raw signatures from fifty counties, this focus on many small counties detracted it from collecting signatures in more populous counties, thus causing it to fall far short of the total signature requirement of 90,704.

105.   Because For AR Kids did not obtain a sufficient number of signatures for the 2024 election cycle, it did not turn in any signatures to the Secretary of State for review.

106.   For AR Kids resubmitted its ballot title for the 2026 election cycle. On February 26, 2025, the Attorney General approved For AR Kids' ballot title. The approved ballot title reads as follows:

> An amendment to Article 14 (Education) of the Arkansas constitution requiring identical academic standards and identical standards for accreditation, including assessments of students and schools based on such standards, for any school that receives State or local funds; defining "receives, or in receipt of, any State or local funds" to mean: (i) receipt by the school of any State or local funds, property, or tax credits to cover or defray, in whole or in part, the costs of any student attending the school; (ii) receipt by the student attending the school, or the student's parents or guardians, of any State or local funds, property, or tax credits to cover or defray, in whole or in part, the costs of the student attending the school; or (iii) receipt by a school, a student attending the school, or the student's parents or guardians, of financial assistance for the cost of the student attending the school that is funded, in whole or in part, by monetary contributions that qualify for a State tax credit under Arkansas law; denying State or local funds to any non-public school that fails to meet the same academic standards, standards for accreditation, or assessment requirements as public schools; expanding the State's obligation to ever maintain a general, suitable, and efficient system of free public schools to include: (1) universal access to voluntary, early childhood education for students three (3) years old until they qualify for Kindergarten; (2) universal access to voluntary afterschool and summer programs necessary for the achievement of an adequate education; (3) assistance to children who are within 200% of the federal poverty line so that the qualifying children can achieve an adequate

education and overcome the negative impact of poverty on education; and (4) services that fully meet the individualized needs of students with disabilities to allow them meaningful access to integrated education; defining an adequate education as, without limitation, all children developing sufficient: (1) oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (2) knowledge of economic, social, and political systems to enable students to make informed choices; (3) understanding of governmental processes to enable students to understand the issues that affect their community, state, and nation; (4) self-knowledge and knowledge of their mental and physical wellness; (5) grounding in the arts to enable students to appreciate their cultural and historical heritage; (6) training or preparation for advanced training in either academic or vocational fields, so as to enable children to choose and pursue life work intelligently; and (7) academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market; requiring the General Assembly to enact legislation to implement this amendment, including allocating funding necessary to fully implement this amendment; forbidding the General Assembly from amending, altering, or repealing this amendment absent a vote of the people; and providing that this amendment's provisions are severable.

107. For AR Kids estimates that in a typical initiative campaign, 30 percent of volunteer signatures are culled for insufficiency and 45 percent of paid-canvasser signatures are culled for insufficiency. With those rates in mind, For AR Kids expects that it will need to collect between 140,000 and 150,000 total signatures to meet the threshold of 90,704 signatures that survive the verification process.

108. For AR Kids expects that, because of the laws passed during the 2025 legislative session, the pool of volunteer canvassers for the 2026 election cycle will be significantly smaller than in past election cycles.

109. Since the Attorney General approved its 2026 ballot measure, For AR Kids has contacted over eighty previous volunteers from more than thirty counties to gauge their interest in collecting signatures for the 2026 initiative campaign. Many

canvassers indicated that they did not intend to participate this cycle and cited the new laws as a reason. For AR Kids estimates that the attrition rate is around 50 percent.

110.   For AR Kids expects that it will have to use paid canvassers for the 2026 election cycle. The requirement that paid canvassers be domiciled in Arkansas significantly reduces the pool of canvassers available to collect signatures for its measures.

111.    For AR Kids began collecting signatures for its 2026 initiative thorough volunteer canvassers in late April 2025.

112.   For AR Kids' efforts have shown that the new Canvassing Regulations will make it substantially more difficult, if not impossible, to collect enough signatures to make the 2026 ballot.

113.   To cite one example, during a weeklong period of canvassing at farmers' markets and similar locations in the Fayetteville area, five canvassers collected a total of thirty-one signatures over sixteen hours—a rate of two signatures per hour. During the 2024 campaign, For AR Kids collected signatures at a rate of approximately 20 per hour.

114.   Canvassers report that interactions with potential signers commonly last at least eight minutes under the new rules. Potential signers who are otherwise willing to sign petitions commonly indicate that they have no time to deal with the process or that they have no ID.

115.   During the 2024 campaign, about 75 percent of For AR Kids canvassers were over age 65. Because of the ailments associated with age, many of these canvassers will find it challenging to comply with the new laws regulating their interactions with potential signers.

116.   For AR Kids further expects that the requirement to collect signatures across fifty different counties will render their task even more difficult, as shown by its experience in 2024.

117.   For AR Kids expects that, based on past experience, it will need to take advantage of a cure period if it is to succeed at meeting the signature threshold.

### *Protect AR Rights*

118.   Protect AR Rights was originally formed in 2020 and successfully advocated the defeat of Issue 3 in that year. Issue 3 was a legislatively referred amendment that would have required sponsors of initiated measures to obtain signatures from 45 counties (a requirement the General Assembly later imposed by statute, as discussed above). It also would have truncated the period for collecting petition signatures by six months and eliminated the cure period. Voters rejected this proposed constitutional amendment by a margin of nearly twelve points.

119.   Protect AR Rights reconstituted itself in 2022 to advocate against Issue 2 of that year, which would have required a supermajority of 60 percent of the voters to approve a constitutional amendment. The voters rejected Issue 2 by a nineteen-point margin.

120.   Protect AR Rights reconstituted itself again on May 9, 2025, to support an initiated amendment to prevent future legislative interference with the initiative- and-referendum process.

121.   Protect AR Rights submitted the first version of its ballot measure, the "Arkansas Ballot Measure Rights Amendment," to the Attorney General on May 18, 2025. The ballot title submitted reads as follows:

> This measure amends the Arkansas Constitution. It gives the people the fundamental right to make and repeal laws by petition. It gives Arkansas registered voters the fundamental right to sign a petition. It gives U.S. citizens the fundamental right to collect signatures on a petition unless the citizen has been convicted of certain crimes or is on a sex offender registry. It makes "petition fraud" a crime. It allows the legislature to decide the penalty range for criminals who intentionally defraud the petition process. It prohibits the government from unduly burdening these fundamental rights. It requires the government to notify a registered voter before it disqualifies his or her signature on a petition. It requires the government to count the signature of a registered voter who timely corrects a problem with the signature. It prohibits the government from making the people collect signatures on petitions from more than fifteen counties. It clarifies that the legislature cannot amend or repeal constitutional amendments that were voted for by the people. It requires a two-thirds vote of the legislature, county quorum court, or city council to amend or repeal an initiated act. It requires the ballot title of a referendum to be "This referendum repeals…" followed by the exact title of the Act to be repealed by the referendum. It requires that if provisions of two or more measures conflict but both pass in the same election, the provision from the measure that received the most votes will be law. It requires lawsuits challenging the government's decision to approve or disqualify a petition or a ballot title to be filed no later than ten days after the government's decision. It requires the courts to expedite review of lawsuits challenging a petition or ballot title decision. It requires court challenges of petitions to be proven by clear and convincing evidence. It prohibits the government from disqualifying a measure, title, or petition for a filing error or scrivener's error that is timely corrected. It requires the government to accept a measure, title, or petition that substantially

34

complies with the Constitution. It declares that current laws that conflict with this measure are null and void. It provides that the provisions of the measure are severable.

122.  On June 2, 2025, the Arkansas Attorney General rejected this ballot title because it did not comply with Act 602 of 2025. The Attorney General wrote that the "ballot title you have submitted ranks at grade 11.5." The Attorney General also identified other issues that needed to be corrected before the ballot title could be certified.

123.  On June 11, 2025, Protect AR Rights submitted a revised version of the Arkansas Ballot Measure Rights Amendment. This revision reads as follows:

This measure amends the Arkansas Constitution. It gives the people the fundamental right to make and repeal laws by petition. It gives Arkansas registered voters the fundamental right to sign a petition. It gives U.S. citizens who have not been convicted of certain crimes the fundamental right to collect signatures on a petition. It makes "petition fraud" a crime. The legislature will decide the penalty range for criminals who defraud petitions. The government will notify registered voters before it rejects their signatures. The government will count the signature of registered voters who timely correct problems with their signature. The government will not require signatures on petitions to be from more than fifteen counties. The legislature may amend or repeal an initiated act by a two-thirds vote. The legislature shall not amend a constitutional amendment. A county or city government may amend or repeal a county or local measure by a two-thirds vote. The ballot title of a referendum will be "This referendum repeals…" followed by the title of the Act. The Secretary of State must publish a notice that explains how the name or title can be challenged. A lawsuit against the ballot title must be filed within ten days after the notice is published. The courts will quickly review of [sic] lawsuits against a petition or title. Lawsuits against petitions shall be proven by clear and convincing evidence. The government will not reject a measure for a filing or clerical error that is timely corrected. The government will not reject a measure that substantially complies with the law. Any laws affecting this amendment must be ministerial. It clarifies that only registered voters'

signatures will be counted. Previously, canvassers signed an affidavit. This changes the affidavit to a declaration under penalty of perjury. This measure repeals all inconsistent state laws. If part of the amendment is held invalid, the rest of it can stand on its own.

124. On July 1, 2025, the Arkansas Attorney General rejected this second version of the ballot title because it again did not comply with Act 602 of 2025. The Attorney General wrote that the "ballot title you have provided with your current submission ranks at 9.3 on the Flesch-Kincaid Grade Level formula." The Attorney General also identified an additional ambiguity in the ballot title that would prevent certification.

125. On July 14, 2025, Protect AR Rights submitted a third version of the Arkansas Ballot Measure Rights Amendment. This version reads as follows:

> This measure amends the Arkansas Constitution. It gives the people the fundamental right to make and repeal laws by petition. It gives Arkansas registered voters the fundamental right to sign a petition. It gives U.S. citizens who have not been convicted of certain crimes the fundamental right to collect signatures on a petition. It makes "petition fraud" a crime. The legislature will decide the penalty range for criminals who defraud petitions. The government will notify registered voters before it rejects their signatures. The government will count the signature of registered voters who timely correct problems with their signature. The government will not require signatures on petitions to be from more than fifteen counties. The legislature may amend or repeal an initiated act by a two-thirds vote. The legislature shall not amend a constitutional amendment. A county or city government may amend or repeal a county or local measure by a two-thirds vote. The ballot title of a referendum will be "This referendum repeals…" followed by the title of the Act. The Secretary of State must publish a notice that explains how the name or title can be challenged. A lawsuit against the ballot title must be filed within ten days after the notice is published. The courts will quickly review of [sic] lawsuits against a petition or title. Lawsuits against petitions shall be proven by clear and convincing evidence. The government will not reject a measure for a filing or clerical error that is timely corrected. The government will not reject a measure that substantially complies with the law. Any laws affecting this

amendment must be clerical. It clarifies that only registered voters' signatures will be counted. Previously, canvassers signed an affidavit. This changes the affidavit to a declaration under penalty of perjury. This measure repeals all inconsistent state laws. If part of the amendment is held invalid, the rest of it can stand on its own.

126.  Protect AR Rights calculates that this third submission scores at 9 on the Flesch-Kincaid Grade Level formula.[12] Protect AR Rights believes that it has satisfied all the Attorney General's concerns except for the Reading-Level Requirement. Protect AR Kids expects an official response to its third draft from the Attorney General's Office by July 29, 2025.

127.  Despite best efforts, Protect AR Rights has not been able to draft—and in fact cannot draft—its ballot title to below an eighth-grade reading level as determined by the Flesch-Kincaid Grade Level formula while also adequately conveying the substance of the measure and satisfying other legal standards for specificity.

128.  Protect AR Rights has begun preparing for a canvassing campaign by contacting potential volunteers and obtaining quotes from paid canvassing firms.

---

[12] Protect AR Rights had also calculated that its second submission scored at 9 on the Flesch-Kincaid Grade Level formula, but the Attorney General's Office concluded that it scored at 9.3.

## CAUSES OF ACTION

129.   Each cause of action stated herein arises under 42 U.S.C. § 1983.

**Count One:**    **The Reading-Level Requirement (Act 602) violates the First Amendment by burdening Intervenor-Plaintiff Protect AR Rights' speech without adequate justification (stated by Intervenor-Plaintiff Protect AR Rights against Defendant Griffin)**

130.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

131.   Both on its face and as applied, the Reading-Level Requirement violates the First Amendment rights of Intervenor-Plaintiff Protect AR Rights. To attempt to comply with this requirement, Intervenor-Plaintiff will be forced to select language to game a mechanical test, such as by using short words and sentences as opposed to the language it wishes to use to communicate its preferred message to voters.

132.   Furthermore, it is likely that many, if not all, initiated measures cannot be written at an eighth-grade level under the Flesch-Kincaid Grade Level formula without omitting essential facts that are needed to gain the Attorney General's approval and to inform the voters of the nature of the political change that the measure proposes. By making it far more difficult, if not impossible, to gain the Attorney General's approval for an initiated measure, the Reading-Level Requirement impedes Protect AR Rights' ability to engage voters about political change and to present its measure to the voters at an election.

133.   The First Amendment impingement is a severe one. Indeed, Protect AR Rights most likely cannot satisfy the requirement while providing a legally sufficient amount of detail about its proposed measure.

134.   Even if the State has some compelling interest in policing the readability of ballot titles, it does not have a compelling interest in imposing the extremely stringent Flesch-Kincaid Grade Level formula. Nor is Act 602 narrowly tailored to whatever compelling interest the State may have.

**Count Two:**     **The Reading-Level Requirement (Act 602) violates the First Amendment because it is a content-based regulation of speech (stated by Intervenor-Plaintiff Protect AR Rights against Defendant Griffin)**

135.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

136.   The Reading-Level Requirement applies only to citizen-initiated measures. It does not apply to legislatively referred constitutional amendments. Nor does it apply to local initiated measures, as distinct from statewide initiated measures.

137.   Because the law singles out initiated measures for disfavored treatment based on their source, it is a content-based regulation of speech. The law inherently discriminates between political messages. Citizens must convey their political message to voters with the simplicity of a middle schooler. The legislature may convey its message to voters with the complexity of a dissertation, or however else it wishes. The Reading-Level Requirement thus singles out for restriction the expression of specific speakers—sponsors who seek to amend Arkansas law—based on their identity.

138.  The law's discrimination between initiated and legislatively referred measures is not narrowly tailored to serve a compelling government interest.

139.  The law's discrimination between initiated and legislatively referred measures lacks any rational basis.

140.  As a result, the Reading-Level Requirement violates the First Amendment on its face.

**Count Three:    The Reading-Level Requirement (Act 602) violates the Equal Protection Clause of the Fourteenth Amendment (stated by Intervenor-Plaintiff Protect AR Rights against Defendant Griffin)**

141.  Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

142.  The Reading-Level Requirement draws a distinction between constitutional amendments based on the identity of those who submit them. Citizens who wish to submit constitutional amendments through the initiative process must write their proposed measures to an eighth-grade reading level under the mechanized Flesch-Kincaid Grade Level formula. Legislators who wish to submit constitutional amendments may write their measures however they like.

143.  Under any standard of review, the Reading-Level Requirement is unconstitutional, because there is no rational basis for requiring only citizen-initiated amendments to achieve a specific level of readability.

144.  As a result, the Reading-Level Requirement is unconstitutional on its face under the Fourteenth Amendment.

**Count Four:**    The Canvassing Regulations (Acts 218, 240, and 274) individually and cumulatively violate the First Amendment by burdening Intervenor-Plaintiffs' speech without adequate justification (stated by all Intervenor-Plaintiffs against Defendant Jester)

145.    Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

146.    All three of the Canvassing Regulations impinge upon Intervenor-Plaintiffs' First Amendment rights by interfering with their ability to engage in unfettered discourse with members of the public. Furthermore, they impinge upon Intervenor-Plaintiffs' First Amendment rights by making it less likely that they will be able to present their message of political change to the voters for consideration at the ballot box.

147.    Individually, each of the Canvassing Regulations poses a severe burden on the Intervenor-Plaintiffs' First Amendment rights.

148.    Cumulatively, each of the Canvassing Regulations poses a severe burden on the Intervenor-Plaintiffs' First Amendment rights.

149.    None of the canvassing requirements is necessary to serve a compelling government interest.

150.    Insofar as the Canvassing Regulations do not severely burden Intervenor-Plaintiffs' First Amendment rights, none of them withstands even lesser scrutiny.

151.    The Fraud-Notification Requirement (Act 218) is not reasonably related to an important government interest because it provides potential voters with no information about what petition fraud is or how this petitioning process might involve criminal sanctions. Moreover, the law already provides voters with

information about criminal penalties by requiring a notice about criminal penalties on the petition parts.

152.  The ID Requirement (Act 240) regulates speech in a discriminatory way because it does not apply to other forms of political petitioning. *See, e.g.*, Ark. Code Ann. § 7-7-103 (independent candidates for statewide office must present petitions containing the signature of 10,000 registered voters or three percent of qualified electors in the state based on the last gubernatorial election, whichever is less); Ark. Code Ann. § 7-7-205 (new political parties must present petitions containing the signature of 10,000 registered voters); Ark. Code Ann. § 7-8-302 (independent presidential candidates must present petitions containing the signature of 5,000 registered voters).

153.  The Reading Requirement (Act 274) is not reasonably related to an important government interest. The State has no important interest in requiring signers to read the entire ballot title in a canvasser's presence or to have the canvasser read the entire ballot title out loud to the signer.

154.  As a result, the Canvassing Regulations individually and cumulatively violate Intervenor-Plaintiffs' First Amendment rights on their face.

155.  Additionally, the Reading Requirement violates Intervenor-Plaintiffs First Amendment rights as applied. Even if it is possible that the law does not severely burden the speech of some ballot-measure sponsors, it severely burdens Intervenor-Plaintiffs' speech. Given the length of Intervenor-Plaintiffs' ballot titles, the Reading Requirement substantially reduces the number of potential signers with

whom canvassers for the ballot measures can interact, and has chilled voters who would otherwise associate with Intervenor-Plaintiffs by signing their petitions.

**Count Five:    The Crime-Notification Requirement (Act 218) and ID Requirement (Act 240) violate the First Amendment because they are content-based regulations of speech (stated by all Intervenor-Plaintiffs against Defendant Jester)**

156.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

157.   The Crime-Notification Requirement and the ID Requirement both regulate speech on the basis of content.

158.   Each requirement applies only to petitions gathered for initiatives and referenda. Independent candidates and new political parties wishing to canvass for signatures do not have to inform their interlocutors that "petition fraud is a criminal offense." Nor do independent candidates or new political parties have to check a potential signer's photo ID.

159.   The State lacks a compelling interest in discriminating between these forms of political speech.

160.   Even if the State has a compelling interest in discriminating among these forms of speech, neither the Crime-Notification Requirement nor the ID Requirement is narrowly tailored to that interest.

161.   As a result, the Crime-Notification Requirement and the ID Requirement each violates the First Amendment on its face.

**Count Six:**    **The Crime-Notification Requirement (Act 218) violates the First Amendment by compelling Intervenor-Plaintiffs' speech (stated by all Intervenor-Plaintiffs against Defendant Jester).**

162.    Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

163.    Act 218 requires Intervenor-Plaintiffs to inject the State's preferred message—that "petition fraud is a criminal offense"—into their conversations with potential signers. This is not a message Intervenor-Plaintiffs wish to deliver and interferes with the message of political change that they do want to deliver.

164.    The State does not have a compelling interest in regulating Intervenor-Plaintiffs' speech in this manner, or, if it does, Act 218 is not narrowly tailored to meet this purpose.

165.    As a result, the Crime-Notification Requirement violates the First Amendment on its face.

**Count Seven:**    **The ID Requirement (Act 240) is unconstitutionally vague (stated by all Intervenor-Plaintiffs against Defendant Jester)**

166.    Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

167.    Act 240 requires a canvasser to "verify the identity" of a potential signer. It provides no meaningful guidance on how to comply with the verification requirement and invites arbitrary enforcement.

168.    The vagueness of Act 240 chills and infringes upon Intervenor-Plaintiffs' First Amendment right to make their ballot measures the topic of statewide conversation. Act 240 leaves Intervenor-Plaintiffs with no way of knowing how to

instruct canvassers on how to verify identity and thus ensure the validity of signatures.

169. Act 240 exposes Intervenor-Plaintiffs to arbitrary cancellation of their signatures by virtue of the Secretary of State's enforcement authority under Act 273 of 2025. The Secretary of State has total discretion to determine that a canvasser failed to verify a signer's identity and thus that all the canvasser's signatures should be thrown out.

170. For these reasons, Act 240 is facially invalid and void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

**Count Eight:    The Reading Requirement (Act 274) is unconstitutionally vague (stated by all Intervenor-Plaintiffs against Defendant Jester).**

171. Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

172. Act 274 precludes a canvasser from knowingly accepting a signature when (1) the ballot title has not been read aloud to the signer in the canvasser's presence or (2) the potential signer has not read the ballot title to herself in the canvasser's presence.

173. The second part of this requirement provides no guidance on how long a canvasser must wait for a potential signer to read a measure, or whether a canvasser must desist from collecting the signature if the potential signer has spent an insufficient amount of time looking at the language of the ballot title.

174. The vagueness of Act 274 chills and infringes upon Intervenor-Plaintiffs' First Amendment right to make their ballot measures the topic of statewide

conversation. Act 274 leaves Intervenor-Plaintiffs with no way of knowing how to instruct canvassers about how or whether to collect a signature from someone who wishes to read the measure silently.

175.  Act 274 exposes Intervenor-Plaintiffs to arbitrary cancellation of their signatures by virtue of the Secretary of State's enforcement authority under Act 273 of 2025. The Secretary of State has total discretion to determine that a canvasser knowingly collected a signature in violation of Act 274, and that all the canvasser's signatures should be disqualified as a result, because the signer did not read the entirety of the ballot title silently to herself.

176.  Act 274 thus is facially invalid and void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

**Count Nine:**    **The In-State Requirements (Ark. Code Ann. § 7-9-103(a)(6) and Act 453) violate the First Amendment by burdening Intervenor-Plaintiffs' speech without adequate justification (stated by all Intervenor-Plaintiffs against Defendant Jester).**

177.  Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

178.  The Residency Requirement of Ark. Code Ann. § 7-9-103(a)(6) and the Domicile Requirement of Act 453 both implicate Intervenor-Plaintiffs' First Amendment rights by reducing their ability to engage with potential voters about their message of political change and by making it less likely that they will be able to present that message to voters for consideration at the ballot box.

179.  The In-State Requirements place a severe burden on Intervenor-Plaintiffs' speech.

180.   Neither the Residency Requirement nor the Domicile Requirement is narrowly tailored to serve a compelling government interest.

181.   Even if the Residency Requirement survives First Amendment scrutiny, the Domicile Requirement does not. Requiring that paid canvassers be domiciled in Arkansas unreasonably discriminates against paid canvassers and serves no interest that is not already served by the Residency Requirement.

182.   As a result, the In-State Requirements individually and cumulatively violate Intervenor-Plaintiffs' First Amendment rights on their face.

**Count Ten:     The Domicile Requirement (Act 453) violates the First Amendment because it is a content-based regulation of speech (stated by all Intervenor-Plaintiffs against Defendant Jester).**

183.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

184.   The Domicile Requirement regulates speech on the basis of content. It applies only to statewide initiatives and referenda, not to local initiatives and referenda or other forms of political canvassing.

185.   The State lacks a compelling interest in discriminating between these forms of political speech.

186.   Even if the State has a compelling interest in discriminating among these forms of speech, the Domicile Requirement is not narrowly tailored to that interest.

187.   The Domicile Requirement lacks even a rational basis because it serves no government function that the Residency Requirement does not.

188.  As a result, the Domicile Requirement violates the First Amendment on its face.

**Count Eleven:**  **The Pre-Collection Disclosure Requirement (Ark. Code Ann. § 7-9-601(a)(2)(C)), and the associated no-count provision (Ark. Code Ann. § 7-9-126(b)(4)) violate the First Amendment (stated by all Intervenor-Plaintiffs against Defendant Jester).**

189.  Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

190.  Ark. Code Ann. § 7-9-601(a)(2)(C) requires a sponsor of a ballot initiative to provide to the Secretary of State the name and address of a paid canvasser before that canvasser solicits any signatures. Ark. Code Ann. § 7-9-126(b)(4) provides that, if the sponsor fails to provide this information, the signatures the paid canvasser collected will not count.

191.  Information disclosed under Ark. Code Ann. § 7-9-601(a)(2)(C) is subject to public disclosure under the Arkansas Freedom of Information Act.

192.  The Pre-Collection Disclosure Requirement subjects paid canvassers to harassment and chills their speech.

193.  There is no substantial relationship between the Pre-Collection Disclosure Requirement and a sufficiently important government interest.

194.  As a result, the Pre-Collection Disclosure Requirement violates the First Amendment on its face.

**Count Twelve:    The Fifty-County Requirement (Ark. Code Ann. § 7-9-126(e)) violates the First Amendment by burdening Intervenor-Plaintiffs' speech without adequate justification (stated by all Intervenor-Plaintiffs against Defendant Jester).**

195.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

196.   The Fifty-County Requirement limits Intervenor-Plaintiffs' expression, and thus implicates Intervenor-Plaintiffs' First Amendment rights, because it diminishes the number of people with whom they can engage in speech about their measures and makes it less likely that they will be able to place their measures on the ballot, thus impeding their ability to make their measures the focus of statewide discussion.

197.   The Fifty-County Requirement places a severe burden on Intervenor-Plaintiffs' speech. The need to collect signatures from fifty counties—including small, rural counties where the population is dispersed—makes it far less likely that Intervenor-Plaintiffs will be able to obtain the total number of signatures to have their measures placed on the ballot.

198.   The Fifty-County Requirement is not narrowly tailored to satisfy a compelling government interest.

199.   The Fifty-County Requirement creates an arbitrary and excessively onerous threshold that is not reasonably related to an important government interest.

200.   As a result, the Fifty-County Requirement violates the First Amendment on its face.

**Count Thirteen:** **The Post-Affidavit Canvassing Pause (Act 241) violates the First Amendment by burdening Intervenor-Plaintiffs' speech without adequate justification (stated by all Intervenor-Plaintiffs against Defendant Jester).**

201.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

202.   Act 241 creates a blackout period on signature collection from the time a canvasser submits the prescribed affidavit to the time the Secretary of State declares that the measure qualifies for a cure period. This blackout period implicates Intervenor-Plaintiffs' First Amendment rights by completely precluding their political speech during the weeks just before the "cure period"—a timeframe in which they have a heightened need to reach registered voters.

203.   Under Ark. Code. Ann. § 7-9-111(a), the Secretary of State has thirty days to review the initial signature submission before certifying a cure. The Secretary of State typically takes most of this thirty-day period to review the signatures.

204.   The State has no legitimate reason for prohibiting speech during this timeframe. Act 241 is unrelated to any interest the State may assert.

205.   Act 241 is a severe speech restriction because it will likely result in Intervenor-Plaintiffs' inability to collect enough signatures to qualify for the ballot.

206.   Act 241 is not narrowly tailored to serve a compelling government interest.

207.   As a result, Act 241 violates the First Amendment on its face.

**Count Fourteen:** **The Additional Affidavit Requirement (Act 241) violates the First Amendment because it is a content-based regulation of speech (stated by all Intervenor-Plaintiffs against Defendant Jester).**

208.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

209.   The Additional Affidavit Requirement regulates speech on the basis of content.

210.   The requirement applies only to petitions gathered for initiatives and referenda. Independent candidates and new political parties wishing to canvass for signatures do not have to submit an affidavit verifying that their canvassers complied with the law.

211.   The State lacks a compelling interest in discriminating between these forms of political speech. The State has no greater interest in verifying the legal compliance of an initiative canvasser than it does a canvasser for independent candidates or new political parties.

212.   Even if the State has a compelling interest in discriminating among these forms of speech, the Additional Affidavit Requirement is not narrowly tailored to that interest.

213.   As a result, the Additional Affidavit Requirement violates the First Amendment on its face.

**Count Fifteen:** The Signature-Exclusion Provision (Act 273) violates the First Amendment because it is a content-based regulation of speech (stated by all Intervenor-Plaintiffs against Defendant Jester).

214.   Intervenor-Plaintiffs incorporate the previous paragraphs as if fully stated herein.

215.   The Signature-Exclusion Provision regulates speech on the basis of content.

216.   The requirement applies only to petitions gathered for initiatives and referenda. The law does not give authority to the Secretary of State to disqualify every signature collected by a canvasser for independent candidates or new political parties if he finds by a preponderance of the evidence that the canvasser violated the law.

217.   The State lacks a compelling interest in discriminating between these forms of political speech. The State has no greater interest in disqualifying signatures collected by purported law violators canvassing for initiatives than it does in disqualifying signatures collected by purported law violators canvassing for independent candidates or new political parties.

218.   Even if the State has a compelling interest in discriminating among these forms of speech, the Signature-Exclusion Provision is not narrowly tailored to that interest.

219.   As a result, the Signature-Exclusion Provision violates the First Amendment on its face.

## Relief Requested

220. The Court should provide the following relief:

    a. Preliminarily and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the following statutes and acts of the Arkansas General Assembly:

        i. The Reading-Level Requirement, Act 602 of 2025;

        ii. The Canvassing Regulations, Acts 218, 240, and 274 of 2025;

        iii. The In-State Requirements, Ark. Code Ann. § 7-9-103(a)(6) and Act 453 of 2025;

        iv. The Pre-Collection Disclosure Requirement, Ark. Code Ann. § 7-9-601(a)(2)(C), and the associated no-count provision, Ark. Code Ann. § 7-9-126(b)(4);

        v. The Fifty-County Requirement, Ark. Code Ann. § 7-9-126(e);

        vi. The Additional Affidavit Requirement and Post-Affidavit Canvassing Pause, Act 241 of 2025; and

        vii. The Signature-Exclusion Provision, Act 273 of 2025.

    b. Enter an order requiring Defendant Jester, his respective agents, officers, employees, and successors, and all persons acting in concert with him, to count and verify any otherwise legally valid signatures that do not comply with the laws challenged here.

    c.  Enter a declaratory judgment that the aforementioned statutes and acts of the Arkansas General Assembly are unconstitutional and of no effect;

    d.  Award Intervenor-Plaintiffs' costs and attorney's fees; and

    e.  Provide any other necessary and proper relief.

Dated: July 24, 2025             Respectfully submitted,

*/s/ John C. Williams*
JOHN C. WILLIAMS, ABN 2013233
SHELBY H. SHROFF, ABN 2019234
ARKANSAS CIVIL LIBERTIES
       UNION FOUNDATION, INC.
904 W. 2nd St.
Little Rock, AR 72201
(501) 374-2842
john@acluarkansas.org
shelby@acluarkansas.org

*-and-*

PETER SHULTS (ABN 2019021)
AMANDA G. ORCUTT (ABN 2019102)
SHULTS LAW FIRM LLP
200 West Capitol Avenue, Suite 1600
Little Rock, Arkansas 72201-3621
(501) 375-2301
pshults@shultslaw.com
aorcutt@shultslaw.com

*-and-*

BEN STAFFORD*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law
**Pro Hac Vice application forthcoming*

*Counsel for Intervenor-Plaintiffs*
*Protect AR Rights and For AR Kids*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, I filed the foregoing on the CM/ECF system, which will serve notice on counsel for all parties.

I further certify that on July 24, 2025, I emailed the foregoing to Senior Assistant Attorneys General Jordan Broyles and Ryan Hale for service on Defendant Attorney General Tim Griffin. I will ensure that Defendant Griffin is served as required under Fed. R. Civ. P. 4 with the Complaint in Intervention, Intervenor-Plaintiffs' Motion for Preliminary Injunction, and Intervenor-Plaintiffs' Brief in Support of Motion for Preliminary Injunction.

/s/ *John C. Williams*
John C. Williams