IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS,
SAVE AR DEMOCRACY, BONNIE HEATHER
MILLER, and DANIELLE QUESNELL                                    Plaintiffs

and

PROTECT AR RIGHTS and FOR AR KIDS              Intervenor-Plaintiffs


v.                          Case No. 5:25-cv-05087-TLB


COLE JESTER, Arkansas Secretary of State,
in his official capacity                                        Defendant

and

TIM GRIFFIN, Arkansas Attorney General,
in his official capacity                          Intervenor-Defendant


## BRIEF IN SUPPORT OF INTERVENOR-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 2

  A. Arkansans have a right to pursue political change through ballot initiatives. .. 2

  B. The Arkansas General Assembly has impeded the people's right to pursue political change through ballot initiatives. ............................................ 6

  C. The challenged laws have harmed and continue to harm Intervenor-Plaintiffs' ability to pursue political change through ballot initiatives. ............................ 8

ARGUMENT ....................................................................................................... 15

  I. Intervenor-Plaintiffs are likely to succeed on the merits. ................... 17

    A. Intervenor-Plaintiffs have standing to bring their claims. ............... 20

    B. Intervenor-Plaintiffs are likely to succeed on their First Amendment claims based on *Meyer* and *Buckley* (Counts One, Four, and Twelve). ...................... 21

      1. The Reading-Level Requirement violates Intervenor-Plaintiffs' First Amendment rights (Count One). ............................................. 24

      2. The Canvassing Regulations violate Intervenor-Plaintiffs' First Amendment rights (Count Four). ............................................... 32

      3. The Fifty-County Requirement violates Intervenor-Plaintiffs' First Amendment rights (Count Twelve). ......................................... 37

    C. Intervenor-Plaintiffs are likely to show that the Crime-Notification Requirement (Act 218) and the ID Requirement (Act 240) discriminate on the basis of content under the First Amendment (Count Five). ..................... 40

    D. Intervenor-Plaintiffs are likely to show that the Reading-Level Requirement (Act 602) is unconstitutionally discriminatory under the First Amendment and the Equal Protection Clause (Counts Two and Three). ............................ 42

    E. Intervenor-Plaintiffs are likely to show that the Crime-Notification Requirement (Act 218) unconstitutionally compels their speech under the First Amendment (Count Five). ............................................................. 43

F.  Intervenor-Plaintiffs are likely to show that the ID Requirement (Act 240) and the Reading Requirement (Act 274) are unconstitutionally vague (Counts Seven and Eight). .................................................................. 45

G.  Intervenor-Plaintiffs are likely to show that the Pre-Collection Disclosure Requirement violates the First Amendment (Count Eleven). .......................... 48

II.  Intervenor-Plaintiffs will suffer irreparable harm without a preliminary injunction. ..................................................................................... 51

III.  The balance of harms favors Intervenor-Plaintiffs and the public interest favors relief. ..................................................................................... 52

CONCLUSION ...................................................................................... 53

CERTIFICATE OF SERVICE ..................................................................... 56

TABLE OF AUTHORITIES

<u>Cases</u><span style="float:right"><u>Page(s)</u></span>

*Bailey v. McCuen,*
  884 S.W.2d 938 (Ark. 1994) ....................................................................... 26

*Brickhouse v. Hill,*
  268 S.W. 865 (Ark. 1925) ............................................................................. 2

*Brown v. Yost,*
  133 F.4th 725 (6th Cir. 2025) .............................................................. 25, 27

*Buckley v. American Constitutional Law Foundation, Inc.,*
  525 U.S. 182 (1999) ............................................... 17, 22, 23, 39, 49

*Dakotans for Health v. Noem,*
  52 F.4th 381 (8th Cir. 2022) ............................................... 18, 21, 49, 50

*Dataphase Sys., Inc. v. CL Sys., Inc.,*
  640 F.2d 109 (8th Cir. 1981) ..................................................................... 15

*Dobrovolny v. Moore,*
  126 F.3d 1111 (8th Cir. 1997) .............................................................. 23, 24

*Elrod v. Burns,*
  427 U.S. 347 (1976) ..................................................................................... 51

*Fayetteville Pub. Library v. Crawford Cnty., Ark.,*
  760 F. Supp. 3d 811 (W.D. Ark. 2024) ................................................... 48

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ..................................................................................... 35

*Johnson v. United States,*
  576 U.S. 591 (2015) .............................................................................. 46, 48

*Kodiak Oil & Gas (USA) Inc. v. Burr,*
  932 F.3d 1125 (8th Cir. 2019) ................................................................... 16

*Krislov v. Rednour,*
  226 F.3d 851 (7th Cir. 2000) ..................................................................... 29

*Lange v. Martin,*
    500 S.W.3d 154 (Ark. 2016)................................................................ 27

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.,*
    540 F.3d 752 (8th Cir. 2008)............................................................... 51

*Meyer v. Grant,*
    486 U.S. 414 (1988)................................................................ *passim*

*Miller v. Thurston,*
    967 F.3d 727 (8th Cir. 2020)..................................................... *passim*

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)................................................................ 19, 30

*Nat'l Inst. of Family & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018)............................................................... 44

*Nat'l Parks Conservation Ass'n v. U.S. E.P.A.,*
    759 F.3d 969 (8th Cir. 2014)............................................... 20

*Paschall v. Thurston,*
    699 S.W.3d 352 (Ark. 2024)............................................ 27, 29

*Phelps-Roper v. Nixon,*
    545 F.3d 685 (8th Cir. 2008)......................................... 16, 51

*Phelps-Roper v. Troutman,*
    662 F.3d 485 (8th Cir. 2011).......................................... 16, 52

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)................................................... 40, 41

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988)............................................ 43, 44, 45

*SD Voice v. Noem,*
    60 F.4th 1071 (8th Cir. 2023) ................................... *passim*

*Sorrell v. IMS Health, Inc.,*
    564 U.S. 552 (2011)................................................. 42

*Stephenson v. Davenport Cmty. Sch. Dist.,*
    110 F.3d 1303 (8th Cir. 1997)............................... 45, 46

*Wilson v. Martin*,
    500 S.W.3d 160 (Ark. 2016) ............................................................................. 27

## STATE CONSTITUTIONAL PROVISIONS

Ark. Const. art. V, § 1 ......................................................................................... 1, 3, 4

## STATUTES

Ark. Code Ann. § 7-7-103 ......................................................................................... 41

Ark. Code Ann. § 7-7-205 ......................................................................................... 41

Ark. Code Ann. § 7-8-302 ......................................................................................... 41

Ark. Code Ann. § 7-9-103 ....................................................................................... 7, 36

Ark. Code Ann. § 7-9-107 ......................................................................................... 4, 6

Ark. Code Ann. § 7-9-108 ..................................................................................... 36, 45

Ark. Code Ann. § 7-9-109 ..................................................................................... 7, 50

Ark. Code Ann. § 7-9-111 ..................................................................................... 32, 36

Ark. Code Ann. § 7-9-126 ....................................................................... 5, 8, 37, 53, 54

Ark. Code Ann. § 7-9-601 ..................................................................................... 7, 53, 54

## FEDERAL RULES

Fed. R. Civ. P. 65 ..................................................................................................... 15

## STATE RULES

Ark. Sup. Ct. R. 6 ..................................................................................................... 26

## OTHER AUTHORITIES

"Arkansas Issue 2 Election Results," N.Y. Times (Nov. 5, 2024), *available at*
https://tinyurl.com/4eza2eub ................................................................. 39

Ark. Att'y Gen. Op. 2025-055,
*available at* https://ag-opinions.s3.amazonaws.com/uploads/2025-033.pdf ...... 30

Ark. Sec'y of State, 2024 Initiatives and Referendum Handbook,
https://www.sos.arkansas.gov/uploads/elections/2023-2024_I__R_Handbook_-
_October_2023.pdf ........................................................................ 4, 40

Barth, Jay, "Initiatives and Referenda," *Encyclopedia of Arkansas* (May 20,
2025), *available at* https://encyclopediaofarkansas.net/entries/initiatives-
and-referenda-9044/................................................................................. 2

<u>I<small>NTRODUCTION</small></u>

For a century, Arkansas citizens have had the right to seek political change through ballot initiative. In fact, the article of the Arkansas Constitution that establishes the legislative branch defines the initiative-and-referendum power *before* it defines the power of the General Assembly. *See* Ark Const. art. 5, § 1. The people have exercised their legislative rights nine times in the twenty-first century, enacting measures that the General Assembly showed no interest in passing, such as an increase to the minimum wage and the legalization of medical marijuana. In recent years, the General Assembly has responded by attempting to claw away the people's rights, culminating in a deluge of restrictive new measures in 2025.

Both individually and in the aggregate, these laws are designed to single out and substantially restrict citizens' free speech and associational rights. They do so by comprehensively targeting and impeding the various stages of the initiative process.

At the start of the process, one law requires sponsors to write their ballot title at an eighth-grade reading level before they may engage with voters about the proposed measure. This law forces sponsors to alter their word choices and messages to pass a rigid formula, and it almost certainly ensures the resulting title is subject to other legal challenges for want of sufficient detail.

If a sponsor can overcome this hurdle, another law then limits those who may seek signatures for a measure by imposing a disclosure requirement that chills canvasser participation.

Canvassers must then follow laws that dictate *how* they must communicate with potential signers. These laws inject the State's own message into canvassers' speech, impose a vague requirement to verify identity using photo ID, and arbitrarily demand that canvassers waste precious time repeatedly reading signers the ballot title or waiting as signers read it to themselves. The laws also dictate *where and with whom* canvassers communicate by arbitrarily requiring signatures from two-thirds of Arkansas counties.

Intervenor-Plaintiffs, who are in the midst of initiative campaigns, are suffering ongoing irreparable injury because of these laws. The Court should enjoin each law, described further below, pending the final adjudication of this case.

## FACTUAL BACKGROUND

### A.  Arkansans have a right to pursue political change through ballot initiatives.

Arkansans have had the right to propose and vote upon ballot initiatives and referenda since 1925.[1] As stated in the very first words of Article 5 of the Arkansas Constitution, which defines the legislative department:

> The legislative power of the people of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives, but the people reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution,

---

[1] Voters originally considered Amendment 7, which created Arkansas's initiative-and-referendum process, in 1920. Though it received 86,360 votes for and 48,662 against, Amendment 7 did not immediately become law because then-existing precedent requiring that proposed amendments receive a majority of votes cast in the gubernatorial election— not simply a majority of the votes cast in the election on the proposed amendment itself. However, in *Brickhouse v. Hill*, 268 S.W. 865 (Ark. 1925), the Arkansas Supreme Court overturned this rule and Amendment 7 became law. *See* Barth, Jay, "Initiatives and Referenda," *Encyclopedia of Arkansas* (May 20, 2025), *available at* https://encyclopediaofarkansas.net/entries/initiatives-and-referenda-9044/.

and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill.

Ark Const. art. 5, § 1.[2] Since 2000, the people have proposed fifteen initiated amendments and initiated acts, passing nine of them. The substantive content of these measures has run the political gamut to include gay marriage, tobacco settlement money, the minimum wage, lotteries, casinos, and medical marijuana. Each shares a similar feature: the General Assembly was either unwilling or unable to pass these measures into law, leaving the people to take policymaking into their own hands. That is the very nature of the people's ultimate reservation of the legislative power to themselves—where the General Assembly refuses to act to advance the people's will, the people may act.

Getting an initiative on the ballot requires a significant amount of time and dedication from sponsors and canvassers, whether volunteers or paid workers. In broad overview, canvassers must obtain valid signatures from a sufficient number of registered voters in the state. For an initiated amendment (which is the form of initiative each Intervenor-Plaintiff supports here), a sponsor must present signatures from ten percent of the number of voters who voted for the office of governor in the last election. Ark Const. art. 5, § 1. For the 2024 and 2026 election

---

[2] "Initiative" means a measure—whether an amendment to the constitution or a legislative act—referred directly by the people to the people. "Referendum" means a vote by the people on whether to veto an act of the General Assembly. This brief uses "initiative" as shorthand to refer to both. Where greater specificity is needed, this brief refers to "initiated amendments" or "initiated acts."

cycles, this amounts to 90,704 signatures. Arkansas Sec'y of State, 2024 Initiatives and Referendum Handbook at 4.[3]

Under the Arkansas Constitution, signatures must come from at least fifteen counties in the state (a floor that the General Assembly has since unlawfully raised, as discussed further below). Signature collection may not begin until the Attorney General certifies the language of the measure, which in turn may not occur until after the general election immediately before the election at which the ballot measure would be voted upon.[4] *See* Ark. Code Ann. § 7-9-107. A sponsor must submit the requisite number of signatures at least four months before the general election at which the measure is to be voted on. Ark Const. art. 5, § 1. For the next election cycle, this date falls on July 3, 2026.

Once the sponsor submits signatures, the Secretary of State counts and verifies them. The sponsor may be able to access a thirty-day "cure period" in which it may collect additional valid signatures to make up for any shortfall in the initial submission. To access this cure period, the petitions originally submitted must contain valid signatures amounting to seventy-five percent of the total required signatures and seventy-five percent of the total required for each of at least fifteen counties (again, a threshold that the General Assembly has recently and improperly heightened to fifty counties). *Id.*

---

[3] Available at https://www.sos.arkansas.gov/uploads/elections/2023-2024_I__R_Handbook_-_October_2023.pdf.

[4] This particular timing rule comes from Act 153 of 2025. No party challenges Act 153 in this litigation.

During any initiative campaign, not every single signature gathered will be valid. This is true for any number of mundane reasons, including people misstating their current address, signing without realizing they must be a registered voter to do so, forgetting they've already signed the petition, or simply scrawling a signature that does not appear to match their signature on file. *See* Ark. Code Ann. § 7-9-126(c) (listing reasons that signatures might be discounted). During a typical initiative campaign, anywhere from thirty to forty-five percent of signatures are rejected as invalid. PI Ex. 6, Declaration of Bill Kopsky ("Kopsky Decl.") ¶12. Accounting for those rates, Intervenor-Plaintiffs expect that they will need to collect between 140,000 and 150,000 total signatures to meet the threshold of 90,704 valid signatures. *Id.*

Thus, sponsors have at most a twenty-month period, plus a possible monthlong cure period, to collect over a hundred thousand signatures from Arkansas voters—though as a practical matter, given the reality of the organizational effort needed for these campaigns, sponsors have much less time than that. For instance, once a sponsor has decided to pursue a ballot measure, it can take several months to organize the ballot question committee ("BQC"), which requires identifying members and officers, getting approval from any member organization's boards of directors, forming drafting and research committees to do early polling, writing the proposed popular name and ballot title, and filing all necessary paperwork with the Arkansas Ethics Commission. *See* Kopsky Decl. ¶4. After the BQC is formed, it can take several more months to go through the certification process with the Arkansas

Attorney General, who often rejects ballot titles several times before approving a final title. *See* PI Ex. 7, Declaration of Jennifer Standerfer ("Standerfer Decl.") ¶¶22–27. This process significantly limits a BQC's time to collect signatures.

**B.    The Arkansas General Assembly has impeded the people's right to pursue political change through ballot initiatives.**

For over a decade, the Arkansas General Assembly has whittled away at the right of the people to associate and speak about political change through ballot initiatives. In the 2025 legislative session, the General Assembly swapped the pocketknife for an ax, hacking at these rights with abandon. Intervenor-Plaintiffs now challenge laws new and old that restrict their constitutional rights.[5]

First, the General Assembly has impeded a sponsor's ability to seek any signatures for a ballot measure by obstructing initial approval. The law already prevents a sponsor from soliciting signatures for a measure until the Arkansas Attorney General reviews it and certifies that it is not "misleading." *See* Ark. Code Ann. § 7-9-107(e). Now, under Act 602 of 2025,[6] the Attorney General also may not certify a measure for signature collection unless the ballot title is written at or below an eighth-grade reading level as determined by the Flesch-Kincaid Grade

---

[5] The discussion below covers only laws that Intervenor-Plaintiffs seek to preliminarily enjoin. Intervenor-Plaintiffs challenge additional laws in their complaint in intervention.

[6] Act 602 is currently codified at Ark. Code Ann. § 7-9-107(g). Part of a second new law, Act 153, is also codified at that subsection, and several other new laws (Acts 154, 272, and 768) are scheduled to be codified at that subsection when they become effective on August 5, 2025.

Level formula, an algorithm driven by word and sentence length. PI Ex. 1, Act 602. Plaintiffs refer to Act 602 as the "Reading-Level Requirement."

Second, assuming a sponsor can pass the Reading-Level Requirement, the General Assembly has impeded canvassers' ability to speak freely with voters through three separate new laws (the "Canvassing Regulations"). Act 218,[7] which Plaintiffs refer to as "the Crime-Notification Requirement," requires canvassers to issue a verbal warning to each potential signer that "petition fraud is a criminal offense." PI Ex. 2, Act 218. Act 240,[8] which Plaintiffs refer to as the "ID Requirement," requires canvassers to "verify the identity" of potential signers using specified photo identification. PI Ex. 3, Act 240. And Act 274,[9] which Plaintiffs refer to as "the Reading Requirement," precludes canvassers from collecting signatures unless they either (1) read the entirety of the ballot title aloud to the would-be signer or (2) wait as the signer reads the ballot title to herself in the canvasser's presence. PI Ex. 4, Act 274.

Third, by requiring that all paid canvassers submit their names and addresses before collecting signatures—the "Pre-Collection Disclosure Requirement," Ark. Code Ann. § 7-9-601(a)(2)(C)—the General Assembly has further impeded signature collection. During past campaigns, opponents of ballot measures have obtained this

---

[7] Codified at Ark. Code Ann. §§ 7-9-103(a)(7) (substantive requirement) and 7-9-103(c)(10) (criminal penalty).

[8] Codified at Ark. Code Ann. § 7-9-109(g).

[9] Codified at Ark. Code Ann. §§ 7-9-103(a)(1)(A) (substantive requirement), 7-9-103(c)(10) (criminal penalty), and 7-9-109(a) (amendment to verification that each canvasser must submit to reflect compliance with substantive requirement).

information through the Arkansas Freedom of Information Act and used it to harass and intimidate canvassers. PI Ex. 15, Declaration of Alison Guthrie ("Guthrie Decl.") ¶¶6–12. And if paid canvassers fail to adhere to this requirement, any signatures they collect do not count. *See* Ark. Code Ann. § 7-9-126(b)(4). The Pre-Collection Disclosure Requirement thus introduces yet another chill on sponsors' ability to engage voters and collect signatures.

Finally, assuming a sponsor can find enough people to sign its petition under the conditions described above, the General Assembly has impeded sponsors' ability to present their measure to the electorate by dictating *where* the sponsor must find those people. The Arkansas Constitution requires that an initiative sponsor obtain a requisite number of signatures from at least fifteen counties. Not satisfied, the General Assembly exceeded the state constitutional bar in 2023 by passing Ark. Code Ann. § 7-9-126(e), which requires Intervenor-Plaintiffs and other sponsors to collect a specified number of signatures from fifty of Arkansas's seventy-five counties (the "Fifty-County Requirement"). The law thus requires sponsors to fan throughout the state to collect signatures from more sparsely inhabited rural areas, which diverts resources that could be more efficiently deployed and burdens the ability to get measures before the electorate. PI Ex. 14, Declaration of Lauren Cowles ("Cowles Decl.") ¶¶5–13; Kopsky Decl. ¶34.

## C.    The challenged laws have harmed and continue to harm Intervenor-Plaintiffs' ability to pursue political change through ballot initiatives.

Intervenor-Plaintiffs are two Arkansas BQCs and sponsors of proposed initiated acts for the 2026 election cycle. Intervenor-Plaintiff For AR Kids supports the

Arkansas Educational Rights Amendment of 2026, which seeks to advance various educational reforms in the state. For AR Kids sponsored a similar measure during the 2024 election cycle and engaged in an ultimately unsuccessful all-volunteer canvassing effort. From March 1, 2024, to July 5, 2024, For AR Kids engaged approximately 750 volunteer canvassers, about 200 to 300 of them regularly active, who collected a total of 70,113 raw signatures—that is, signatures that were never submitted to the Secretary of State for verification. Kopsky Decl. ¶¶7–8.

Intervenor-Plaintiff Protect AR Rights supports the Arkansas Ballot Measure Rights Amendment, which seeks to reform the ballot-initiative process in several ways, such as by limiting the legislature's ability to change initiated constitutional amendments, by restricting the time in which state-court challenges to initiatives may be brought, and by eliminating the Fifty-County Requirement.

For AR Kids and Protect AR Rights are in different positions in terms of their ability to canvass under the current laws. Because the Attorney General approved For AR Kids' measure before the effective date of Act 602, For AR Kids did not have to meet the Reading-Level Requirement and it has been able to canvass (about which more below).[10] Protect AR Rights, on the other hand, cannot canvass because the Attorney General has not approved its ballot measure. On June 2, 2025, and then again on July 1, 2025, the Attorney General rejected Protect AR Rights' ballot measure. PI Exs. 16 and 17, Attorney General Rejection Letters. Each time, the

---

[10] Act 602 went into effect on April 14, 2025. The Act does not apply retroactively, so For AR Kids, whose ballot title was approved on February 26, 2025, is not bound by the Reading-Level Requirement this year.

9

Attorney General found that, among other deficiencies, the ballot title failed to satisfy the Reading-Level Requirement. *See* PI Exs. 16 and 17. On July 14, 2025, Protect AR Rights submitted a third version of the ballot measure, which reads at grade level 9 on the Flesch-Kincaid Grade Level formula. Standerfer Decl. ¶27. Protect AR Rights believes that this version resolves all issues with the ballot title except for the Reading-Level Requirement and expects an official response from the Attorney General's Office on July 29, 2025. *Id.*

The Reading-Level Requirement entails application of the Flesch-Kincaid Grade Level formula, which produces a number based on word and sentence length.[11] Longer sentences with multisyllabic words produce a higher score. *See id.* ¶16. And even relatively simple sentences produce scores that exceed an eighth-grade level on the Flesch-Kincaid Grade Level formula. For example, the following sentence produces a Flesch-Kincaid Grade Level of 12.7: "This measure amends the Arkansas Constitution." *Id.* ¶20. Such language, and other multisyllabic words such as "fundamental," are essential to the ballot title but drive up the readability score. *Id.* ¶28. Protect AR Rights believes that it cannot produce a ballot title that satisfies the Reading-Level Requirement while also adequately summarizing the law, as Arkansas law also requires. *Id.* ¶30.

---

[11] The Flesch-Kincaid Grade Level formula, which the General Assembly has approved as its readability measure, does not actually assign a grade level. Rather, it assigns a number based on sentence and word length, which can reach into the 100s. A separate measure, the Flesch Reading Ease score, assigns a more traditional K-12 grade level. *See* Standerfer Decl. ¶¶9–10.

As for the canvassing process, the Canvassing Regulations raise significant hurdles to both attracting canvassers and collecting signatures. While For AR Kids anticipates using paid canvassers during this election cycle, it expects that volunteers will collect most of its signatures. Kopsky Decl. ¶5. In April 2025, For AR Kids contacted eighty-two previous volunteers from more than thirty counties to gauge their interest in collecting signatures for the 2026 initiative campaign. PI Ex. 8, Declaration of Sara Stumpenhaus ("Stumpenhaus Decl.") ¶11. Many canvassers indicated that they are less willing to participate this cycle and cited the new laws as a reason. *Id.* ¶¶12–14. Overall, the survey showed that 19.1 percent of respondents probably would not canvass because of the new laws and that 29.3 percent of respondents were unsure whether they would continue to canvass. *Id.* ¶15. For AR Kids similarly estimates that, based on interactions with volunteer canvassers, the attrition rate is around fifty percent. Kopsky Decl. ¶25.

Canvassers report that they fear being charged with a crime or that the signatures they collect will be discounted due to a mistake during the collection process. *Id.*; Stumpenhaus Decl. ¶17. Canvassers also are uncertain of how some of the new laws apply—for example, they do not know when to accept a signer's statement that they have read the entire ballot title in their presence. PI Ex. 9, Declaration of Cheri Ertman ("Ertman Decl.") ¶16; PI Ex. 12, Declaration of Sarah Thompson ("Thompson Decl.") ¶17. For AR Kids, which must train canvassers on how these laws apply, is uncertain about how to instruct on this point. Kopsky Decl. ¶30–31. Nor does it know how to instruct canvassers about what to do when the

11

information on a signer's ID does not match the information they put on the petition. *Id.* ¶32.

Within the survey mentioned above, canvassers specifically linked their willingness to participate to each of the three restrictions. 42.7% of volunteers responded that Act 218, the Fraud-Notification Requirement, would negatively impact their willingness to volunteer and ability to collect signatures. Stumpenhaus Decl. ¶12. The numbers were 58.5 percent for Act 240, the ID Requirement, and 69.5 percent for Act 274, the Reading Requirement. *Id.* ¶13–14. Some volunteers simply do not intend to canvass under the conditions that the new laws impose. PI Ex. 10, Declaration of Judy Harrison ("Harrison Decl.") ¶19–20.

Canvassers' experiences on the ground show how the new Canvassing Regulations are impeding the speech and association attendant to petition circulation. Earlier this year, For AR Kids sent experienced canvassers to collect signatures subject to the new laws. These canvassers report that, during past cycles, in heavily trafficked locations such as the Fayetteville Farmer's Market and the Little Rock Zoo, or canvassing door-to-door, they could collect at least ten signatures per hour and as many as twenty. Ertman Decl. ¶13 (ten to fifteen signatures per hour); PI Ex. 11, Declaration of Julia Taylor ("Taylor Decl.") ¶14 (ten signatures per hour); Thompson Decl. ¶13 (ten to twenty signatures per hour); PI Ex. 13, Declaration of Elaine Williams ("Williams Decl.") ¶12 (twelve to fifteen signatures per hour). In the same or similar locations this year, while complying with the Canvassing Regulations these canvassers collected two to three signatures

per hour, if that. Ertman Decl. ¶13 (two signatures per hour); Taylor Decl. ¶14 (two signatures per hour); Thompson Decl. ¶13 (three signatures per hour); Williams Decl. ¶12 (less than one signature per hour).

One of the primary hurdles to signature collection under the Canvassing Regulations is time. The core of signature collection is speech and association—canvassers seek to persuade voters to associate with the initiative sponsor to advance a proposed constitutional amendment. But people are busy, and the time available to persuade a passerby is precious and limited. The Canvassing Regulations hijack that time by forcing canvassers to share the State's preferred messaging rather than their own, and to take more of a potential signatory's time than they are often willing to share. Whereas in previous years canvassers would typically spend two to three minutes with a signer, this year canvassers have required at least six to ten minutes to obtain a signature, if not more, as a result of the new requirements. Ertman Decl. ¶14 (six to ten minutes to obtain a signature under new laws); Harrison Decl. ¶13 (ten minutes); Taylor Decl. ¶15 (eight minutes); Thompson Decl. ¶14 (ten to fifteen minutes); Williams Decl. ¶13 (thirty-five minutes). Indeed, it takes nearly three minutes to read For AR Kids' ballot title. Kopsky Decl. ¶21. As canvassers spend extra time interacting with one signer, they miss the opportunity to engage other citizens. Taylor Decl. ¶18.

The Canvassing Regulations also discourage interactions between canvassers and voters who might otherwise be willing to sign a petition. Canvassers find that people who are interested in signing decline to do so because they do not have time

13

to go through all the steps; because they do not want to spend time reading the ballot title or having it read to them; because they do not have the required photo ID; because, even if they have ID, they do not want to show it to a stranger; or because they are concerned about criminal provisions associated with signing petitions. Harrison Decl. ¶¶15–16; Taylor Decl. ¶¶19–21; Thompson Decl. ¶¶15–16; Williams Decl. ¶15–17, 22–23.

Experience has also shown that the Fifty-County Requirement significantly burdens a sponsor's ability to get its measure before the people for statewide consideration at the general election. The Fifty-County Requirement became law in 2023 and was first in place for the 2024 election cycle. The law stymied campaigns by requiring them to divert canvassers from population centers, where they can interact with more voters, to smaller counties, where the signatures collected add little to the overall signature numbers. For example, though For AR Kids collected enough signatures from fifty counties, satisfying this requirement caused it to fall short of the 90,704 total signatures required. Kopsky Decl. ¶34. For AR Kids spent many hours trying to recruit leaders and volunteer canvassers in every county in Arkansas instead of building larger volunteer networks in some of Arkansas's key population centers. *Id.* It also sent volunteers who live in high-density counties to smaller, remote counties to collect signatures. *Id.* The volunteers could have collected far more signatures in a similar time period by canvassing in higher-density areas closer to home. *Id.* Allocating so much of its resources to meeting the

Fifty-County Requirement significantly impeded For AR Kids' ability to collect enough signatures to qualify for the ballot. *Id.*

Likewise, Arkansans for Limited Government ("AFLG"), the sponsor of the Arkansas Abortion Amendment of 2024, collected 87,382 volunteer signatures and 14,143 paid signatures during the 2024 election cycle. Cowles Decl. ¶¶7–8. AFLG found it especially difficult to find volunteers who could cover counties outside Central and Northwest Arkansas, where most of their canvassers were based. *Id.* ¶12. Time that could have been spent collecting signatures was instead spent driving to distant locations. *Id.* Though AFLG met the Fifty-County Requirement, it did so at the expense of its overall numbers. *Id.* ¶10. When the Secretary of State disqualified the paid signatures for a technical violation, AFLG did not have enough volunteer signatures to qualify for the ballot. *Id.* ¶9.

## Argument

The Court is authorized to grant a preliminary injunction under Fed. R. Civ. P. 65. The familiar *Dataphase* factors apply when assessing whether to grant a preliminary injunction. The Court must weigh the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to the other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "While no single factor is determinative, the probability of

success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (internal citation and quotation omitted).

In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011). Because "a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights," "[i]n a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (internal quotation marks omitted).

All four *Dataphase* factors cut in Intervenor-Plaintiffs' favor. For the reasons stated below, Intervenor-Plaintiffs are likely to succeed on the merits and show irreparable harm—even before accounting for the special First Amendment considerations articulated above. The balance of harms favors Intervenor-Plaintiffs and the public interest favors enforcement of constitutional rights. The Court should thus grant a preliminary injunction that precludes Defendants from enforcing the challenged laws and that requires the Secretary of State to count and verify otherwise valid signatures collected without adherence to the challenged laws.

## I.    Intervenor-Plaintiffs are likely to succeed on the merits.

In establishing that they are likely to succeed on the merits, Intervenor-Plaintiffs proceed as follows:

First, they briefly address their standing to challenge the laws.

Second, they show that several of the laws they challenge are unconstitutional under the framework for analyzing the First Amendment rights of ballot-initiative sponsors established in *Meyer v. Grant*, 486 U.S. 414 (1988); *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182 (1999), and relevant Eighth Circuit precedent. Specifically, they are likely to succeed under this framework on Count One (challenging the Reading-Level Requirement), Count Four (challenging the Canvassing Regulations), and Count Twelve (challenging the Fifty-County Requirement).

Third, they establish that the Crime-Notification Requirement (Act 218) and the ID Requirement (Act 240) each discriminate on the basis of content because they apply only to ballot initiatives, not to other forms of political petitioning. Intervenor-Plaintiffs are thus likely to succeed on Counts Five and Ten of the complaint in intervention.

Fourth, and relatedly, the Reading-Level Requirement of Act 602 is discriminatory because it applies only to citizen-initiated measures, not to legislatively referred measures. Regardless of whether this is considered a content-based measure in violation of the First Amendment, as alleged in Count Two, or a

17

law that cannot satisfy the rational-basis test of the Equal Protection Clause, as alleged in Count Three, Intervenor-Plaintiffs are entitled to relief.

Fifth, Intervenor-Plaintiffs are likely to succeed on Count Six because the Crime-Notification Requirement (Act 218) unconstitutionally compels their speech.

Sixth, Intervenor-Plaintiffs are likely to succeed on Counts Seven and Eight because the ID Requirement (Act 240) and the Reading Requirement (Act 274) are unconstitutionally vague.

Seventh, Intervenor-Plaintiffs are likely to succeed on Count Eleven because the Pre-Collection Disclosure Requirement plainly violates Supreme Court and Eighth Circuit precedent. *See Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022).

To be clear, to preliminarily enjoin the laws, the Court need not find that Intervenor-Plaintiffs are likely to succeed on every single count of the complaint in intervention raised here. Most of the challenged laws have multiple fatal constitutional flaws, each of which is independently sufficient reason to provide relief. To preliminarily enjoin each law, the Court need only decide that Intervenor-Plaintiffs are likely to succeed on one of the constitutional theories they assert here for each law.

Finally, in each of the counts addressed here, Intervenor-Plaintiffs bring a facial challenge. In a facial challenge, the plaintiff must show that "a law's unconstitutional applications are substantial when compared to its constitutional ones," a judgment that requires a court to "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the

other." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). In *Moody*, an internet trade association brought a facial challenge to two different laws that limited the ability of social-media platforms to engage in content-moderation. *See id.* at 717. *Moody* held that the lower courts erred in finding the laws at issue there as facially unconstitutional because they proceeded as if the laws applied to only "the largest and most paradigmatic social-media platforms"—though they would also "apply to, and differently affect, other kinds of websites and apps." *Id.* at 718. The Supreme Court thus remanded for the lower courts to "evaluate the full scope of the law's coverage" and to "then decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other." *Id.* at 744.

Here, the facial analysis is relatively straightforward. These laws apply to any sponsor of a ballot measure and, in some cases, to any canvasser who wishes to collect signatures. None of these laws has any differential effect based upon the identity of the ballot-measure sponsor or the individual canvasser. Regardless of the measure a given sponsor or canvasser seeks to support, each of these laws severely affects speech or otherwise violates the Constitution regardless of individual application. Insofar as a given claim requires a more detailed discussion of facial challenges, Intervenor-Plaintiffs provide additional analysis in the relevant sections below.

### A.    Intervenor-Plaintiffs have standing to bring their claims.

As previously noted in Intervenor-Plaintiffs' briefing in support of their motion to intervene—*see* ECF No. 6 at 5–8, ECF No. 17 at 2–3—at least one Intervenor-Plaintiff is injured by each of the laws that they seek to preliminarily enjoin, that injury is traceable to one of the Defendants, and an order enjoining the law will redress the injury. *See Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 974 (8th Cir. 2014) (stating standing requirements). Intervenor-Plaintiffs thus have Article III standing to seek a preliminary injunction.

Intervenor-Plaintiff Protect AR Rights is injured by the Reading-Level Requirement, Act 602, because the law has prevented it from having its ballot measure approved and from canvassing for the measure. Standerfer Decl. ¶23, 26–27. Enjoining the Attorney General from enforcing Act 602 will cure the injury by allowing Protect AR Rights to obtain approval from the Attorney General and by allowing it to collect signatures for placement on the ballot.

For AR Kids is injured by the other laws challenged here (and Protect AR Rights will be injured by them once it is able to collect signatures). The Canvassing Regulations (Acts 218, 240, and 274) directly interfere with For AR Kids' speech rights by reducing its ability to reach citizens who would sign its petition. Kopsky Decl. ¶19–29. The Fifty-County Requirement injures For AR Kids' speech rights by requiring it to divert canvassers to areas where they can collect fewer signatures, preventing For AR Kids from getting its proposal on the ballot (as indeed occurred in 2024). *Id.* at ¶34; *see also* Cowles Decl. ¶11–12. These harms to For AR Kids

arise directly from the challenged laws and would be redressed by an order enjoining the Secretary of State from enforcing them and by requiring him to count and verify otherwise valid signatures collected without regard to the laws at issue here.

Finally, though the analysis is somewhat different, For AR Kids also has standing to challenge the Pre-Collection Disclosure Requirement. For AR Kids intends to use paid canvassers during the 2026 election cycle. Kopsky Decl. ¶6. The Pre-Collection Disclosure Requirement has caused paid canvassers to be intimidated and harassed in past campaigns, Guthrie Decl. ¶¶6–12. This sort of harassment is likely to harm For AR Kids (and other BQCs) by chilling paid canvassers from collecting signatures. *See* Kopsky Decl. ¶36. Enjoining the Secretary of State from enforcing the law that causes this injury will redress the harm. Indeed, the Eighth Circuit has held that initiative sponsors have standing to challenge canvasser disclosure requirements in similar circumstances. *See Dakotans for Health*, 54 F.4th at 385–88.

## B.  Intervenor-Plaintiffs are likely to succeed on their First Amendment claims based on *Meyer* and *Buckley* (Counts One, Four, and Twelve).

It is well settled that initiatives and referenda involve "core political speech." *Meyer*, 486 U.S. at 422. At least two forms of protected expression are at play: "expression of desire for political change," embodied by the ballot measure itself, and "discussion of the merits of the proposed change," embodied by conversations between canvassers and would-be signers during the canvassing process. *Id.* at 421. When states regulate ballot initiatives, they enter into "an area in which the

importance of First Amendment protections is at its zenith." *Id.* at 425. States thus have the burden to adequately justify any restrictions they place on ballot initiatives. *See id.*

In *Meyer*, the Court struck down a state law that made it a felony to work as a paid canvasser. The Court explained that this law implicated the First Amendment in two ways: "First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 422–23. The Court then held that the State had failed to justify the law. Specifically, it rejected the State's asserted interest in "the integrity of the initiative process." *Id.* at 426. For one, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage than at the time of balloting." *Id.* at 427. Moreover, the Court found that the State already addressed this asserted interest in other more tailored ways, such as by criminalizing fraud in the process and by requiring that each petition page state the criminal penalties associated with fraud. *Id.*

Likewise, in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), the Court struck down laws that required canvassers to be registered voters and to wear badges stating their names.[12] The evidence showed that the registration requirement "drastically reduces" the number of petitioners, thus

---

[12] The Court also struck down a law requiring the disclosure of the names and residences of paid canvassers. This aspect of the opinion is discussed in Part I.G.

producing "a speech diminution of the very kind produced by the ban on paid circulators at issue in *Meyer*." *Id.* at 193–94. Further, the badge requirement "inhibits participation in the petitioning process" because the proof showed that canvassers were less willing to work while wearing a badge. *Id.* at 197–98. In neither case did the State adequately justify these restrictions as needed to police fraud and lawbreaking because other laws served that function just as well. *See id.* at 196, 198.

Interpreting *Meyer* and *Buckley*, the Eighth Circuit has created a two-step analysis of whether an initiative restriction is constitutional. First, the court must determine whether the restriction concerns the First Amendment at all. Regulations that affect "the communication of ideas associated with the circulation of petitions" implicate First Amendment interests. *Miller v. Thurston*, 967 F.3d 727, 737 (8th Cir. 2020). So, too, do restrictions that "make it less likely that [a sponsor] will garner the number of signatures necessary to place a matter on the ballot, thus limiting its ability to make its political causes the focus of statewide discussion." *SD Voice v. Noem*, 60 F.4th 1071, 1078 (8th Cir. 2023) (cleaned up) (quoting *Meyer*, 486 U.S. at 423). However, regulations that concern the "difficulty of the process alone" but "in no way restrict[] the ability to circulate petitions or otherwise engage in political speech" do not implicate the First Amendment and thus do not require constitutional scrutiny. *Miller*, 967 F.3d at 737 (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)) (brackets omitted). Under these standards, the court has found that laws requiring in-person signatures under pandemic conditions

and laws restricting the timeframe in which sponsors may collect signatures implicate the First Amendment. *See Miller*, 967 F.3d at 738 (in-person requirement); *SD Voice*, 60 F.4th at 1080 (timeframe). On the other hand, laws that require sponsors to have petitions notarized and that set threshold signature-collection levels do not. *See Miller*, 967 F.3d at 738 (notary requirement); *Dobrovolny*, 126 F.3d at 1112–13 (10-percent threshold without advance notice of absolute number).

Second, if a law implicates the First Amendment, the court must determine what level of scrutiny applies. If the restriction is "severe," the court applies strict scrutiny. *Miller*, 967 F.3d at 739. If the restriction is not "severe," then it survives as long as it is "reasonable, nondiscriminatory, and furthers an important regulatory interest." *Id.* at 740. In assessing whether the restriction is "severe," a court must consider "the character and magnitude of the burden the State's rule imposes on First Amendment rights"; to be deemed severe, "the burden must go beyond the merely inconvenient." *Id.* at 739 (cleaned up).

Applying these precedents here, Intervenor-Plaintiffs are likely to show that the Reading-Level Requirement, Canvassing Regulations, and Fifty-County Requirement violate the First Amendment.

### 1.    The Reading-Level Requirement violates Intervenor-Plaintiffs' First Amendment rights (Count One).

Under Act 602, the Attorney General must not certify a proposed ballot title if it is composed above an eighth-grade reading level, as determined by the Flesch-Kincaid Grade Level formula as it existed on January 1, 2025. *See* PI Ex. 1. The

24

Flesch-Kincaid Grade Level formula is a readability algorithm based on average sentence and word length, application of which disfavors the use of multisyllabic words or long sentences, no matter how common the word or straightforward the sentence. For example, under the formula, even the statement "I like Labrador retrievers" comes in at above an eighth-grade reading level. Standerfer Decl. ¶18.d.

The Reading-Level Requirement affects "the communication of ideas associated with the circulation of petitions" by narrowing the way in which sponsors may write their ballot titles—the key document in which they communicate their proposal for political change. *Miller*, 967 F.3d at 737. By forcing ballot titles to meet the Flesch-Kincaid test, the Reading-Level Requirement controls the how sponsors speak with the public and precludes canvassing at all unless the ballot title satisfies the algorithm. Such restrictions directly regulate the content of speech. *Cf. Brown v. Yost*, 133 F.4th 725, 734 (6th Cir. 2025) (explaining that the Ohio Attorney General's editorial control over the content of Ohio ballot titles implicates "how citizens can advocate for their proposed legislation").

The Reading-Level Requirement also implicates the First Amendment because it makes it less likely that a sponsor's initiative will make it to the ballot and thus become a topic of statewide discussion amongst voters. *See SD Voice*, 60 F.4th at 1078. Because the requirement is so difficult to satisfy, it drastically decreases the chances that the Attorney General will approve the ballot title at all. And, as explained further below, even if the sponsor can draft a ballot title to satisfy the

formula, it does so at a heightened risk that a court will later deem the ballot title inadequate, thus keeping the people from voting on the measure.

Furthermore, the Reading-Level Requirement imposes a severe burden. Unless the proposed political change is exceedingly simple (and perhaps not even then), it is extremely difficult for a sponsor to draft a ballot title in a way that satisfies the Flesch-Kincaid test.[13] Ballot measures typically address nuanced issues that are legally and logistically complex. The Flesch-Kincaid test penalizes the use of words that are necessary to describe the measure. Standerfer Decl. ¶28.

Not only that, but Arkansas law demands that the sponsor provide specific description of the legal change in the ballot title. The Attorney General must reject ballot titles that do not include enough detail to give voters a fair understanding of the initiative or do not include everything the Attorney General considers an "essential fact." *See Bailey v. McCuen,* 884 S.W.2d 938, 942 (Ark. 1994). Even when the Attorney General finds that the ballot title sufficiently describes the measure, citizens may file suit arguing otherwise *after* the Secretary of State has certified that the sponsor collected enough signatures for the measure to appear on the ballot. *See* Ark. Sup. Ct. R. 6-5(a). In such suits, the Arkansas Supreme Court will merely "consider" the Attorney General's certification and "attach some significance to it"; the court does not "defer to the Attorney General's certification or give it

---

[13] Many recent constitutional amendments of apparent simplicity fail to read at an eighth-grade level under the Flesch-Kincaid Grade Level formula. For instance, the ballot title for Amendment 96, which allows the governor to retain her powers when out of state, reads at a grade level 12.3 under the formula. Similarly, the ballot title for Amendment 88, which provides a constitutional right to hunt, fish, trap, and harvest wildlife, reads at a grade level 12.3 under the formula. *See* Standerfer Decl. ¶15.

presumptive effect." *Wilson v. Martin*, 500 S.W.3d 160, 166 (Ark. 2016). Indeed, the Supreme Court has overruled the Attorney General's initial certification at least three times in the past decade. *See Paschall v. Thurston*, 699 S.W.3d 352, 355 (Ark. 2024) (ballot title concerning marijuana did not inform voters of all forms of legalization or of provisions that would amend Arkansas Constitution); *Wilson*, 500 S.W.3d at 167 (ballot title did not define "non-economic damages"); *Lange v. Martin*, 500 S.W.3d 154, 159 (Ark. 2016) (ballot title of measure to legalize sports gambling did not inform voters that sports gambling is illegal under federal law). The upshot of these rulings is that the sponsors should have included *more* complexity in the wording of their ballot titles, not less.

The Reading-Level Requirement thus puts sponsors in the untenable position of writing their ballot title in a grossly simplified way that will likely doom it later for want of sufficient and clear detail. Even if it is technically possible to write the ballot title at an eighth-grade level, the court must consider the entire process. *See Brown*, 133 F.4th at 736 ("When determining the character and magnitude of Plaintiffs' injury, we consider the combined effect of the applicable election regulations." (internal quotation marks omitted)). By whipsawing sponsors into writing simple ballot titles that will later be rejected, Act 602 imposes a severe burden.

Applying strict scrutiny, the Attorney General cannot show that the Reading-Level Requirement is narrowly tailored to advance a compelling government interest. Act 602 asserts an interest in (1) "[p]reserving and protecting the integrity

of the initiative process" and (2) "[p]rotecting voters from initiatives and referenda that are deficient, confusing, or misleading or that are placed on the ballot by means of conduct that is (i) Misleading; (ii) Fraudulent; (iii) Felonious or (iv) Otherwise unlawful." PI Ex. 1. It is unclear how the Reading-Level Requirement advances the "integrity of the initiative process." In any case, "merely rely[ing] on a bare assertion of election integrity" does not satisfy strict scrutiny. *SD Voice*, 60 F.4th at 1081. Moreover, the reading level at which a ballot title is written has nothing to do with the "conduct" of those who seek signatures for it. If fraud or lawbreaking is being committed, it is not being committed during the drafting process. These may be compelling interests, but requiring ballot titles to be written at an eighth-grade reading level does nothing to fix them.

As for the State's asserted interest in avoiding confusing or misleading ballot titles, if that interest were so compelling the General Assembly would have required that its own referred constitutional amendments be written with the same simplicity. But it does not—it applies only to "an initiative petition or referendum petition." PI Ex. 1. There is no reason that one type of ballot title but not the other should be readable to a middle schooler. This irrational distinction means that Act 602 is not even "reasonable" and "nondiscriminatory," as required to survive rational-basis review. *Miller*, 967 F.3d at 740.

Moreover, this law assumes that ballot sponsors cannot write an adequate ballot title and that voters cannot understand the issues they vote on. Put simply, this is a paternalistic law. "[T]here is no per se bar to paternalistic laws, but they

are highly suspect when they also burden speech." *Krislov v. Rednour*, 226 F.3d 851, 864 (7th Cir. 2000).

These are not the only reasons that Act 602 fails. Requiring this particular algorithm is not narrowly tailored to an asserted interest in "[p]rotecting voters from initiatives and referenda that are deficient, confusing, or misleading." Ex. 1 The Flesch-Kincaid Grade Level formula analyzes only sentence and word length to determine readability. It does not consider other important factors affecting clarity, such as whether the text uses words that are familiar to readers or whether the sentences are written in active voice. And it does not analyze whether the ballot title fairly presents the ballot measure—under Arkansas law, the ultimate question of whether the ballot title is "deficient." *See Paschall*, 699 S.W.3d at 357 (courts must ensure that a ballot title fairly presents the ballot measure by, among other things, "provid[ing] an accurate representation of the contents of the" measure). Ballot titles that do not accurately represent their respective measures could still pass the Reading-Level Requirement; but ballot titles that do accurately represent their respective measures may still fail the Reading-Level Requirement. Because the Reading-Level Requirement often works *against* the law's requirement that a ballot title fairly present its ballot measure, it is far from narrowly tailored to an interest in preventing deficient or misleading ballot titles.

Finally, even if the State has a compelling interest in "protecting voters from initiatives and referenda that are deficient, confusing, or misleading," that interest is already adequately served by the existing process, in which the Attorney General

approves only sufficiently worded ballot titles and the Arkansas Supreme Court provides additional review. For all of these reasons, Act 602 cannot survive strict scrutiny and is invalid on its face.

Intervenor-Plaintiffs acknowledge that it may not be literally *impossible* to write a ballot title to an eighth-grade reading level and to gain the Attorney General's approval. Plaintiffs say that they have done so and that, for this reason, Protect AR Rights has only an as-applied challenge to the law. *See* ECF No. 13 at 6. Even assuming that Plaintiffs have indeed satisfied the Reading-Level Requirement—which is not clear[14]—their point is incorrect. It does not consider the initiative process in its entire context. Not only must a sponsor write the ballot title to an eighth-grade reading level, but it must do so in a way that survives a state-court challenge for insufficient detail. It is hardly obvious that Plaintiffs' ballot measure would survive that challenge. The approval of a single ballot title that may or may not survive a later challenge does not rebut the significant evidence Intervenor-Plaintiffs present to show that Act 602's "unconstitutional applications are substantial when compared to its constitutional ones." *Moody*, 603 U.S. at 718. Indeed, if the Court accepts that Act 602 is totally irrational because it unreasonably discriminates between citizen-initiated measures and legislatively

---

[14] Act 602 says that the reading level must not be "above eighth grade." The Attorney General certified that Plaintiffs' measure is written at grade-level 8.5. *See* Arkansas Attorney General Opinion 2025-055, *available at* https://ag-opinions.s3.amazonaws.com/uploads/2025-033.pdf. It is unclear whether grade level 8.5 is "above eighth grade."

referred measures, there are *zero* constitutional applications of the law. *Cf.* Part I.D.

But even were there some question about whether Intervenor-Plaintiffs adequately support a facial challenge in Count One, they have certainly supported an as-applied challenge. As the proof shows, Protect AR Rights cannot satisfy the Reading-Level Requirement while also including everything that they reasonably believe essential to the ballot title—not to mention the detail needed to survive a later challenge. Standerfer Decl. ¶30. The Reading-Level Requirement severely burdens the way in which Protect AR Rights expresses itself, and it ensures that Protect AR Rights will not be able to present its proposal for political change to the voters. For example, it is crucial that the ballot title explain that Protect AR Rights' measure creates a "fundamental right"—but the word "fundamental" increases the reading score, preventing Protect AR Rights from complying with Act 602. *Id.* ¶28. And, assuming that the Flesch-Kincaid test can be met, drafting at an eighth-grade reading level while also adhering to other legal requirements for ballot titles is laborious and eats into precious time that could be used collecting signatures. *See id.* ¶22–27. For the reasons already discussed, the State cannot show that Act 602 is narrowly tailored to satisfy a compelling interest, or that it even survives lesser scrutiny.

## 2. The Canvassing Regulations violate Intervenor-Plaintiffs' First Amendment rights (Count Four).

Each of the Canvassing Regulations—the Crime-Notification Requirement (Act 218), the ID Requirement (Act 240), and the Reading Requirement (Act 274)—violates the First Amendment, both individually and cumulatively,

### a. *The Canvassing Regulations implicate the First Amendment.*

Each Canvassing Regulation affects "the communication of ideas associated with the circulation of petitions," and thus implicates the First Amendment, because each controls what canvassers must say and how they must interact with the public. *Miller*, 967 F.3d at 737. Canvassers wish to share a message of political change. They have a "right to freely engage in discussions concerning the need for that change." *Meyer*, 486 U.S. at 421. But each of these laws impedes those discussions. As canvassers are trying to convince the public of the merits of their proposal, Act 218 requires them to inform listeners that they might be committing a crime. The ID Requirement likewise impedes canvassers' speech by requiring them to do verification work that the State already does. In the past, canvassers would simply ask whether a potential signer was a registered Arkansas voter. If it turns out that the signer is mistaken about their status, any signature that cannot be matched with a registered voter will be invalidated through the verification process conducted by the Secretary of State's Office and county clerk's offices. *See* Ark. Code Ann. §§ 7-9-111(a)–(b), 7-9-126(c). Now, Act 240 forces canvassers to spend their time duplicating this verification work at the expense of advocacy for the measure. And the Reading Requirement completely dictates how canvassers must deliver

their message, replacing free discourse with a state-imposed method for discussing proposed political change.

Moreover, each of the Canvassing Regulations makes it less likely that a measure becomes a topic of statewide discussion by making it to the ballot. *See SD Voice*, 60 F.4th at 1078. As discussed below, each contributes to the depletion of canvassers and increases the time it takes to obtain a signature, thus making it unlikely that any initiative campaign can collect enough signatures.[15]

      b.   *The Canvassing Regulations are subject to strict scrutiny.*

Individually and collectively, the Canvassing Regulations create a severe burden because they "limit[] the number of voices that will convey a message on the ballot" and thus "make[] it less likely that [sponsors] will secure the number of signatures necessary to place the matter on the ballot." *SD Voice*, 60 F.4th at 1080.[16] They do so in at least two ways: by depleting the supply of available canvassers and by reducing the number of potential voters that canvassers are able to reach.

First, the Canvassing Regulations pose severe burdens on canvassers. The survey of canvassers that For AR Kids conducted reflects these burdens. The laws

---

[15] Intervenor-Plaintiffs acknowledge that the Reading Requirement may apply differently to different sponsors based on the length of their ballot title. It may be less burdensome to read the entirety of a short ballot title than a long one. Intervenor-Plaintiffs submit that there are few if any constitutional applications of the Reading Requirement given its interference with sponsors' and canvassers' speech. However, at the very least Intervenor-Plaintiffs have a valid as-applied challenge to the law, given the proof they have presented about the burden the law causes and the length of their measures.

[16] In *SD Voice*, these reasons caused the court to "harbor doubt" that the restriction at issue was "less than severe," but it did not decide that issue because the restrictions failed even rational-basis review. *SD Voice*, 60 F.4th at 1080. As explained in the next section, that path is available to the Court here as well.

negatively affect past volunteers' willingness to canvass: 19.1 percent of respondents probably will not canvass again because of the new laws, and an additional 29.3 percent are unsure whether they will. Stumpenhaus Decl. ¶15; *see also* Kopsky Decl. ¶26 (canvasser attrition rate is around 50 percent). Canvassers are also deterred by the criminal penalties associated with even an inadvertent violation of the new laws. Stumpenhaus Decl. ¶17. The Canvassing Regulations are particularly hard on For AR Kids' base of older canvassers, and even some dedicated volunteers have decided that they have canvassed their last if they must submit to these laws. Harrison Decl. ¶19–20. In short, the Canvassing Regulations mean that Intervenor-Plaintiffs will have fewer canvassers to help get their message out, thus impeding their ability to communicate with voters.

The Canvassing Regulations also significantly increase the time needed to interact with each individual voter and collect a signature. Reading For AR Kids' ballot title alone takes nearly three minutes—the entire amount of time it would take many canvassers to collect signatures in past cycles. Kopsky Decl. ¶21. Now collection generally takes at least six to ten minutes, and can take as much as thirty-five minutes. Ertman Decl. ¶14 (six to ten minutes); Harrison Decl. ¶13 (ten minutes); Taylor Decl. ¶15 (eight minutes); Thompson Decl. ¶14 (ten to fifteen minutes); Williams Decl. ¶13 (thirty-five minutes). The math is simple. If it takes three times as long to interact with each voter under the new laws, a canvasser's capacity to collect signatures is reduced in direct proportion. A day in which a canvasser could collect 50 signatures becomes a day in which they can collect fewer

34

than 20. *Cf.* Taylor Decl. ¶¶14, 22. The result is a twofold First Amendment violation. Impeding signature collection impedes voters' ability to sign a petition to express their view on a political matter and their desire to associate with the BQC. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194–95 (2010). It also reduces each canvasser's speech. Extra time spent fulfilling the state-mandated speech requirements to collect one signature means time not spent talking to other interested voters about the measure. Taylor Decl. ¶18. And voters are likely to disengage when they learn how long the process takes—a loss not only of a signature but also of an opportunity for the canvasser to convey their message. Thompson Decl. ¶16.

Because the Canvassing Regulations impose a severe burden on speech, the State must show that they are narrowly tailored to meet a compelling government interest. The State cannot make that showing. While none of the Acts contains a statement of purpose, and the State cannot invent post-hoc rationalizations for the challenges, presumably the State will assert the same intent to combat fraud and misrepresentation as stated in Act 602. Assuming these interests are compelling, the Canvassing Regulations are not narrowly tailored. There are ways other than the Reading Requirement to inform voters about the content of a ballot measure. Most notably, the ballot title is printed on the petition and voters who don't already feel adequately informed about the measure are free to read it. And to the extent that canvassers share information about a proposed ballot measure, the State already makes it a crime to "[k]nowingly misrepresent[] the purpose and effect of

the petition . . . for the purpose of causing a person to sign a petition." Ark. Code Ann. § 7-9-103(c)(6). Likewise, the Crime-Notification Requirement is redundant of existing requirements that petitions include information about criminal penalties, which "shall be in larger type than the other instructions." Ark. Code Ann. § 7-9-108(c). And the ID Requirement merely delegates to canvassers a function that the Secretary of State already performs—verification that signatures are valid. *See* Ark. Code Ann. § 7-9-111(a) (requiring the Secretary of State to "ascertain and declare the sufficiency or insufficiency of signatures" within thirty days). The State may not force sponsors and canvassers to spend their time conveying the State's preferred messages instead of their own speech—particularly when the new laws simply duplicate existing information and processes.

While Intervenor-Plaintiffs anticipate the State's arguments here, the State bears the burden to show that its restrictions satisfy strict scrutiny. *See Meyer*, 486 U.S. at 423 (holding that because speech protection is "at its zenith," "the burden that [the State] must overcome to justify this criminal law is well-nigh insurmountable"). Intervenor-Plaintiffs reserve the right to reply to any interest that the State might assert in an attempt to satisfy its burden.

          c. *The Canvassing Regulations fail even rational-basis review.*

The Canvassing Regulations are independently unconstitutional because none is "reasonable, nondiscriminatory, and [in furtherance of] an important regulatory interest." *Miller*, 967 F.3d at 740.

36

The Crime-Notification Requirement requires canvassers to inform potential signers that "petition fraud is a criminal offense." That notification tells voters nothing about what "petition fraud" is, how it can be avoided, or what the penalties for doing it are. It thus fails to serve any antifraud interest that the State may assert.

The Reading Requirement is likewise irrational. Voters may read the ballot title before encountering a canvasser; they may learn about it from conversations with others or from the media; they may discuss it directly with a canvasser; or they may educate themselves about it in numerous ways, without having to read it or have it read to them at a specified time.

Finally, neither the ID Requirement nor the Crime-Notification Requirement is non-discriminatory, as it must be to survive. *See Miller*, 967 F.3d at 740. Neither law applies to other forms of canvassing such as canvassing for new political parties or independent candidates. Presumably the same interests that the State asserts to justify these laws also apply to other forms of canvassing. There is no reason for the State to single out one disfavored form of petition circulation for additional regulation and restriction. That discrimination reveals these laws to be irrationally targeted at citizen initiatives. *Cf.* Part I.C *infra*.

3.  **The Fifty-County Requirement violates Intervenor-Plaintiffs' First Amendment rights (Count Twelve).**

Under Ark. Code Ann. § 7-9-126(e), sponsors must collect signatures from fifty Arkansas counties—two-thirds of the counties in the state—rather than the fifteen counties that the Arkansas Constitution requires. As a practical matter, this law

requires sponsors to divert canvassers from more highly populated counties, where they can speak with more voters more quickly, to smaller counties, where voters are more spread out and more time-consuming to reach. Cowles Decl. ¶¶5–13; Kopsky Decl. ¶34. By diverting canvassers to less populous counties where they will reach fewer voters, this law affects "the communication of ideas associated with the circulation of petitions." *Miller*, 967 at 737. The law interferes with speech by dictating *where* canvassers must communicate their message, without regard for the speaker's preferred venue or choice of audience. And it ensures that canvassers will convey their message to fewer people. *See* Cowles Decl. ¶12; Kopsky Decl. ¶34. The requirement also implicates the First Amendment for the independent reason that it makes it less likely that a sponsor will collect enough signatures to make the ballot. *See SD Voice*, 50 F.4th at 1078. Indeed, For AR Kids identifies this law as a key reason its measure failed to make the ballot in 2024. Kopsky Decl. ¶34.

The law's burden on speech is severe, not merely inconvenient. Sponsors have to spend significant time and resources building volunteer networks in remote areas, and canvassers must spend hours driving to far-flung counties, using time that they would otherwise spend talking to voters in areas closer to home. Cowles Decl. ¶12; Kopsky Decl. ¶34. There is no way around this burden. Without forfeiting many hours they could spend talking to voters, they cannot satisfy the law's requirement.

Moreover, it is doubtful that the State can articulate even an important interest needed to justify the law under relaxed scrutiny, to say nothing of whether the law survives strict scrutiny. Presumably the State would say that the law is meant to

ensure widespread support for initiatives. But it is unclear why *petitions* need widespread geographical support—every voter gets to vote on the measure when it reaches the ballot, and a measure must carry some degree of support throughout the state to succeed at the ballot box.

For example, Issue 2 of 2024, which carried by 55.8 percent, won the majority of the vote in sixty-nine of the state's seventy-five counties. *See* "Arkansas Issue 2 Election Results: Require Voted Approval for Casino Licenses," N.Y. Times, Nov. 21, 2024, *available at* https://tinyurl.com/4eza2eub. The general election, not the petitioning phase, is the indicator of whether a measure has broad support. Garnering widespread geographical support at the petitioning stage is not a legitimate interest. *Cf. Meyer*, 486 U.S. at 427 ("[T]he risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage than at the time of balloting."); *Buckley*, 525 U.S. at 213 (Thomas, J., concurring) ("I would think, at the very least, the State's interest in informing the public of the financial interests behind an initiative proposal is not compelling during the petitioning stage.").

Furthermore, the Fifty-County Requirement bears no logical connection to ensuring widespread geographical support. Even a measure that goes down to defeat will garner far more votes than signatures needed to satisfy the Fifty-County Requirement. Again, take Issue 2 of 2024. Though the measure passed, it performed poorly in some counties, none more so than Yell County, where it received only forty-two percent of the vote, amounting to approximately 2,682 votes. *See* "Arkansas Issue 2 Election Results," N.Y. Times, *available at*

https://tinyurl.com/4eza2eub. Meanwhile, the sponsor was required to collect signatures from 265 Yell County voters to qualify the measure for the ballot in the first instance. *See* 2024 Initiatives and Referenda Handbook at 68, *available at* https://tinyurl.com/uvr3z4rf. Obviously, whether the sponsor could collect signatures from 265 Yell County voters had nothing to do with whether Yell County as a whole supported the measure, which it clearly did not. Even if Issue 2 had received only *five* percent of the Yell County vote, it would have received more Yell County votes than sponsors were required to collect signatures.

Because the State has imposed a law that has nothing to do with a broad base of support and that simply impedes the speech and association of initiative sponsors and canvassers, the Fifty-County Requirement violates the First Amendment.

C.  **Intervenor-Plaintiffs are likely to show that the Crime-Notification Requirement (Act 218) and the ID Requirement (Act 240) discriminate on the basis of content under the First Amendment (Count Five).**

The Crime-Notification Requirement and ID Requirement are impermissible content-based restrictions on speech. *See Reed v. Town of Gilbert*, 576 U.S. 155 (2015). In *Reed*, in the course of striking down an ordinance regulating signs directing drivers to events, the Court explained that a speech regulation is content-based if it "draws distinctions based on the message a speaker conveys." *Id.* at 163. The Court elaborated that some such regulations are "obvious, defining regulated speech by particular subject matter," and others are "more subtle, defining regulated speech by its function or purpose." *Id.* When a speech regulation is content-based, strict scrutiny applies. *Id.* at 166.

As established above, each of the laws challenged here regulates speech. The Crime-Notification Requirement requires canvassers to deliver a specific, ill-defined message—"petition fraud is a criminal offense"—that distracts from canvassers' chosen message. And the ID Requirement interferes with canvassers' speech by requiring them to demand a potential signer show them ID at the expense of discussion about the proposed measure.

Moreover, each of these laws regulates speech on the basis of its content— namely, whether the speech at issue is advocating that Arkansans adopt a citizen-proposed measure altering current Arkansas law. Such laws do not apply to other forms of political petitioning that advance different speech content. For example, independent candidates for statewide office must present petitions containing the signature of 10,000 registered voters or three percent of qualified electors in the state based on the last gubernatorial election, whichever is less. *See* Ark. Code Ann. § 7-7-103. New political parties must present petitions containing the signature of 10,000 registered voters. *See* Ark. Code Ann. § 7-7-205. And independent presidential candidates must present petitions containing the signature of 5,000 registered voters. *See* Ark. Code Ann. § 7-8-302. Canvassers who collect signatures for any of these purposes are not required to inform signers that petition fraud is a crime and are not required to check the signer's ID.

None of these content-based regulations can survive strict scrutiny. *Cf. Reed*, 576 U.S. at 171 ("[I]t is the Town's burden to demonstrate that the Code's differentiation between temporary directional signs and other types of signs, such

41

as political signs and ideological signs, furthers a compelling governmental interest and is narrowly tailored to that end."). No compelling interest justifies imposing speech regulations on ballot initiatives but not on other forms of political canvassing, and such laws are not narrowly tailored to whatever interest the State may assert.

## D. Intervenor-Plaintiffs are likely to show that the Reading-Level Requirement (Act 602) is unconstitutionally discriminatory under the First Amendment and the Equal Protection Clause (Counts Two and Three).

The Reading-Level Requirement is another regulation of speech—it dictates how initiative sponsors must communicate their ideas—and it is also another content-based one, albeit for somewhat different reasons than the laws discussed in the previous section. The law not only singles out specific *content*—statewide ballot initiatives, not local ones—but it also discriminates against *speakers* because it applies only to citizen-initiated measures. When members of the General Assembly refer constitutional amendments, they enjoy the ability to speak however they wish without passing a formulaic speech requirement. "[C]ontent- and speaker-based rules" such as the Reading-Level Requirement raise suspicion that the government is regulating disfavored speech and thus are subject to heightened scrutiny. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563–67 (2011). It is doubtful that the State can articulate any legitimate basis at all for discriminating between citizen-initiated and legislatively referred measures, but even if it could, the law cannot survive heightened scrutiny for the reasons argued in Part I.B.1 *supra*.

42

Moreover, and independently, the Reading-Level Requirement violates the Equal Protection Clause. If the State's aim is to increase the readability of laws the voters will pass on at the ballot box, then there is no reason to require only one type of measure to be especially readable. The Reading Requirement's lack of rational basis dooms it on Equal Protection grounds as well as First Amendment grounds.

**E.    Intervenor-Plaintiffs are likely to show that the Crime-Notification Requirement (Act 218) unconstitutionally compels their speech under the First Amendment (Count Five).**

Canvassers want to make a specific point to potential signers: this is why you should support my measure and sign the petition. The Crime-Notification Requirement demands that canvassers interrupt this point to deliver the State's message: "Petition fraud is a criminal offense." The Crime-Notification Requirement deters signers from engaging—thus diminishing canvassers' speech—and even more perniciously, it directly undermines canvassers' own message because some potential voters will walk away when portentously and vaguely informed that engaging with the canvasser could lead to criminal penalties. Williams Decl. ¶¶16, 22–23.

Compelled notices of this sort are subject to strict scrutiny. For example, in *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988), the Court held that a state could not require charitable solicitors to disclose "the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." The Court found this requirement to be a content-based regulation of speech, subject to strict scrutiny, because "[m]andating

speech that a speaker would not otherwise make necessarily alters the content of the speech." *Id.* Even though the required information was purely "factual," its compelled disclosure "would clearly and substantially burden the protected speech." *Id.* at 798.

The Court has continued to adhere to this principle, most notably in *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755 (2018). There, the Court reaffirmed that "[b]y compelling individuals to speak a particular message, such notices alter the content of their speech." *Id.* at 766 (cleaned up). Applying this principle, the Court held that a state could not require licensed crisis pregnancy centers to "provide a government-drafted script about the availability of state-sponsored services, as well as the contact information for how to obtain them." *Id.*

Here, the Crime-Notification Requirement likewise burdens canvassers' speech and alters the content of their message. As in *Riley*, where "the disclosure will be the last words spoken as the donor closes the door or hangs up the phone," 487 U.S. at 800, the disclosure that "petition fraud is a criminal offense" will cause a potential signer to think twice about signing a petition and in many cases to disengage with the process completely. And the law alters the content of the canvassers' own message, which is to encourage a signature, not to deter it. It is thus subject to strict scrutiny.

For reasons already stated above, the State cannot demonstrate that the law is narrowly tailored to a compelling state interest. Assuming a compelling state interest in combatting fraud, the Crime-Notification Requirement is not narrowly

tailored to serve that interest. The State has numerous less speech-restrictive ways to combat fraud, including criminal prosecution of lawbreakers. *Cf. id.* at 800 ("[T]he State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements."). A verbal Crime-Notification Requirement is particularly unnecessary because petitions already must contain a written notice of the laws related to petition fraud. *See* Ark. Code Ann. § 7-9-108(c); PI Ex. 18. This notice, as opposed to a generic and uninformative warning about "petition fraud," better addresses the criminal penalties associated with fraudulent petition practices.

**F.    Intervenor-Plaintiffs are likely to show that the ID Requirement (Act 240) and the Reading Requirement (Act 274) are unconstitutionally vague (Counts Seven and Eight).**

The ID Requirement and Reading Requirement are unconstitutionally vague because they use imprecise language, making it unclear how canvassers and Intervenor-Plaintiffs are to comply and opening the door for arbitrary and discriminatory enforcement.

A law is unconstitutionally vague if it "forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application," or if it enables "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal citations and quotations omitted). In the First Amendment context, "the

[vagueness] doctrine demands a greater degree of specificity" where "the literal scope of the [] regulation is capable of reaching expression sheltered by the First Amendment." *Id.* at 1308–09 (internal quotation omitted).

As explained above, these laws implicate the First Amendment because they control what canvassers must say and how they must interact with the public. Canvassers wish to share a message of political change, and they have a "right to freely engage in discussions concerning the need for that change." *Meyer*, 486 U.S. at 421. However, the ID Requirement and Reading Requirement impede those discussions.

In restricting the First Amendment rights of sponsors and canvassers, the ID Requirement and Reading Requirement do not use sufficiently specific terminology or impose guardrails against arbitrary enforcement, as is required to pass constitutional muster. *See Stephenson*, 110 F.3d at 1308–09. Instead, the ID Requirement and Reading Requirement both use imprecise and undefined language that leaves "grave uncertainty" about the meaning and scope of their requirements. *Johnson v. United States*, 576 U.S. 591, 597 (2015).

Specifically, the ID Requirement requires a canvasser to "verify the identity" of a potential signer. However, the law provides no meaningful guidance on how a canvasser is supposed to comply with the verification requirement. The ID Requirement also leaves Intervenor-Plaintiffs unsure how to instruct canvassers to comply. Kopsky Decl. ¶¶30–32. For instance, if the name or address on a person's ID does not match what the person writes on the petition form, and the person

explains that they have recently moved or gotten married and not yet updated their ID to reflect their married name, the law provides no guidance on whether the canvasser may collect that person's signature.

The Reading Requirement precludes a canvasser from knowingly accepting a signature when (1) the ballot title has not been read aloud to the signer in the canvasser's presence or (2) the potential signer has not read the ballot title to herself in the canvasser's presence. However, the second part of the Reading Requirement provides no guidance on how long a canvasser must wait for a potential signer to read a measure, or whether a canvasser must desist from collecting the signature if the potential signer has spent an insufficient amount of time looking at the language of the ballot title. For instance, one canvasser informed a potential signer that she would need to read the entire ballot title in the canvasser's presence before signing the petition. Ertman Decl. ¶16. The signer looked at the form for about a minute and then said she had read it. *Id.* The canvasser was unsure of how thoroughly the signer read the ballot title but took the signer's word and allowed her to sign the petition. *Id.* The canvasser did not know whether she was supposed to do anything more to comply with the Reading Requirement. *Id.* The Reading Requirement also leaves Intervenor-Plaintiffs with no way of knowing how to instruct canvassers about how or whether to collect a signature from someone who wishes to read the measure silently. Kopsky Decl. ¶31.

Moreover, the vagueness of these requirements invites arbitrary enforcement. It exposes canvassers to arbitrary punishment and Intervenor-Plaintiffs to arbitrary

cancellation of the signatures they collect by virtue of the Secretary of State's enforcement authority under Act 273 of 2025.[17] The Secretary of State has total discretion to determine that a canvasser failed to verify a signer's identity or knowingly collected a signature in violation of the Reading Requirement and thus that all the canvasser's signatures should be thrown out.

In sum, the ID Requirement and Reading Requirement use imprecise and undefined language that leaves Intervenor-Plaintiffs unsure how to comply with their requirements. This renders them unconstitutionally vague even if one can imagine "some conduct that clearly falls within the provision's grasp." *Fayetteville Pub. Library v. Crawford Cnty., Ark.*, 760 F. Supp. 3d 811, 827 (W.D. Ark. 2024) (quoting *Johnson*, 576 U.S. at 602). For these reasons, the ID Requirement and Reading Requirement are void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

## G.   Intervenor-Plaintiffs are likely to show that the Pre-Collection Disclosure Requirement violates the First Amendment (Count Eleven).

The Pre-Collection Disclosure Requirement is doomed to fail under the Supreme Court's decision in *Buckley* and the Eighth Circuit's decision in *Dakotans for Health v. Noem*. Both cases struck disclosure requirements that are materially

---

[17] Act 273 of 2025 provides that the Secretary of State "shall not count signatures collected and witnessed by a canvasser if the Secretary of State finds by a preponderance of the evidence that the canvasser has violated Arkansas laws regarding canvassing, perjury, forgery, or fraudulent practices in the procurement of petition signatures or any provision of the Arkansas Constitution applicable to the collection of signatures on an initiative or referendum petition during the current election cycle." *See* PI Ex. 5, Act 273.

indistinguishable from the one at issue here, and the State can provide no better justification for the law than the ones the courts rejected in those cases.

In *Buckley*, the Supreme Court struck down a law requiring canvassers to wear a badge identifying themselves by name because it "discourages participation in the petition circulation process by forcing name identification without sufficient cause." *Buckley*, 525 U.S. at 200. The proof showed that the identification requirement induced harassment and caused fewer canvassers to associate with the campaign. *Id.* at 198. The requirement was problematic because it "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest"—that is, at the time they are delivering their political message *Id.* at 199. The State's purported interest in identifying lawbreaking canvassers was served just as well by a requirement that canvassers submit an identifying affidavit, which was "separated from the moment the circulator speaks." *Id.* at 198.

In *Dakotans for Health v. Noem*, the Eighth Circuit applied *Buckley* to strike down a law that required paid canvassers to disclose their name, residential address, and other identifying information. This information was publicly available during the canvassing period, and if the disclosure was incomplete or incorrect that canvasser's signatures were discounted. 52 F.4th at 384–85. Because the statute "compell[ed] disclosure of information to the government related to political activity," the court applied "exacting scrutiny"—that is, a test "just short of strict scrutiny" that asks whether there is a "substantial relation between the disclosure requirement and a sufficiently important governmental interest," and whether the

disclosure requirement is "narrowly tailored to the government's asserted interest." *Id.* at 389. Though the court credited the State's asserted interest in preventing corruption and protecting the integrity of the ballot-initiative process, it found that the disclosure provision was not narrowly tailored. *See id.* at 389–90. The law was flawed in that it applied only to paid canvassers, a requirement that "effectively thumbs its nose at both *Meyer* and *Buckley.*" *Id.* at 390. Just as problematic, the law created a "recipe for harassment" by requiring disclosure of information during the canvassing process, rather than after canvassing is complete. *Id.* at 391. As the court noted, the Supreme Court "has come down on the side of protecting the personal information of circulators during the circulation process." *Id.* As the court concluded, "[b]eing forced to publicly disclose one's phone number, email address, and residential address in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world," and the "required disclosure of this information *before circulation even commences* is not narrowly tailored to [the State's] interest." *Id.* at 392.

Arkansas's Pre-Collection Disclosure Requirement very plainly must fail in the face of these precedents. Requiring canvassers to disclose their residential address before circulation is chilling—particularly where, are here, history shows that the requirement indeed does expose paid canvassers to harassment. Guthrie Decl. ¶¶6–12. The Pre-Collection Disclosure Requirement is not narrowly tailored because the State may satisfy any interest in ballot integrity and fraud prevention through post-canvassing disclosure requirements that are already on the books. *See* Ark. Code

Ann. § 7-9-109(a). Intervenor-Plaintiffs are likely to succeed—indeed, almost certain to succeed—on this claim.

## II. Intervenor-Plaintiffs will suffer irreparable harm without a preliminary injunction.

Given that the laws challenged here all infringe upon Intervenor-Plaintiffs' First Amendment rights, Intervenor-Plaintiffs are irreparably harmed. "[L]oss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Because "a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights," "[i]n a First Amendment case . . . the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Nixon*, 545 F.3d at 690 (internal quotation marks omitted).

Though the infringement on Intervenor-Plaintiffs' First Amendment rights is enough to show irreparable harm, Intervenor-Plaintiffs will also be irreparably harmed in other ways unless the Court issues a preliminary injunction. Presently, Intervenor-Plaintiffs are losing volunteer canvassers because the volunteers find it too burdensome to comply with the new laws and feel their efforts will go to waste with the laws in place. Kopsky Decl. ¶26. Likewise, the new laws are making it difficult for Intervenor-Plaintiffs to raise funds. *Id.* ¶29.

The ultimate mark of irreparable harm is that Intervenor-Plaintiffs' campaigns will fail if the laws are not enjoined pending resolution of the merits. Protect AR Rights will not be able even to begin collecting signatures unless Act 602 is enjoined. And neither Intervenor-Plaintiff will be able to collect enough signatures if the other laws challenged here are not enjoined. As previously noted, For AR Kids needs to collect about 140,000 raw, unverified signatures before July 2026; in 2024, they collected half of that in a four-month period. Kopsky Decl. ¶¶8, 12. Even with the old laws in place, Intervenor-Plaintiffs would need approximately eight months to collect signatures, given that they again intend to run a mostly (though not solely) volunteer campaign. But as should be clear from the discussion above, those timelines are entirely unrealistic under the new laws, where the population of canvassers is diminished and canvassers can collect a fraction of the number of signatures they were able to collect under the old laws. *See* Ertman Decl. ¶13–14 (ten to fifteen signatures per hour has become two); Taylor Decl. ¶14 (ten signatures per hour has become two); Thompson Decl. ¶13 (ten to twenty signatures per hour has become three); Williams Decl. ¶12 (twelve to fifteen signatures per hour has become less than one). So really what Intervenor-Plaintiffs need is *years* to collect the requisite number of signatures while complying with the laws challenged here— an obvious impossibility.

### III. The balance of harms favors Intervenor-Plaintiffs and the public interest favors relief.

The balance of the equities favors Intervenor-Plaintiffs, particularly given the infringement on their First Amendment rights. *See Troutman*, 662 F.3d at 488. If a

preliminary injunction is not granted, Intervenor-Plaintiffs will be restrained in their ability to engage in political speech and association. Defendants have no legitimate interest in enforcing a statute that violates the First Amendment. As Intervenor-Plaintiffs have previously established, Defendants have alternative means of addressing their interests and will not be harmed by a preliminary injunction. Moreover, the public interest favors the protection of First Amendment rights over the suppression of speech.

## Conclusion

For the reasons stated herein, Intervenor-Plaintiffs request that their motion for preliminary injunction be granted. Intervenor-Plaintiffs ask the Court to issue an order that, pending a decision on the merits of Intervenor-Plaintiffs' claims, preliminarily enjoins Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the following statutes and acts of the Arkansas General Assembly:

     i.    The Reading-Level Requirement, Act 602 of 2025;

    ii.    The Canvassing Regulations, Acts 218, 240, and 274 of 2025;

    iii.    The Pre-Collection Disclosure Requirement, Ark. Code Ann. § 7-9-601(a)(2)(C); and

    iv.    The Fifty-County Requirement, Ark. Code Ann. § 7-9-126(e).

Furthermore, Intervenor-Plaintiffs request that, insofar as the case has not been resolved on the merits before Defendant Jester would otherwise be required to count and verify signatures for certification of initiative and referendum petitions

for inclusion on the 2026 ballot, the Court issue an order requiring Defendant Jester, his respective agents, officers, employees, and successors, and all persons acting in concert with him, to count and verify any otherwise legally valid signatures that do not comply with the Canvassing Regulations, Acts 218, 240, and 274 of 2025; with the Pre-Collection Disclosure Requirement, Ark. Code Ann. § 7-9-601(a)(2)(C); or with the Fifty-County Requirement, Ark. Code Ann. § 7-9-126(e).

Dated: July 24, 2025                    Respectfully submitted,

*/s/ John C. Williams*
JOHN C. WILLIAMS (ABN 2013233)
SHELBY H. SHROFF (ABN 2019234)
Arkansas Civil Liberties
        Union Foundation, Inc.
904 W. 2nd St.
Little Rock, AR 72201
(501) 374-2842
john@acluarkansas.org
shelby@acluarkansas.org

*-and-*

PETER SHULTS (ABN 2019021)
AMANDA G. ORCUTT (ABN 2019102)
SHULTS LAW FIRM LLP
200 West Capitol Avenue, Suite 1600
Little Rock, Arkansas 72201-3621
(501) 375-2301
pshults@shultslaw.com
aorcutt@shultslaw.com

*-and-*

Ben Stafford*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101

54

Telephone: (206) 656-0177
bstafford@elias.law
*Pro Hac Vice application forthcoming*

*Counsel for Intervenor-Plaintiffs*
*Protect AR Rights and For AR Kids*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, I filed the foregoing on the CM/ECF system, which will serve notice on counsel for all parties.

I further certify that on July 24, 2025, I emailed the foregoing to Senior Assistant Attorneys General Jordan Broyles and Ryan Hale for service on Defendant Attorney General Tim Griffin. I will ensure that Defendant Griffin is served as required under Fed. R. Civ. P. 4 with the Complaint in Intervention, Intervenor-Plaintiffs' Motion for Preliminary Injunction, and Intervenor-Plaintiffs' Brief in Support of Motion for Preliminary Injunction.

/s/ *John C. Williams*
John C. Williams