**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**LEAGUE OF WOMEN VOTERS OF ARKANSAS;
SAVE AR DEMOCRACY; BONNIE HEATHER
MILLER; and DANIELLE QUESNELL**                    **PLAINTIFFS**

**and**

**PROTECT AR RIGHTS; and FOR AR KIDS**        **INTERVENOR-PLAINTIFFS**

**V.**                **CASE NO. 5:25-CV-5087**

**COLE JESTER, in his Official Capacity
as Secretary of State of Arkansas**                    **DEFENDANT**

**and**

**TIM GRIFFIN, in his Official Capacity
as Attorney General of Arkansas**                **INTERVENOR-DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

## TABLE OF CONTENTS

I. BACKGROUND ........................................................................................................ 1

   A. Arkansas's Initiative and Referendum Process................................................ 2

   B. The Challenged Laws ...................................................................................... 6
      1. Act 602: Eighth Grade Reading Level Requirement................................ 7
      2. Residency and Domicile (Act 453) Requirements ................................. 10
      3. Pre-Collection Disclosure Requirement ................................................ 11
      4. Disqualifying Offenses ......................................................................... 13
      5. Commission/Pay-Per-Signature Ban..................................................... 15
      6. Fifty-County Requirement ..................................................................... 15
      7. The Canvassing Regulations (Acts 218, 240, and 274) ....................... 16
      8. Act 241: Post-Collection Affidavit Requirement ................................... 21
      9. Act 241: "Cool Off" Period .................................................................. 23
      10. Publication Cost Reimbursement ......................................................... 24

II. LEGAL STANDARD ............................................................................................ 25

III. DISCUSSION ...................................................................................................... 25

   A. Jurisdictional Issues....................................................................................... 25
      1. Act 602: Standing and Mootness.......................................................... 26
      2. Pre-Collection Disclosure Requirement: Standing ............................... 29
      3. Act 274: Standing ................................................................................ 30
      4. Publication Cost Reimbursement Requirement: Standing and Ripeness.......... 31

   B. Likelihood of Success on the Merits .............................................................. 33
      1. Act 602: Eighth Grade Reading Level Requirement.............................. 36
      2. Residency and Domicile (Act 453) Requirements ................................. 42
      3. Pre-Collection Disclosure Requirement ................................................ 44
      4. Disqualifying Offenses ......................................................................... 48
      5. Commission/Pay-Per-Signature Ban..................................................... 50
      6. Fifty-County Requirement ..................................................................... 51
      7. The Canvassing Regulations (Acts 218, 240, and 274) ....................... 52
      8. Act 241: Post-Collection Affidavit Requirement ................................... 59
      9. Act 241: "Cool Off" Period .................................................................. 61
      10. Publication Cost Reimbursement ......................................................... 64
      11. Non-First Amendment Challenges ........................................................ 66

   C. Remaining Preliminary Injunction Factors ...................................................... 71

IV. CONCLUSION ..................................................................................................... 74

*"It's not the voting that's democracy; it's the counting."*
–Tom Stoppard, *Jumpers* (1972).

## I.  BACKGROUND

"Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). To that end, the First Amendment to the United States Constitution forbids laws "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." This reflects the American people's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

This constitutionally protected "core political speech need not center on a candidate for office." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). The First Amendment's protections "extend equally to issue-based elections." *Id.* Although the Constitution does not require states to permit ballot initiatives and referendums, where a state has such a process, "the circulation of [initiative and referendum] petition[s] involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). This core political speech is protected by the First Amendment.

Plaintiffs and Intervenor-Plaintiffs are petition sponsors and their members. They intend to gather signatures for ballot measures in hopes of placing them on the 2026 general election ballot. They challenge a number of Arkansas laws regulating the signature gathering process and move to have those laws preliminarily enjoined. (Docs.

20 & 24).[1] The Court held a hearing on their Motions on September 30, 2025. For the reasons that follow, the Motions are **GRANTED IN PART AND DENIED IN PART**.

### A. Arkansas's Initiative and Referendum Process

Under Article 5, § 1 of the Arkansas Constitution, the people of Arkansas "reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill." Before Arkansans can exercise their power at the polls, someone must successfully petition to get the initiative or referendum on the ballot.[2] The rest of this section describes the existing, unchallenged laws surrounding the petition process.

Article 5, § 1 sets out the number of electors who must petition for a measure to appear on the ballot: six percent of legal voters for referendums, eight percent for laws, and ten percent for constitutional amendments.[3] And the petition must bear "the signature of not less than one-half of the designated percentage of the electors" from "at least fifteen" of the State's seventy-five counties. *Id.* For the 2026 election, a petition sponsor must gather 90,704 signatures to qualify an initiated constitutional amendment for the

---

[1] The Court has reviewed Plaintiffs' and Intervenor-Plaintiffs' briefs in support (Docs. 21 & 25), Defendant and Intervenor-Defendant's combined response (Doc. 39), Plaintiffs' and Intervenor-Plaintiffs' replies (Docs. 42 & 43), and the many exhibits submitted by the parties.

[2] Initiatives are measures referred directly by the people to the people. Referendums are votes by the people on whether to veto a law passed by the General Assembly.

[3] The number of legal voters is equal to "[t]he total number of votes cast for the office of Governor in the last preceding general election." Ark. Const. art. V, § 1.

ballot. Ark. Sec'y of State, 2024 Initiatives and Referendum Handbook 4 (2023) [hereinafter Handbook].[4]

Prior to gathering signatures, a petition sponsor must submit the full text of the measure, a proposed popular name, and a proposed ballot title to the Attorney General and receive his certification for the popular name and ballot title. If the popular name and ballot title are rejected, the sponsor can amend and resubmit them. The Attorney General can also substitute and certify "a more suitable and correct ballot title." Ark. Code Ann. § 7-9-107(d)(1). "The ballot title must be an impartial summary of the proposed amendment, and it must give voters a fair understanding of the issues presented and the scope and significance of the proposed changes in the law." *Wilson v. Martin*, 2016 Ark. 334, at 7 (2016). It "must be free from misleading tendencies that, whether by amplification, omission, or fallacy, thwart a fair understanding of the issue presented," "[i]t cannot omit material information that would give the voters serious ground for reflection," and it must be "complete enough to convey an intelligible idea of the scope and import of the proposed law." *Id.*

After the Attorney General approves a ballot title and popular name but before beginning circulation of a statewide petition, "the sponsor shall file a printed petition part with the Secretary of State in the exact form that will be used for obtaining signatures." Ark. Code Ann. § 7-9-104(c)(2).

Petitions are divided into "petition parts," which are the actual packets of paper that people sign. Each petition part contains one signature page, and each signature page

---

[4]     https://www.sos.arkansas.gov/uploads/elections/2023-2024_I__R_Handbook_-_October_2023.pdf [https://perma.cc/KPL5-SWSB].

contains ten signature lines. Handbook at 6; Pl.'s Ex. 15. Each signer must sign and print their name and list their date of birth, home address, and date of signing. Ark. Code Ann. § 7-9-104(a). The signature page must be attached to: a page of "Instructions to Canvassers and Signers" which lists qualifications to sign the petition and petition-related crimes; and the proposed measure's full text, popular name, and ballot title. Pl.'s Ex. 15; Ark. Code Ann. § 7-9-108(c). The list of petition-related crimes "shall be in larger type than the other instructions." Ark. Code Ann. § 7-9-108(c). The signature page and the materials that must be attached thereto constitute one petition part. All the signatures on a petition part must be from the same county. *Id.* § 108(d). At the bottom of each signature page, canvassers must complete an affidavit, attesting

> that each of the foregoing persons signed his or her own name to this sheet of the petition in my presence. To the best of my knowledge and belief, each signature is genuine and each signer is a registered voter of the State of Arkansas, [in the County listed at the top of the petition]. At all times during the circulation of this signature sheet, an exact copy of the popular name, ballot title, and text was attached to the signature sheet. My current residence address is correctly stated below.

*Id.* § 109(a). The canvasser must sign the affidavit in the presence of a notary, list their home address, and indicate whether they are paid or volunteer. *Id.* The notary must verify the identity of the canvasser and personally witness their signature before notarizing the affidavit. *Id.*; *id.* § 103(c)(8). Because the law requires a notarized affidavit on every signature page, and each signature page contains ten signatures, at least 9,071 of these affidavits must be completed to qualify one constitutional amendment for the ballot.

For initiative petitions on statewide measures, sponsors have until four months before a general election to get enough signatures and submit their petitions to the Secretary of State. Ark. Const. art. V, § 1. Referendum petitions, on the other hand, must

"be filed with the Secretary of State not later than ninety days after the final adjournment of the session at which such Act was passed." *Id.*

Once a sponsor submits a petition, the Secretary of State must decide whether the petition is "sufficient" in terms of the ballot title, popular name, and number of signatures. Ark. Const. Art. 5, § 1; *Armstrong v. Thurston*, 2022 Ark. 167, at 6–7 (2022). Counting signatures is a two-step process. For the first step, the "initial" or "facial" count, Arkansas law requires the Secretary to exclude signatures or whole petition parts and all the signatures contained therein for any number of reasons ranging from technical to nefarious. *See* Ark. Code Ann. § 7-9-126(b)(5)(B) ("A petition part and all signatures appearing on the petition part shall not be counted . . . if . . . [t]he canvasser verification . . . [l]acks a legible notary signature or a legible notary seal."); *id.* § 126(c)(2) (directing officials not to count "[a] signature that is obviously not that of the purported petitioner"). To survive this step, the petition—minus excluded signatures—must contain "the designated number of signatures required by the Arkansas Constitution and statutory law in order to certify the measure for the election ballot." *Id.* § 126(d).

Step two is verifying the remaining signatures. The Secretary of State's office checks that each signature's information matches a registered voter of the listed county of Arkansas. If the verified signatures after step two fall short of the total needed to qualify the measure but are equal to at least seventy-five percent of the total and seventy-five percent of the number required from at least fifteen counties, the Secretary must permit the sponsor a thirty-day "amendment" or "cure" period to collect additional signatures. Ark. Const. art. 5, § 1. "During a typical initiative campaign, anywhere from thirty to forty-

five percent of signatures are rejected as invalid" by the Secretary of State. (Doc. 25, p. 5).

The Secretary of State's sufficiency determination is not final, however. The Arkansas Supreme Court has original and exclusive jurisdiction to review his decision. Ark. Const. art. 5, § 1. The Arkansas Supreme Court reviews the Secretary's "three types of sufficiency determinations," (1) the sufficiency of the ballot name and title, (2) the facial sufficiency of the petition (step one above), and (3) the sufficiency of the petition during and after signature verification process (step two above). *Cowles v. Thurston*, 2024 Ark. 121, at 3 (2024). The Court does not defer to the sufficiency determinations of the Secretary of State or, with respect to ballot titles and popular names, the Attorney General. *Paschall v. Thurston*, 2024 Ark. 155, at 3 n.1 (2024).

If a ballot measure survives the process above, it is placed on the ballot. A proposed constitutional amendment must secure "a majority of all registered voters eligible to vote upon the constitutional amendment." Ark. Const. art. 5, § 1. Other measures (initiated laws and referendums) must secure "a majority of the votes cast upon such measure." *Id.*

## B. The Challenged Laws

Since 2013, the Arkansas General Assembly has enacted a series of increasingly onerous laws regulating the petition process. That year, the General Assembly found that there "were widespread instances of apparent fraud, forgery, and false statements in the signature-gathering process" preceding the 2012 general election. 2013 Ark. Act 1413, sec. 1(a)(6). This finding appeared to be based on the high rates of facial invalidation of signatures. *Id.* sec. 1(a)(4)–(5). Concerns about the 2012 petition process prompted investigations, but no petition fraud charges were filed. (Doc. 39, p. 3; *To Amend the Law*

6

*Concerning Initiative and Referendum Petitions: Hearing on S.B. 207, S.B. 208, and S.B. 211 Before the H. Comm. on State Agencies and Governmental Affs.*, 95th Gen. Assemb., at 2:44:55–2:45:35 (Feb, 17, 2025) [hereinafter *Hearing*][5]). Defendants assert that "[m]any of the challenged laws were enacted as direct responses to sponsors and canvassers acting in bad faith." (Doc. 39, p. 4).

Arkansas law permits both statewide and local petitions, and some of the challenged laws apply to both, while others apply only to statewide petitions. Local petitions are reviewed by local officials who are not defendants here. The challenged laws and the relevant facts and evidence for each are described below in the order they occur in the petition process.

### 1. Act 602: Eighth Grade Reading Level Requirement

A petition sponsor cannot begin to collect signatures until a popular name and ballot title have been approved by the Attorney General. Under Act 602, in addition to the other requirements a ballot title must meet, "[t]he Attorney General shall not certify a proposed ballot title with a reading level above eighth grade as determined by the Flesch-Kincaid *Grade Level formula* as it existed on January 1, 2025." The Flesch-Kincaid Grade Level ("FKGL") formula assigns a "grade level" to a piece of writing based on word and sentence length.[6] It disfavors long words and long sentences. It is mathematically impossible for a piece of writing with an average of two syllables per word to score below 8.4. The First Amendment, for example, has an FKGL of 9.6—above eighth grade by any

---

[5]    https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/%2020250217/-1/30700.

[6] FKGL = 0.39 * (total words / total sentences) + 11.8 * (total syllables / total words) – 15.59.

definition. And the FKGL does not have an upper bound; scores can reach well above 12, the highest grade level in U.S. schools.

Defendants have presented evidence in the form of a medical journal article that "[t]he average American adult reads at an eighth-grade level." (Doc. 39-8, pp. 1–2). They assert that Act 602 protects Arkansans from being "bamboozled by ballot titles that use language that is technically true but nevertheless 'deficient, confusing, or misleading' to a majority of Arkansas voters." (Doc. 39, pp. 34–35 (quoting Act 602)). And they tie Act 602 to past election cycles, namely 2016, when the Arkansas Medical Marijuana Amendment, with an FKGL of 18.1, was placed on the ballot and passed into law by a majority of Arkansans. *Id.* Act 602 does not apply to legislatively referred amendments placed on the ballot by the General Assembly. In 2024, the one legislatively referred amendment on the ballot had a ballot title with a reading level of 19.3. For the next election, the General Assembly has referred an amendment with a ballot title that scores a 19.6. (Doc. 43, p. 37).

Only one plaintiff, Protect AR Rights, challenges Act 602. The other petition sponsors in this litigation were either able to comply with Act 602 or received the Attorney General's approval for their ballot titles before Act 602 went into effect. Jennifer Standerfer, an attorney and the primary drafter of Protect AR Rights' proposed amendment, struggled to comply with Act 602's requirements. Her proposed ballot titles were twice rejected by the Attorney General because of their reading level. Ark. Att'y Gen., Opinion No. 2025-037, at 5; Ark. Att'y Gen., Opinion No. 2025-046, at 2.[7]

---

[7] https://ag-opinions.s3.amazonaws.com/uploads/2025-046.pdf [https://perma.cc/UXM4-K5YJ];                https://ag-opinions.s3.amazonaws.com/uploads/2025-037.pdf [https://perma.cc/NB69-LW2A].

On July 24, 2025, when Protect AR Rights filed its Motion for Preliminary Injunction, its third request for the Attorney General to approve a ballot title was pending. Four days after Protect AR Rights moved for a preliminary injunction, the Attorney General granted its request and certified the ballot title which was submitted with an FKGL of 9.2 but, with "a few minor changes" by the Attorney General, had an FKGL of 8.9. (Doc. 43-2, p. 2). The Attorney General noted that "in light of the significance of the subject matter undertaken and the potential complexity and far-reaching effects of this proposal," as well as potential lurking ambiguities in the title, Protect AR Rights should beware that its proposal was "susceptib[le] to a successful ballot-title challenge." *Id.* at p. 4.

The Arkansas Supreme Court has not determined whether "a reading level above eighth grade" includes an FKGL greater than 8 but less than 9, although the Attorney General has, in the above opinion and in this litigation, interpreted Act 602 to "prohibit [him] from certifying a ballot title with a ninth-grade reading level or higher." (Doc. 39, p. 34). In any event, Protect AR Rights may now begin collecting signatures on its proposed amendment but remains concerned about the post-collection sufficiency review.

Although none of the plaintiffs in this litigation are currently circulating a referendum petition, there is evidence in the record demonstrating the special difficulty of complying with Act 602 in the referendum context. Referendums are citizen-initiated vetoes of laws passed by the General Assembly, laws which are sometimes complex. Under Act 602, referendum petition sponsors must craft ballot titles that accurately describe the scope and significance of vetoing those laws—but they can only use simple words and short sentences to describe them. One canvasser who worked on a referendum petition for the LEARNS Act described the problem as follows:

> The LEARNS Act was over 100 pages long and contained complex education policy changes. Getting a ballot title approved for the referendum was one of the most challenging parts of the process. The final approved title was more than 8,000 words—over 16 pages long.

(Doc. 20-6, ¶ 4). Because the FKGL formula requires the use of more but shorter words and more but shorter sentences to describe even relatively straightforward legal changes,[8] extremely long ballot titles seem likely to become the norm for citizen initiatives.

## 2. Residency and Domicile Requirements

Once a sponsor has completed all the prerequisites to circulating a petition, it can begin sending out canvassers to collect signatures. Under Arkansas Code § 7-9-103(a)(6), all canvassers must be residents of Arkansas. Under Act 453, paid canvassers circulating statewide ballot petitions must also be domiciliaries of Arkansas. Domicile requires actual residence in a place plus the intent to make that place one's fixed and permanent abode. *Leathers v. Warmack*, 341 Ark. 609, 618 (2000). Thus, out-of-state college students attending the University of Arkansas, for example, could not serve as paid canvassers on statewide petitions.

Defendants say that Act 453 was enacted in response to an incident in 2024 where sponsors attempted to evade the residency requirement by housing paid canvassers from out of state in hotels and listing the canvassers' address as the hotel. (Doc. 39, pp. 5–6). The canvassers there were circulating local petitions, which are not included in Act 453's coverage. *See* Doc. 39-5.

Plaintiffs have presented evidence that there are out-of-state canvassers who would like to canvass in Arkansas but are prevented from doing so by the residency and

---

[8] For example, the successful 2010 amendment entitled "Amending the Arkansas Constitution to provide for a constitutional right to hunt, fish, trap, and harvest wildlife." scores an FKGL of 12.3. (Doc. 24-7, ¶ 15).

domicile requirements. For example, The People, a nonprofit based in Michigan, has "volunteers who are interested in going to Arkansas . . . to circulate petitions" but are prevented from doing so by the residency requirement. (Doc. 20-11. ¶ 8). Kellie Cobb, a resident of Fort Smith who served as a volunteer canvasser in the 2024 election cycle, noted that in a border town like Fort Smith many Oklahoma residents were interested in canvassing but were prevented from doing so because they lived in Oklahoma, "even if they were just minutes away." (Doc. 20-10, ¶ 12). And Amy Cruz, an Arkansas resident and professional canvasser,[9] asserts that "[m]ost professional canvassers are not Arkansas residents. Limiting canvassers to Arkansas residents prevents companies from bringing in skilled canvassing professionals." (Doc. 20-4, ¶ 10).

Plaintiffs have not presented quantitative evidence about the effect these laws have on the number of available canvassers, and Plaintiffs' counsel conceded at the hearing that, before and after the residency requirement was imposed in 2021, "the numbers [of canvassers] are pretty much the same, it's just that they are all from Arkansas and they're just not paid."

### 3. Pre-Collection Disclosure Requirement

Once a sponsor has identified willing and able paid canvassers, it must "[p]rovide a complete list of all paid canvassers' names and current residential addresses to the Secretary of State" and "[s]ubmit a copy of the signed statement provided by the paid canvasser under subdivision (d)(3) [requiring a canvasser to affirm that they have not been found guilty of a disqualifying offense]." Ark. Code Ann. § 7-9-601(a)(2)(C)–(D).

---

[9] Ms. Cruz is prevented from working as a paid canvasser in Arkansas due to a felony conviction when she was 15, but she has worked as a paid canvasser in other states and has worked on "paid signature collection efforts in Arkansas in a non-canvassing role." (Doc. 20-4, ¶¶ 2–3).

These records are subject to public disclosure under Arkansas's Freedom of Information Act ("FOIA"). Signatures obtained before filing or without filing the above disclosures "shall not be counted by the Secretary of State . . . for any purpose." *Id.* § 601(f). Canvasser lists must also be kept up to date, and all ten signatures on a petition part shall not be counted if the canvassers disclosures "were not submitted or updated by the Sponsor to the Secretary of State before the petitioner signed the petition." *Id.* § 126(b)(4)(A). It's a Class A misdemeanor for a canvasser or sponsor to "[a]ccept[ ] or pay[ ] money or anything of value for obtaining signatures on a petition" knowing that the "canvasser's name or address is not included on the sponsor's list filed with the Secretary of State." *Id.* § 103(c)(5).[10]

In the 2024 election cycle, the Family Council, a "conservative education and research organization based in Little Rock," successfully FOIA requested paid canvasser records for the Arkansas Abortion Amendment and the Arkansas Marijuana Amendment and posted the names and hometowns of these canvassers online. One paid canvasser whose name was published interpreted this as "a veiled threat and form of intimidation." The publication of her name and hometown gave her "a great deal of concern for [her] safety," and she will "seriously reconsider" canvassing this cycle if doxxing remains a threat. (Doc. 20-5, ¶ 5). Another paid canvasser who lived with her disabled mother and brother at the time her name was posted, also feared for her and her family's safety, noting that "[i]t would not have been hard for people to discover my home address and phone number knowing my name and hometown." (Doc. 24-15, ¶ 9). Even before she was

---

[10] As discussed below, violations of the election laws, including this one, would disqualify the person from ever acting as a paid canvasser in the future.

doxed, she had experienced counter-protestors "writ[ing] down canvassers' license plate numbers, tak[ing] [their] photographs, and follow[ing] [them] home." *Id.* ¶ 10. Afterward, "[she] felt [she] must always be looking over [her] shoulder." This experience not only "threaten[ed] [her] physical safety" but also "had a negative impact on [her] mental health." *Id.* ¶ 12.

Defendants assert that these disclosures must occur pre-collection because "acquiring this information on the frontend . . . allows the Secretary of State to identify whether any paid canvassers have a disqualifying offense before collecting signatures." (Doc. 39, p. 44). When pressed at the hearing, however, Defendants' counsel could not say whether the Secretary's office does in fact check canvassers' criminal histories "on the frontend," or if that check only occurs on the backend to invalidate signatures. Even if the Secretary conducts these criminal history checks on the frontend, nothing in the law requires him to inform the petition sponsor that one of their canvassers is disqualified, and counsel did not know what the Secretary would do in that situation. Counsel blamed his lack of knowledge on the newness of the laws—but the Pre-Collection Disclosure Requirement has been in effect since 2013. 2013 Ark. Act 1413.

### 4. Disqualifying Offenses

As stated above, paid canvassers must submit a signed statement that they have not been convicted of a disqualifying offense to the petition sponsor, who must then submit that statement to the Secretary of State. Ark. Code Ann. § 7-9-601(a)(2)(D), (d)(3). Signatures collected in violation of this requirement are not counted for any purpose. *Id.* § 601(f).

In 2013 when the Disqualifying Offenses Provision was first enacted, the list of disqualifying offenses was limited to "violation[s] of the election laws, fraud, forgery, or

identification theft." 2013 Ark. Act 1413, sec. 21, § 7-9-601(b)(3). In 2015, felonies generally were added.  2015 Ark. Act 1219, sec. 4, § 7-9-601(d)(3). And in 2021, twelve additional categories of crimes were added, including "violation[s] of the drug and narcotics laws," "[t]respass," "[v]andalism," and "simple theft or larceny." 2021 Act 951, sec. 6, § 7-9-601(3)(ii).

There is no time limit on the disqualifying effect of these convictions, so an Arkansan with a juvenile felony conviction from thirty years ago is barred from acting as a paid canvasser, *see* Doc. 20-4, ¶¶ 1–3, as is an Arkansan with a sealed misdemeanor shoplifting conviction from 1998 and a sealed misdemeanor marijuana possession conviction from 2002, *see* Doc. 20-8, ¶¶ 1–4. Petition sponsors are therefore prevented from hiring these and other Arkansas residents who would otherwise be interested in paid canvassing. And many of the other challenged laws come with criminal penalties that could permanently disqualify canvassers who are convicted of violating them. While these would-be paid canvassers are barred from collecting signatures on initiative or referendum petitions, they can be paid to canvass for independent candidates, Ark. Code Ann. § 7-7-103(b)(3)(C), or new political parties seeking ballot access, *id.* § 205(a). *See* Doc. 20-8, ¶ 5.

Defendants assert that disqualifying people from acting as paid canvassers based on their criminal histories protects Arkansans and their personal information from criminal canvassers while still allowing those criminal canvassers to engage in petition-related speech (and collect Arkansans' personal information) as volunteers, without the "perverse monetary incentives." (Doc. 39, p. 30).

### 5. Commission/Pay-Per-Signature Ban

Arkansas law also prohibits payment "on a basis related to the number of signatures obtained." Ark. Code Ann. § 7-9-601(g)(1). "A signature obtained in violation of this subsection is void and shall not be counted," and "[a] violation under this subsection is a Class A misdemeanor." *Id.* § 601(g)(3)–(4).

According to one professional canvasser, ""[m]ost professional canvassers are paid by the signature." (Doc. 20-4, ¶ 10). Therefore, Plaintiffs assert that professional canvassers "will not come to States where canvassers are paid by the hour." There is, however, no evidence in the record to that effect. But Defendants' evidence for the contention that pay-per-signature is "directly linked to high levels of fraud in the signature-gathering process" is conclusory at best. (Doc. 39, pp. 6–7 (quoting Jocelyn Friedrichs Benson, *Election Fraud and the Initiative Process: A Study of the 2006 Michigan Civil Rights Initiative*, 34 Fordham Urb. L.J. 889, 923 (2007)).[11] There are no similar restrictions on how third parties or independent candidates pay their campaign employees.

### 6. Fifty-County Requirement

Under the Arkansas Constitution, a successful petition must bear "the signature of not less than one-half of the designated percentage of the electors" from "at least fifteen" of the State's seventy-five counties. Ark. Const. art. V, § 1. The General Assembly legislatively raised this requirement to fifty counties in 2023. Ark. Code Ann. § 7-9-126(e). Organizers who worked the 2024 cycle blame the fifty-county requirement for their failure

---

[11] This law review article relies for this assertion on an online article by Willamette professor Richard J. Ellis for which the link is now broken. The Court was therefore not able to locate the primary source for this claim. Defendants also rely on an NPR article where the head of a canvassing organization and the head of the national association of election officials both reported that "[p]aying canvassers per hour instead of for every signature is a policy that goes a long way in preventing fraud." (Doc. 39-6).

to qualify their measures. It "created a logistical nightmare for the campaign. It was difficult to ensure [they] had sufficient volunteers in the smaller and more remote counties." Most volunteer canvassers "work full-time jobs and were limited to canvassing on nights and weekends. Sometimes they did not have enough time to travel to distant counties." But even when they did, they would lose half their canvassing time traveling. "If they had been able to spend the entire day canvassing closer to home in a more populated part of the state, they could have collected many more signatures." (Doc. 24-14, ¶¶ 11–12). The fifty-county requirement forces sponsors "to collect signatures in smaller, remote counties when they could have collected far more signatures by canvassing in higher-density areas." (Doc. 24-6, ¶ 34).

### 7.  The Canvassing Regulations (Acts 218, 240, and 274)

In addition to the hoops sponsors and canvassers must jump through before they begin collecting signatures, the legislature also created three additional requirements canvassers must comply with each time they collect a signature. Under these newly enacted laws, before a canvasser can accept a signature: (1) the canvasser must tell the potential signer that "petition fraud is a *criminal offense*," Act 218; (2) the canvasser must view the potential signer's photo identification "to verify the identity of the potential petitioner," Act 240; and (3) the potential petitioner must read or have the ballot title read aloud to them "in the presence of the canvasser," Act 274. Plaintiffs and Intervenor-Plaintiffs assert that, individually and especially combined, these new requirements slow down the signature-gathering process significantly and deter both would-be petitioners and would-be canvassers from participating.

16

### *Act 218: Crime Notification Requirement*

Act 218 forbids canvassers from obtaining a signature "without disclosing to the potential petitioner that petition fraud is a *criminal offense* before the potential petitioner signs the petition." This disclosure must be verbal unless "verbal notification is impossible," in which case written notification is permissible "with a document that is provided separately from all other petition materials." Failure to make this disclosure before a potential petitioner signs the petition is a Class A misdemeanor. Ark. Code Ann. § 7-9-103(c). Act 218's requirements operate in addition to the existing requirement that each petition part come with a written definition of petition fraud and related crimes.

Intervenor-Plaintiff For AR Kids, which circulated a petition in the 2024 cycle and is currently circulating a petition for 2026, polled its volunteers from the 2024 cycle about the impact of these new laws. Of the eighty-two responses that it received from over thirty counties, 42.7% reported that the Crime Notification Requirement would impact their willingness to volunteer and their ability to collect signatures. (Doc. 24-8, ¶ 12). For AR Kids also "sent some of its more experienced volunteer canvassers out to collect signatures under the Canvassing Regulations to assess how they would impact canvassers' collection rates." (Doc. 24-6, ¶ 21). They reported that some potential petitioners were "scared to sign after the canvasser gave the required warning that 'petition fraud is a criminal offense.' Even though nothing illegal was occurring, people said they would not go to jail for signing a petition and thus refused to sign." *Id.* ¶ 24.

Defendants assert that this six-word phrase takes just seconds to say and provides an additional guardrail to ensure that petitioners are following the law. (Doc. 39, p. 9).

### *Act 240: ID Verification Requirement*

Act 240 requires a canvasser to "view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner before obtaining the signature." If the canvasser "cannot verify the identity," they "shall not obtain a signature." A canvasser who signs the canvasser affidavit at the bottom of a signature page but does not comply with this requirement "makes a false statement on a petition verification form." Knowingly making a false statement on a petition verification form is a Class A misdemeanor and a Class D felony. Ark. Code Ann. §§ 7-9-103(c)(7), 109(d).

58.5% of the volunteers surveyed reported that the ID Verification requirement would impact their willingness to volunteer and their ability to collect signatures. (Doc. 24-8, ¶ 13). For AR Kids' volunteers reported that "[s]ome people were interested in signing but were unable because they did not have the required photo ID with them at the time. Others had ID with them but did not want to show it to a stranger." (Doc. 24-6, ¶ 23).

Defendants assert that this Act helps canvassers ensure petitioners are who they say, and that photo ID verification is common in many areas of Arkansas life, like voting and purchasing alcohol and tobacco. (Doc. 39, p. 10).

### *Act 274: Title Reading Requirement*

Finally, Act 274 requires that a potential petitioner "read[ ] the ballot title of the petition in the presence of the canvasser or hav[e] the ballot title of the petition read aloud to him or her in the presence of the canvasser." It is a Class A misdemeanor for a canvasser to knowingly accept a signature "when the person signing the petition has not read the ballot title of the petition in the presence of the canvasser or the ballot title of the petition has not been read aloud to the person in the presence of the canvasser." Ark. Code Ann. § 7-9-103(c). Act 274 also adds to the canvasser affidavit that "each signer

read the ballot title of the petition or had the ballot title of the petition read to the signer in my presence." Knowingly making a false statement on this canvasser affidavit is, as previously stated, also a Class D felony. *Id.* § 109(d).

69.5% of volunteers surveyed reported that the Reading Requirement would impact their willingness to volunteer and their ability to collect signatures. (Doc. 24-8, ¶ 14). Ballot titles can be quite long: For AR Kids' ballot title takes "almost three minutes" to read. (Doc. 24-6, ¶ 21). Thus, "[s]ome people specifically refused to sign after seeing how long the ballot title was because they did not want to take the time to read it in the volunteer canvasser's presence or have it read aloud to them." (Doc. 24-6, ¶ 22). The problem is even worse for referendums: when organizers sought to repeal the LEARNS Act, which is over 100 pages long, "[g]etting a ballot title approved for the referendum was one on the most challenging parts of the process. The final approved title was more than 8,000 words—over 16 pages long." (Doc. 20-6, ¶ 4). And referendum petitions have a "hard 90-day deadline[ ]," as opposed to the two years between general elections, so the additional time burden "makes success nearly impossible." *Id.* ¶ 8.

Defendants say that this requirement is necessary so that petitioners can "confirm that the canvasser is representing the petition accurately," and that is will "dissuade[ ] bad actors from misrepresenting what is on the petition." (Doc. 39, p. 13).

The combined impact of these Regulations makes it much slower to collect signatures. In years past, it took volunteer canvassers "around two to three minutes to engage with an individual and collect their signature. Adhering to the Canvassing Regulations, however, it took the canvassers between six and ten minutes to collect just one signature." (Doc. 24-6, ¶ 6).

19

19.1% of the volunteers surveyed reported that they would probably not volunteer because of the new laws, and 29.3% reported that they were unsure whether they would continue to volunteer. (Doc. 24-8, ¶ 15). In total, For AR Kids expects "that about fifty percent [of past volunteers] will not volunteer as canvassers during this election cycle due to the Canvassing Regulations." (Doc. 24-6, ¶ 26). Some "volunteers have expressed fear of canvassing because they are scared they will be charged with criminal penalties for making simple mistakes." (Doc. 24-8, ¶ 17). "Volunteers are scared that the new laws are meant to trap them and that they will be charged with a crime or that all the signatures they collect will be disqualified if they accidentally forget to comply with one of the new laws even once." *Id.* "Many of the volunteers feel intimidated to put their own legal safety on the line to collect signatures." *Id.* ¶ 18. "Others have expressed that they are chilled from volunteering for us this year because it was already difficult to collect enough signatures to qualify for the ballot and the Canvassing Regulations will make it practically impossible." (Doc. 24-6, ¶ 26). The impact of fewer canvassers is compounded by the fact that it will take the remaining canvassers longer to obtain a signature.

Volunteer canvassers are also concerned about how these regulations will be enforced. Having been filmed by petition opponents in the past, they fear that they will be filmed again and that now, "[t]hese videos could be selectively edited to make it look like a canvasser skipped a required step, even if they didn't." (Doc. 20-10, ¶ 11). And their fears are well-founded: in the House Committee Hearing on the Crime Notification Requirement, a representative for the Secretary of State's office testified that he anticipated that violations "would come from most likely eye-witness accounts, video,

recordings. There are various means where it would be a citizen or somebody reporting that the notification or the warning had not been given."[12]

Petition sponsors say they will struggle to fill the resulting dearth of volunteers with paid canvassers. One organizer described the economic toll of the regulations:

> Of the paid canvassing firms from which we've obtained quotes, two have told us the cost of a paid canvassing campaign under the new laws would be about twice as much as a campaign without the laws in place. A third firm told us that the cost of hiring paid canvassers to do significant signature collection under the new laws would be prohibitively high and declined to give a specific quote.

(Doc. 24-6, ¶ 28).

Defendants do not address the collective impact of these laws, arguing that the Court must look at the impact of each law separately.

### 8.  Act 241: Post-Collection Affidavit Requirement

In addition to the required petition part affidavit that must be signed and notarized every ten signatures, Act 241 requires that a canvasser "file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas law regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle." "The Secretary of State shall not count the signatures submitted by the canvasser until a true affidavit is submitted." However, such affidavit "shall have no bearing to establish the genuineness or falsity of the signatures obtained by the canvasser." Act 241 applies only to statewide measures, not local measures.

Signatures submitted by a canvasser who has not filed a true affidavit "shall not be counted for any purpose . . . including the initial count of signatures." Ark. Code Ann. § 7-

---

[12] *Hearing* at 6:07:30-6:08:20.

9-126(c). Thus, rather than invalidating signatures ten at a time as permitted under § 7-9-126(b), the Secretary of State can invalidate every signature collected by a particular canvasser in one fell swoop. One organizer noted the outsized effect this requirement may have on "grassroots efforts": "Coordinating dozens of volunteers across the state, ensuring they complete and notarize a new form, and absorbing the added printing and compliance costs is not feasible for a volunteer led effort." (Doc. 20-6, ¶ 9).

Defendants assert that Act 241 is necessary because without it, canvassers are only required to verify that they followed *some* election laws. (Doc. 39, p. 7). Without this Post-Collection Affidavit, Defendants claim that canvassers do not have to verify that they: complied with the age requirement (eighteen or older) under Ark. Code Ann. § 7-9-103(a)(3); read and understood the Arkansas law applicable to obtaining signatures as required by *id.* § 601(d)(4); and have not been convicted of a disqualifying offense under *id.* § 601(d)(3). With the exception of the age requirement,[13] however, Defendants' claim that canvassers are bound by these laws but are not required to verify compliance is at best misleading. First, § 601 applies only to paid canvassers, but all canvassers must complete a Post-Collection Affidavit under Act 241. Second, the very provisions that Defendants cite require paid canvassers to submit "[a] signed statement" that they read and understand the applicable law and have not been convicted of a disqualifying offense before they can collect signatures. *Id.* § 601(d)(3)–(4). While there may be some theoretical gap that Act 241 covers for paid canvassers who are convicted of a disqualifying offense after submitting their Pre-Collection Disclosures, Defendants have

---

[13] There is no evidence in the record that underage canvassers were or are a problem.

not provided any evidence of that ever actually happening, nor that such event was connected to petition fraud

### 9. Act 241: "Cool Off" Period

Any canvasser that complies with Act 241 by submitting the required affidavit "shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for" a cure period. Once a petition is submitted for the Secretary of State's review, he has thirty days to determine whether there are enough valid signatures to qualify the petition for the ballot or, if not, for a thirty-day cure period to collect more signatures. It is common practice for petition sponsors to continue collecting signatures during this review period in anticipation of qualifying for and needing a cure period. "The first few days after the initial submission is an important time to keep gathering signatures in case a cure period is needed. You want to keep up the momentum of the signature collection effort going and the time to gather additional signatures is limited." (Doc. 20-4, ¶ 11).

Act 241 creates what Defendants have referred to as a "cool off" period. People who canvassed before the petition was submitted and complied with Act 241's Affidavit Requirement are not allowed to collect signatures while the petition is under review. People who did not collect signatures before the petition was submitted and therefore did not submit a Post-Collection Affidavit, may, however, collect signatures during the review period; they do not have to wait until the Secretary determines that the sponsor is eligible for a cure period.

Defendants assert that this cool off period is necessary to prevent canvassers from misleading potential petitioners "into believing that their signatures matter if they sign during the liminal period between petition submission and the Secretary's notification that

a sponsor may submit additional signatures." (Doc. 39, p. 8). There is no evidence in the record that previous canvassers are more likely to mislead potential petitioners than are new canvassers with no experience. Defendants also assert that the cool off period "limits a hypothetical election official's ability to manufacture additional time for sponsors of a favored measure to collect signatures." *Id.* The threat of such malfeasance by an election official is, as Defendants say, hypothetical.

### 10.  Publication Cost Reimbursement

Under Arkansas law, "[b]efore the election at which any proposed or referred measure is to be voted upon by the people, notice shall be published in two (2) weekly issues of some newspaper in each county." Ark. Code Ann. § 7-9-113(b)(1). The Secretary of State is "charged with the duty of letting contracts for publishing notices." *Id.* § 113(a)(1). "For measures proposed by petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty (30) calendar days of notification of the final costs for publication." *Id.* § 113(a)(2)(A). In recent years, these publication costs have been in the tens of thousands of dollars which, Plaintiffs say, may keep otherwise successful initiatives off the ballot because of the sponsor's inability to pay. (Doc. 20-1, ¶ 12 (2022 marijuana legalization: $86,733.06; 2024 casino licensing: $57,890.57)).

Defendants note that in 2016, the year before the Reimbursement Requirement went into effect, "the Secretary of State's office paid more than $1.7 million" to publish notices. (Doc. 39, p. 11). This figure appears to include the publication cost of both legislative and citizen-initiated measures.

24

## II.  LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "While no single factor is determinative, the probability of success factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citation modified). "When seeking to enjoin the implementation of a state statute, the plaintiff must show more than just a 'fair chance' that it will succeed on the merits. It must show that it is likely to prevail on the merits." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025) (citation modified).

## III.  DISCUSSION

The Court addresses the threshold jurisdictional issues raised by Defendants, before turning to the merits of Plaintiffs and Intervenor-Plaintiffs' claims, and finally to the other preliminary injunction factors.

### A.  Jurisdictional Issues

Defendants challenge Plaintiffs' and Intervenor-Plaintiffs' standing to seek injunctions of four of the challenged laws and make related claims that some of these challenges are unripe or have become moot.

"Article III of the Constitution limits federal-court jurisdiction to 'cases' and 'controversies.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (quoting U.S. Const. art. III, § 2). Article III has been interpreted to require that a plaintiff have "standing" to bring suit. To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact for a First Amendment challenge to a state statute, the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can itself constitute injury in fact." *281 Care Comm. v. Arneson* (*281 Care Comm. II*), 766 F.3d 774, 780 (8th Cir. 2014) (citation modified).

"Standing is not dispensed in gross," so the Court addresses Defendants' challenges claim by claim. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation modified).

### 1. Act 602: Standing and Mootness

Defendants assert that Intervenor-Plaintiffs lack standing to challenge Act 602's Reading Level Requirement because the Attorney General has now approved their ballot title, so they are not suffering from a judicially redressable injury. (Doc. 39, p. 21). Alternately, Defendants argue that this claim has become moot.

Under the Eleventh Amendment, states enjoy sovereign immunity from suits brought by citizens. Federal courts are therefore barred from entertaining suits brought by citizens against states except in limited circumstances. Suits for prospective injunctive relief against the state official charged with carrying out a challenged state action are one such exception. *See Ex parte Young*, 209 U.S. 123, 159–60 (1908). *Ex parte Young* suits are by nature limited to one particular type of redress—prospective injunctive relief. *Bio Gen*, 142 F.4th at 604. And such suits may only proceed against officials who have "'some connection with the enforcement' of the challenged law." *Id.* (quoting *Ex parte Young*, 209 U.S. at 157–59). Defendants' argument, although they fail to make it in so many words, is that the Attorney General, having already completed his role in carrying out Act 602, no

26

longer has any connection with its enforcement. Therefore, the *Ex parte Young* exception to sovereign immunity does not apply because there is no prospective relief the Court could grant as against the Attorney General. And retrospective relief is barred by the Eleventh Amendment, so Intervenor-Plaintiffs' challenge to Act 602, however meritorious, is not judicially redressable.

One problem with this argument is that "[s]tanding is determined as of the commencement of the lawsuit." *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018). Even when sovereign immunity is at issue, the Supreme Court has instructed that "a court need only conduct a straightforward inquiry into whether the *complaint* alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (emphasis added) (citation modified). And Protect AR Rights plainly had standing to seek a forward-looking injunction preventing the Attorney General from enforcing Act 602 against them at the time this litigation was filed.

Mootness doctrine, however, reflects the Article III requirement "that 'an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed.'" *Campbell-Ewald Co.*, 577 U.S. at 160 (alteration in original) (quoting *Arizonans for Off. Eng. v. Arizona,* 520 U.S. 43, 67 (1997)). "A case becomes moot . . . when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* at 160–61 (citation modified). The party asserting mootness "bears the burden to establish that a once-live case has become moot." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022).

Here, while the claim for a preliminary injunction may be moot as to the Attorney General,[14] Protect AR Rights argues that the Secretary of State still has a connection with the enforcement of Act 602 because, under Article 5, § 1 of the Arkansas Constitution, he is tasked with determining "[t]he sufficiency of all state-wide petitions," subject to review by the Arkansas Supreme Court.

While Defendants deny that the Secretary of State enforces Act 602, the Arkansas Supreme Court has repeatedly recognized that the Secretary of State makes the initial determination of the sufficiency of ballot titles, and Defendants have given the Court no reason to conclude that Act 602's Reading Level Requirement simply dissolves as soon as the Attorney General pre-certifies a ballot title. *See Roberts v. Priest*, 341 Ark. 813, 825 (2000) (finding ballot title deficient where sponsor "s[ought] to characterize the errors in the popular name and ballot title as mere typographical omissions that escaped the attention of the drafters, the Attorney General, and the Secretary of State"); *Paschall*, 2024 Ark. 155, at 3 n.1. "Redressability exists . . . if the risk of injury 'would be reduced to some extent if [the plaintiffs] received the relief they seek.'" *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024) (second alteration in original) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007)). Because prospective injunctive relief against the Secretary of State remains available and is likely to reduce the risk that Protect AR Rights will be further injured by Act 602, this claim is not moot.

---

[14] There is an exception to mootness for "disputes capable of repetition, yet evading review" that often applies in the election law context. *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). But Protect AR Rights has not invoked it here.

### 2.  Pre-Collection Disclosure Requirement: Standing

Defendants argue that, whatever injuries or threatened injuries Plaintiffs and Intervenor-Plaintiffs allege based on the possibility of doxxing, those injuries are not fairly traceable to the Pre-Collection Disclosure Requirement because Arkansas FOIA, not the Disclosure Requirement itself, mandates public disclosure. Defendants argue that the mere disclosure to the Secretary of State mandated by Arkansas Code § 7-9-601 does not injure Plaintiffs, and they therefore lack an injury in fact as well.

Defendants are wrong on both counts. A defendant's conduct need not be "the very last step in the chain of causation" to establish traceability. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). For example in *Bennett*, the plaintiffs (recipients of irrigation water) had Article III standing to challenge the Fish and Wildlife Service's biological opinion recommending restrictions on the availability of irrigation water even though the Bureau of Reclamation "retain[ed] ultimate responsibility for determining whether and how a proposed action shall go forward," and therefore did not necessarily have to abide by the biological opinion. *Id.* at 169–70.

Moreover, the chilling effect of these disclosures is an injury in fact. *Dakotans for Health v. Noem*, 52 F.4th 381, 387–88 (8th Cir. 2022). Plaintiffs have provided ample evidence that, because of the history of public disclosure and harassment, would-be paid canvassers are reluctant to turn their names and home addresses over to the Secretary of State without protection from public disclosure, thereby "affect[ing] the number of persons willing to circulate petitions for" Plaintiffs even if their information is not ultimately publicly disclosed. *Id.* at 388.

### 3. Act 274: Standing

Defendants also argue that Plaintiffs are not injured by Act 274's Reading Requirement because "they have not alleged an intent to knowingly allow a person to sign a [petition] without the person having read or heard the ballot title." (Doc. 39, p. 22). To establish injury in fact in First Amendment cases, "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can itself constitute injury in fact." *281 Care Comm. II*, 766 F.3d at 780 (citation omitted). "The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute [is] 'objectively reasonable.'" *Id.* Thus, a plaintiff need not allege that they will actually violate a challenged statute—refraining from such violation under a credible threat of adverse enforcement action constitutes injury. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

Here, Plaintiffs and Intervenor-Plaintiffs have alleged that they want to accept signatures without waiting for petitioners to read or have the ballot title read to them, but that they are prevented from doing so by Act 274. That have offered ample evidence of the substantial time burden the Reading Requirement imposes. And the Secretary of State has never disclaimed the intent to enforce this requirement—his history of sweeping invalidation of signatures indicates that in all likelihood Act 274 will be enforced against noncompliant canvassers. And just this year, the General Assembly expanded his obligation to do so, ordering him not to count any signatures "collected and witnessed by a canvasser if the Secretary of State finds by a preponderance of the evidence that the canvasser has violated Arkansas laws regarding canvassing." 2025 Ark. Act 273.

30

Given the State's history of nonenforcement of its election laws, the threat of criminal prosecution may be more remote, but the threat of signature invalidation is no less chilling when the entire purpose of the speech at issue is collecting valid signatures. Plaintiffs' decision to chill their speech and comply with Act 274 in light of the provisions available to enforce it is objectively reasonable. Therefore, they have established an injury in fact sufficient to confer standing.

### 4.  Publication Cost Reimbursement Requirement: Standing and Ripeness

Finally, Defendants argue that Plaintiffs do not have standing to challenge the Publication Cost Reimbursement Requirement and that their claim is not ripe because they have not secured sufficient signatures to qualify a measure for the ballot. An injury in fact for purposes of Article III standing must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). Defendants argue that Plaintiffs have not suffered an injury in fact because the injury Defendants identify—having to reimburse the Secretary of State[15]—is merely hypothetical so long as Plaintiffs have not gathered sufficient signatures to qualify a measure.

But Plaintiffs' injury is not limited to the ultimate question of whether they have to reimburse the Secretary's publication cost. In some cases, a law "will itself affect parties concretely enough to satisfy this requirement," even before the law is applied to the particular plaintiffs. *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993). For example, standing exists where the challenged law "present[s] plaintiffs with the immediate

---

[15] Defendants imply that Plaintiffs will not be injured by this requirement if they are ultimately able to reimburse the Secretary. But being required to pay money to secure ballot access is plainly also a cognizable injury. *Lubin v. Panish*, 415 U.S. 709 (1974).

dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Id.*

That is the situation here. Petition sponsors are playing a zero-sum game. Any dollar they save in anticipation of paying publication costs is a dollar they do not spend on their signature collection efforts. On the one hand if Plaintiffs spend all their money to collect enough signatures, they may come up short on publication costs, and the Secretary will exclude their otherwise qualified measure from the ballot. On the other hand if they save money in anticipation of paying publication costs, they will forego spending in furtherance of signature collection, potentially dooming their petition and, on Defendants' theory of standing, ensuring they never have standing to challenge the Reimbursement Requirement that contributed to their failure. This dilemma is sufficient to confer standing.

The closely related ripeness doctrine "flows both from the Article III 'cases' and 'controversies' limitations and also from prudential considerations for refusing to exercise jurisdiction." *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000). "Ripeness is peculiarly a question of timing." *Id.* at 1039 (quoting *Anderson v. Green,* 513 U.S. 557, 559 (1995)). "A claim is not ripe if the alleged injury rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *281 Care Comm. v. Arneson* (*281 Care Comm. I*), 638 F.3d 621, 631 (8th Cir. 2011) (citation modified). A plaintiff "must show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 867 (8th Cir. 2013) (citation modified). Defendants argue that Plaintiffs' alleged injury rests on the contingent future event of filing a sufficient petition.

They ignore the more immediate injury that the Reimbursement Requirement works by necessitating that the petition sponsor modify their behavior.

"The 'fitness for judicial decision' inquiry goes to a court's ability to visit an issue." *Neb. Pub. Power Dist.*, 234 F.3d at 1038. "While courts shy from settling disputes contingent in part on future possibilities, certain cases may warrant review based on their particular disposition." Such cases may include those "where an issue is largely legal in nature" and "may be resolved without further factual development." *Id.* (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 12 (2000)). That is the case here, so the fitness prong is satisfied and indicates in favor of finding this dispute ripe.

"The hardship factor looks to the harm parties would suffer, both financially and as a result of uncertainty-induced behavior modification in the absence of judicial review." *Iowa League of Cities*, 711 F.3d at 867. As described above, the existing uncertainty regarding the constitutionality of the Reimbursement Requirement forces Plaintiffs into a Catch-22 of foregoing core political speech on the frontend or having the Secretary of State effectively nullify petitioners' speech on the backend. The hardship prong also indicates against delaying judicial review. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983) (finding challenge to unimplemented statute justiciable because "requir[ing] the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship"). Accordingly, the Court concludes that Plaintiffs are presently injured by the Reimbursement Requirement and that their challenge is ripe.

### B. Likelihood of Success on the Merits

Plaintiffs and Intervenor-Plaintiffs primarily argue that the challenged laws violate the First Amendment. The Court addresses these claims first, in the same order they were

described above. The Court then addresses Intervenor-Plaintiffs' handful of non-First Amendment challenges.

Plaintiffs and Intervenor-Plaintiffs present a few different theories of First Amendment violations. They challenge all of the laws as unconstitutional burdens on speech associated with the ballot initiative process. Intervenor-Plaintiffs also challenge a few of the laws as content-based restrictions on speech, and one law, Act 218's Crime Notification Requirement, as unconstitutionally compelling speech.

"As a general rule, content-based speech restrictions can only stand if they meet the demands of strict scrutiny." *281 Care Comm. I*, 638 F.3d at 633. To survive strict scrutiny, a law must be "narrowly tailored to meet a compelling government interest." *Id*. at 636. But because "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech,'" *Meyer*, 486 U.S. at 421–22, even content-neutral regulations of the petition process may receive heightened scrutiny under the First Amendment.

In analyzing claims that a law unconstitutionally burdens the petition process in violation of the First Amendment, the Court must first determine whether the challenged law "implicate[s] the First Amendment." *SD Voice v. Noem*, 60 F.4th 1071, 1077 (8th Cir. 2023). Laws regulating the petition process implicate the First Amendment when they "affect[ ] the communication of ideas associated with the circulation of [a] petition." *Id.* at 1079 (second alteration in original) (quoting *Miller v. Thurston*, 967 F.3d 727, 738 (8th Cir. 2020)). But such laws do not implicate the First Amendment if they merely make the petition process "difficult" without "restrict[ing] [the] ability to circulate petitions or otherwise engage in political speech." *Miller*, 967 F.3d at 737 (second alteration in

original) (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)). If the law does not implicate the First Amendment, the challenge fails.

If the Court finds that the law implicates the First Amendment, it "appl[ies] the *Anderson*/*Burdick*[16] sliding standard." *SD Voice*, 60 F.4th at 1080 (footnote added). "Under this standard, [the Court] weigh[s] the character and magnitude of the burden the State's rule imposes on First Amendment rights against the interest[s] the State contends justify that burden, and consider[s] the extent to which the State's concerns make the burden necessary." *Id.* (citation modified).

If the challenged law "imposes a severe burden on the ability to engage in political speech, strict scrutiny applies." *Id.* "A severe burden is one that goes beyond the merely inconvenient." *Id.* (citation modified). But if the burden is not severe, the Court "review[s] the law to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *Id.* (citation modified). "Nondiscrimination" in this context refers not to suspect classifications but to political neutrality. *Burdick*, 504 U.S. at 438. Although this standard is more deferential than strict scrutiny, it is a more searching review than rational basis. *Contrast id.* at 1080–81 (examining state's articulated reasons for enacting challenged law), and *id.* at 1081 (concluding that law was unconstitutional under lesser scrutiny where the state "merely relie[d] on a bare assertion of election integrity rather than evidence or a reasonable response connected to the" purported reason for the law), *with F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, [on rational-basis review] it is

---

[16] *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."), *and id.* ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

Finally, some laws including those "compelling disclosure of information to the government related to political activity," are subject to an intermediate form of scrutiny known as "exacting scrutiny." *Dakotans for Health*, 52 F.4th 381 at 389. To survive exacting scrutiny, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–08 (2021)). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Bonta*, 594 U.S. at 607–08). However, unlike strict scrutiny, "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, [though] it does require that they be narrowly tailored to the government's asserted interest." *Id.* (quoting *Bonta*, 594 U.S. at 607–08).[17]

### 1. Act 602: Eighth Grade Reading Level Requirement

Defendants concede that Act 602 implicates the First Amendment. Therefore, the Court begins at step two, identifying the appropriate level of scrutiny. Plaintiffs assert that the Reading Level Requirement must withstand strict scrutiny because it imposes a severe burden and also constitutes a content-based restriction on speech. Defendants

---

[17] Defendants argue that Plaintiffs and Intervenor-Plaintiffs have not shown that the challenged laws are facially unconstitutional. The challenged laws here operate in a single, narrow context—circulation of initiative and referendum petitions. The Court cannot conceive of, and Defendants do not offer, any applications of these laws for which the First Amendment analysis would differ to Defendants' benefit. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 482 n.7 (2025).

argue that it need only satisfy lesser scrutiny because it does not impose a severe burden and reflects a content-neutral, speaker-based distinction. The Court concludes that on both theories, Act 602's Reading Level Requirement burdens speech in a manner and at a level necessitating strict scrutiny.

Under the *Anderson/Burdick* sliding scale, the Reading Level Requirement imposes a severe burden on the ability to engage in political speech. Defendant argues to the contrary, claiming that the burden is not severe because "one can imagine relatively simple ways for individuals to comply" with Act 602, and indeed all Plaintiffs have succeeded in doing so. *Miller*, 967 F.3d at 740. As a factual matter, this is not entirely accurate—not all petition sponsors in this litigation had to comply with Act 602, and Protect AR Rights was only able to do so with the Attorney General's forcible modification of its ballot title. Moreover, this argument ignores the Supreme Court's instruction that courts look at the "*character* and magnitude" of the burden imposed. Here, however easy it may be to comply with Act 602,[18] the character of the law—dictating what kind of words and sentences a petition sponsor can use to describe a ballot measure—pushes the burden beyond mere inconvenience. This is a difference in kind from the various procedural hurdles that have been found to impose a less than severe burden. *See id.* at 739 (in-person signature requirement); *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001) (residency requirement for canvassers); *SD Voice*, 60 F.4th at 1080 (assuming without deciding that petition filing deadline one year before election date imposes a less than severe burden). Thus, strict scrutiny is applicable.

---

[18] And there is ample evidence in the record reflecting that it is not so easy.

37

And strict scrutiny is also applicable because the Reading Level Requirement is a content-based restriction. The Reading Level Requirement applies only to citizen-initiated ballot measures, but not legislatively referred amendments. Because Act 602 bars the Attorney General, but not county clerks, from certifying ballot titles with reading levels above eighth grade, it also singles out statewide measures for regulation while excluding local measures. Defendants assert that this is a permissible, content-agnostic, speaker-based distinction because it "says nothing about the content of the initiated measure—that is, the subject of the proposed law." (Doc. 39, p. 49). This argument ignores the most logical basis on which the Court could find the Act content-based: it literally limits the words sponsors can use in their ballot titles.

And it is also content-based because of the distinctions it draws between petitions. Defendants are correct that speaker-based distinctions do not automatically render laws content-based. But "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994). That is certainly the case here.

Consider the state versus local distinction. As has happened in previous elections, some petition sponsors circulate both state and local petitions during the same election cycle. (Doc. 39-4). But the same sponsor—the same speaker—is subject to different regulations of their ballot title based on whether the petition seeks to change state law or local law. "If the [Act]'s distinctions were truly speaker based, both types of [petition] would receive the same treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015). The State cannot bootstrap Act 602 into content-neutrality by defining a speaker based on the content of their speech, here, whether that speech is aimed at changing state law.

And Defendants' arguments justifying the law only reinforce its content-based nature. Defendant argues that the State's interest in controlling the reading level of citizen petitions is "tied to past cycles, where measures with complex regulatory schemes have had ballot titles that are far above the average U.S. adult's reading level." (Doc. 39, p. 35). They point to the Arkansas Medical Marijuana Amendment of 2016—passed into law by a majority of Arkansas voters—which had a reading level of 18.1, well above the now-permissible level. It's difficult to imagine how a ballot measure about medical marijuana could ever comply with Act 602; "Medical" has three syllables, "marijuana" has four, and one can hardly imagine a ballot title for a medical marijuana amendment providing a fair understanding of the amendment without saying "medical marijuana." The implication of this argument seems to be that this successful ballot initiative should never have been put to the voters in the first place because, on account of the measure's reading level, the voters must have been misled or confused into passing it. It seems more likely given the extensive review for fairness and accuracy that ballot titles are already subject to,[19] that the General Assembly disfavors petition sponsors' speech because sponsors "propose to say what the General Assembly does not want them to say." (Doc. 43, p. 37).

"Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 576 U.S. at 163–

---

[19] Indeed, the Arkansas Medical Marijuana Amendment was subject to a ballot title challenge. The Arkansas Supreme Court found that the ballot title—even with an 18.1 reading level—was not misleading and "impart[ed] a fair understanding of the issues presented and the scope and significance of the proposed changes in the law." *Rose v. Martin*, 2016 Ark. 339, *7–8 (2016).

64. Here, Act 602 defines regulated speech by its purpose—changing state law. It is therefore subject to strict scrutiny.

To survive strict scrutiny, Act 602 must be narrowly tailored to serve a compelling government interest. Defendants argue that "the General Assembly wanted to make sure the initiative process was 'fair, transparent, and uniform' for all Arkansans, who should not be bamboozled by ballot titles that use language that is technically true but nevertheless 'deficient, confusing, or misleading' to a majority of Arkansas voters." (Doc. 39, pp. 34–35 (quoting Act 602 of 2025, §§ 1, 4)). "The Readability Requirement prevents subtle forms of fraud and corruption by preventing technically correct but confusingly worded ballot titles, and it promotes transparency through voter accessibility." *Id.* at p. 35.

As described above, Defendants complain of "complex regulatory schemes" and use the successful Arkansas Medical Marijuana Amendment of 2016 as their posterchild for why Act 602 is necessary to prevent voter confusion. They do not, however, present any evidence that voters were in fact confused or misled about that Amendment or any other. "The State's fear that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech." *Brown v. Hartlage*, 456 U.S. 45, 60 (1982). Nor does the State have a legitimate, let alone compelling, interest in limiting citizen petitions to the simple and straightforward. The General Assembly itself may enact complex regulatory schemes, but Act 602 would bar referendums whenever it is not possible to accurately describe the law to be repealed at an eighth grade FKGL.

> When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

*Turner Broad.*, 512 U.S. at 664 (citations omitted). "[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.'" *Id.* (citation omitted). Arkansas already has multiple checks in place to guard against confusingly worded or technically true but misleading ballot titles—the Attorney General, the Secretary of State, and the Arkansas Supreme Court all review ballot titles. *See Paschall*, 2024 Ark. 155, at 8 n.6 (collecting cases). Nothing in the record indicates that the existing checks against such titles have failed or that any Arkansans have actually been misled by complicated or confusing ballot titles.

And whatever interest the State has, Act 602 is not narrowly tailored to serving it. Having experimented with the FKGL, the Court questions whether its use in this context is even reasonable. It penalizes use of many of the words necessary to describing any ballot initiative because they have more than one syllable.[20] It is substantially underinclusive—in recent years, legislatively referred amendments have had ballot titles with consistently high FKGLs, but they are excluded from regulation. And it is overinclusive; rather than barring only ballot titles which are misleading or confusing— Arkansas law already does that—Act 602 bars ballot titles based on whether they use long words,[21] even if those words, like "Arkansas" and "Constitution" are easily understood by voters. In any event, the State has less restrictive means at its disposal,

---

[20] Doc. 24-7, ¶ 20 ("I ran the following sentence: 'This measure amends the Arkansas Constitution.' This produced a Flesch-Kincaid Grade Level of 12.7").

[21] Again, it is mathematically impossible for a ballot title with an average of two syllables per word to have an FKGL below 8.4. A piece of writing with an average of 10 words per sentence and two syllables per word would have an FKGL of 11.91.

like engaging in its own speech, at whatever reading level it wants, to educate Arkansans about the ballot measures in circulation.

Intervenor-Plaintiffs also ask this Court to certify to the Arkansas Supreme Court the question "whether a ballot title that scores above 8.0 but bellow 9.0 on the Flesch-Kincaid Grade Level formula has 'a reading level above eighth grade' under Act 602 of 2025." Even assuming the Arkansas Supreme Court would adopt Defendants' interpretation of Act 602, the First Amendment issues with the Act would remain, so the Court declines to certify this question.

### 2. Residency and Domicile (Act 453) Requirements

All canvassers must be U.S. citizens and Arkansas residents to collect valid signatures. Ark. Code Ann. § 7-9-103(a)(6). In addition, paid canvassers must be domiciled in Arkansas. Act 453.

The Eighth Circuit has previously upheld a residency requirement for canvassers, finding it survived strict scrutiny and was justified by the state's interests in "protect[ing] the petition process from fraud and abuse by ensuring that circulators answer to the Secretary [of State]'s subpoena power," and "ensur[ing] that a provision has grass-roots support in [the state] and that the initiative process is not completely taken over by moneyed, out-of-state special interest groups." *Jaeger*, 241 F.3d at 616–17.

Plaintiffs attempt to distinguish *Jaeger* because there, there was "no evidence in the record . . . regarding what the additional cost to the [sponsors] would be." *Id.* at 617. Here, Plaintiffs have presented evidence that there are out-of-state individuals and groups interested in canvassing in Arkansas. They have not, however, presented any information demonstrating that these requirements "drastically reduce[ ] the number of persons, both volunteer and paid, available to circulate petitions." *Buckley v. Am. Const. L. Found., Inc.*,

525 U.S. 182, 193 (1999) (finding voter registration requirement for canvassers unconstitutional where it cut the number of qualified canvassers from 2.3 million to 1.9 million). And Plaintiffs' counsel conceded that they have not observed a drop in the number of canvassers since the residency requirement went into effect. Nor have any of these out-of-staters been joined as plaintiffs in this case asserting their own right to speak in Arkansas.

Plaintiffs have not argued that there are less restrictive means available for achieving the State's asserted interest in, among other things, "'ensur[ing] that circulators [can] answer to [potential] subpoena[s]' after circulation ends." (Doc. 39, p. 27 (second, third, and fourth alterations in original) (quoting *Jaeger*, 241 F.3d at 617)). In their briefing, Plaintiffs point to other cases where courts have found that "requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement . . . [is] a more narrowly tailored means than a residency requirement to achieve the same result." (Doc. 42, p. 11 (quoting *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008)). But at the hearing, Plaintiffs' counsel disclaimed this argument. The Court therefore concludes that, on the record before it, *Jaeger* controls and Plaintiffs have not shown that the Residency Requirement is likely unconstitutional.

With respect to the Domicile Requirement newly imposed by Act 453, the Court is skeptical that this restriction is at all connected to the State's purported reason for Act 453's enactment. The State points to an incident in the 2024 election cycle where petition sponsors housed paid canvassers in hotels so the canvassers could claim Arkansas residency. Notably, per the State's own evidence, that incident involved local election petitions, not statewide petitions. *See* Doc. 39-4. But under Act 453, "[a] person shall not

act as a paid canvasser unless he or she is . . . [d]omiciled in the state if acting as a paid canvasser for a statewide initiative petition or statewide referendum petition." Thus, Act 453 is completely inapplicable to the bad conduct that ostensibly precipitated its enactment. Even assuming lesser scrutiny applies to Act 453, Arkansas "merely relies on a bare assertion of election integrity rather than evidence or a reasonable response connected to the" domicile requirement. *SD Voice*, 60 F.4th at 1081. Therefore, the Court concludes that Act 453's Domicile Requirement is likely unconstitutional under any level of scrutiny.

### 3. Pre-Collection Disclosure Requirement

"Before a signature is solicited by a paid canvasser the sponsor shall . . . [p]rovide a complete list of all paid canvassers' names and current residential addresses to the Secretary of State for statewide initiative petitions and referendum petitions" and "[s]ubmit a copy of the signed statement provided by the paid canvasser under subdivision (d)(3)," which requires canvassers to affirm that they have not been found guilty of a disqualifying offense. Ark. Code Ann. § 7-9-601(a)(2)(C)–(D).

Defendants concede that exacting scrutiny applies to this Disclosure Requirement. The Eighth Circuit has previously upheld the preliminary injunction of a similar disclosure requirement in *Dakotans for Health*. There, the challenged laws required "paid ballot petition circulators to disclose their name, residential address, email address, phone number, government-issued identification, voter registration state, petition sponsor name, and sex offender status prior to circulating any petition for a ballot measure." 52 F.4th at 384. They also required "these disclosures to be 'available upon request' in a publicly available directory, while the petitions are still being circulated and prior to commencement of the signature verification process." *Id.*

44

Defendants attempt to distinguish Arkansas's Disclosure Requirement because here, the disclosure provisions themselves do not require public disclosure on request. Instead, Arkansas's generally applicable FOIA provision applies to Pre-Collection Disclosures and makes them available on request, as happened in the 2024 election cycle. But this distinction is immaterial. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (applying First Amendment scrutiny to challenge to state's Public Records Act as applied to referendum petitions and noting that "[t]he label is not what matters. The important point is . . . plaintiffs' claim and the relief that would follow—an injunction barring the secretary of state from making referendum petitions available to the public . . . ." (internal quotations omitted)). Whether Plaintiffs style their claims as challenges to the Disclosure Requirement itself or the Arkansas's FOIA provision as applied to these disclosures, the First Amendment analysis is the same.

"[E]xacting scrutiny requires 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *Dakotans for Health*, 52 F.4th at 389 (quoting *Bonta*, 594 U.S. at 607). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Bonta*, 594 U.S. at 607 (citation omitted). Under exacting scrutiny, the means chosen must be narrowly tailored to government's asserted interest, but unlike strict scrutiny, they do not have to be the least restrictive means of achieving that interest. *Dakotans for Health*, 52 F.4th at 389.

Arkansas asserts its interests in election integrity, transparency, and public confidence in the citizen petition process. Defendants argue that the challenged laws are sufficiently tailored because they only require disclosure to the Secretary of State, not the

45

downstream public disclosure that causes paid canvassers to experience "a great deal of concern for [their] safety" and to "seriously reconsider" canvassing. (Doc. 20-5, ¶ 5). By that same token, however, the Pre-Collection Disclosure Requirement is not narrowly tailored because it fails to exempt these records from public disclosure during the circulation process, even though such public disclosure presents "a recipe for harassment" and contravenes the Supreme Court's demonstrated preference for erring "on the side of protecting the personal information of circulators during the circulation process." *Dakotans for Health*, 52 F.4th at 391 (citing *Buckley*, 525 U.S. at 198–200). Arkansas can and does take measures to shield lots of other information from FOIA requests.[22]

Plaintiffs also argue that the Disclosure Requirement is not narrowly tailored because the State's "asserted interests in election integrity are general in nature, but the statute does not apply generally—it applies only to those who are paid." *Id.* at 390. "[A]bsent evidence to the contrary," courts are "not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a

---

[22] *See* Ark. Code Ann. § 25-19-105(a)(1)(A) (allowing exceptions to FOIA "as otherwise specifically provided by this section or by laws specifically enacted to provide otherwise"); *id.* § 105(b) ("The following shall not be deemed to be made open to the public: (13) home addresses of nonelected state employees, nonelected municipal employees, nonelected school employees, and nonelected county employees; (19) personal information of current and former public water system customers and municipally owned utility system customers, including home and business addresses" (cleaned up)); Ark. Code Ann. § 12-12-312(a)(1)(A)(i) (State Crime Laboratory investigation records); Ark. Code Ann. § 15-5-409(b) (applications submitted to the Arkansas Development Finance Authority remain confidential while under review unless and until the application is recommended for approval); Ark. Code Ann. § 20-18-304(b)(3)(A) ("Disclosure of information which may identify any person or institution named in any vital record or vital report may be made only pursuant to rules which require submission of written requests for information by researchers and execution of agreements that protect the confidentiality of the information provided.").

reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." *Buckley*, 525 U.S. at 203−04 (quoting *Meyer*, 486 U.S. at 426).

Defendants claim that they have presented abundant evidence here, pointing to: (1) the General Assembly's Legislative findings in 2013 that "[s]ponsors and paid canvassers *may* have an incentive to knowingly submit forged or otherwise invalid signatures" and "[u]ntrained paid canvassers will continue to obtain and submit forged and otherwise facially invalid signatures," 2013 Ark. Act 1413, sec. 1(a)(3), (b)(1) (first emphasis added); (2) the 2024 incident where paid local initiative canvassers stayed in hotels to claim residency, Doc. 39-4; and (3) a law review article claiming an association between petition fraud and payment on a per-signature basis, Benson, *supra*, at 923. The Court does not find that this evidence supports the conclusion that the Pre-Collection Disclosure Requirement targets corruption particular to paid circulators.

Moreover, the State has offered no justification for the timing of the required disclosure. Defendants assert that "[a]cquiring this information on the frontend also allows the Secretary of State to identify whether any paid canvassers have a disqualifying offense before collecting signatures, which is not met by post-collection disclosures elsewhere." (Doc. 39, p. 44 (citations omitted)). However, at the hearing, Defendants' counsel could not represent to the Court that the Secretary of State's office even looks at these disclosures until a petition is submitted for signature validation. The Court therefore concludes that Defendants' asserted interest in maintaining these disclosures *before* circulation begins is nothing more than an invented, *post hoc* rationalization. *Kennedy v.*

*Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

These "flaws show 'there is a dramatic mismatch between the interests that the State seeks to promote and the disclosure regime that it has implemented in service to that end.'" *Dakotans for Health*, 52 F.4th at 391 (citation modified) (quoting *Bonta*, 594 U.S. at 612). Being forced to disclose, at risk of public dissemination, "such sensitive details as a person's home address" "in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world." *Id.* (quoting *Bonta*, 594 U.S. at 617). The chill on Arkansans' speech is especially stark here because circulators of controversial petitions were actually targeted for harassment in the last election cycle. In sum, the State offers no good reason to depart from the Eighth Circuit's conclusion in *Dakotans for Health*. Plaintiffs and Intervenor-Plaintiffs have shown that the Pre-Collection Disclosure Requirement is likely unconstitutional.

#### 4. Disqualifying Offenses

Ark. Code Ann. § 7-9-601(d) prohibits Arkansans with convictions of any of a long list of "disqualifying offenses" from serving as paid canvassers. There is no time limit, so individuals with juvenile convictions or otherwise sealed convictions who have had their voting rights restored can vote on ballot measures, but they can't be paid canvassers for them. *See* Doc. 20-4, ¶¶ 1–3; Doc. 20-8, ¶¶ 1–4. Before 2021, this list of disqualifying offenses was limited to felonies and violations of the election laws, fraud, forgery, or identification theft. *See* Act 951 of 2021. Now it includes misdemeanor drug crimes, trespass offenses, and shoplifting.

Contrast this with ballot access petitions for independent candidates, Ark. Code Ann. § 7-7-103(C), or new political parties, Ark. Code Ann. § 7-7-205(a), which have no

48

restrictions on paid canvassing at all. Thus, "despite being disqualified from collecting signatures for a ballot initiative," a person with a disqualifying offense conviction is "still allowed under Arkansas law to collect signatures for candidates—including independent and judicial candidates—as well as for new political parties seeking ballot access." (Doc. 20-8, ¶ 5).

The State concedes that this provision implicates speech but asserts that only lesser scrutiny applies. Because Plaintiffs have failed to present evidence regarding the magnitude of the effect this prohibition has on the number of available canvassers, the Court assumes that the burden on sponsors' speech is not severe. The Court therefore "review[s] the law to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *SD Voice*, 60 F.4th at 1080 (citation modified). The State asserts that its long list of permanently disqualifying offenses furthers its interest in election integrity and public confidence. Defendants have, however, failed to connect many of these offenses to the State's purported interests.

The State asserts that "the disqualifying offenses are rooted in Act 1413 of 2013, which was enacted after paid canvassers inundated the initiative process with fraud, forgery, and other misdeeds." (Doc. 39, p. 30). But that Act only disqualified paid canvassers with convictions for "violation[s] of the election laws, fraud, forgery, or identification theft." It wasn't until 2021 that Arkansas added the twelve other categories of misdemeanor offenses. The Court remains skeptical that many of the offenses on this list have any connection whatsoever with the State's asserted interest. At the same time, however, legislatures "can 'respond to potential deficiencies in the electoral process with foresight, provided that the response is reasonable and does not significantly impinge on

constitutionally protected rights.'" *Miller*, 967 F.3d at 740 (quoting *Timmons*, 529 U.S. at 364).

Plaintiffs have presented no evidence about the scope of the infringement on sponsors' ability to hire canvassers. And while individual would-be canvassers with disqualifying offenses have their own First Amendment interests at stake and Plaintiffs assert that this law "constitutes an unreasonable restriction on that citizen's right to circulate petitions," (Doc. 21, p.14), those restricted canvassers are not parties to this litigation. And the existing Plaintiffs have not supported their claim that the disqualifying offenses provision substantially restricts the number of available canvassers with evidence to that effect, leaving the Court unable to conclude on this record that the Disqualifying Offenses Provision is likely unconstitutional.

### 5. Commission/Pay-Per-Signature Ban

Arkansas law also prohibits paying petition canvassers "on a basis related to the number of signatures obtained." Ark. Code Ann. § 7-9-601(g)(1). The Eighth Circuit in *Jaeger* upheld a similar law. 241 F.3d at 617–18. The court noted that the law's challengers had "produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures." *Id.* at 618. The same is true here. Plaintiffs offer the statement of one professional canvasser that "[m]ost professional canvassers are paid by the signature." (Doc. 20-4, ¶ 10). And Arkansas law does not restrict how other types of canvassers are paid. But there is no evidence in the record that professional canvassers are unwilling to work on a per-hour basis, nor is there evidence that this prohibition has cut down on the number of people available for hire as canvassers. Accordingly, the Court follows *Jaeger* and concludes that Plaintiffs have not shown the Commission Ban is likely unconstitutional.

### 6. Fifty-County Requirement

Under the Arkansas Constitution, in addition to the overall signature requirement, petitions must be signed by a certain percentage of the electors of at least fifteen of the State's seventy-five counties. Ark. Const. art. V, § 1. The General Assembly raised the county requirement from fifteen to fifty by statute. Ark. Code Ann. § 7-9-126(e). Intervenor-Plaintiffs assert that this increase implicates speech "by dictating *where* canvassers must communicate their message, without regard for the speaker's preferred venue or choice of audience." (Doc. 25, p. 38). It also restricts the number of people they can reach by requiring them to speak to smaller audiences in sparsely populated areas and makes it less likely that sponsors will collect enough signatures to make their petition a topic of statewide discussion. *Id.*

Defendants dispute that the Fifty-County Requirement implicates speech at all, claiming it "only regulates the number and type of signatures necessary for a petition to make it on the ballot." (Doc. 39, p. 36). "[T]he difficulty of the process [of getting a measure on the ballot] is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected." *Dobrovolny*, 126 F.3d at 1113. Indeed, the Eighth Circuit has previously held that laws setting the number of signatures necessary to put an item on the ballot do not implicate the First Amendment. *See id.* at 1112–13; *Wellwood v. Johnson*, 172 F.3d 1007, 1009 (8th Cir. 1999).

Intervenor-Plaintiffs attempt to distinguish these cases because the challenged laws there, unlike the law here, did not dictate where sponsors had to circulate their message or with whom they had to associate to communicate their ideas. Here, Intervenor-Plaintiffs have provided evidence that the Fifty-County Requirement makes it

much more difficult to get a measure on the ballot, but this fact alone is not sufficient to implicate the First Amendment. The Fifty-County Requirement—unlike the Eighth Grade Reading Requirement—does not restrict the communicative content of the sponsor's pitch for their ballot measure. It just requires the sponsor to make that pitch to more, and more difficult to reach, people. But that's not enough to raise the spectre of a First Amendment violation. Moreover, although Intervenor-Plaintiffs challenge only the statutory Fifty-County Requirement, the same arguments could be applied to the Arkansas Constitution's fifteen-county requirement. *See Buckley*, 525 U.S. at 194 ("The voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation." (citation omitted)). Afflicting such decisions with a First Amendment interest would put courts in the tricky business of drawing lines between "difficult" and "too difficult" when it comes to the baseline criteria for ballot access. The Court concludes that the Fifty-County Requirement likely does not implicate the First Amendment.

### 7.  The Canvassing Regulations (Acts 218, 240, and 274)[23]

In its most recent session, the General Assembly added three items to the checklist for what a canvasser must do to obtain a signature that the Secretary of State will deem valid. Act 218 requires the canvasser to tell the potential petitioner that "petition fraud is a criminal offense"; Act 240 requires the canvasser to "view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner"; and Act

---

[23] The State urges the Court to consider these regulations separately. But the interests proffered by the State to justify them are the same, so it makes sense to combine the analysis where the distinctions between them are not relevant. Moreover, although the laws operate together in a way that magnifies each of their individual burdens, they are also unconstitutionally burdensome when considered individually.

274 requires the canvasser to be present while the potential petitioner reads the ballot title or has the ballot title read to them.

Plaintiffs and Intervenor-Plaintiffs assert that these regulations individually, and especially collectively, impose a severe burden on petition sponsors' speech by deterring both potential canvassers from canvassing and potential petitioners from signing. And the burdens imposed by these laws have compounding effects on sponsors: by significantly increasing the time it takes to gather a single signature and running off potential petitioners with that increased time demand and the threat of prosecution, sponsors need to have more canvassers willing to spend more time canvassing to obtain enough signatures. But those same, much-needed canvassers are also deterred from canvassing by the threat that any mistake they make in following these new laws could result in criminal punishment and invalidation of every signature they collected.

Defendants concede that Act 218's Crime Notification Requirement implicates speech but deny that Act 240's ID Verification and Act 274's Reading Requirement do. With respect to ID Verification, Defendants argue that this requirement merely regulates who may sign a petition, not speech related to the petition. But Act 240 does not change the definition of qualified petitioners. Instead, it requires canvassers to verify whether potential petitioners are qualified in a particular way, by viewing a photo ID. And it's hard to imagine how a canvasser would come to view that ID without asking. As Intervenor-Plaintiffs argue, this "require[s] the canvasser to interrupt her own speech to communicate in a way that she would not otherwise communicate." (Doc. 43, p. 7). Thus, the ID Requirement implicates speech.

Defendants argue that the Reading Requirement does not implicate sponsors' or canvassers' speech because it only regulates the potential petitioner. "While the petitioner performs that duty [reading the ballot title], a canvasser is free to communicate with the petitioner however he or she would like. True, a canvasser may avoid engaging with a person who is trying to understand what ballot title is at issue, so the canvasser does not annoy the petitioner. But the READ Act does not require the canvasser to communicate or not communicate anything." (Doc. 39, p. 42).

However, a canvasser who knowingly accepts a signature from a petitioner who did not read or listen to the ballot title in their presence is guilty of a criminal offense. In the real world, it seems highly unlikely that a canvasser would risk criminal penalties by talking to a potential petitioner while the petitioner is reading or by talking over someone reading the ballot title aloud to the petitioner. And if no one else is around to read the ballot title aloud, the canvasser will be the one doing the reading, rather than engaging in their desired speech about the measure. As a practical matter, the Reading Requirement either silences canvassers or compels their speech for however long it takes to read the ballot title. This affects the communication of ideas associated with the petition and therefore implicates speech.

The State has not attempted to rebut the evidence of the severe burdens these laws impose on sponsors and canvassers. *See supra* section I.B.7. Plaintiffs and Intervenor-Plaintiffs have presented ample evidence that these laws individually deter both canvassers and petitioners from involving themselves in the petition process at varying rates. And together, laws which more than triple the time necessary to collect a single signature and which discourage half of past canvassers from participating in the

future impose a severe burden. With respect to the ID Verification Requirement only, Defendants point to the Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2008), where the Court held that a photo ID requirement to vote did not "qualify as a substantial burden on the right to vote." *Id.* There, however, state IDs were free, and the Court noted that a photo ID requirement to vote would not be constitutional "if the State required voters to pay a tax or a fee to obtain a new photo identification." *Id.* at 198 (citing *Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966), which struck down a $1.50 poll tax). Here, Arkansas charges a $5 fee for an identification card. Ark. Code Ann. § 27-16-805(a)(2)(A). Therefore, the *Crawford* Court's conclusion that a photo ID requirement to vote does not impose a substantial burden on the right to vote is not controlling here.

And evidence in the record demonstrates that the ID Verification Requirement goes beyond mere inconvenience. Unlike with in-person voting, potential petitioners do not typically arrive at the farmers market or university campus with the intention of signing a petition. They may not have an ID with them; moreover, they may not feel comfortable showing their ID to a canvasser who, unlike a poll worker, is not a government employee. *See* Doc. 39, p. 5 (Defendants noting the threat canvassers pose to Arkansans' personal information). Thus, the Court concludes that the ID Verification Requirement imposes a severe burden on petitioning. But even if it did not, it would still need to withstand strict scrutiny as a content-based restriction on speech.

Intervenor-Plaintiffs argue that the Crime Notification and ID Verification Requirements are content-based restrictions on speech because they apply to petition sponsors based on "whether the speech at issue is advocating that Arkansans adopt a

55

citizen-proposed measure altering current Arkansas law." (Doc. 39, p. 41). As with the Disqualifying Offenses provision, independent candidates and new political parties who also must collect signatures for ballot access are not required to comply with these provisions. As with the Reading Level Requirement, the State argues that this is a content-neutral, speaker-based restriction because it applies to "all initiative speakers, regardless of the petition's content." (Doc. 39, pp. 47–48). "Thus, the Acts are neutrally regulating all speakers who *want to put an issue on the ballot*." *Id.* at p. 48 (emphasis added). But once again, Defendants cannot claim that a statute is speaker based when the "speaker" is defined by the content of their speech—here, whether the speaker wants to put an issue on the ballot. Such content-based restrictions on core political speech must withstand strict scrutiny.

Finally, Intervenor-Plaintiffs argue that the Crime Notification Requirement constitutes compelled speech. At a minimum, disclaimer and disclosure requirements are subject to exacting scrutiny. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010). Defendants argue that this is a permissible use of the State's "'regulatory authority' to require individuals in certain positions 'to provide truthful information relevant to' another's decision." (Doc. 39, p. 40 (quoting *B.W.C. v. Williams*, 990 F.3d 614, 621 (8th Cir. 2021)). But the Supreme Court has rejected states' general power to impose truthful disclosure requirements in any area where they have regulatory authority. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) (rejecting "professional speech" as a separate category of less protected speech and noting that the Court "has afforded less protection for professional speech in two circumstances—. . . laws that require professionals to disclose factual, noncontroversial information in their 'commercial

56

speech'" and regulations of professional conduct that "incidentally involves speech" (citations omitted)); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) ("[E]ither form of compulsion"—whether compelled statements of opinion or compelled statements of fact—"burdens protected speech.").

For all these reasons, the Canvassing Regulations are subject to strict scrutiny. The State offers the same interests to justify the burden these Regulations impose on core political speech: protecting the integrity of the petition process against fraud and promoting public confidence. (Doc. 39, pp. 39–42). No one disputes that these interests are compelling. However, the State has not even attempted to meet its burden of "demonstrat[ing] that it is necessary to burden [sponsors]' ability to communicate their message in order to meet its concerns." *Meyer*, 486 U.S. at 426.

Defendants point to legislative testimony on these Acts where a representative of the Secretary of State's office said that she has seen situations where a person signed someone else's name to a petition; signed a petition more than once; or signed a petition when they were not legally entitled to do so.[24] But the Secretary of State's office successfully catching these invalid signatures tends to indicate that the process is already working to ensure petition integrity. The State undoubtedly has an interest in ensuring that only genuine signatures are counted. It is less clear that the State has a compelling interest in making the Secretary of State's review redundant and ensuring that sponsors never submit invalid—as opposed to fraudulent—signatures.[25]

---

[24] *Hearing* at 6:06:30–6:06:50.

[25] Considering the many innocent oversights that can result in signature invalidation for reasons unrelated to a signature's genuineness, the Court is unpersuaded that the State has a compelling interest in achieving an invalidation rate of 0%. *Cf. Brown v. Ent.*

Existing controls include the unchallenged written notice attached to every petition part that actually describes what conduct constitutes petition fraud; the Secretary of State's independent validation that signatures are associated with registered voters; and the criminal prohibitions on petition fraud, which include "[k]nowingly misrepresent[ing] the purpose and effect of the petition or the measure affected for the purpose of causing a person to sign a petition." Ark. Code Ann. § 5-55-601 (establishing petition fraud as a Class D felony); *id.* § 7-9-103 (establishing a Class A misdemeanor covering largely the same conduct). But the State does not enforce its criminal prohibitions: "Since I've been with the State, in the past for the fraudulent signatures that we've turned over to legal, they have chosen not to pursue that. I don't really know why."[26] Indeed, the State has offered no evidence of a single petition fraud conviction. Arkansas "cannot seek to punish fraud indirectly by indiscriminately [restricting] a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented." *McIntyre*, 514 U.S. at 357.

Here, the State already has at its disposal less restrictive means of achieving its asserted interests: enforcing its existing criminal prohibitions. Each of the ends sought to be achieved by the Canvassing Regulations—reducing petition fraud, ensuring only qualified electors' signatures are counted, and protecting potential petitioners from being misled about a petition's contents—are covered by existing laws. And Defendants have

---

*Merchants Ass'n*, 564 U.S. 786, 803 n.9 (2011) (no compelling interest in closing modest compliance gap). And by merely providing the Secretary of State even more reasons to invalidate the signatures of qualified voters without apparent fraud or misconduct, it hardly seems likely that the Regulations will result in higher rates of valid signatures.

[26] *Hearing* at 2:44:55–2:45:35.

made no showing that those laws—if actually enforced—are not up to the task. Moreover, prosecuting bad actors is more likely to deter bad actors specifically, because the alternative enforcement mechanism of signature invalidation which the State has been using sweeps in all kinds of non-fraudulent signatures. The State cannot eschew the less speech-restrictive option, direct enforcement of its election integrity laws, in favor of the more speech-restrictive option, broad prophylactic speech regulation. Because the Canvassing Regulations are not narrowly tailored to the State's interests, the Court concludes that they are likely unconstitutional.

### 8. Act 241: Post-Collection Affidavit Requirement

Under Act 241, all canvassers on statewide petitions must "file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas law regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle." The Secretary cannot count any signature submitted by a canvasser unless and until this "true affidavit" is submitted. Thus, the Secretary can invalidate every signature submitted by a canvasser in one fell swoop, rather than ten at a time as permitted for failure to complete and notarize the canvasser affidavit on every petition part. While signatures submitted with this Affidavit cannot be counted, "[a] true affidavit submitted under [this provision] shall have no bearing to establish the genuineness or falsity of the signatures obtained by the canvasser."

Defendants argue that the Affidavit Requirement does not implicate speech because it's "after-the-fact," so it does not regulate the sponsor's communication of ideas associated with the circulation of petitions. (Doc. 39, p. 30). But "*signing* a petition is 'core political speech.'" *SD Voice*, 60 F.4th at 1078 (emphasis added) (quoting *Nev. Comm'n*

*on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011)). And the Affidavit Requirement nullifies this speech based not on the legitimacy of the signature, but on the canvasser's after-the-fact compliance with this Requirement. This implicates the First Amendment. *See id.* ("As SD Voice aptly observes, a 'person who circulates a petition within one year of the election, or who signs such a petition, engages in a futile act.'").

And the Requirement cannot withstand any level of scrutiny on the *Anderson*/*Burdick* sliding scale. Courts are instructed to "weigh the character and magnitude of the burden the State's rule imposes on First Amendment rights against the interest[s] the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *SD Voice*, 60 F.4th at 1080 (citation omitted). Here, Defendants argue that the Post-Collection Affidavit is not "a burdensome requirement on top of all of the other petition parts that canvassers have to sign."

But the penalty for violations—invalidation of all voter signatures collected by a canvasser—burdens far more speech than the existing petition part affidavits. And the interests the State contends justify this additional, draconian penalty are already served by the petition part affidavits. Nothing in the record indicates that this new power to invalidate signatures *en masse* actually serves any interest other than the General Assembly's apparent desire to make disqualifying citizen petitions easier and more efficient. Even if this additional burden was minimal (it's not),[27] there is no legitimate, let

---

[27] There is evidence that the Post-Collection Affidavit Requirement imposes a severe and disproportionate burden on grassroots organizers: "I'm also concerned about the additional paperwork now required from canvassers, including notarized affidavits submitted to the Secretary of State. For grassroots efforts like CAPES [Citizens of Arkansas for Public Education and Students], that's a significant barrier. Coordinating dozens of volunteers across the state, ensuring they complete and notarize a new form,

alone important, countervailing state interest to justify imposing it on top of the existing affidavit requirements.[28] The Post-Collection Affidavit Requirement created by Act 241 is likely unconstitutional.

### 9. Act 241: "Cool Off" Period

After a petition is submitted for the Secretary of State's review, he has thirty days to determine whether the sponsor has collected enough signatures to qualify the petition for the ballot or to qualify for a thirty-day cure period to collect additional signatures. During this review period, it is common practice for petition sponsors to continue collecting signatures in anticipation of qualifying for a cure period. But under Act 241, every canvasser who submits the Post-Collection Affidavit—every canvasser who canvassed during the election cycle and complied with the law—is barred from collecting signatures while their petition is under review. Act 241 does not bar signature collection during the review period altogether though. It only sidelines canvassers who filed a Post-Collection Affidavit. So if a sponsor is able to recruit or hire a new set of canvassers, the new canvassers can collect signatures during the review period. In the words of one organizer, "[r]equiring some canvassers to not be able to collect signatures during this time but allowing newly hired canvassers makes no sense." (Doc. 20-4, ¶ 11).

---

and absorbing the added printing and compliances costs is not feasible for a volunteer led effort." (Doc. 20-6, ¶ 9).

[28] Intervenor-Plaintiffs also argue that the State lacks a legitimate interest in this additional affidavit because additional affidavits are barred by the Arkansas Constitution. "[E]ach part of any petition shall have attached thereto the affidavit of the person circulating the same, . . . and no other affidavit or verification shall be required to establish the genuineness of such signatures." Ark. Const. art. V, § 1. Intervenor-Plaintiffs do not discuss whether a state constitution can define the contours of legitimate state interests for federal constitutional purposes, so the Court does not address this argument.

Defendants refer to this as the "Cool Off" Period. "Cool off from what?" you might ask. Surely the State of Arkansas is not trying to put some of its citizens in time out because of their speech? But that is exactly what Act 241 does. And Defendants offer no justification for silencing canvassers based on their past political speech. Silencing canvassers' core political speech for up to thirty days is a severe burden. Act 241's Cool Off Period cannot survive exacting, let alone strict, scrutiny, because Defendants have not identified any sufficiently important government interest justifying this prohibition.

Defendants argue that the Cool Off Period is necessary to protect potential petitioners from being misled or confused about whether their signatures will count since the sponsor may not be entitled to a cure period. But there is no reason to think that only past canvassers present such a risk, so Act 241 is substantially underinclusive. Moreover, this asserted harm—that petitioners might mistakenly believe their signatures will count— would seem to justify banning canvassing altogether since the Secretary of State routinely invalidates upward of a third of signatures on a petition, often for reasons unrelated to the signature's apparent genuineness. *See Hearing* at 3:10:20 (describing Secretary's practice of culling whole pages of signatures for reasons unrelated to apparent fraud). It is also overinclusive because it disqualifies all past canvassers, even those who would accurately inform potential petitioners of the petition's status.

Defendants also argue that this provision ensures sponsors get the same amount of time to collect additional signatures and "prevents a *hypothetical* Secretary of State from manufacturing additional time to collect signatures for favored petitions, while minimizing the additional time for disfavored ones." (Doc. 39, p. 32 (emphasis added)). "[W]ithout the cool-off period, the final 30-day clock to collect signatures will run earlier for

a petition that the Secretary of State quickly determines is entitled to additional time to collect signature than for a petition that the Secretary more slowly determines is entitled to additional time." *Id.* But there is no law actually prohibiting the Secretary or his employees from engaging in such gamesmanship. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 539 (1993) ("The neutrality of a law is suspect if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation."). And as Defendants themselves say, this threat is nothing more than hypothetical. *Turner Broad.*, 512 U.S. at 664 ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must . . . demonstrate that the recited harms are real, not merely conjectural . . . .").

Moreover, Act 241 seems likely to create, rather than eliminate, an unequal time problem by allowing well-heeled petition sponsors who can afford a second team of canvassers to collect signatures during the review period, while boxing out grassroots volunteer efforts. *Kennedy*, 597 U.S. at 543 ("[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights.").

"[T]he Government may not penalize an individual for 'robustly exercis[ing]' his First Amendment rights." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 205 (2014) (quoting *Davis,* 554 U.S. at 739). The Cool Off Period does just that. While there may be good reasons to regulate signature collection during the review period, none have been presented to this Court. Defendants have offered no justification for restricting signature collection by law-abiding Arkansans based only on whether they have engaged in First-

Amendment-protected canvassing activity in the past. In the absence of an important governmental interest justifying this Cool Off Period, it is likely unconstitutional.

### 10. Publication Cost Reimbursement

Finally, Plaintiffs challenge Ark. Code Ann. § 7-9-113(a)(2)(A), which requires that petition sponsors "reimburse the cost of publication to the Secretary of State within thirty (30) calendar days of notification of the final costs for publication." Notice must be published "in two (2) weekly issues of some newspaper in each county" before the election at which the measure is to be voted on. *Id.* § 113(b)(1). The publication period begins eight weeks before the election. *Id.* § 113(b)(2)(B). Before 2017, the publication costs were borne by the State, not the petition sponsor. Publication costs can be in the tens-of-thousands-of-dollars range. (Doc. 20-1, ¶ 12 (2022 marijuana legalization: $86,733.06; 2024 casino licensing: $57,890.57)). Plaintiffs assert that these publication costs will inhibit publication when a sponsor is unable to afford them.

Defendant asserts that this Requirement "does not implicate the First Amendment" because it does not restrict sponsors from circulating petitions or otherwise engaging in political speech. (Doc. 39, p. 33). But burdening speech about the petition during the circulation process is not the only way an election regulation may implicate the First Amendment.

The right of the people "to cast their votes effectively . . . rank[s] among our most precious freedoms . . . , and [is] thus protected against federal encroachment by the First Amendment and state infringement by the Fourteenth Amendment." *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 694 (8th Cir. 2011) (citations omitted); *Brown v. Yost*, 133 F.4th 725, 736 (6th Cir. 2025) ("Election laws may also impose severe [First Amendment] burdens when they exclude or virtually exclude electors or initiatives from the ballot.'"

64

(citation modified)). Indeed, all manner of ballot access restrictions are subject to First Amendment scrutiny. *Green Party of Ark. v. Martin*, 649 F.3d 675, 681–83 (8th Cir. 2011) (applying *Anderson/Burdick* to "petition process [which] compel[led] the Green Party to spend significant funds in order to secure ballot access" but finding that the burden was not severe).

Assuming lesser scrutiny applies, the Publication Cost Requirement fails. Defendants assert that the Publication Cost Requirement serves the State's interest in saving taxpayer dollars. While that interest is legitimate, fee-for-ballot-access schemes are not. The Supreme Court has repeatedly rejected mandatory fees "in the absence of reasonable alternative means of ballot access." *Lubin v. Panish*, 415 U.S. 709, 718 (1974). In *Bullock v. Carter*, the Supreme Court struck down, on Equal Protection grounds, a Texas statute requiring "candidates to pay a flat fee of $50 plus their pro rata share of the costs of the election in order to get on the primary ballot. The assessment of costs involved sums as high as $8,900." *Lubin*, 415 U.S. at 715 n.4 (citation omitted) (citing *Bullock*, 405 U.S. 134 (1972)). The Court later described Texas' law as "so patently exclusionary as to violate traditional equal protection concepts." *Id.* And in *Lubin*, the Court struck down a California law under which "the payment of a fee is an absolute, not an alternative, condition, and failure to meet it is a disqualification from running for office." *Id.* at 718.

Here, Arkansas offers no alternative means of ballot access for otherwise qualified petitions. And the State has already paid the publication costs, so the law effectively holds ballot access for ransom while the State is out the money regardless of whether the sponsor pays. Moreover, the Supreme Court has "reject[ed] the theory that since the

candidates are availing themselves of the primary machinery, it is appropriate that they pay that share of the cost that they have occasioned." *Bullock*, 405 U.S. at 147–48. There, the Court noted that, under the Texas law, "the costs do not arise because candidates decide to enter a primary or because the parties decide to conduct one, but because the State has, as a matter of legislative choice, directed that party primaries be held." *Id.* at 148. Here, too, the costs of publication do not arise because initiative sponsors decide to publish their initiatives in weekly newspapers, but because the State has, as a matter of legislative choice, directed such publication.

"Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests." *Green Party*, 649 F.3d at 683 (quoting *Lubin*, 415 U.S. at 718). Selection of ballot measures on the basis of ability to pay publication costs without providing any alternatives means is likewise not a reasonable and nondiscriminatory method of furthering the State's important regulatory interests. The Publication Cost Reimbursement requirement is likely unconstitutional.

### 11. Non-First Amendment Challenges

Intervenor-Plaintiffs also challenge Act 240's ID Verification Requirement and Act 274's Reading Requirement on due process vagueness grounds, and Act 602's Reading-Level Requirement on equal protection grounds. The Court examines the vagueness challenges before turning to the equal protection challenge.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law must sufficiently define terms so "that ordinary people can understand what conduct is prohibited." *United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002).

Otherwise, those who attempt to interpret and comply with the law will "necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (citation modified). Such vagueness permits "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Id.* And "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. 104, 109 (citation modified).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499. Laws imposing criminal penalties are also subject to a more stringent vagueness standard. *Id.* As discussed above, both these laws implicate the First Amendment and come with criminal penalties—the most stringent vagueness analysis is therefore required.

Act 240 states that "[a] canvasser who witnesses signatures on a petition part shall view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner before obtaining the signature." "If a canvasser cannot verify the identity of the potential petitioner, the canvasser shall not obtain a signature from the

potential petitioner." "A canvasser who submits a canvasser affidavit . . . but does not comply the requirement [to verify the potential petitioner's identity] makes a false statement on a petition verification form." "Knowingly" making a false statement on a petition verification form is a Class D felony. Ark. Code Ann. § 7-9-109(d).

Act 274 requires that, before signing, a petitioner "read[ ] the ballot title of the petition in the presence of the canvasser or hav[e] the ballot title of the petition read aloud to him or her in the presence of the canvasser." A canvasser knowingly accepting a signature when the petitioner has not read the ballot title or had the ballot title read to them in the presence of the canvasser is a Class A misdemeanor. Ark. Code Ann. § 7-9-103(c). Intervenor-Plaintiffs assert that these regulations "are unconstitutionally vague because they use imprecise language, making it unclear how canvassers and Intervenor-Plaintiffs are to comply and opening the door for arbitrary and discriminatory enforcement." (Doc. 25, p. 45). The risk of arbitrary or discriminatory enforcement is exacerbated "by virtue of the Secretary of State's enforcement authority under Act 273 of 2025." *Id.* at p. 48. Act 273 directs the Secretary not to count signatures if he "finds by a preponderance of the evidence that the canvasser has violated Arkansas laws regarding canvassing . . . ."

On Act 240, Intervenor-Plaintiffs take issue with the phrase "verify the identity." "For instance, if the name or address on a person's ID does not match what the person writes on the petition form, and the person explains that they have recently moved or gotten married and not yet updated their ID to reflect their married name, the law provides no guidance on whether the canvasser may collect the person's signature." (Doc. 25, pp. 46–47). Defendants asserts that this is not vague, stating that canvassers "need only

68

'view' the petitioner's photo ID and confirm (that is, 'verify') that the petitioner appears to be the person whose ID is presented." (Doc. 39, pp. 52–53). They also claim that "the knowledge requirement obviates any claim that the statute is vague." (Doc. 39, p. 53).

With respect to Act 274, Intervenor-Plaintiffs claim that this provision "provides no guidance on how long a canvasser must wait for a potential signer to read a measure, or whether a canvasser must desist from collecting the signature if the potential signer has spent an insufficient amount of time looking at the language of the ballot title." (Doc. 25, p. 47). As above, Defendants assert that this is not vague because canvassers commit a crime only if they "know" a petitioner did not read the ballot title and allow them to sign. (Doc. 39, p. 53).

With respect to the first vagueness concern, notice, the Court considers Defendants' constructions of these provisions in their briefing reasonable, and if these laws are applied only in those situations Defendants describe in their briefing, then the Court finds that the Act provides adequate notice of what conduct is prohibited or required. *See* Doc. 39, p. 52 (To comply with Act 240, "a canvasser need only 'view' the petitioner's photo ID and confirm (that is, 'verify') that the petitioner appears to be the person whose ID is presented."); *id.* at p. 53 (To comply with Act 274, a canvasser may accept a signature so long as they do not know that the petitioner did not read the ballot title in their presence.).

On the other hand, the Court is concerned that the sweeping power to invalidate signatures conferred on the Secretary of State, combined with the anticipated vigilante reporting regime[29] permit, if not invite, discriminatory enforcement. But the Court is

---

[29] *Hearing* at 6:07:30-6:08:20.

reluctant, on this record, to conclude that these as-yet unenforced statutes are void for vagueness on this basis alone.

Finally, Intervenor-Plaintiffs' equal protection challenge to Act 602's Reading-Level Requirement must fail. Intervenor-Plaintiffs assert that there is no rational basis for treating citizen-initiated measures differently than legislatively referred measures. "An equal-protection challenge to a state law triggers rational-basis scrutiny unless the law draws a suspect classification or restricts a fundamental right." *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (citation modified). Under Eighth Circuit law, "[n]o right can qualify as 'fundamental' for purposes of equal-protection analysis unless it is guaranteed by the U.S. Constitution." *Id.* And "the right to place initiatives on the state ballot is not a right guaranteed by the United States Constitution, but is a right created by state law." *Id.* (citation modified). "Rational-basis scrutiny is a highly deferential standard that is met as long as someone could rationally conclude that the law furthers a legitimate government interest. The plaintiff bears the burden to negative every conceivable basis which might support the law." *Id.* at 566 (citation modified).

Rational basis review tolerates underinclusive laws. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Ry. Exp. Agency v. New York*, 336 U.S. 106, 110 (1949). While the State has not offered a great reason to distinguish between citizen-initiated and legislatively referred ballot measures, the Reading-Level Requirement is rationally related to and may advance the State's legitimate interest in protecting against misleading or confusing ballot titles. It likely does not violate equal protection.

## C. Remaining Preliminary Injunction Factors

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2364 (2025) (citation omitted). With respect to Act 602's Reading-Level Requirement, Act 453's Domicile Requirement, the Pre-Collection Disclosure Requirement, the Canvassing Regulations (Acts 218, 240, and 274), Act 241's Post-Collection Affidavit Requirement and Cool Off Period, and the Publication Costs Requirement, Plaintiffs and Intervenor-Plaintiffs have made a strong showing that these laws likely violate the First Amendment.

Defendants argue that "Plaintiffs' and Intervenors' delay in challenging these laws 'vitiates much of the force of their allegations of irreparable harm.'" (Doc. 39, pp. 54–55) (quoting *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977)). Indeed, the Pre-Collection Disclosure Requirement and the Publication Costs Requirement were enacted in 2013 and 2017 respectively. The newly enacted laws, however, were promptly challenged within weeks of their enactment.

With respect to the Pre-Collection Disclosure Requirement, the harms Plaintiffs and Intervenor-Plaintiffs assert—canvasser harassment and its associated chilling effect—actually materialized in the most recent election cycle. As the Supreme Court and the Eighth Circuit noted, "[t]he risks of public disclosure 'are heightened in the 21st century and seem to *grow with each passing year*, as anyone with access to a computer can compile a wealth of information about anyone else, including such sensitive details as a person's home address or the school attended by his children.'" *Dakotans for Health*, 52 F.4th at 392 (emphasis added) (quoting *Bonta*, 594 U.S. at 617).

While the Pre-Collection Disclosure Requirement may have been on the books for a decade, the practice of doxxing to harass and intimidate political opponents is of a more

recent vintage. Plaintiffs' and Intervenor-Plaintiffs' decision to challenge the law only after it was used to harass canvassers underscore the gravity of their injury; where the feared public disclosure has actually occurred, the chilling impact of this Requirement is likely to be stronger than ever. Like the Eighth Circuit in *Dakotans for Health*, this Court concludes that "[t]his harm is irreparable absent injunctive relief." *Id.* at 392.

With respect to the Publication Costs Requirement, however, Plaintiffs have failed to justify their delay in challenging this several-year-old law. The Court therefore declines to preliminarily enjoin it. *See Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) ("[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." (citation modified)). The denial of a preliminary injunction does not, however, prevent this claim from proceeding on the merits.

And finally, on the newly enacted laws, Defendants offer no rebuttal to the irreparable nature of the deprivation of First Amendment freedoms these laws impose.

"[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled in part by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). When plaintiffs make a strong showing on their First Amendment claim and the government lacks a compelling interest supporting a challenged law, "an injunction is both equitable and in the public interest." *Mahmoud*, 145 S. Ct. at 2364. "While [Arkansas] has important interests in protecting the integrity of the ballot initiative process, it has no interest in enforcing overbroad restrictions that likely violate the Constitution." *Dakotans for Health*, 52 F.4th at 392.

Defendants argue that the Court should refrain from enjoining these provisions because of the *Purcell* principle—"that that federal courts should usually refrain from interfering with state election laws in the lead up to an election." *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). But the 2026 general election is a year away. And Defendants do not claim that an injunction will result in the evils *Purcell* seeks to prevent—"voter confusion and consequent incentive to remain away from the polls"—but instead that Plaintiffs and Intervenor-Plaintiffs will play by a different set of rules than everyone else during the petition process. While that result may seem unfair, it will hardly result in the "mayhem" Defendants claim. Local and statewide petitions are already circulated under different sets of rules and mayhem has not resulted. And the Court has no doubt that the Secretary of State's office, with its many capable attorneys, will be able to comply with this Order when reviewing Plaintiffs' and Intervenor-Plaintiffs' petitions. Moreover, it is Defendants who seek to limit the scope of the Court's injunction. (Doc. 39, pp. 58–59). The State cannot demand a narrow injunction while simultaneously claiming that such injunction should not issue because it is unfair or confusing to non-parties.

Defendants also argue that confusion—and additional litigation—is likely to result if there is no final judgment until after the next election. What, then, would the status of a voter-approved ballot measure be if Defendants ultimately prevail on the merits and the measure should never have made the ballot in the first place? Naturally, such questions can be avoided by an expeditious resolution of this case. If a final judgment before the 2026 general election is Defendants' goal, it should take comfort in knowing that is the Court's goal, too. Resolution of ballot challenges on the eve of elections is already par for

the course in Arkansas. *See Paschall*, 2024 Ark. 155, at 18 (invalidating ballot measure on the first day of early voting and enjoining the Secretary of State from "certifying any ballots cast for the proposed amendment at the November 5, 2024, general election").

The State does not have an interest in infringing First Amendment rights for the duration of this litigation merely because an election lurks in the distance. The equities and public interest favor Plaintiffs and Intervenor-Plaintiffs, and a preliminary injunction is warranted.

## IV.  CONCLUSION

In the General Assembly's book, high rates of signature invalidation under the existing, highly regulated petition validation system are only evidence that the system has failed, not that the system has worked. These high rates of invalidation are used to justify more regulation, which will inevitably result in even higher rates of invalidation, justifying even more regulation and steadily chipping away at the right to direct democracy enshrined in the Arkansas Constitution. While the United States Constitution does not guarantee direct democracy, it does "safeguard[ ] an individual's right to participate in the public debate through political expression and political association." *McCutcheon*, 572 U.S. at 203. Many of the challenged laws likely infringe on this right.

**IT IS THEREFORE ORDERED** that Plaintiffs' and Intervenor-Plaintiffs' Motions for Preliminary Injunction (Docs. 20 & 24) are **GRANTED IN PART AND DENIED IN PART**. Because the claim against him is moot, Intervenor-Defendant Tim Griffin is **DISMISSED**. Pursuant to Federal Rule of Civil Procedure 65(a), the Secretary of State and his officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with him, are **PRELIMINARILY ENJOINED**, pending a final disposition on the merits, from:

74

- Disclosing or facilitating disclosure to any member of the public any information provided by Plaintiffs or Intervenor-Plaintiffs pursuant to the Pre-Collection Disclosure Requirements of Arkansas Code § 7-9-601;

- Enforcing Act 602 against Protect AR Rights, including by finding its petition insufficient based on the reading level of the petition's ballot title;

- Enforcing Acts 241 and 453 against Plaintiffs, including by invalidating signatures, finding petitions insufficient, or pursuing criminal charges based on noncompliance; and

- Enforcing Acts 218, 240, and 274 against Plaintiffs or Intervenor-Plaintiffs, including by invalidating signatures, finding petitions insufficient, or pursuing criminal charges based on noncompliance.

**IT IS SO ORDERED** on this 19th day of November, 2025.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE