**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF ARKANSAS, INC, SAVE AR DEMOCRACY, and BONNIE HEATHER MILLER and DANIELLE QUESNELL,<br><br>*Plaintiffs,*<br><br>and<br><br>PROTECT AR RIGHTS and FOR AR KIDS,<br><br>*Intervenor-Plaintiffs,*<br><br>v.<br><br>COLE JESTER, in his official capacity as Secretary of State of Arkansas,<br><br>*Defendant.* | Case No. 5:25-cv-05087-TLB |

**MEMORANDUM BRIEF IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Ballot measures are deeply embedded in Arkansas: they are specifically authorized by the Arkansas Constitution and have been used by Arkansas citizens to propose laws and state constitutional amendments since at least 1938. Because ballot measures are a right guaranteed to all Arkansas citizens, it violates the First Amendment to burden that right because it inhibits access to the ballot box and does so without a legitimate state interest. The essential step in a successful measure—and a healthy democracy—is engaging with and educating voters to exercise their franchise in an informed manner. In Arkansas, this engagement is largely completed through petition circulators or canvassers who contact voters to request their consideration—up or down—of proposed measures. But this critical component of Arkansas citizens' free speech is under serious attack.

Since 2013, the Arkansas General Assembly has passed a series of increasingly restrictive laws inhibiting Arkansans' ability to engage in a fundamental right guaranteed to all Arkansas citizens: the ballot measure process. The most recent iteration of these restrictions significantly burdens the constitutional rights of Arkansas citizens—including Plaintiffs now gathering signatures to give Arkansans the opportunity to qualify ballot questions for the 2026 election—to engage in core political speech. These laws serve no legitimate governmental purpose. This Court can decide as a matter of law that the following laws (together, "Challenged Laws") are unconstitutional:

- **The Pre-Circulation Disclosure Requirements:** Ark. Code Ann. § 7-9-601(a)(2)(C) and Ark. Code Ann. § 7-9-601(a)(2)(D) compel pre-petition circulation disclosure of personal information about paid petition canvassers

- **The Prohibition on Paid Canvassers with a "Disqualifying Offense":** Ark. Code Ann. § 7-9-601(d) prohibits paid canvassers who have a "disqualifying offense" from collecting signatures.

- **The Criminal Offense Warning:** Act 218 of 2025 requires that a canvasser,

before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense.

- **The Photo Identification Requirement:** Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition and submit an affidavit to this effect which, if false, carries criminal penalties.

- **The "True Affidavit" Requirement and Signature Collection Pause:** Act 241 of 2025 requires that a canvasser file a "true affidavit" with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. Act 241 of 2025 also states that "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1."

- **The Sponsor Publication Cost Reimbursement:** Ark. Code Ann. § 7-9-113(a)(2)(a) provides that "[f]or measures proposed by the petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication."[1]

## II. SUMMARY OF UNDISPUTED FACTS

### A. Arkansas's Initiative and Referendum Process

The right of every Arkansas citizen to consider and vote on an initiated act or an initiated constitutional amendment (collectively referred to as a "measure" or "ballot measure") concerning critical issues of state government is guaranteed by the U.S. Constitution and enshrined in the Arkansas Constitution. Specifically, Article 5, Section 1 of the Arkansas Constitution provides that "[t]he Legislative power of the people of this State shall be vested in a General Assembly, but the people reserve unto themselves the power to proposed legislative measures, laws and amendments to the Constitution, and to enact or reject the same

[1] Plaintiffs do not request summary judgment as to the other laws challenged in Plaintiffs' Complaint. Plaintiffs' challenges to the residency and domicile requirements and the pay-per-signature requirement should proceed to trial.

at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill." Statement of Undisputed Material Facts ("SUMF") ¶ 1. Over the last few decades, Arkansas citizens have exercised this right almost every election cycle.

### B. The Arkansas General Assembly's Increasing Restrictions on the Circulation of Initiative and Referendum Petitions.

The regulation of paid canvassers in Arkansas first began with the passage of Act 1413 of 2013, codified as Ark. Code. Ann. § 7-9-601. *Id.* ¶ 2. The Arkansas General Assembly amended Ark. Code Ann. § 7-9-601 in 2015, 2017, 2019, and 2021, increasing the restrictions with each subsequent amendment. *Id.* ¶ 3. Recently, the Arkansas General Assembly enacted a litany of additional restrictions on the initiative and referendum process.

Ark. Code Ann. § 7-9-601 requires that, before collecting signatures on a statewide initiative petition or statewide referendum petition, the sponsor of the initiative shall provide the canvasser with a copy of the most recent edition of the Secretary of State's initiative and referenda handbook and explain to the canvasser the Arkansas law applicable to obtaining signatures on an initiative or referendum. In addition, the sponsor must provide a complete list of all canvassers' names and current residential addresses to the Secretary of State along with a signed statement, taken under oath, stating that the person has not plead guilty to a "disqualifying offense." *Id.* ¶ 4.[2]

Ark. Code Ann. § 7-9-113(a)(2)(a) provides that "[f]or measures proposed by the petition, the petition sponsor shall reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication." Historically, publication costs of the general election were borne by the State and not the petition sponsor consistent with the

[2] Ark. Code Ann. §7-9-103(a)(4) provides that a person may not act as a canvasser on a statewide petition if the information required under Ark. Code Ann. §7-9-601 is not filed with the Secretary of State *before* that person solicits a signature. *Id.* ¶ 5.

Arkansas Constitution's provision for initiatives without taxing the costs on the petition sponsor. *Id.* ¶ 6.

Act 218 of 2025 requires that a canvasser, before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense. If the canvasser fails to do this, they are guilty of a criminal offense. *Id.* ¶ 7.

Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition, and submit an affidavit to this effect which, if false, carries criminal penalties. *Id.* ¶ 8.

Act 274 of 2025 requires that, prior to signing a petition, a person must read the ballot title or have the ballot title read to them. If a canvasser accepts a signature on the petition in violation of this requirement, then the canvasser is guilty of a misdemeanor. *Id.* ¶ 9.

Act 241 of 2025 requires that a canvasser file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. Signatures shall not be counted by the Secretary of State until this affidavit is filed. Act 241 of 2025 also states that "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1." *Id.* ¶ 10.

These restrictions on canvassing apply only to statewide measures involving the initiative and referendum process; they do not apply to countywide or municipal measures. The restrictions also do not apply to other types of petitioning in Arkansas—for example, they do not apply to candidates—nor do they apply to parties trying to qualify for the ballot. But the limitations placed

on statewide ballot measures by these statutes have no place in the Arkansas system of ordered government: they were passed by the General Assembly to prevent citizens from exercising their fundamental right to use the initiative and referendum process.

### C. Plaintiffs' Circulation of an Initiated Constitutional Amendment and Proposed Initiated Act for the 2026 Election.

Plaintiff LWVAR is a nonpartisan, nonprofit, membership organization, and is the Arkansas state affiliate of the League of Women Voters. *Id.* ¶ 16. LWVAR encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. *Id.* ¶ 17. LWVAR has approximately 400 members located in counties across the State. *Id.* at ¶ 18. Its members actively participate in the initiative and referendum process. *Id.*

Currently, LWVAR is a member of Plaintiff SARD and has registered as a ballot question committee itself for the 2026 general election. *Id.* at ¶ 19. SARD is an Arkansas ballot question committee responsible for the organization of the signature-gathering effort to certify a proposed constitutional amendment to the November 3, 2026, general election ballot, and to support its passage by Arkansas voters. *Id.* at ¶ 20. Plaintiff Bonnie Heather Miller is the president of the LWVAR, and a member of the SARD and the LWVAR ballot question committees. *Id.* ¶ 21. Plaintiff Danielle Quesnell is the president of the League of Women Voters of Benton County, and a member of the SARD ballot question committee. *Id.* ¶ 22. Ms. Miller and Ms. Quesnell are residents and registered voters in the State of Arkansas who have served as canvassers in the past and are currently canvassing and recruiting others to canvass for LWVAR and SARD's proposed initiated constitutional amendment and proposed initiated act. *Id.* ¶ 23. Because there are not enough volunteers in Arkansas for LWVAR and SARD to collect the required number of signatures, LWVAR must use paid canvassers. *Id.* ¶ 25.

For LWVAR and SARD's proposed initiated constitutional amendment and proposed initiated act to end up on the ballot, they must first obtain the Arkansas Attorney General's approval of a ballot title. Sponsors then must submit a prescribed number of signatures from registered Arkansas voters to the Secretary of State. The Secretary of State reviews and validates each signature to ensure, among other things, that it belongs to a registered voter who only signed the petition once. *Id.* ¶ 12. During the 2026 election cycle, sponsors of initiated constitutional amendments like Plaintiffs are required to present 90,704 valid signatures. *Id.* ¶ 15. Sponsors meet this requirement by using canvassers—whether volunteer or paid—who engage with Arkansas voters and attempt to persuade them to support placement of the measure on the ballot. Signatures must be submitted four months before the election. *Id.* ¶ 11. The Secretary of State may invalidate signatures for various reasons, such as illegibility, incompleteness of accompanying information, or other "material defect." Ark. Code Ann. § 7-9-126(c); SUMF ¶ 12. If the Secretary of State then validates 75 percent of the signatures submitted, the Arkansas Constitution guarantees the sponsor a final 30-day window to obtain additional valid signatures sufficient to satisfy the threshold. *Id.* ¶ 13.

**D. The Restrictions Imposed by the Challenged Acts Impair Plaintiffs' Ability to Canvass and Gather Signatures.**

The Challenged Laws severely restrict Plaintiffs' ability to engage with, associate with, and educate voters on ballot measures, as well as to collect signatures through paid and volunteer canvassers. *Id.* ¶¶ 28-30. These laws prohibitively restrict the pool of available canvassers for LWVAR and SARD. *Id.* ¶ 29. Many prior petition circulators in Arkansas are now unable or unwilling to participate in canvassing because of these laws and have seen a negative impact in their ability to engage with voters and collect signatures:

- "I have not collected signatures this year because I've been waiting to see what happens with the new laws." *Id.*

- "The new laws passed by the Arkansas Attorney General Assembly requiring a canvasser to ask for photo ID, read aloud or have the petition signer read the ballot title and advise the individual that petition fraud is a crime are severe impediments to the canvassing process and will greatly reduce the number of signatures that I could obtain in a given period of time." *Id.* ¶ 28.

- "Although I am an experienced canvasser, I am not permitted to be a paid canvasser in Arkansas due to a felony conviction when I was 15 years old. This felony conviction is over 30 years old, and my voting rights have been restored." *Id.* ¶ 29.

- "Under the new state laws, volunteering as a canvasser feels legally risky and personally intimidating. Many of the requirements are complex, technical, and easy to misinterpret. . . . These risks are a serious deterrent to people like me who want to help." *Id.*

- "[T]he requirements for initiative and referendum petitions have become so strict that even a minor, good-faith mistake by a canvasser can result in criminal charges and disqualified signatures." *Id.*

- "Under the new rules, I am deeply concerned that volunteer participation will drop and that signature collection will slow down dramatically." *Id.* ¶ 30.

- "I want to keep participating, but these new burdens make it feel more like a legal trap than a civic opportunity." *Id.* ¶ 29.

- "The cumulative impact of these requirements, . . . has made it extraordinarily difficult for volunteers like me to meaningfully participate in the initiative process." *Id.*

- "These new rules discourage participation at every level. They make it harder for voters to sign, for volunteers to canvass, and for ordinary Arkansans to use the referendum process at all." *Id.* ¶ 28.

### E. The State Offered No Legitimate Basis for the Challenged Acts.

Senator Hammer, the sponsor of these laws, has been explicit about their true purpose, stating in a radio interview that "[outside groups] drop the rock in the state, and it just ripples out from there. . . . So it's to the benefit of abortionists and to the benefit of the marijuana industry and others to be able to do whatever they have to do to get a foothold." *Id.* ¶ 35.[3] The State produced

[3] Senator Hammer's statement is not offered for its truth, but to demonstrate Senator Hammer's state of mind.

no evidence that the comprehensive suite of laws passed during the 2013 session to preserve the integrity of the initiative process have been ineffective at addressing election integrity. Indeed, there have only been five criminal convictions related to election fraud in Arkansas over the last 20 years. *Id.* ¶ 34.

## III. LEGAL STANDARD

### A. Legal Standard for Partial Summary Judgment.

A party may move for partial summary judgment under Rule 56 to obtain a "pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment. Like full summary judgment, partial summary judgment is appropriate where there is no dispute of material fact, and a reasonable fact finder could not find in favor of the nonmoving party. Fed. R. Civ. P. 56(a);*Quinn v. St. Louis Cnty.*, 653 F.3d 745, 750 (8th Cir. 2011). The burden is on the movant to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Strict Scrutiny Applies to Plaintiffs' First Amendment Claims.

The circulation of petitions is "core political speech" and the "First Amendment protection for such interaction… is 'at its zenith." *Buckley v. Am. Cost. L. Found., Inc.* 525 U.S. 182, 196 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). When analyzing the constitutionality of petition laws, this Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (quoting

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The first step is for this Court to "determine whether the challenged law 'implicate[s] the First Amendment.'" *League of Women Voters of Arkansas v. Jester*, 2025 WL 3231637, at *17 (quoting *SD Voice v. Noem*, 60 F.4th 1071, 1077 (8th Cir. 2023)). "Laws regulating the petition process implicate the First Amendment when they affect the communication of ideas associated with the circulation of a petition." *Id.* (cleaned up).

When a petition law "imposes a severe burden on the ability to engage in political speech, strict scrutiny applies." *SD Voice v. Noem*, 60 F.4th at 1080. "A severe burden is one that goes 'beyond the merely inconvenient.'" *Id.* (internal citations omitted). "Under strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest,'[] rather than a means substantially related to a sufficiently important interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). "A statute compelling disclosure of information to the government related to political activity is typically subject to 'exacting scrutiny.'" *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (8th Cir. 2022). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Americans for Prosperity Found*, 594 U.S. at 608.

## IV. ARGUMENT

Plaintiffs are entitled to summary judgment on each of the Challenged Laws. The burden that these laws inflict on Plaintiffs' core constitutional rights to engage in political speech operates to freeze the political status quo and effectively excludes all measures from the ballot. Thus, the Challenged Acts are subject to strict scrutiny. *See Miller v. Thurston*, 967 F.3d 727, 739 (8th Cir. 2020). But the requirements from which Plaintiffs seek relief also do not survive less exacting scrutiny because they are not narrowly tailored to serve the government's asserted interest. *See Dakotans for Health*, 52 F.4th 381. The Arkansas General Assembly has so restricted the ways in

which petitions may be circulated to place measures on the ballot that it infringes upon the core political speech of Arkansas citizens and Plaintiffs in violation of the First Amendment to the Constitution of the United States and the Arkansas Constitution. The Challenged Acts do not pass muster under either level of scrutiny, and the Court should grant summary judgment.

**A. The Pre-Circulation Disclosure Requirements Are Unconstitutional.**

Ark. Code Ann. § 7-9-601 (a)(2)(C) and Ark. Code Ann. § 7-9-601 (a)(2)(D) compel pre-petition circulation disclosure of personal information about paid petition canvassers, making them subject to potential harassment. Ark. Code Ann. § 7-9-126(4)(A) provides that all signatures collected by any paid canvasser prior to their name being provided to the Secretary of State are not to be counted for any purpose. Ark. Code Ann. § 7-9-103(a)(4) provides that no person may act as a paid canvasser unless the sponsor has not provided the required information under § 7-9-601 to the Secretary of State prior to the circulation of a petition and Ark. Code Ann. § 7-9-103(c)(5) makes it a crime to accept or pay money acting as a canvasser, sponsor or agent to any person whose name was not included on the sponsor's list that was submitted to the Secretary of State.

These pre-circulation disclosure requirements are almost identical to those that the Eighth Circuit already found to be intrusive, burdensome, and unconstitutional. *Dakotans for Health*, 52 F.4th at 391. In *Dakotans for Health*, a ballot question committee challenged a law that required the production of paid canvassers' personal information, permitted public disclosure of that information "while the petitions are still being circulated and prior to commencement of the signature verification process," and voided all signatures collected by a canvasser who failed to provide or update the information. 52 F.4th at 384–85. On the merits, the court applied exacting scrutiny and found the law inadequately tailored to the state's interest in the integrity of the ballot-initiative process. First, the law contradicted precedent by discriminating against paid canvassers without adequate reason. *Id.* at 390. Second, the requirement for disclosure before the end of

canvassing was a "recipe for harassment" and a "severe burden on speech," and "chilling in today's world." *Id*. at 391–92.

The facts here and the facts in *Dakotans for Health* are nearly identical. Each of the pre-circulation disclosure requirements relates to the disclosure of personal information including the canvasser's "name and current residential address prior to circulation of a petition." The names and address of the canvassers and the signed statement are now public records and subject to public disclosure pursuant to the Arkansas Freedom of Information Act. In June 2024, the opponents of one of the measures being circulated obtained the canvasser lists and published them on their website, subjecting those individuals to personal harassment and doxxing. SUMF ¶ 33. This was all intended to deter petition canvassers from bringing ballot measures to the electorate (and effectively doing so). The potential disclosure of canvassers' information creates a significant barrier to a sponsor's ability to hire canvassers and impermissibly limits the pool of available canvassers. *Id.* ¶ 29 (citing Dkt. 20-5).

This *threat* of public disclosure—created by the pre-circulation disclosure requirements—chills Plaintiffs' speech. The chilling effect is very real: "As a paid canvasser my name and address were on a list that was sent by the sponsor to the Arkansas Secretary of State *before* I could begin collecting signatures. *During* the signature collection process the Arkansas Family Council, who opposed both the medical marijuana and abortion amendments published the name of all paid canvassers and our hometowns on their website. . . . The fact that an organization would publish my name and hometown concerns me greatly and in my opinion is a veiled threat and a form of intimidation. . . . The publication of my name and hometown gives me a great deal of concern for my safety and the safety of others." *Id*. (emphasis added). As this Court recognized, "[t]he chill on Arkansans' speech is especially stark here because circulators of controversial petitions were actually targeted for harassment in the last election cycle." *League of Women Voters of Arkansas*

*v. Jester*, 2025 WL 3231637, at *23. There is no reason to depart from the Eighth Circuit's precedent. *Dakotans for Health*, 52 F.4th at 391. This Court should grant summary judgment and find the pre-circulation disclosure requirements unconstitutional.

### B. The Statute Prohibiting Citizens with "Disqualifying Offenses" from Paid Canvassing Is Unconstitutional.

Ark. Code Ann. § 7-9-601(d) prohibits paid canvassers who have a "disqualifying offense" from collecting signatures. The list of "disqualifying offense[s]" is exhaustive and includes all felonies and 15 other listed offenses. Ark. Code Ann. § 7-9-601(f) provides that signatures collected in violation of this section shall not be counted by the Secretary of State for any purpose. Because there is no time limit for the offense, an individual who was convicted of a simple misdemeanor offense 40 years ago is still prohibited from collecting signatures on a petition. *Id.* Preventing individuals who fall within the expansive list of "disqualifying offenses" from collecting signatures significantly reduces the pool of potential canvassers available to Plaintiffs. For example, Lee Evans would like to be a paid canvasser but cannot because he was convicted of shoplifting in 1998 and marijuana possession in 2002 (both misdemeanor convictions). SUMF ¶ 30 (citing Dkt. 20-8). Similarly, Amy Cruz was convicted of a felony nearly 30 years ago when she was still a minor. *Id.* ¶ 29 (citing Dkt. 20-4). Although her voting rights have been restored in Arkansas, she is prohibited from paid canvassing under this statute. *Id.*

Barring citizens from collecting signatures on petitions for offenses that occurred decades ago and that have no relation to any conduct involved in canvassing imposes an unreasonable restriction on their right to circulate petitions, reducing the LWVAR and SARD's ability to collect signatures because it reduces the pool of canvassers available. Further, "individual would-be canvassers with disqualifying offenses have their own First Amendment interests at stake . . ." *League of Women Voters of Arkansas v. Jester*, 2025 WL 3231637, at *24. Plaintiffs have sought

leave to amend their Complaint to add Mr. Evans and Ms. Cruz as individual plaintiffs. *See* Dkt. 64. The Court should grant leave to amend the Complaint and should grant summary judgment for the additional reasons advanced by the new Plaintiffs.

The "disqualifying offense" restrictions on paid circulators serve no legitimate governmental purpose, but even if they did, they are not narrowly tailored. Absent evidence to the contrary, paid circulators do not pose a greater risk to the integrity of the petition process and are not more likely to accept a false signature than a volunteer. Further, any argument that these restrictions are reasonable restrictions melts before the artificial distinction that disqualifies Mr. Evans from collecting signatures for measures but allowing him to collect signatures for candidates and new political parties seeking ballot access. SUMF ¶ 30 (citing Dkt. 20-8). Restrictions like these that "discriminate against paid circulators for reasons unrelated to legitimate state interests" violate those individuals' rights to free speech. *See Dakotans for Health*, 52 F.4th at 392. This Court should grant summary judgment and find Ark. Code Ann. § 7-9-601(d) and (f) unconstitutional.

### C. The Canvassing Restrictions, Individually and Collectively, Are Unconstitutional.

Individually and collectively, Act 218 of 2025, Act 240 of 2025, and Act 274 of 2025 (together, the "Canvassing Restrictions") significantly restrict the canvassing process in Arkansas. They were designed and enacted to interfere with Arkansas citizens' right to petition by making the on-the-ground process of petitioning drastically more difficult if not outright impossible. They also violate the right to free speech, burdening an open discussion of political issues.

#### *1. The Criminal Offense Warning Violates the First Amendment.*

Act 218 requires that a canvasser, before allowing a person to sign a petition, must disclose to the person that "petition fraud" is a criminal offense. The canvasser must convey this statement

verbally unless that is "impossible," in which case it must be conveyed in writing. If the canvasser fails to do this, the canvasser is guilty of a criminal offense. This law severely burdens speech because it scares voters who would otherwise be willing to engage with canvassers and/or sign petitions. *See* SUMF ¶ 28; *see also Buckley,* 525 U.S. at 198–99. The State has provided nothing more than conjecture to justify this burden on speech. It "merely posit[s] the existence of the disease sought to be cured." That is not enough. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). Individually, this law cannot pass muster.

***2. The Photo Identification Requirement Violates the First Amendment.***

Act 240 of 2025 requires the canvasser to view a person's photo identification before obtaining their signature on the petition and submit an affidavit to this effect which, if false, carries criminal penalties. This law creates a severe burden on speech because it necessarily reduces the number of individuals that will engage with canvassers and/or sign petitions. Some people will not have their photo identification with them at the time a canvasser approaches. Others will not produce photo identification to a stranger. SUMF ¶ 31. For those carrying identification who are willing to show it, the process consumes a significant amount of time as the canvasser engages in verification. *Id*. As with the other Canvassing Regulations, this one deters canvasser participation. *Id.* ¶ 29. Thus, "the ID Verification Requirement imposes a severe burden on petitioning." *League of Women Voters of Arkansas v. Jester*, 2025 WL 3231637, at *27.

The State cannot justify imposing this additional burden. Under existing law, no petition is counted until the Secretary of State verifies the voter's handwriting on the petition matches the voter's signature on file. *See* Ark. Code Ann. § 7-9-103(a)(1)(A) (stating information petitioners are required to provide); Ark. Code Ann. § 7-9-126(c) (reasons Secretary may invalidate). The State criminalizes signing a petition if one is not authorized to do so, Ark. Code Ann. § 7-9-103(b)(3), and then verifies every petition to confirm it is signed by a valid voter. There is no

evidence in the record that this process is not effective because it is—indeed the State has put nothing in the record to establish election integrity issues in the ballot measure process. Requiring voters whose handwriting has been verified to also show photos to canvassers is nothing more than an additional burden designed to reduce chances to gather petition signatures that serves no legitimate state purpose. Individually, this law cannot pass muster.

***3. The Reading Requirement Violates the First Amendment.***

Act 274 of 2025 requires that, prior to signing a petition, the canvasser must read the ballot title aloud or wait as the signer reads it to herself in the canvasser's presence. If a canvasser accepts a signature on the petition in violation of this requirement, then the canvasser is guilty of a misdemeanor. This law expands the time that canvassers must spend with each potential signer and leads people to disengage from canvassers. According to the testimony of the Secretary of State's office at the public hearing on Act 274, the time to listen to or read any ballot title could take up to eight minutes. SUMF ¶ 27. The reading time is compounded by the need to interact with thousands of signers, those extra minutes add up to hours during which canvassers could be speaking with and collecting signatures from others—"a speech diminution of the very kind produced by the ban on paid circulators at issue in *Meye*r." *Buckley*, 525 U.S. at 193–94. The Reading Requirement "tremendously slow[s] down the process and dramatically affect[s] the number of signatures that a canvasser could collect in a given period of time." SUMF ¶ 32. The burden is severe—the evidence shows that the Reading Requirement and causes canvassers to forfeit opportunities to speak with voters.

The State cannot justify this severe burden. Under existing law, the State can and does punish anyone who "[k]nowingly misrepresents the purpose and effect of the petition or the measure affected for the purpose of causing a person to sign a petition." Ark. Code Ann. § 7-9-103(a)(3)(6). This new law is simply a mechanism to burden speech. Individually, this law cannot

pass muster.

#### *4. Collectively, the Canvassing Requirements Violate the First Amendment.*

Although each of the Canvassing Requirements individually violates the Constitution, the severe burden of these laws only magnifies when they are applied together. Canvassers must execute *all three* of the Canvassing Requirements during *every* interaction they have with *each* potential signer—resulting in more time needed with each signer, greater likelihood of repelling potential signers, and greater deterrence to canvasser participation. "[T]ogether, laws which more than triple the time necessary to collect a single signature and which discourage half of past canvassers from participating in the future impose a severe burden." *League of Women Voters of Arkansas v. Jester*, 2025 WL 3231637, at *26 (discussing the burden of the Canvassing Requirements). Thus, the Canvassing Requirements are subject to strict scrutiny, and it is the State's burden to justify them. *See Meyer*, 486 U.S. at 425. The State has failed to "prove that the restriction[s] further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 952 (8th Cir. 2018). This is especially true because the State's interests are diminished in the petition-gathering context. *See Meyer*, 486 U.S. at 427 ("[Th]e risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting.").

The State has not produced evidence of any actual fraud for these laws to address. The statutes are not targeted at specific fraudsters—instead, they impermissibly burden the speech of everyone who participates in the process. *See Buckley*, 525 U.S. at 510 (Thomas, J., concurring) (finding badge requirement not narrowly tailored because it "burdens all circulators, whether they are responsible for committing fraud or not"). Moreover, the State's ends in preventing fraud can be met (or already are met) in other, less restrictive ways: affixing information about the ballot title and petition fraud to petitioners' materials; enforcing fraud laws; and relying on the Secretary

of State's current process for identifying invalid signatures, which already successfully identifies unintentional mistakes. There is no evidence that the State is validating petitions that should not have been counted.[4] The Canvassing Requirements violate the First Amendment, and the Court should grant summary judgment on this claim.

**D. The Affidavit and Cool-Off Requirements of Act 241 Are Unconstitutional.**

Act 241 of 2025 requires that a canvasser file a "true affidavit" with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas laws regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle. The affidavit serves no purpose but to intimidate a canvasser. And it is effective. *See, e.g.*, SUMF ¶ 29 (Citing Dkt. 20-3). Arkansas already has laws criminalizing, prohibiting and penalizing perjury, forgery, and all other felonies or fraudulent practices, in the securing of signatures or filing of petitions, (*see* Ark. Code Ann. § 5-55-601 (offense of petition fraud is a class D felony)), and there is no evidence that these protections are inadequate to assure integrity in the ballot and referendum initiative process in Article 5. The Act states that the signatures shall not be counted by the Secretary of State until *after* this affidavit is filed. The addition of the affidavit and its strict compliance requirements is a transparent effort to give the Secretary of State a reason not to count signatures of registered voters who exercised their constitutional right to sign the petition. The affidavit requirement imposes a severe burden on the Plaintiffs' core political speech and is not narrowly tailored to advance a compelling state interest.

[4] Even if the Canvassing Requirements did not trigger strict scrutiny—they do, they could not satisfy the lesser burden that they be "reasonable, nondiscriminatory, and further[] an important regulatory interest." *Miller*, 967 F.3d at 740. To meet this requirement, the State must do more than "merely rel[y] on a bare assertion of election integrity rather than evidence or a reasonable response connected to" asserted problems in the petitioning process. *SD Voice v. Noem*, 60 F.4th 1071, 1081 (8th Cir. 2023). The State has presented no recent evidence of fraud in the initiative process—there is none, and it cannot show that the laws constitute a reasonable response to any purported fraud if there was any.

And an even greater prohibition lurks in Act 241: "[a] canvasser who has filed a true affidavit under subsection (i) of this section shall not collect additional signatures unless the Secretary of State determines that the sponsor of the initiative petition or referendum petition is eligible for an amendment to the initiative petition or referendum petition under Arkansas Constitution, Article 5, Section 1." In other words, once a canvasser turns in a list of supporting citizens, the canvasser must await further action by the Secretary of State before collecting additional signatures. Specifically, after the petitions are turned in to the Secretary of State, and while the Secretary of State is verifying the signatures on the petitions to see if they met the threshold for certification or qualify for a 30-day cure period, the person who collected signatures and filed the affidavit cannot collect any more signatures until the Secretary of State determines that the sponsor is entitled to a cure. Prohibiting canvassers from collecting signatures during this period substantially hinders sponsors' ability to collect the requisite number of signatures and serves no purpose. Nor does this provision make sense: individuals who had not previously collected signatures and therefore had not filed an affidavit could collect signatures, but those who had previously acted as a canvasser could not. There is no legitimate reason for this distinction.[5] Act 241's clear purpose is to disrupt the canvassing process. It serves no legitimate state interest at all.

### E. The Statute Requiring the Petition Sponsor to Cover Publication Costs Is Unconstitutional.

Ark. Code Ann. § 7-9-113(a)(2)(a) provides, in contravention of express provisions of the Arkansas Constitution, that "[f]or measures proposed by the petition, the petition sponsor shall

---

[5] The Arkansas Supreme Court previously struck down a similar requirement because it acted "as an unwarranted restriction on the right to circulate a petition" and "violated the rights to petition and liberty of speech granted in Article 2, §§ 4 and 6 of the Constitution of the State of Arkansas." *McDaniel v. Spencer*, 2015 Ark. 94, 14-15, 457 S.W.3d 641, 652-53 (2015), *as revised* (Mar. 11, 2015).

reimburse the cost of publication to the Secretary of State within thirty calendar days of notification of the final costs of publication." The Arkansas Constitution provides for initiatives without taxing the costs on the petition sponsor, and all such publication costs of the general election have always been borne by the State and not the petition sponsor. Publication costs can be prohibitively significant. In 2022, Responsible Growth Arkansas, the sponsor of the initiative to legalize marijuana, was required to pay $86,733.06 in publication costs to the Secretary of State. SUMF ¶ 25. In 2024, Local Voters in Charge, the sponsor of an initiative to remove the casino license in Pope County, was required to pay $57,890.57 in publication costs to the Secretary of State. *Id.* These publication costs will inhibit the publication of petitions sponsored by people who are unable to afford the significant added costs imposed by this Unconstitutional Act, chilling access to the mechanisms provided in Article V of Arkansas' Constitution and effectively operating as a poll tax. *Id.* There is no evidence that this statute serves a legitimate state interest, let alone a compelling one.

Plaintiff Miller, President of Plaintiff LWVAR and chair of Plaintiff SARD, testified that these publication costs will inhibit the publication of petitions. *Id.* When a petition's sponsor is concerned it cannot afford the significant costs imposed by this requirement and thus, potentially not bring a petition at all, it generally chills access to the mechanisms provided in Article V of the Arkansas Constitution and effectively operates as a poll tax. *See id.*; *see also League of Women Voters of Arkansas v. Jester*, 2025 WL 3231637, at *31 (The publication cost requirement "effectively holds ballot access for ransom while the State is out the money regardless of whether the sponsor pays."). Ark. Code Ann. § 7-9-113(a)(2)(a) is unconstitutional; this Court should grant summary judgment on this Act as well.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion

for Partial Summary Judgment and enter judgment that the Challenged Laws are unconstitutional.

Dated: April 17, 2026

Respectfully submitted,

/s/ Cara Lawson

David A. Couch
PO Box 7530
Little Rock, AR 72227
(501) 661-1300
david@davidcouchlaw.com

*Counsel for the Plaintiffs*

Michael Dockterman
Cara Lawson
McDermott Will & Schulte LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
(312) 372-2000
mdockterman@mcdermottlaw.com
clawson@mcdermottlaw.com

*Counsel for Plaintiff League of Women Voters of Arkansas*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2026, I filed the foregoing on the CM/ECF system, which will serve notice on counsel for all parties.

*/s/ Cara Lawson*

Cara Lawson