IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS;
SAVE AR DEMOCRACY; BONNIE HEATHER
MILLER; and DANIELLE QUESNELL                                  PLAINTIFFS

and

PROTECT AR RIGHTS; and FOR AR KIDS          INTERVENOR-PLAINTIFFS

V.                              CASE NO. 5:25-CV-5087

COLE JESTER, in his Official Capacity
as Secretary of State of Arkansas                              DEFENDANT


**<u>MEMORANDUM OPINION AND ORDER</u>**

**TABLE OF CONTENTS**

I. BACKGROUND ........................................................................................................ 1

   A. Arkansas's Initiative and Referendum Process................................................ 1

   B. Parties .............................................................................................................. 6

   C. Enactment of the Challenged Laws................................................................. 7

II. LEGAL STANDARD ............................................................................................. 17

III. DISCUSSION ....................................................................................................... 18

   A. Jurisdictional Issues....................................................................................... 18
     1. Sovereign Immunity ................................................................................. 18
     2. Act 602: Mootness.................................................................................... 21
     3. Pre-Collection Disclosure Requirement: Standing .................................. 22
     4. Disqualifying Offenses Provision: Standing............................................ 23
     5. Reading Requirement: Standing ............................................................. 24
     6. Publication Cost Reimbursement Requirement: Standing and Ripeness.......... 25

   B. First Amendment Claims ............................................................................... 26
     1. Residency and Domicile (Act 453) Requirements .................................. 28
     2. Pre-Collection Disclosure Requirement .................................................. 31
     3. Disqualifying Offenses ............................................................................ 34
     4. Commission/Pay-Per-Signature Ban........................................................ 37
     5. Fifty County Requirement ....................................................................... 38
     6. The Canvassing Regulations (Acts 218, 240, and 274) .......................... 39
     7. Act 241: Post-Collection Affidavit Requirement and Cool Off Period ................. 49
     8. Act 273: Signature Exclusion Provision .................................................. 51
     9. Publication Cost Reimbursement Requirement........................................ 52

   C. Vagueness Claims.......................................................................................... 54

   D. Permanent Injunction Factors ....................................................................... 58

IV. CONCLUSION ..................................................................................................... 59

Now before the Court are Plaintiffs', Intervenor-Plaintiffs', and Defendant's respective Motions for Summary Judgment (Docs. 83, 86, 89 & 129). Defendant has also filed a Motion for Judgment on the Pleadings (Doc. 114). Each of these motions is fully briefed and the Court has reviewed all relevant documents.

## I.  BACKGROUND

### A.  Arkansas's Initiative and Referendum Process

Under Article 5, § 1 of the Arkansas Constitution, the people of Arkansas  "reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill." Before Arkansans can exercise their power at the polls, someone must successfully petition to get the initiative or referendum on the ballot.[1] "[Petition sponsors] seek by petition to achieve political change in [Arkansas]; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment." *Meyer v. Grant*, 486 U.S. 414, 421 (1988).

To get a measure on the ballot, a petition sponsor must collect valid signatures from a certain percentage of Arkansas voters: six percent of legal voters for referendums, eight percent for laws, and ten percent for constitutional amendments.[2] Under the Arkansas Constitution, sponsors must also get signatures from a certain percentage of voters in at least fifteen of Arkansas's seventy-five counties. The General Assembly has

---

[1] Initiatives are measures referred directly by the people to the people. Referendums are votes by the people on whether to veto a law passed by the General Assembly.

[2] The number of legal voters is equal to "[t]he total number of votes cast for the office of Governor in the last preceding general election." Ark. Const. art. V, § 1.

1

legislatively raised the number of counties from which sponsors must meet the requisite percentage to fifty. Ark. Code Ann. § 7-9-126(e). For the 2026 election, a petition sponsor must gather 90,704 signatures to qualify an initiated constitutional amendment for the ballot. Ark. Sec'y of State, 2026 Initiatives and Referenda Handbook 2 (2025) [hereinafter Handbook].[3]

Before it can start gathering signatures, a petition sponsor must submit the full text of the measure, a proposed popular name, and a proposed ballot title to the Attorney General and receive his certification for the popular name and ballot title. If the popular name and ballot title are rejected, the sponsor can amend and resubmit them. The Attorney General can also substitute and certify "a more suitable and correct ballot title." Ark. Code Ann. § 7-9-107(d)(1). "The ballot title must be an impartial summary of the proposed amendment, and it must give voters a fair understanding of the issues presented and the scope and significance of the proposed changes in the law." *Wilson v. Martin*, 2016 Ark. 334, at 7 (2016). It "must be free from misleading tendencies that, whether by amplification, omission, or fallacy, thwart a fair understanding of the issue presented," "[i]t cannot omit material information that would give the voters serious ground for reflection," and it must be "complete enough to convey an intelligible idea of the scope and import of the proposed law." *Id.*

After the Attorney General approves a ballot title and popular name but before beginning circulation of a statewide petition, "the sponsor shall file a printed petition part

---

[3]        https://www.sos.arkansas.gov/uploads/elections/2025-2026_I_R_Handbook_-_December_2025_(00000005)_Final_copy_12.31_.25_.pdf        [https://perma.cc/6RJS-K9EK].

with the Secretary of State in the exact form that will be used for obtaining signatures." Ark. Code Ann. § 7-9-104(c)(2).

Petitions are divided into "petition parts," which are the actual packets of paper that people sign. Each petition part contains one signature page, and each signature page contains ten signature lines. Handbook at 87. Each petitioner must sign and print their name and list their date of birth, home address, and date of signing. *Id.*; Ark. Code Ann. § 7-9-104(a). The signature page must be attached to: a page of "Instructions to Canvassers and Signers" which lists qualifications to sign the petition and petition-related crimes; and the proposed measure's full text, popular name, and ballot title. Ark. Code Ann. § 7-9-108(c). The list of petition-related crimes "shall be in larger type than the other instructions." Ark. Code Ann. § 7-9-108(c). The signature page and the materials that must be attached thereto constitute one petition part. All the signatures on a petition part must be from the same county. *Id.* § 108(d). At the bottom of each signature page, canvassers must complete an affidavit, attesting

> that each of the foregoing persons signed his or her own name to this sheet of the petition in my presence. To the best of my knowledge and belief, each signature is genuine and each signer is a registered voter of the State of Arkansas, [in the County listed at the top of the petition]. At all times during the circulation of this signature sheet, an exact copy of the popular name, ballot title, and text was attached to the signature sheet. My current residence address is correctly stated below.

*Id.* § 109(a). The canvasser must sign the affidavit in the presence of a notary, list their home address, and indicate whether they are paid or volunteer. *Id.* The notary must verify the identity of the canvasser and personally witness their signature before notarizing the affidavit. *Id.*; *id.* § 103(c)(8). Because the law requires a notarized affidavit on every

signature page, and each signature page contains ten signatures, at least 9,071 of these affidavits must be completed to qualify one constitutional amendment for the ballot.

For initiative petitions on statewide measures, sponsors have until four months before a general election to get enough signatures and submit their petitions to the Secretary of State. Ark. Const. art. V, § 1. Referendum petitions, on the other hand, must "be filed with the Secretary of State not later than ninety days after the final adjournment of the session at which such Act was passed." *Id.*

Arkansas law sensibly criminalizes malfeasance in the petition process, including "knowingly . . . [s]ign[ing] a name other than his or her own name," Ark. Code Ann. § 7-9-103(b)(1); "knowingly . . . [s]ign[ing] his or her name more than one (1) time to a petition," *id.* § 103(b)(2); when acting as a canvasser, "[k]nowingly misrepresent[ing] the purpose and effect of the petition or the measure affected for the purpose of causing a person to sign a petition," *id.* § 103(c)(6); and when acting as a canvasser, "knowingly mak[ing] a false statement on a petition verification form," *id.* § 103(c)(7). "When the official charged with verifying the signatures has reasonable grounds to believe that one (1) or more signatures on a petition is forged, the official shall report the suspected forgery and basis for suspecting forgery to . . . [t]he Division of Arkansas State Police, in the case of a statewide petition." *Id.* § 103(e).

In addition to these criminal penalties, the Secretary of State also undertakes a robust review of the signatures. Once a sponsor submits a petition, the Secretary of State must decide whether the petition is "sufficient" in terms of the ballot title, popular name, and number of signatures. Ark. Const. Art. 5, § 1; *Armstrong v. Thurston*, 2022 Ark. 167, at 6–7 (2022). Counting signatures is a two-step process. For the first step, the "initial" or

4

"facial" count, Arkansas law requires the Secretary to exclude signatures or whole petition parts and all the signatures contained therein for any number of reasons ranging from technical to nefarious. *See* Ark. Code Ann. § 7-9-126(b)(5)(B) ("A petition part and all signatures appearing on the petition part shall not be counted . . . if . . . [t]he canvasser verification . . . [l]acks a legible notary signature or a legible notary seal."); *id.* § 126(c)(2) (directing officials not to count "[a] signature that is obviously not that of the purported petitioner"). To survive this step, the petition—minus excluded signatures—must contain "the designated number of signatures required by the Arkansas Constitution and statutory law in order to certify the measure for the election ballot." *Id.* § 126(d).

Step two is verifying the remaining signatures. "The Secretary of State reviews and validates each signature to ensure, among other things, that it belongs to a registered voter who only signed the petition once." (Doc. 99, ¶ 12). If the verified signatures after step two fall short of the total needed to qualify the measure but are equal to at least seventy-five percent of the total and meet the minimum requirements for the number of counties, the Secretary must permit the sponsor a thirty-day "amendment" or "cure" period to collect additional signatures. Ark. Const. art. 5, § 1; Ark. Code Ann. § 7-9-126(f).

The Secretary of State's sufficiency determination is not final, however. The Arkansas Supreme Court has original and exclusive jurisdiction to review his decision. Ark. Const. art. 5, § 1. The Arkansas Supreme Court reviews the Secretary's "three types of sufficiency determinations": (1) the sufficiency of the ballot name and title, (2) the facial sufficiency of the petition (step one above), and (3) the sufficiency of the petition during and after signature verification process (step two above). *Cowles v. Thurston*, 2024 Ark. 121, at 3 (2024). The Court does not defer to the sufficiency determinations of the

Secretary of State or, with respect to ballot titles and popular names, the Attorney General. *Paschall v. Thurston*, 2024 Ark. 155, at 3 n.1 (2024).

Even before the passage of many of the challenged laws, the regulations described above limited ballot access. On average, less than one citizen-initiated amendment per election cycle has made the ballot for the past several decades. (Doc. 90, p. 1). To become law, a proposed constitutional amendment must secure "a majority of all registered voters eligible to vote upon the constitutional amendment." Ark. Const. art. 5, § 1. Other measures (initiated laws and referendums) must secure "a majority of the votes cast upon such measure." *Id.*

### B.  Parties

Plaintiffs League of Women Voters of Arkansas ("LWVAR") and Save AR Democracy ("SARD") are ballot question committees sponsoring petitions in the 2026 election cycle. Plaintiffs Bonnie Miller and Danielle Quesnell are members of both LWVAR and SARD. Plaintiff Lee Evans is a resident of Washington County, Arkansas, and Plaintiff Amy Cruz is a resident of Lee County, Arkansas. Mr. Evans and Ms. Cruz would like to work as paid canvassers on ballot measures in Arkansas but are legally barred from doing so because of their criminal histories.

Intervenor-Plaintiffs For AR Kids and Protect AR Rights are ballot question committees circulating petitions for the 2026 general election.

Defendant Cole Jester is the Arkansas Secretary of State. He is charged by the Arkansas Constitution with certifying initiative and referendum petitions and is sued in his official capacity.

### C. Enactment of the Challenged Laws

The challenged laws dates back to 2013, when the General Assembly enacted sweeping reforms to the petition process, including many of the unchallenged laws described above. The General Assembly found that, of the four petitions submitted in the 2012 election cycle, "none had an initial validity rate in excess of fifty-six percent (56%), and three (3) of the petitions had an initial validity rate below thirty-one percent (31%)." Ark. Act 1413 of 2013 sec. 1(a)(5). The General Assembly also found that, "[o]f the three petitions with the lowest initial validity rate, there were widespread instances of apparent fraud, forgery, and false statements in the signature-gathering process." *Id.* sec. 1(a)(6). The General Assembly noted that "[s]ponsors and paid canvassers may have an incentive to knowingly submit forged or otherwise invalid signatures" and that, "if an effort is not made to address these issues . . . [u]*ntrained* paid canvassers will continue to obtain and submit forged and otherwise facially invalid signatures." *Id.* sec. 1(a)(3), 1(b)(1) (emphasis in original). No one was ever charged with or convicted of fraud, forgery, or false statements in connection with the 2012 petitions, and Defendant has presented no evidence that there were any actual frauds, forgeries, or false statements.[4]

Only a portion of the 2013 changes are challenged in this litigation. Plaintiffs and IP both challenge the pre-collection disclosure requirement: under Arkansas Code § 7-9-601(a)(2)(C)–(D), a petition sponsor must "[p]rovide a complete list of all paid canvassers' names and current residential addresses to the Secretary of State" and "[s]ubmit a copy of the signed statement provided by the paid canvasser under subdivision (d)(3) [requiring

---

[4] Defendant cites two newspaper articles about investigations following the 2012 election. "Newspaper articles are 'rank hearsay.'" *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010) (quoting *Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 147 (8th Cir.1991)).

a canvasser to affirm that they have not been found guilty of a disqualifying offense]." Arkansas's Freedom of Information Act ("FOIA") does not exempt these lists from public disclosure on request. *See* Ark. Code Ann. § 25-19-105.

In 2024, "the Arkansas Family Council who opposed both the medical marijuana and abortion amendments published the name[s] of all paid canvassers and our hometowns on their website." (Doc. 20-5, ¶ 5 (White Dec.)). Canvassers whose names were published described this action as "a veiled threat and a form of intimidation," *id.*, which "threaten[ed] [their] physical safety," Doc. 24-15, ¶ 12 (Guthrie Dec.). As one canvasser put it: "If the law that allows them to publish my name stays in place, I will have to seriously reconsider whether I can keep canvassing due to concerns over my safety." (Doc. 20-5, ¶ 5).

Plaintiffs also challenge the disqualifying offense provision (as it now exists) which bars people with certain disqualifying offenses from working as paid canvassers for ballot measures. At the time it was enacted in 2013, the only disqualifying offenses were "violation[s] of the election laws, fraud, forgery, or identification theft." 2013 Ark. Act 1413, sec. 21, § 7-9-601(b)(3).

In the intervening years, the General Assembly continued to, from time to time, add additional restrictions to petition activities. In 2015, the General Assembly made all felonies disqualifying offenses. 2015 Ark. Act 1219, sec. 4, § 7-9-601(d)(3). Under Arkansas law, "[b]efore the election at which any proposed or referred measure is to be voted upon by the people, notice shall be published in two (2) weekly issues of some newspaper in each county." Ark. Code Ann. § 7-9-113(b)(1). The Secretary of State is "charged with the duty of letting contracts for publishing notices." *Id.* § 113(a)(1). In 2017,

the General Assembly mandated that petition sponsors reimburse the Secretary of State for the cost of publication. Ark. Act 982 of 2017. Both sides agree that these costs are significant.

In 2021, the General Assembly limited canvassing (paid and volunteer) for initiative and referendum petitions to Arkansas residents only and banned payment on a basis related to the number of signatures collected. *See* Ark. Act 951 of 2021, sec. 1(6), sec. 7(g)(1). Defendant asserts that the residency requirement is necessary to protect Arkansans from "criminal canvassers." (Doc. 90, p. 5). The residency requirement followed a decision by the Arkansas Supreme Court holding Arkansas's previous background check requirement for paid canvassers unconstitutional. The Court found the background check requirement unconstitutional because it was impossible to comply with: the sponsor was required to obtain both a federal and state criminal record search from the Arkansas State Police specifically, but the Arkansas State Police can only run state criminal history record searches. *Thurston v. Safe Surgery Ark.*, 2021 Ark. 55 (2021). Following this decision, the General Assembly passed Act 951 of 2021. In passing that law, the General Assembly found "that petition canvassers in the State of Arkansas have been approaching Arkansas voters without first passing the required criminal history and criminal record searches" and "that the use of canvassers who have not passed criminal history and criminal record searches poses a threat to the health and safety of voters who may give personal information to canvassers with disqualifying offenses." *Id.* sec. 9.

There is no evidence in the record connecting any canvassers (with or without a criminal history) to any crimes against petitioners. After Act 951, the background check requirement still applies only to paid canvassers. *See* Ark. Code Ann. § 7-9-601(a)(2)(F),

(b)(1).  Sponsors are now required to both "[o]btain the criminal history and criminal record of the paid canvasser" from any source, and to "obtain, at the sponsor's cost, from the Division of Arkansas State Police, a current state criminal history and criminal record search." *Id.* Defendant claims that the residency requirement (which applies to both paid and volunteer canvassers) is necessary to make the background checks conducted by the Arkansas State Police more effective at verifying whether a paid canvasser has a disqualifying offense. (Doc. 90, p. 5).

Act 951 of 2021 also bans "payment[ ] on a basis related to the number of signatures obtained on a statewide initiative petition or statewide referendum petition." Defendant primarily relies on inadmissible hearsay to support the claim that paid canvassers are more likely to commit petition fraud,[5] but he also points to a declaration submitted by Intervenor-Plaintiffs which states: "During a typical initiative campaign, thirty percent of volunteer signatures are culled as invalid and forty-five percent of paid-canvasser signatures are culled as invalid." (Doc. 24-6, ¶ 12 (Kopsky Dec.)). This could be explained by more fraud among paid canvassers, or it could be explained by the fact that paid canvassers are subject to more regulations which give the Secretary of State more reasons for invalidating signatures unrelated to fraud.

---

[5] Defendant relies on a 2007 law review article and a 2023 NPR article connecting pay-per-signature with increased incidence of fraud. As the Court previously noted, the primary source for the 2007 law review article's claim is no longer available. (Doc. 50, p. 15 n.11). And both these sources are inadmissible hearsay. Defendant argues that they are not offered for their truth but instead "to show that the Legislature was aware of certain issues with and abuses of the petitioning process." (Doc. 109, p. 3). There is no evidence that the law review article was known to the legislature in 2021, and the NPR article could not have been known to the legislature in 2021 because it was not published until 2023.

Lastly, Act 951 added twelve categories of offenses to the list of disqualifying offenses. Because all felonies were already classed as disqualifying, the twelve new categories only extend the reach of the statute to more misdemeanors. The categories include "violation[s] of the drug and narcotics laws," "[t]respass," "[v]andalism," and "simple theft or larceny." 2021 Act 951, sec. 6, § 7-9-601(3)(ii). There is no time limit on the disqualifying effect of these convictions. There are no background checks or disqualifying offenses for paid canvassing on behalf of an independent candidate or new political party. Ark. Code Ann. §§ 7-7-103(b)(3)(C), 205(a); Doc. 20-8, ¶ 5 (Evans Dec.).

Plaintiff Lee Evans operates a political consulting business that provides paid canvassing services in Arkansas. He is personally unable to collect signatures on ballot measures because of decades-old misdemeanor marijuana possession and shoplifting convictions that have since been sealed. (Doc. 129-1, pp. 15:24–17:12, 18:13–15 (Evans Dep.)). In the campaigns he was legally allowed to work in Arkansas, he has never had a signature disqualified. *Id.* at p. 12:17–20. He was paid by signature in Arkansas until the law was changed. *Id.* at p. 12:8–10.

Plaintiff Amy Cruz is a professional canvasser. She is disqualified from working as a paid canvasser on ballot measures in Arkansas based on a decades-old felony conviction for an aggravated robbery committed when she was fifteen. (Doc. 129-2, pp. 6:3–5, 9:12:16 (Cruz Dep.)). She has since had her voting rights restored. (Doc. 20-4, ¶ 3 (Cruz Dec.)). She has worked on ballot measure and candidate campaigns in other states. (Doc. 129-2, pp. 14:17–21, 17:12–18:8, 19:8–16). She was paid by the signature in these campaigns. *Id.* at p. 18:17–20. In 2024, she worked in a paid position with a national organization to train canvassers and review petitions for a ballot measure in

11

Arkansas. *Id.* at pp. 21:4–22:2. She also collected signatures for the petition as a volunteer canvasser but was legally barred from working as a paid canvasser. *Id.* at pp. 25:17–26:5.

In 2023, the General Assembly statutorily raised from fifteen to fifty the number of counties for which the signatures of a certain percentage of electors must be collected. 2023 Ark. Act 236.

And in 2025, the General Assembly enacted a slate of new restrictions: Act 213 requires a canvasser to tell a potential petitioner that "petition fraud is a criminal offense" before allowing them to sign. Act 240 requires a canvasser to view a potential petitioner's photo identification before allowing them to sign. Act 241 requires, in addition to the affidavit on each petition part, that every canvasser file another post-circulation "true affidavit" with the Secretary of State certifying that they complied with all Arkansas laws— none of the canvasser's signatures will be counted until this affidavit is submitted. After submitting the true affidavit, the canvasser is not allowed to collect additional signatures until the Secretary determines that the sponsor is eligible for a cure period. Act 273 directs the Secretary to exclude all the signatures collected by a canvasser if he "finds by a preponderance of the evidence that the canvasser has violated Arkansas laws." Act 274 requires that a potential petitioner read the ballot title or have the ballot title read to them in the presence of the canvasser before they are allowed to sign. Act 453 requires that paid canvassers for statewide ballot petitions be both residents and domiciliaries of

12

Arkansas. And Act 602 requires that ballot titles not be written "with a reading level above the eighth grade as determined by the Flesch-Kincaid Grade Level formula."[6]

These restrictions were, according to Defendant, a response to malfeasance during the 2024 election. Act 453, the domicile requirement, was purportedly enacted in response to out-of-state canvassers claiming to be residents of an Arkansas hotel to comply with the State's residency requirement. Notably, the incident Defendant relies on (but cannot prove) [7] involved canvassers for local, not statewide, petitions, which are excluded from Act 453's domicile requirement. 2025 Ark. Act 453, sec. 1, § 7–9–103(a)(7)(B) ("A person shall not act as a paid canvasser unless he or she is . . . [d]omiciled in the state if acting as a paid canvassers for a statewide initiative petition or statewide referendum petition."). Defendant also submitted paid canvasser lists from 2019 and 2020 where many of the canvassers listed current residence addresses in Arkansas but permanent domicile addresses outside Arkansas. (Doc. 105). The relevance of this evidence is unclear—as described above, Arkansas did not have a residency requirement until 2021. Finally, Defendant submitted a letter from David Couch, Plaintiffs' attorney, complaining to the Secretary of State's office about out-of-state canvassers in the 2022 election cycle, after the residency requirement went into effect. (Doc. 98-2).

The rest of the 2025 laws were, Defendant says, justified by the widespread misconduct canvassers were seen engaging in during the 2024 petition process.

---

[6] The Flesch-Kincaid Grade Level ("FKGL") formula assigns a "grade level" to a piece of writing based on word and sentence length. FKGL = 0.39 * (total words / total sentences) + 11.8 * (total syllables / total words) – 15.59.

[7] Again, Defendant relies solely on newspaper articles, which are not admissible evidence. (Doc. 90, p. 5).

Defendant relies on his senior counsel Tanner Thomas's recorded phone conversations with fifteen people who complained of canvasser misconduct, primarily relating to the unsuccessful 2024 abortion amendment petition. (Docs. 89-1 & 89-2).[8] These interviews took place in May and June of 2025, after the challenged Acts were passed and after this case was filed. (Doc. 91, ¶ 38; Doc. 89-2, p. 2 ("Tim Griffin has requested evidence be gathered to support litigation efforts.")). Intervenor-Plaintiffs say these post-litigation interviews were not part of an unbiased investigation: Mr. Thomas was working with the president of the Family Council—the organization responsible for putting paid canvassers' information online in the 2024 election cycle—to find witnesses for this litigation. *See* Def. Ex. B-12 (on file with the Clerk of Court) at 4:26–4:33 (Mr. Thomas: "Mr. Cox has gone through a lot of folks to help me branch out and contact and all of that.").[9]

Interviews taken after the challenged laws were passed could not have influenced the legislature's decision. One of Mr. Thomas's witnesses, Vikki Parker, did testify before the General Assembly, and the Court has reviewed the committee hearing testimony Defendant cited. The bill's sponsor, State Senator Kim Hammer, told the committee that

---

[8] Mr. Thomas's descriptions of these interviews are inadmissible hearsay. Defendant argues to the contrary that these descriptions are not hearsay because they are not offered for their truth, but to show "to show that the Secretary of State and legislature received repeated reports of petition abuse and therefore perceived a need for statutory reform." (Doc. 109, p. 2). Mr. Thomas's writings are, however, hearsay within hearsay. To have any evidentiary value, Mr. Thomas's statements about the statements must be true. To the extent that Defendant means to rely on the recordings themselves, he has provided them to the Court in full, several hours of recorded materials, with no citations to relevant time stamps. The Court is not obligated to hunt through the record to find potentially competent evidence supporting Defendant's litigation-minded summation thereof. *See United States v. Stuckey*, 255 F.3d 528, 531 (8th Cir. 2001); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006).

[9] Mr. Thomas's own statements are definitional nonhearsay under Federal Rule of Evidence 801(d)(2).

"the Secretary of State Elections Department, pro-life organizations, churches, and members of the General Assembly have received numerous reports that citizens have been tricked into signing petitions that [they] would never support." *To Amend the Law Concerning Initiative and Referendum Petitions: Hearing on S.B. 210 Before the S. Comm. on State Agencies and Governmental Affs.*, 95th Gen. Assemb., at 10:12:15–10:12:50 (Feb. 11, 2025) [hereinafter *S. Hearing*].[10] Senator Hammer claimed these signers were given "misleading information such as calling the abortion amendment an amendment to protect pregnant women or women's health." *Id.*

Leslie Bellamy, the Director of Elections in the Office of the Secretary of State of Arkansas, testified that every cycle, people call her office asking for their names to be removed from petitions because they realize the petition they signed was not what they were told. *Id.* at 11:05:58–11:06:06. At another hearing, she testified that she had seen signatures which violated various Arkansas laws and thus, according to Defendant, "could have been petition fraud." *To Amend the Law Concerning Initiative and Referendum Petitions: Hearing on S.B. 207, S.B. 208, and S.B. 211 Before the H. Comm. on State Agencies and Governmental Affs.*, 95th Gen. Assemb., at 6:06:30–6:06:50 (Feb. 17, 2025) [hereinafter *H. Hearing*];[11] Doc. 90, pp. 8–9. She also submitted a declaration in this litigation stating that there was a "major increase in reported fraud in the 2024 election cycle." (Doc. 109-1, ¶ 16).

---

[10] https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20250211/1/30647.

[11] https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20250217/-1/30700.

Vikki Parker, on behalf of herself and a crisis pregnancy center, testified regarding a number of incidents she heard about or observed including: a Mr. Curtis Holt being asked to sign a petition without being given an opportunity to see the amendment because he was told it hadn't been written yet;[12] petitions left unattended for people to sign without a canvasser present at one business in Fayetteville; and canvassers misrepresenting the abortion amendment by saying it was "for reproductive rights." *S. Hearing* at 12:00:00–12:03:00. She testified that she and others submitted affidavits to the Attorney General's or Secretary of State's offices "but there was nothing that happened throughout the whole process." *Id.* at 12:08:35–12:09:10. Unchallenged Arkansas laws already require that a copy of the title and measure be attached to the petition, Ark. Code Ann. § 7-9-106, that petitioners sign in the presence of the canvasser, *id.* § 7-9-108(b), and that canvassers not knowingly misrepresent the purpose and effect of the petition for the purpose of causing a person to sign, *id.* § 7-9-103(c)(6).[13] There is no evidence that Ms. Parker's or anyone else's complaints resulted in law enforcement action.

Defendant also submitted a declaration and memorandum from another of his employees, Brandon McCabe, an attorney in his office. Mr. McCabe states that the office's review of signatures found 5,839 duplicate signatures and 1,416 transcriptions on the 2024 medical marijuana amendment, and 387 duplicate signatures and 518 transcriptions on the 2024 casino repeal amendment. (Doc. 98-3, ¶ 6 (McCabe Dec.)). According to Mr. McCabe, a "'transcription' occurs when the same handwriting is found to list and sign

---

[12] Curtis Holt's written statement was also provided by Defendant. Def. Ex. B-5 (on file with the Clerk of Court).

[13] The Court expresses no opinion on whether the statements about the abortion amendment cited above were misrepresentations.

16

more than one individual's name on the same petition." (Doc. 98-4, p. 2 (McCabe Memo.)). This determination is aided by the "Master Transcription File" which "provides original signature pages which allow for handwriting review on line items which were flagged." *Id.* at p. 3.  It is not clear from Mr. McCabe's declaration or memorandum whether he personally reviewed signatures or merely wrote the memorandum summarizing someone else's findings. *Id.*; Doc. 98-3.  He concludes: "When combined, this evidence highlights the importance of reviewing petition signatures." (Doc. 98-3, ¶ 7). There is no evidence that any of these signatures were referred to the Arkansas State Police as suspected forgeries or that any further investigation was undertaken.

Plaintiffs and Intervenor-Plaintiffs assert that individually and collectively these laws make it nearly impossible to qualify a measure for the ballot in Arkansas. As relevant here, they also say these laws either directly regulate or otherwise chill political communications between petition sponsors, canvassers, and Arkansas voters. Under Act 273, they also give the Secretary of State many new bases on which to invalidate signatures completely unrelated to whether those signatures belong to a legally qualified Arkansas voter who engaged in core political speech in support of a particular ballot measure or direct democracy generally.

## II.  LEGAL STANDARD

A party requesting summary judgment must establish the absence of any genuine disputes of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999). Once the moving party meets its burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S.

at 587 (quoting Fed. R. Civ. P. 56(c)). The Court must base its determination of whether a genuine issue of material fact exists on "evidence that will be admissible at trial. [T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (alteration in original) (internal quotations and citations omitted). Where, as here, both sides have filed motions for summary judgment, the motions are to be reviewed in their own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

Plaintiffs and Intervenor-Plaintiffs seek a permanent injunction. To succeed, they must demonstrate "actual success on the merits, and if they do, then the court must also consider the threat of irreparable harm to the moving parties, the harms an injunction might inflict on other parties, and the public interest." *Watkins v. Lawrence Cnty.*, 102 F.4th 933, 942 (8th Cir. 2024).

### III. DISCUSSION

### A. Jurisdictional Issues

Defendant asserts jurisdictional challenges to several of Plaintiffs' and Intervenor-Plaintiffs' claims, some which the Court has previously addressed and some which the Court has not.

### 1. Sovereign Immunity

Defendant asserts that Plaintiffs' claims in Count II of their Complaint (Doc. 107, ¶¶ 71–76) are barred by sovereign immunity. "States generally enjoy sovereign immunity in federal courts from suits brought by citizens of other states and their own citizens." *Bio*

*Gen LLC v. Sanders*, 142 F.4th 591, 604 (8th Cir. 2025). "Sovereign immunity is jurisdictional in nature." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).

Count II alleges that the challenged laws violate Article 5, Section 1 of the Arkansas Constitution. (Doc. 107, ¶¶ 71–76). *Ex parte Young* creates an exception to state sovereign immunity for suits seeking "prospective injunctive relief against state officials acting in their official capacities." *Bio Gen*, 142 F.4th at 604. Plaintiffs assert that Count II falls within that exception, while Defendant argues it does not. Defendant is correct. *Ex parte Young* permits suit against state officials seeking to enjoin actions that violate federal law. It does not, however, permit suit "when a plaintiff alleges that a state official has violated *state* law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "[T]his court may not instruct 'state officials on how to conform their conduct to state law.'" *Smith v. Reynolds*, 139 F.4th 631, 637 (8th Cir. 2025) (quoting *Pennhurst*, 465 U.S. at 106). Plaintiffs' claim that the challenged laws violate the Arkansas Constitution is barred by sovereign immunity. There is no set of facts in which the answer would be otherwise, so Defendant's Motion for Judgment on the Pleadings is **GRANTED IN PART** with respect to Count II, and Count II of Plaintiffs' Complaint (Doc. 107) is therefore **DISMISSED WITH PREJUDICE**.

Defendant also argues that there is no Article III case or controversy with respect to the following challenged laws: (1) the eighth-grade reading level requirement; (2) the pre-collection disclosure requirement; (3) the disqualifying offenses provision; (4) the reading requirement; and (5) the publication cost reimbursement requirement.

A case or controversy must be present at the beginning of a lawsuit and must continue throughout. *Brazil v. Ark. Dep't of Hum. Servs.*, 892 F.3d 957, 959 (8th Cir. 2018).

19

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "To establish injury in fact for a First Amendment challenge to a state statute, the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can itself constitute injury in fact." *281 Care Comm. v. Arneson* (*281 Care Comm. II*), 766 F.3d 774, 780 (8th Cir. 2014) (citation modified).

If a party sues too early, the court may lack jurisdiction because their claim is not yet ripe. "A claim is not ripe if the alleged injury rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *281 Care Comm. v. Arneson* (*281 Care Comm. I*), 638 F.3d 621, 631 (8th Cir. 2011) (citation modified). If a party sues too late (or the courts move too slowly), the court may lose jurisdiction because their claim becomes moot. "A case becomes moot . . . only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (citation modified). The party asserting mootness "bears the burden to establish that a once-live case has become moot." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022).

20

"Standing is not dispensed in gross," so the Court addresses Defendant's challenges claim by claim. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation modified).

### 2. Act 602: Mootness

Defendant asserts that Intervenor-Plaintiffs' challenge to the Reading Level Requirement is moot because the Attorney General certified Protect AR Rights' ballot title as modified. Thus, Defendant asserts, "there is 'no further relief that might be appropriate or available.'" (Doc. 90, p. 18 (quoting *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1036 (8th Cir. 2004))).

In response, Intervenor-Plaintiffs assert that the voluntary cessation exception to mootness applies as to the Attorney General, and that the Secretary of State also has enforcement authority with respect to the Reading Level Requirement and can therefore be enjoined from enforcing it against Protect AR Rights.

With respect to the Attorney General, Intervenor-Plaintiffs failed to assert an exception when Defendant challenged this claim as moot at the preliminary injunction phase and the Court has already dismissed the Attorney General as a Defendant. (Doc. 50, p. 74). Only the claims against the Secretary of State remain in this litigation.

The Court previously concluded that the Secretary of State has enforcement authority for Act 602 because he is responsible for reviewing and certifying petitions, including their ballot titles. (Doc. 50, p. 28). Defendant now directs the Court to Arkansas Code § 7-9-107(h) which says: "If the sponsor of a proposed measure fails to comply with this section, that failure shall not contribute in any way to a determination by the Secretary of State that the proposed measure, or any individual signature submitted to the Secretary of State in connection with the proposed measure, is insufficient for any

21

reason." Act 602's Reading Level Requirement is codified in the same section. *See id.* § 107(l). The Court therefore finds that Defendant has met his burden of proving that the claim against him is moot because there is no relief the Court can offer Protect AR Rights within the confines of *Ex parte Young*. Defendant's Motion for Judgment on the Pleadings is **GRANTED IN PART** and Protect AR Rights' challenges to Act 602 are **DISMISSED WITH PREJUDICE** as to the Secretary of State.

### 3. Pre-Collection Disclosure Requirement: Standing

With respect to the pre-collection disclosure requirement, Defendant seeks to divide and conquer. Because the law requiring paid canvassers to disclose their names and current residential addresses to the Secretary of State is separately codified from the law requiring the Secretary of State to disclose those names and addresses to any member of the public who requests them, the harm of public disclosure is not traceable to the forced disclosure to the Secretary of State. (Doc. 90, p. 16). The Court previously rejected this argument. (Doc. 50, p. 29). "When third party behavior is predictable, commonsense inferences may be drawn." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025).

Here, Plaintiffs and Intervenor-Plaintiffs have provided historical evidence supporting their claim that members of the public will use FOIA requests to get paid canvassers' names and addresses to dox and harass canvassers for petitions with which they disagree, an effective heckler's veto. Defendant's evidence suggests that his office is actually working with the group responsible for the public disclosures in 2024. *See supra* pp. 14–15. This predictable third-party behavior supports the commonsense conclusion that Plaintiffs' and Intervenor-Plaintiffs' injuries are traceable to the disclosures to the Secretary of State required by Arkansas Code §§ 7-9-601(a)(2)(C), 7-9-126(b)(4),

22

and 7-9-103(a)(4). Arkansas may not target canvassers and petition sponsors "through stringent and allegedly unlawful regulation, and then evade the resulting lawsuits by claiming that the targets of its regulation should be locked out of court as unaffected bystanders." *Diamond Alt. Energy*, 606 U.S. at 125.

Defendant also presents a new argument: the Intervenor-Plaintiffs' challenge to the pre-collection disclosure requirement is not ripe because Intervenor-Plaintiffs do not employ paid canvassers and have not shown a prospect of future harassment. (Doc. 90, p. 20). Intervenor-Plaintiffs respond that while they have not yet engaged paid canvassers, they intend to do so during their 2026 campaign, as the treasurer for both Intervenor-Plaintiffs attested. (Doc. 24-6, ¶ 6 (Kopsky Dec.)). With just a few months left in the 2026 election cycle, their injury is imminent. Moreover, the threat of doxxing chills paid canvassing activity and makes it more difficult to hire paid canvassers in the first place. Intervenor-Plaintiffs' challenge to the pre-collection disclosure requirement is ripe.

### 4. Disqualifying Offenses Provision: Standing

Defendant argues that individual Plaintiffs Lee Evans and Amy Cruz lack standing to challenge the disqualifying offenses provision because there is no "certainly impending" injury against them since "they have no agreements in place to work as paid canvassers in Arkansas and no one intends to hire them as paid canvassers." (Doc. 130, p. 6). This argument is frivolous.

Both Mr. Evans and Ms. Cruz have worked on campaigns in Arkansas in the most recent election cycle in which they have been limited in their roles by their disqualifying offenses. They have refrained from seeking paid canvasser positions because they know they are legally barred from holding them. *See* Doc. 129-1, p. 13:20–25 (Evans Dep.) ("I knew that I had a disqualifying offense and I did not try . . . [b]ecause if I tried to, I don't

23

want to be accused of breaking a law."); Doc. 129-2, p. 30:10–13 (Cruz Dep.) ("[I]f I legally could, I would."). They are not required to seek a job they cannot lawfully hold to establish standing to challenge the law that forbids them from holding the job.

Defendant's argument is especially ridiculous given Mr. Evans's and Ms. Cruz's job histories. Mr. Evans owns a political consulting company that provides paid canvassers in Arkansas. Ms. Cruz worked for a national paid canvassing organization on a ballot initiative in Arkansas in the last election as an organizer because she is not permitted to work as a paid canvasser. The Court does not need to speculate to conclude that Mr. Evans and Ms. Cruz would like to work as paid canvassers and could readily find such work if they were not legally barred from it.

### 5. *Reading Requirement: Standing*

Defendant argues that Plaintiffs and Intervenor-Plaintiffs lack standing to challenge Act 274's Reading Requirement because they have not expressed an intent to knowingly violate the Requirement. (Doc. 90, p. 19). But that is not the test.

To establish injury in fact in First Amendment cases, "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute. Self-censorship can itself constitute injury in fact." *281 Care Comm. II*, 766 F.3d at 780 (citation omitted). "The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute [is] 'objectively reasonable.'" *Id.* Thus, a plaintiff need not allege that they will actually violate a challenged statute—refraining from such violation under a credible threat of adverse enforcement action constitutes injury. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be

24

entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

Here, as the Court previously concluded, Plaintiffs and Intervenor-Plaintiffs have presented evidence that they are chilled from engaging in their desired course of conduct—collecting signatures without the petitioner reading or having the ballot title read to them in the canvasser's presence. (Doc. 50, pp. 30–31). Defendant offers no reason for the Court to depart from this conclusion.

### 6. *Publication Cost Reimbursement Requirement: Standing and Ripeness*

Finally, Defendant asserts that Plaintiffs lack standing to challenge the publication cost reimbursement requirement and that their claim is not ripe. The Court previously rejected these arguments, and Defendant offers no explanation for why the Court should depart from its earlier conclusion. *See* Doc. 50, pp. 31–33. Money remains fungible, and the publication cost requirement forces petition sponsors to choose between spending money to collect signatures and risking insufficient funds for publication costs, or saving money for publication costs and risking insufficient signatures. This dilemma is injury enough. *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993).

With respect to ripeness, Plaintiffs "must show both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013) (citation modified). Here, the issue is "largely legal in nature," making it fit for judicial decision, and the uncertainty described above imposes hardship on Plaintiffs if judicial review is delayed. *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 12 (2000)).

## B.  First Amendment Claims

"As a general rule, content-based speech restrictions can only stand if they meet the demands of strict scrutiny." *281 Care Comm. I*, 638 F.3d at 633. "Under the strict-scrutiny test, [the government] ha[s] the burden to prove that the [law] is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002). But because "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech,'" *Meyer*, 486 U.S. at 421–22, even content-neutral regulations of the petition process may receive heightened scrutiny under the First Amendment.

In analyzing claims that a law unconstitutionally burdens the petition process in violation of the First Amendment, the Court must first determine whether the challenged law "implicate[s] the First Amendment." *SD Voice v. Noem*, 60 F.4th 1071, 1077 (8th Cir. 2023). Laws regulating the petition process implicate the First Amendment when they "affect[ ] the communication of ideas associated with the circulation of [a] petition." *Id.* at 1079 (second alteration in original) (quoting *Miller v. Thurston*, 967 F.3d 727, 738 (8th Cir. 2020)). But such laws do not implicate the First Amendment if they merely make the petition process "difficult" without "restrict[ing] [the] ability to circulate petitions or otherwise engage in political speech." *Miller*, 967 F.3d at 737 (second alteration in original) (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)). If the law does not implicate the First Amendment, the challenge fails.

If the Court finds that the law implicates the First Amendment, it "appl[ies] the *Anderson/Burdick*[14] sliding standard." *SD Voice*, 60 F.4th at 1080 (footnote added).

---

[14] *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

26

"Under this standard, [the Court] weigh[s] the character and magnitude of the burden the State's rule imposes on First Amendment rights against the interest[s] the State contends justify that burden, and consider[s] the extent to which the State's concerns make the burden necessary." *Id.* (citation modified).

If the challenged law "imposes a severe burden on the ability to engage in political speech, strict scrutiny applies." *Id.* "A severe burden is one that goes beyond the merely inconvenient." *Id.* (citation modified). But if the burden is not severe, the Court "review[s] the law to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *Id.* (citation modified). "Nondiscrimination" in this context refers not to suspect classifications but to political neutrality. *Burdick*, 504 U.S. at 438. Although this standard is more deferential than strict scrutiny, it is a more searching review than rational basis. *Contrast id.* at 1080–81 (examining state's articulated reasons for enacting challenged law), *and id.* at 1081 (concluding that law was unconstitutional under lesser scrutiny where the state "merely relie[d] on a bare assertion of election integrity rather than evidence or a reasonable response connected to the" purported reason for the law), *with F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, [on rational-basis review] it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."), *and id.* ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

Finally, some laws including those "compelling disclosure of information to the government related to political activity," are subject to an intermediate form of scrutiny

27

known as "exacting scrutiny." *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (8th Cir. 2022). To survive exacting scrutiny, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–08 (2021)). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Bonta*, 594 U.S. at 607–08). However, unlike strict scrutiny, "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, [though] it does require that they be narrowly tailored to the government's asserted interest." *Id.* (quoting *Bonta*, 594 U.S. at 607–08).[15]

"Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). "This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence *de novo*, or to replace [the legislature's] factual predictions with our own. Rather, it is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).

### 1. Residency and Domicile (Act 453) Requirements

Arkansas law requires that all canvassers on initiative and referendum petitions be Arkansas residents, Code § 7-9-103(a)(6), and, following the passage of Act 453, paid canvassers on statewide initiative and referendum petitions also be Arkansas

---

[15] Defendants argue that Plaintiffs and Intervenor-Plaintiffs have not shown that the challenged laws are facially unconstitutional. The challenged laws here operate in a single, narrow context—circulation of statewide initiative and referendum petitions. "Because the statute[s] do[ ] not apply differently" to different petitions within that category, "[the Court] need only consider whether that sole application violates the First Amendment." *Sanderson v. Hanaway*, 163 F.4th 1101, 1106 (8th Cir. 2026).

domiciliaries. Domicile requires actual residence in a place plus the intent to make that place one's fixed and permanent abode. *Leathers v. Warmack*, 341 Ark. 609, 618 (2000). Defendant moves for summary judgment on the residency and domicile requirement, Intervenor-Plaintiffs move for summary judgment on only the domicile requirement, and Plaintiffs assert that both these challenges should proceed to trial.

With respect to the residency requirement, Defendant appears to concede that the First Amendment is implicated, but claims that the burden is not severe. (Doc. 90, pp. 24–26). The Eighth Circuit previously upheld a residency requirement, stating that it allowed the Secretary of State "to protect the petition process from fraud and abuse by ensuring that circulators answer to the Secretary's subpoena power." *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001).[16] The state in that case supported the necessity of a residency requirement with evidence that, in a prior election, non-residents "who were involved in petition irregularities left the State, and the matter was never fully resolved." *Id.* The court also noted that the 70% success rate for circulated petitions to reach the ballot "demonstrate[d] that no severe burden has been placed on those wishing to circulate petitions." *Id.* at 617. The Eighth Circuit was the first circuit court to address this question, and it is now the only one to have reached the conclusion that a residency requirement for canvassers is constitutional. *See We the People PAC v. Bellows*, 40 F.4th

---

[16] The Eighth Circuit also mentioned, but did not discuss or recognize as compelling, a state's asserted interest in "ensur[ing] that a provision has grass-roots support in North Dakota and that the initiative process is not completely taken over by moneyed, out-of-state special interest groups." *Jaeger*, 241 F.3d at 617. The Supreme Court has refused to recognize a state's interest "in making sure that an initiative has sufficient grass roots support" because that interest "is adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Meyer*, 486 U.S. at 425–26.

29

1 (1st Cir. 2022); *Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir. 2013); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008).

The case now before the Court is not factually similar to *Jaeger*. Since the residency requirement went into effect, only three of the twenty-five circulated petitions have made the ballot, suggesting that the burdens here are more severe. (Doc. 100, ¶¶ 17–18). Moreover, even under lesser scrutiny, the challenged regulation must "further[ ] an important regulatory interest." *SD Voice*, 60 F.4th at 1080. Defendant has not connected his asserted interest in preventing fraud with the residency requirement: the record does not contain even a single instance of an invalid or fraudulent signature filed by a non-resident in Arkansas. And Plaintiffs and Intervenor-Plaintiffs have presented evidence that the residency requirement burdens petition sponsors' circulation efforts: the residency requirement increases the cost of hiring canvassers, and there are non-residents who would like to canvass in Arkansas on behalf of petition-sponsor Plaintiffs and Intervenor-Plaintiffs but are unable to do so because of the residency requirement. (Doc. 20-1, ¶ 11 (Miller Dec.); Doc. 20-10, ¶ 12 (Cobb Dec.); Doc. 20-11, ¶ 8 (Fahey Dec.); Doc. 24-15, ¶ 18–21 (Guthrie Dec.)). Viewing the facts in the light most favorable to Plaintiffs and Intervenor-Plaintiffs, Defendant has not met his burden of proving that he is entitled to judgment on the First Amendment challenge to the residency requirement as a matter of law. Defendant's Motion for Judgment on the Pleadings and Motion for Summary Judgment are **DENIED** with respect to the residency requirement.

Defendant and Intervenor-Plaintiffs both move for summary judgment on Act 453's domicile requirement. The domicile requirement is even more restrictive than the residency requirement but only applies to paid canvassers on statewide petitions.

Intervenor-Plaintiffs argue that Act 453's scope (statewide petitions only) is inconsistent with the purported reason for its enactment (canvassers staying in hotels to evade the residency requirement on a local campaign, *see supra* p. 15). In response, however, Defendant did produce some evidence that paid canvassers were attempting to evade the residency requirement on statewide petitions as well, namely Plaintiffs' attorney's complaint to that effect, *see supra* p. 15. There is no evidence that this complaint was investigated. There is evidence that the domicile requirement cuts down on the number of available canvassers: before the domicile requirement went into effect, many paid canvassers listed domicile addresses outside Arkansas. (Doc. 105). The constitutionality of the domicile requirement is, in some respects, bound up with the residency requirement, and neither Intervenor-Plaintiffs nor Defendants have produced sufficient evidence for the Court to conclude that Act 453 either is or is not compliant with the First Amendment as a matter of law. Defendant's and Intervenor-Plaintiffs' Motions for Summary Judgment and Defendant's Motion for Judgment on the Pleadings are **DENIED** with respect to Act 453.

### 2. Pre-Collection Disclosure Requirement

Before a paid canvasser can solicit a signature, the petition sponsor must "[p]rovide a complete list of all paid canvassers' names and current residential addresses to the Secretary of State" and submit a copy of the canvassers' signed statements affirming that they have not been found guilty of a disqualifying offense. Ark. Code Ann. § 7-9-601(a)(2)(C)–(D). All parties seek summary judgment on the First Amendment challenge to this provision. Defendant and Intervenor-Plaintiffs agree that exacting scrutiny applies, while Plaintiffs assert that strict scrutiny applies. The provision fails under either standard.

31

Exacting scrutiny "is just short of strict scrutiny." *Dakotans for Health*, 52 F.4th at 389. It requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (quoting *Bonta*, 594 U.S. at 607). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Bonta*, 594 U.S. at 607). Under exacting scrutiny, disclosure regimes must be narrowly tailored to, but need not be the least restrictive means of, achieving the government's asserted interest. *Id.*

The Eighth Circuit confronted a similar disclosure regime in *Dakotans for Health* and concluded that the pre-circulation disclosure of paid canvassers' personal information was not substantially related or narrowly tailored to the state's asserted interest in election integrity. *Id.* at 391.

Defendant attempts to distinguish this on-point precedent because § 601 itself does not mandate public disclosure on request, unlike the law at issue in *Dakotans for Health*. Instead, FOIA applies to the pre-collection disclosures and makes them available to the public on request. This is a distinction without a difference—the First Amendment impact is the same. Even assuming that paid canvassers pose a greater threat to election integrity than volunteer canvassers,[17] "[t]here is still a dramatic mismatch . . . between the interest[s] that the [State] seeks to promote and the disclosure regime that [it] has implemented in service to that end." *Id.* at 391 (alterations in original) (quoting *Bonta*, 594 U.S. at 612)).

---

[17] In *Dakotans for Health*, the Eighth Circuit noted a tailoring problem in applying disclosure requirements only to paid canvassers in the absence of evidence that paid canvassers pose a greater threat to petition integrity than do volunteer canvassers. 52 F.4th at 390.

While Defendant asserts that public disclosure is not at issue in this litigation because § 601 requires "disclosure only to the appropriate election official," he asserts on the same page that "disclosure promotes transparency by letting the public know who is circulating petitions." (Doc. 90, p. 52 (quoting *Dakotans for Health*, 52 F.4th at 390)). He further claims this information may be "needed during the signature verification process" and that it must be acquired "on the frontend" to "allow[ ] the Secretary of State to identify whether any paid canvassers have a disqualifying offense before collecting signatures." *Id.* "[W]hile the State's interests are strong, they do not stand in isolation to justify any regulatory scheme it puts forward. Rather, the statute itself must be narrowly tailored to meet these asserted interests." *Dakotans for Health*, 52 F.4th at 391. It is not.

Arkansas could have tailored the pre-collection disclosure requirement to avoid the threat of public disclosure and its attendant chilling effect by exempting these disclosures from FOIA's coverage, at least while circulation is ongoing. *See* Ark. Code Ann. § 25-19-105(a)(1)(A) (allowing exceptions to FOIA "as otherwise specifically provided by this section or by laws specifically enacted to provide otherwise"). Defendant has shown no relation between his need for this information for purposes like signature validation and the public's need for it. "Being forced to publicly disclose one's . . . residential address in order to exercise the right to circulate a petition—even as a paid circulator—is chilling in today's world." *Dakotans for Health*, 52 F.4th at 392. Arkansas has made no efforts to tailor its disclosure regime to guard against its obvious chilling effect—even after a harassment campaign against paid canvassers was actually waged in Arkansas in 2024.

To the extent that Defendant admits this is a public disclosure regime justified by the State's interest in "transparency," its application "not just during the verification

33

process," but also "at the time a circulator is soliciting signatures" also causes it to fail exacting scrutiny because it "compels personal name [and home address] identification at the precise moment when the circulator's interest in anonymity is greatest." *Id.* at 390–91; *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 199 (1999). Doxxing is a 21st Century heckler's veto, and the government should take care not to aid it. Arkansas has taken no such care here. The Pre-Collection Disclosure Requirement violates the First Amendment because it is not narrowly tailored to serve Arkansas's stated interests. Plaintiffs and Intervenor-Plaintiffs' Motions for Summary Judgment are **GRANTED** with respect to the pre-collection disclosure requirement, and Defendant's Motion is **DENIED**.

### 3. Disqualifying Offenses

Arkansas law disqualifies anyone with a conviction for a felony or sixteen categories of offenses whether felony or misdemeanor from serving as a paid canvasser on an initiative or referendum petition. Ark. Code Ann. § 7-9-601(d)(3). Plaintiff and Defendant both move for summary judgment on Plaintiffs' First Amendment challenge to the disqualifying offenses provision. The Court previously found that Plaintiffs had not shown a likelihood of success on the merits with respect to the petition sponsor Plaintiffs' First Amendment claims because "Plaintiffs have presented no evidence about the scope of the infringement on sponsors' ability to hire canvassers." (Doc. 50, p. 50). That is still the case.

But Plaintiffs have amended their complaint to add two would-be paid canvassers who are barred from paid canvassing on ballot petitions in Arkansas because they have disqualifying offenses. These would-be canvasser Plaintiffs have First Amendment rights independent of a petition sponsor, which the Court now takes up.

34

Defendant analyzes the canvasser-Plaintiffs' claims under the *Anderson/Burdick* sliding scale that applies to ballot petition regulations. (Doc. 130, pp. 9–11). It does not appear to the Court that this is the correct framework. The kind of First Amendment burdens the Supreme Court was concerned with in *Meyer*—"limits [on] the number of voices who will convey [a sponsors]' message"—are not implicated here. 486 U.S. at 422. Mr. Evans and Ms. Cruz are concerned with only two voices: their own. Laws directly regulating individuals' speech are not exempt from more generally applicable First Amendment principles just because they exist in the election context.

The disqualifying offenses provision limits protected speech. The First Amendment protects petition sponsors' ability to pay canvassers for their speech, *Meyer*, 486 U.S. at 428, and it correspondingly protects canvassers' ability to accept payment from petition sponsors, *see Miller v. Ziegler*, 109 F.4th 1045, 1049 (8th Cir. 2024) (finding that paid lobbying ban "burdens political speech" because it "cuts off the speech of would-be lobbyists"). The Court "know[s] of no doctrine that permits the state to deny to a person First Amendment liberties other than the right to vote solely because that person was once convicted of a crime or other offense." *Schultz v. City of Cumberland*, 228 F.3d 831, 852 (7th Cir. 2000); *see Packingham v. North Carolina*, 582 U.S. 98, 105 (2017); *Sanderson*, 163 F.4th 1101.

Even assuming the disqualifying offenses provision is content neutral (it applies only to initiative and referendum petitions so it is not, *see infra* pp. 48–49), it cannot withstand First Amendment review. Content-neutral speech restrictions are subject to intermediate scrutiny. *Packingham*, 582 U.S. at 105. "In order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest. In

other words, the law must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 105–06 (citation modified). "This narrow tailoring requirement means not only that the regulation must 'promote[ ] a substantial government interest that would be achieved less effectively absent the regulation,' but also that 'the factual situation demonstrates a real need for the government to act to protect its interests.'" *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1099 (8th Cir. 2013) (cleaned up) (first quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); and then quoting *Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cnty.*, 930 F.2d 591, 595 (8th Cir.1991)).

Defendant asserts a legitimate governmental interest in "preserv[ing] the integrity of the petition process." (Doc. 130, p. 10). But he has not shown that paid canvassers with disqualifying offenses threaten the petition process's integrity. He relies on the General Assembly's 2013 legislative findings, but the General Assembly at that time saw fit only to exclude people with convictions for violations of the election laws, fraud, forgery, or identification theft. Two years later, the General Assembly made no findings when it added all felonies to the list of disqualifying offenses, and Defendant too offers no justification for this expansion. *See* 2015 Ark. Act 1219; Doc. 130, p. 10. In 2021 when the General Assembly added twelve categories of offenses, its legislative findings reflected the concern about canvassers approaching potential petitioners without having passed a background check after the Arkansas Supreme Court invalidated the background check provision. *See* 2021 Ark. Act 951, sec. 9; *supra* p. 11. Once again, the legislature made no findings about the need to expand the list of disqualifying offenses, and Defendant offers no justification here, either. *See* 2021 Ark. Act 951; Doc. 130, p. 10.

36

These omissions are especially telling because the individual Plaintiffs were only disqualified following these later additions.

As applied to Mr. Evans and Ms. Cruz, the disqualifying offenses provision is not in any way tailored to a real and significant interest in protecting election integrity. Mr. Evans never had a signature disqualified during his time as a paid canvasser. Ms. Cruz has worked as a paid canvasser without issue in seven other states and as an unpaid canvasser in Arkansas. Defendant has not demonstrated any threat that these Plaintiffs pose to the integrity of Arkansas's petition process.

Mr. Evans and Ms. Cruz have shown that the disqualifying offenses provision burdens their First Amendment rights, and Defendant has failed to justify that burden. Plaintiffs' Motion for Summary Judgment is **GRANTED** with respect to Mr. Evans's and Ms. Cruz's claims and **DENIED** with respect to the other Plaintiffs' claims. Defendant's Motion for Summary Judgment is **GRANTED** with respect to the other Plaintiffs' claims, and his Motion and Supplemental Motion are **DENIED** with respect to Mr. Evans and Ms. Cruz's claims. His Motion for Judgment on the Pleadings is **DENIED** with respect to the disqualifying offenses provision. The challenge to the disqualifying offenses provision on behalf of Plaintiffs other than Mr. Evans and Ms. Cruz is **DISMISSED WITH PREJUDICE**.

### 4. Commission/Pay-Per-Signature Ban

Arkansas law also prohibits paying petition canvassers "on a basis related to the number of signatures obtained." Ark. Code Ann. § 7-9-601(g)(1). Defendant moves for summary judgment on Plaintiffs' claim that the commission ban violates the First Amendment, and Plaintiffs oppose his motion. It is undisputed that this law implicates the First Amendment. Therefore, the first question is whether the ban imposes a severe or less than severe burden on speech. Despite completing discovery, Plaintiffs have

produced no evidence that the commission ban negatively impacts sponsors' ability to hire paid canvassers or the magnitude of such impact. Their sole piece of evidence that the commission ban reduces the number of available canvassers is one professional canvasser's statement that "[m]ost professional canvassers are paid by the signature." (Doc. 20-4, ¶ 10 (Cruz Dec.)). There continues to be no evidence in the record that professional canvassers are unwilling to work on a per-hour basis, nor that this prohibition notably reduces the number of people available for hire as canvassers.

Defendant likewise failed to produce competent evidence linking commission payments to increased fraud. *See Jaeger*, 241 F.3d at 618 (upholding a similar law where the challengers "produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures" but the state had undertaken and an investigation which "revealed that payment per signature was an issue" in a previous cycle). Even under lesser scrutiny, the challenged regulation must "further[ ] an important regulatory interest." *SD Voice*, 60 F.4th at 1080. But Defendant has produced no evidence connecting commission payments to fraudulent signatures in Arkansas. Defendant's Motion for Summary Judgment and Motion for Judgment on the Pleadings are **DENIED** with respect to the commission ban.

### 5. Fifty County Requirement

Under the Arkansas Constitution, in addition to the overall signature requirement, petitions must be signed by a certain percentage of the electors of at least fifteen of the State's seventy-five counties. Ark. Const. art. V, § 1. The General Assembly raised the county requirement from fifteen to fifty by statute. Ark. Code Ann. § 7-9-126(e). The Court previously concluded that Intervenor-Plaintiffs were not likely to succeed on their First Amendment challenge to this law because baseline criteria for qualifying a ballot measure

38

unrelated to canvassers' speech or the validity of an individual's signature do not implicate the First Amendment. Defendant moves for summary judgment on Intervenor-Plaintiffs' First Amendment challenge to this requirement.

Intervenor-Plaintiffs have offered no legal reason for the Court to depart from its prior conclusion. In response to Defendant's Motion for Judgment on the Pleadings, Intervenor-Plaintiffs assert that they "are entitled to the opportunity to convince the Court at trial that the Fifty-County Requirement implicates and violates the First Amendment." (Doc. 81, p. 8). In response to Defendant's Motion for Summary Judgment, they merely direct the Court's attention to the same evidence it was presented with at the preliminary injunction phase. (Doc. 96, p. 25). While Intervenor-Plaintiffs have demonstrated that the fifty county requirement makes it much more difficult to qualify a measure for the ballot, the Court remains unwilling to conclude that at a certain point the numerical requirements for ballot access become so onerous that they create a First Amendment problem. Defendant's Motion for Summary Judgment is **GRANTED** with respect to the fifty county requirement and Intervenor-Plaintiffs' claim is **DISMISSED WITH PREJUDICE**.

### 6. The Canvassing Regulations (Acts 218, 240, and 274)

In its most recent session, the General Assembly enacted three laws that directly regulate how canvassers and potential petitioners must interact during the solicitation of a signature from a petitioner. Act 218 requires the canvasser to tell the potential petitioner that "petition fraud is a criminal offense"; Act 240 requires the canvasser to "view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner"; and Act 274 requires the canvasser to be present while the potential petitioner reads the ballot title or has the ballot title read to them.

39

All parties move for summary judgment on the First Amendment challenges to all three of these laws.

**Act 218: Crime Notification Requirement**

Act 218, the crime notification requirement, is the easiest. It compels canvassers' speech and therefore must withstand strict scrutiny, which it cannot. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) [hereinafter *NILFA*].

"Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (citation modified). "The general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* Thus, "compelled statements of fact . . . , like compelled statements of opinion, are subject to First Amendment scrutiny." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006).

In a limited set of circumstances, compelled speech may, as Defendant points out, be subject to less searching First Amendment review.[18] *NIFLA*, 585 U.S. at 768 ("[O]ur precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'"). This is

---

[18] The case Defendant points to for this argument did not involve compelled speech at all—the Eighth Circuit concluded that the challenged law involved the Government's own speech. *B.W.C. v. Williams*, 990 F.3d 614, 619 (8th Cir. 2021) ("Unlike a student required to recite the Pledge or a motorist required to display the state's motto, there is no confusion here: it is the government's message to parents considering Form 11."). But in the case of Act 218, it is undisputed that the law compels canvassers to speak with their own mouths the State's desired message verbatim.

not such a case. "Petition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change.' First Amendment protection for such interaction . . . is 'at its zenith.'" *Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422, 425)). It is not less protected commercial speech, and the Court is unaware of any cases treating it as such merely because states have the power to regulate it. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980) ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). States do not have the general power to impose truthful disclosure requirements in any area where they have regulatory authority. *See NILFA*, 585 U.S. at 768–69.

Because Act 218 compels speech, it "is unconstitutional unless it can survive strict scrutiny." *Sanderson*, 163 F.4th at 1107. Under strict scrutiny, Act 218 is "presumptively unconstitutional and may be justified only if the government proves that [it] [is] narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. To meet the narrow tailoring required by strict scrutiny, the law must be "the least restrictive means of achieving the government's compelling interest." *Sanderson*, 163 F.4th at 1107.

Defendant has a compelling interest in preventing petition fraud. But he has made no showing that Act 218 is narrowly tailored to serve that interest. The Court previously noted that Arkansas already has at its disposal a less restrictive means of addressing petition fraud—enforcing its existing laws. Despite Defendant's hand wringing about fraud, the State of Arkansas remains stubbornly disinterested in investigating and prosecuting wrongdoers, instead opting to heap additional burdens on the sponsors and canvassers who do comply with the law. Take it from Defendant's own Director of

41

Elections: "Since I've been with the State, in the past for the fraudulent signatures that we've turned over to legal, they have chosen not to pursue that. I don't really know why."[19] "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Arkansas cannot ratchet up speech restrictions by claiming the existing laws aren't working while simultaneously refusing to enforce the existing laws.

Arkansas law also already requires that written instructions be attached to every petition part setting out "the penalties imposed for violations of this act. The instructions on penalties shall be in larger type than the other instructions." Ark. Code Ann. § 7-9-108(c). Defendant now argues that this notice of penalties is too long to "consistently reach[ ] petitioners." (Doc. 98, p. 11). Arkansas might further its interest without conscripting canvassers as the State's mouthpiece by requiring that the petition instructions include a shorter written notice that "petition fraud is a criminal offense" in large type at the top.

Because Act 218 compels speech, Defendant must show that it withstands strict scrutiny, which he has not even attempted to do. Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment are therefore **GRANTED** with respect to Act 218, and Defendant's Motion is **DENIED**.

### Act 240: ID Verification Requirement

Act 240 requires a canvasser to "view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner before obtaining the signature."

---

[19] *H. Hearing* at 2:44:55–2:45:35 (statement of Leslie Bellamy).

If the canvasser "cannot verify the identity," they "shall not obtain a signature." A canvasser who signs the canvasser affidavit at the bottom of a signature page but does not comply with this requirement "makes a false statement on a petition verification form." Knowingly making a false statement on a petition verification form is a Class A misdemeanor and a Class D felony. Ark. Code Ann. §§ 7-9-103(c)(7), 109(d).

"[T]he circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *SD Voice*, 60 F.4th at 1078 (quoting *Meyer*, 486 U.S. at 421–22). "[S]igning a petition is [also] 'core political speech.'" *Id.* (quoting *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011)). Requiring a petitioner to possess and present an ID before engaging in core political speech plainly implicates the First Amendment.

Defendant's argument to the contrary is unavailing. He presents the ID requirement as a "modernization" of *Hoyle v. Priest*, 265 F.3d 699 (8th Cir. 2001). (Doc. 98, p. 12). Notably, *Hoyle* did not deal with a photo ID requirement although photo IDs did exist in 2001. In *Hoyle*, the Eighth Circuit upheld Arkansas's law that "mandate[d] counting only signatures of registered voters toward petition certification." *Id.* at 703. There, the Secretary of State, not petition sponsors or canvassers, did the counting and exclusion of non-voters. The challenged law could not violate the First Amendment rights of canvassers or petition sponsors because it did not require them to do anything. And to the extent that the registered-voter requirement impeded on the First Amendment rights of the petitioners whose signatures were excluded, it was constitutionally permissible for Arkansas to enact a content-neutral law that "merely regulates who qualifies to legally sign an initiative petition." *Id.* at 704. The law "in no way impeded the supporters of a

43

measure from circulating a petition or from expressing their views." *Id.*[20] It is still the case that Arkansas's Secretary of State reviews every signature to confirm that the petitioner is a registered voter. Act 240 is not a modernization, it is an additional burden.

Act 240 does not regulate who qualifies to legally sign a petition—a registered voter is not removed from the voter rolls when they leave their wallet at home. Instead, it regulates what a legally qualified petitioner must do before signing a petition and what a canvasser must do before allowing them to. This impedes supporters of a measure from expressing their views by signing a petition. Impositions on core political speech implicate the First Amendment.

The burden imposed by the ID requirement is also severe. The evidence before the Court demonstrates that the ID requirement goes beyond mere inconvenience. Plaintiffs and Intervenor-Plaintiffs have presented evidence that the ID requirement "force[s] [canvassers] into a policing role" where they must "turn people away from exercising a right." (Doc. 20-7, ¶ 6 (Spencer Dec.)). Canvassers report that they must turn people away from signing because they don't have an ID with them. *Id.* ¶ 7. Canvassers also feel that this requirement is redundant because canvassers are already able "to verify a person's active voter registration, using the Secretary of State's own database." (Doc. 20-10, ¶ 8 (Cobb Dec.)). One For AR Kids volunteer conducted a survey of former volunteer canvassers to help with planning for this campaign cycle in light of the new

---

[20] Defendant misrepresents the content of the *Hoyle* opinion, claiming that if asking for ID implicates the First Amendment, the *Hoyle* court would have also found that the law at issue there implicated the First Amendment because canvassers at the time were required by Arkansas law to "'verif[y]' their belief that petitioners truthfully provided their 'name' and 'residence' and were 'legal voter[s].'" (Doc. 90, p. 35 (quoting 1991 Ark. Act 197, § 1)). But the canvasser affidavit requirement was not discussed by the *Hoyle* court at all—as relevant here, the court only discussed the registered-voter requirement.

laws. (Doc. 24-8, ¶ 11 (Stumpenhaus Dec.)). Eighty-two people responded, and 58.5% of respondents reported that Act 240 would impact their willingness to volunteer and ability to collect signatures. *Id.* ¶ 13.[21] Act 240 imposes a severe burden on Plaintiffs' and Intervenor-Plaintiffs' speech by "limit[ing] the number of voices who will convey [their] message" and consequently "limit[ing] the size of the audience they can reach." *Meyer*, 486 U.S. at 422–23; *Buckley*, 525 U.S. at 193–97 (holding that a law requiring canvassers be registered voters "cut[ ] down the number of message carriers in the ballot-access arena without impelling cause").

Defendant argues to the contrary that, because voter ID is a constitutionally permissible limitation on voting, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008), Act 240 must also be a constitutionally permissible restriction on canvassing. Differences in context aside, voter ID requirements do not affect the speech or conduct of anyone other than the voter herself. In the ballot-access arena, there is political expression on both sides of the transaction—the petition sponsors and canvassers who encourage people to sign, and the petitioners who voice support for political change by signing. *Crawford* addresses only the burden on the second kind of expression (to the extent that signing a petition can be analogized to voting). But neither *Crawford* nor Defendant address the burden on the first kind of expression—the reduction in the number of voices willing to circulate a petition sponsor's message. Because Act 240 cuts down the number of people willing to circulate Plaintiffs and Intervenor-Plaintiffs' message, it is subject to strict scrutiny.

---

[21] Defendant "dispute[s] the survey's reliability" but does not explain why the survey is unreliable. (Doc. 100, ¶¶ 52–56).

Act 240 is also subject to strict scrutiny because it is a content-based restriction on speech. A potential petitioner does not need to show a canvasser a photo ID to sign a ballot-access petition for an independent candidate or a new political party. Thus, application of the ID requirement turns on the content of the petition a potential petitioner wishes to support.

Defendant asserts that this is a mere speaker-based distinction. Unlike in his preliminary injunction briefing, he now resists outright defining the class of speakers Act 240 regulates by the speech they are engaged in. *See* Doc. 39, p. 48 ("[T]he Acts are neutrally regulating all speakers who *want to put an issue on the ballot*." (emphasis added)). Instead, he claims Act 240 differentiates between speakers based on the process they are engaged in. (Doc. 90, p. 37 (citing *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72–73 (2022)). But the cited discussion actually supports the conclusion that Act 240 is content based. There the Court noted that "restrictions on solicitation are not content based and do not inherently present 'the potential for becoming a means of suppressing a particular point of view,' so long as they do not discriminate based on topic, subject matter, or viewpoint." *City of Austin*, 596 U.S. at 72 (quoting *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). Thus, "a statute prohibiting solicitation for religious causes" is unconstitutional, but regulations of "solicitation generally" may be constitutional. *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296 (1940)).

Unlike the "evenhanded[ ]" regulation that the Supreme Court upheld in *Heffron*, 452 U.S. at 649, which confined all solicitations on state fair grounds to assigned booths, Act 240 does not apply to all canvassers. It is more like the statute invalidated in *Cantwell*,

46

which prohibited solicitation "for any alleged religious, charitable, or philanthropic cause." *Id.* at 301–02. Act 240 similarly applies to only a subset of canvassing based on the subject matter of the petition being circulated. One campaign for political change, putting a new law on the ballot, is subject to a photo ID requirement. Another campaign for political change, putting a new party on the ballot, is not.

Defendant also relies on *Wellwood v. Johnson*, 172 F.3d 1007 (8th Cir. 1999), to argue that Arkansas may permissibly "differentiate between types of issues" in its petitioning laws. There, Arkansas set a higher signature threshold for "local-option elections (initiatives to decide whether to change a county from "wet" to "dry," or vice versa)." *Id.* at 1008. As the Court noted above with respect to Intervenor-Plaintiffs' challenge to the fifty county requirement, regulations setting the required number of signatures do not implicate the First Amendment because they "d[o] not infringe upon the 'ability to circulate petitions or otherwise engage in political speech.'" *Id.* at 1009 (quoting *Dobrovolny,* 126 F.3d at 1112). As just explained, Act 240 does not tell the Secretary of State what the legal requirements for a sufficient petition are. It tells canvassers and petitioners what hoops they must jump through to engage in political speech. And because it sets those hoops based on the content of that political speech, Act 240 is subject to strict scrutiny.

Defendant does not argue Act 240 is in any way tailored to his (nebulous) anti-fraud interest. Plaintiffs and Intervenor-Plaintiffs have met their burden of showing that Act 240 is subject to strict scrutiny, and Defendant has not met proof with proof in response. Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment are **GRANTED** with respect to Act 240, and Defendant's Motion is **DENIED**.

47

**Act 274: Reading Requirement**

Finally, Act 274 requires a potential petitioner to read the ballot title or have it read to them in the presence of the canvasser who collects their signature. A canvasser who knowingly accepts a signature from a petitioner who did not read or listen to the ballot title in the canvasser's presence is guilty of a criminal offense.

Plaintiffs and Intervenor-Plaintiffs have presented evidence that Act 274 "tremendously slow[s] down the process." (Doc. 20-10, ¶ 10 (Cobb Dec.)). "Defendant does not dispute that the Canvassing Regulations may lengthen a canvasser's interaction with potential petitioners . . . ." (Doc. 100, ¶ 63). In terms of word count, Act 274 bears most of the blame for the increase in time per signature: Protect AR Rights' ballot title, for example, is 493 words long, about as long as two pages of double-spaced, 12-point font text. In For AR Kids' survey, Act 274 had an even larger impact on past volunteers than did Act 240, with 69.5% of respondents reporting that Act 274 would impact their willingness to volunteer and ability to collect signatures. Act 274 implicates speech, and the burden it imposes is severe because it alters how canvassers communicate with potential petitioners, reduces the number of canvassers willing to carry petition sponsors' messages, and increases the amount of time a canvasser must spend with each petitioner, thereby limiting the size of the audience they can reach.

Defendant asserts that Act 274 is necessary because the State has received reports of canvassers misrepresenting the petitions they're circulating. Arkansas law already prohibits "misrepresent[ing] the purpose and effect of the petition or the measure affected for the purpose of causing a person to sign a petition." Ark. Code Ann. § 7-9 103(a)(3)(6). But as with Act 218, Arkansas refused to prosecute any of these reported

48

instances of canvasser misconduct. And as with Act 218, the First Amendment requires that the government attempt the less restrictive alternative of enforcing existing laws against bad actors before imposing burdensome speech codes on good and bad actors alike. If the State will not enforce its existing laws, it is unclear what effect Act 274 will have beyond making it significantly more difficult for a petition sponsor who does comply with the law to get a measure on the ballot. Defendant does not argue that Act 274 can survive strict scrutiny, and the Court concludes that it cannot. Plaintiffs and Intervenor-Plaintiffs' Motions for Summary Judgment are **GRANTED** with respect to Act 274, and Defendant's Motion is **DENIED**.

### 7. *Act 241: Post-Collection Affidavit Requirement and Cool-Off Period*

Act 241 requires all canvassers on statewide petitions to "file a true affidavit with the Secretary of State certifying that the canvasser has complied with the Arkansas Constitution and all Arkansas law regarding canvassing, perjury, forgery, and fraudulent practices in the procurement of petition signatures during the current election cycle." The Secretary cannot count any signature submitted by a canvasser unless and until this "true affidavit" is submitted. Ark. Code Ann. § 7-9-111(j). Thus, the Secretary can invalidate every signature submitted by a canvasser in one fell swoop, rather than ten at a time as permitted for failure to complete and notarize the canvasser affidavit on each petition part. While signatures submitted without this affidavit cannot be counted, "[a] true affidavit submitted under [this provision] shall have no bearing to establish the genuineness or falsity of the signatures obtained by the canvasser." *Id.* § 7-9-111(j)(3).

Like Act 218, Act 241 applies only to ballot measure petitions but not independent candidate or new political party petitions. Like Act 218, it is therefore content based and

49

subject to strict scrutiny.[22] Defendant does not argue that Act 241 can survive strict scrutiny, and the Court concludes it cannot.

Moreover, Act 241 cannot survive any level of First Amendment scrutiny because it is unreasonable. Defendant asserts that Act 241 was necessary to close the gap left by the petition part affidavits, which require canvassers to verify "that they had followed some but not all laws." (Doc. 90, p. 6). The reasonable solution would be to change the petition part affidavit to cover all laws. The unreasonable solution, chosen by Arkansas here, was to keep the insufficient petition part affidavit while adding another affidavit on top. The only apparent advantage of this approach is that it gives the Secretary of State the power to invalidate every signature a canvasser collected at once, instead of ten at a time.

Worse, Act 241 silences canvassers from the time they submit their affidavit until the Secretary decides whether the sponsor is entitled to a cure period. The Secretary of State initially described this provision as the "cool-off" period, (Doc. 39, pp. 7–8, 31–32), but having apparently realized that the government is not allowed to send people to time out for engaging in core political speech, now refers to it as the "equal time provision," (Doc. 90, pp. 6–8, 29–30).

Defendant does not dispute that the cool-off period implicates speech. Like the affidavit provision of Act 241, the cool-off period cannot withstand any level of scrutiny

---

[22] Even if the Court found that Act 241 did not implicate speech from an *Anderson*/*Burdick* perspective, it would still be subject to strict scrutiny under the First Amendment because it discriminates based on the content of the expressive message of the petition. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) ("We have long held, for example, that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not.").

because it is unreasonable. Act 241 does not create equal time for sponsors to cure petitions. Defendant implicitly acknowledges this, claiming it ensures "equal time among canvassers." (Doc. 90, p. 29). But the Court here is concerned with the First Amendment rights of sponsors, and Act 241 only creates new forms of inequality among sponsors. It disqualifies certain canvassers—those who have already engaged in core political speech by circulating a petition in the current cycle—while the petition is under review. Petition sponsors are free to recruit or hire new canvassers to circulate petitions during the review period, though. Thus, petition sponsors who can afford to hire a fresh set of paid canvassers will be able to circulate their petitions during the review period, but petition sponsors who cannot afford to do so will not. The Court raised this concern in its preliminary injunction order, *see* Doc. 50, p. 63, but Defendant has not addressed it on summary judgment. The cool-off period of Act 241 burdens sponsors First Amendment rights in a manner that the State has failed to justify. Plaintiffs and Intervenor-Plaintiffs' Motions for Summary Judgment are **GRANTED** with respect to Act 241, and Defendant's Motion for Summary Judgment and Motion for Judgment on the Pleadings are **DENIED**.

### 8. Act 273: Signature Exclusion Provision

Act 273, as now codified at Arkansas Code Ark. Code Ann. § 7-9-103, states, in relevant part:

> The Secretary of State shall not count signatures collected and witnessed by a canvasser for a statewide initiative petition or statewide referendum petition and the county clerk shall not count signatures collected and witnessed by a canvasser for a local initiative petition or local referendum petition if the Secretary of State or the county clerk finds by a preponderance of the evidence that the canvasser has violated Arkansas laws regarding canvassing, perjury, forgery, or fraudulent practices in the procurement of petition signatures or any provision of the Arkansas Constitution applicable to the collection of signatures on an initiative petition or referendum petition during the current election cycle.

51

Intervenor-Plaintiffs and Defendant move for summary judgment on Intervenor-Plaintiffs' First Amendment challenge to Act 273. As in *Wellwood*, 172 F.3d at 1009, this provision does not require petition sponsors, canvassers, or petitioners to do anything; it instead tells the Secretary what he must do. While it certainly raises the stakes of noncompliance with or selective enforcement of the many other laws challenged in this litigation, it does not itself regulate petition sponsors, canvassers, or petitioners. Accordingly, the Court agrees with Defendant that Act 273 does not implicate the First Amendment and Intervenor-Plaintiffs' First Amendment challenge therefore fails. Defendant's Motion for Summary Judgment is **GRANTED** with respect to Act 273, Intervenor-Plaintiffs' Motion is **DENIED**, and their First Amendment challenge is **DISMISSED WITH PREJUDICE**.

### 9. *Publication Cost Reimbursement Requirement*

Finally, Plaintiffs challenge Ark. Code Ann. § 7-9-113(a)(2)(A), which requires that petition sponsors "reimburse the cost of publication to the Secretary of State within thirty (30) calendar days of notification of the final costs for publication." Notice must be published "in two (2) weekly issues of some newspaper in each county" before the election at which the measure is to be voted on. *Id.* § 113(b)(1). The publication period begins eight weeks before the election. *Id.* § 113(b)(2)(B). Before 2017, the publication costs were borne by the State, not the petition sponsor. Both parties agree that these costs are significant. Both parties move for summary judgment on Plaintiffs' First Amendment claim.

Defendant asserts that the publication cost reimbursement does not implicate the First Amendment because it does not affect the communication of ideas during the petition process. (Doc. 90, p. 38). But, as the Supreme Court recognizes, invalid speech restrictions may occur "at different stages of the speech process," including by "seeking

52

to exact a cost after the speech occurs." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336–37 (2010) (citing *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 267 (1964)). That is exactly what the reimbursement requirement does regardless of how the Secretary enforces it against sponsors. *See* Doc. 90, p. 39 (claiming that there is no provision of law "that allows the Secretary to disqualify a proposed initiative if the fee is not paid"). It therefore implicates the First Amendment.

Assuming lesser scrutiny applies, the publication cost requirement fails. Defendant asserts that reimbursement of publication costs serves the State's interest in saving taxpayer dollars. While that interest is legitimate, charging for ballot access is not a legitimate means to further that interest. The Supreme Court has repeatedly rejected mandatory fees "in the absence of reasonable alternative means of ballot access." *Lubin v. Panish*, 415 U.S. 709, 718 (1974). In *Bullock v. Carter*, the Supreme Court struck down, on Equal Protection grounds, a Texas statute requiring "candidates to pay a flat fee of $50 plus their pro rata share of the costs of the election in order to get on the primary ballot. The assessment of costs involved sums as high as $8,900." *Lubin*, 415 U.S. at 715 n.4 (citation omitted) (citing *Bullock,* 405 U.S. 134 (1972)). The Court later described Texas' law as "so patently exclusionary as to violate traditional equal protection concepts." *Id.* And in *Lubin*, the Court struck down a California law under which "the payment of a fee is an absolute, not an alternative, condition, and failure to meet it is a disqualification from running for office." *Id.* at 718.

Here, Arkansas offers petition sponsors no alternative to paying publication costs. These publication costs are incurred under State decree, not by choice of the sponsors. The Supreme Court has "reject[ed] the theory that since the candidates are availing

53

themselves of the primary machinery, it is appropriate that they pay that share of the cost that they have occasioned." *Bullock*, 405 U.S. at 147–48. There, the Court noted that, under the Texas law, "the costs do not arise because candidates decide to enter a primary or because the parties decide to conduct one, but because the State has, as a matter of legislative choice, directed that party primaries be held." *Id.* at 148. Here, too, the costs of publication do not arise because initiative sponsors decide to publish their initiatives in weekly newspapers, but because the State has, as a matter of legislative choice, directed such publication.

"Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests." *Green Party of Ark. v. Martin*, 649 F.3d 675, 683 (8th Cir. 2011) (quoting *Lubin*, 415 U.S. at 718). Penalizing petition sponsors on the basis of ability to pay publication costs without providing any alternative means for complying with the law is likewise not a reasonable and nondiscriminatory method of furthering the State's important regulatory interests. The publication cost reimbursement requirement violates the First Amendment. Plaintiffs' Motion for Summary Judgment is **GRANTED** as to the publication cost requirement, and Defendant's Motion for Summary Judgment and Motion for Judgment on the Pleadings are **DENIED**.

### C. Vagueness Claims

Intervenor-Plaintiffs also claim that Act 240, the photo ID requirement, and Act 274, the reading requirement, are void for vagueness under the Due Process Clause of the Fourteenth Amendment. Defendant moves for judgment on the pleadings and for summary judgment on these claims. At the preliminary injunction phase, the Court

declined to conclude, on the record then before it, that either Act was void for vagueness. (Doc. 50, p. 70).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law must sufficiently define terms so "that ordinary people can understand what conduct is prohibited." *United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002). Such vagueness permits "arbitrary and discriminatory enforcement" by "impermissibly delegat[ing] basic policy matters to [government officials] for resolution on an ad hoc and subjective basis." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (citation modified). And "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. 104, 109 (citation modified).

Act 240 states that "[a] canvasser who witnesses signatures on a petition part shall view a copy of a potential petitioner's photo identification to verify the identity of the potential petitioner before obtaining the signature." Intervenor-Plaintiffs claim that it is unclear what a canvasser must do to "verify" the potential petitioner's identity. Defendant says that "a canvasser need only 'view' the potential petitioner's photographic identification and confirm (that is, 'verify') that the petitioner appears to be the person whose identification is presented." (Doc. 90, p. 57). Intervenor-Plaintiffs argue that this cannot be correct, because then the canvasser would not be "required to match the name to the signature, check the birthdate, check that the person is a registered voter, or do

55

anything other than confirm that the signer can produce an ID with a photo bearing a resemblance to the person." (Doc. 96, p. 23). This would defeat the purported anti-fraud purpose of the Act, since Defendant's claimed interpretation does not require the canvasser to ensure that the potential petitioner signs as the person that the canvasser has just verified them to be.

Act 274 requires that, before signing, a petitioner "read[ ] the ballot title of the petition in the presence of the canvasser or hav[e] the ballot title of the petition read aloud to him or her in the presence of the canvasser." Intervenor-Plaintiffs contend that this does not tell canvassers "how to determine that a signer read the entirety of the ballot title, should she choose to read it silently rather than have it read to her." (Doc. 81, p. 5).

Although the Court did not previously find a likelihood of success on the vagueness challenges, Intervenor-Plaintiffs assert that, on the record now before the Court, there is a genuine issue of material fact regarding the likelihood of arbitrary or discriminatory enforcement. Intervenor-Plaintiffs point out that Mr. Thomas "proactively gathered stories to build a case of wrongdoing by canvassers for the abortion amendment," an investigation that aligned with the Secretary's political viewpoint. Doc. 96, p. 24; *see* Doc. 96-6 (Defendant's social media post stating: "The fight for the sanctity of life is the most important battle of our lifetimes. Every human is made in the image of God. While we have secured so many wins, the fight to protect every innocent life—from conception to natural death—is only just beginning."). Mr. Thomas also worked with the president of the Family Council, the organization responsible for putting paid canvassers' information online in the 2024 election cycle, to find witnesses for this litigation. *See supra* p. 16.

Finally, Defendant's office has created a new petition fraud investigator position. According to Defendant's employee, the position is "primarily administrative in nature, ensuring that information is organized in productive, efficient, and useful ways." (Doc. 96-3). However, this investigator, Patrick Hall, also goes out to investigate canvassers on the ground. Julia Taylor, a volunteer canvasser for Intervenor-Plaintiff For AR Kids, was approached by Mr. Hall while canvassing in February of 2026. (Doc. 96-2, ¶¶ 2, 4 (Taylor Dec.)). He "asked to sign the petition" and then asked if she "needed to see his ID." *Id.* ¶¶ 4–5. The Secretary of State and his employees, including Mr. Hall, were then and are still preliminarily enjoined from enforcing Act 240's ID requirement against For AR Kids, so Ms. Taylor did not need to see his ID. (Doc. 50, p. 75). He then told Ms. Taylor and her fellow canvasser that he "work[ed] for the Secretary of State's office as a petition fraud investigator" and asked to see their IDs. (Doc. 96-2, ¶¶ 6–7). Ms. Taylor "did not want to share [her] ID" but "felt that [she] did not have a choice in that moment." *Id.* ¶ 7. The two canvassers produced their IDs, and Mr. Hall took photos of the IDs and left without signing the petition. *Id.* Ms. Taylor felt "nervous and intimidated" by this interaction. *Id.* ¶ 8. In an email response to a reporter after this incident, Defendant's employee stated: "While we appreciate canvassers who are willing to engage with our employees, no one is required to talk to them or show identification if they do not want to." (Doc. 96-3).

Intervenor-Plaintiffs have presented evidence from which a reasonable factfinder could conclude that Act 240 and Act 274 encourage arbitrary or discriminatory enforcement. Accordingly, Defendant's Motion for Judgment on the Pleadings and Motion for Summary Judgment as to Intervenor-Plaintiffs' void-for-vagueness claims are **DENIED**.

57

### D.  Permanent Injunction Factors

Plaintiffs and Intervenor-Plaintiffs seek to permanently enjoin the challenged laws.

A plaintiff seeking a permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Above, the Court found that the following laws violate the First Amendment as a matter of law: the pre-collection disclosure requirement, Ark. Code Ann. § 7-9-601(a)(2)(C)–(D); Act 218, the crime notification requirement; Act 240, the ID verification requirement; Act 274, the reading requirement; Act 241, the post-collection affidavit requirement and cool-off period; and the publication cost reimbursement requirement, § 7-9-113(a)(2)(A). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2364 (2025) (citation omitted). The balance of equities also favors Plaintiffs and Intervenor-Plaintiffs because Arkansas has no interest in enforcing laws the violate the First Amendment. *Dakotans for Health*, 52 F.4th at 392. Finally, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled in part by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Plaintiffs and Intervenor-Plaintiffs are entitled to a permanent injunction of these laws. The Court will refrain from entering judgment, including the permanent injunction, until all claims are resolved following the bench trial in this matter. The Court's preliminary injunction remains in effect in the interim.

## IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion for Judgment on the Pleadings (Doc. 114) is **GRANTED IN PART AND DENIED IN PART**. Count II of Plaintiffs' Complaint (Doc. 107) is **DISMISSED WITH PREJUDICE**. Intervenor-Plaintiffs' challenge to Act 602 as against the Secretary of State is **DISMISSED WITH PREJUDICE**. Defendant's Motion for Summary Judgment (Doc. 89) is **GRANTED IN PART AND DENIED IN PART**. Intervenor-Plaintiffs' challenges to the fifty county requirement, Arkansas Code § 7-9-126(e), and Act 273, codified at *id.* § 103(g), are **DISMISSED WITH PREJUDICE**. Plaintiffs', other than Mr. Evans and Ms. Cruz, challenge to the disqualifying offenses provision, *id.* § 601(d)(3), is **DISMISSED WITH PREJUDICE**. Defendant's Supplemental Motion for Summary Judgment (Doc. 129) is **DENIED**.

Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment (Docs. 83 & 86) are **GRANTED IN PART AND DENIED IN PART**. Summary Judgment is **GRANTED** in favor of Plaintiffs and Intervenor-Plaintiffs with respect to their First Amendment challenges to the pre-collection disclosure requirement, Arkansas Code § 7-9-601(a)(2)(C)–(D); the canvassing regulations, Acts 218, 240, and 274, codified at *id.* §§ 103(a)(1) & (7), (c)(11), 109(a) & (g); the post-collection affidavit and cool-off period of Act 241, codified at *id.* §§ 111(j)–(k), 126(c)(9); Plaintiffs Lee Evans's and Amy Cruz's First Amendment challenges to the disqualifying offenses provision, *id.* § 601(d)(3); and Plaintiffs' First Amendment challenge to the publication cost reimbursement requirement, *id.* § 113(a)(2)(A).

The following claims will proceed to trial: Plaintiffs' and Intervenor-Plaintiffs' First Amendment challenges to the residency and domicile requirements, *id.* § 103(a)(6) and Act 453, codified at *id.* § 103(a)(8); Plaintiffs' First Amendment challenge to the

59

commission ban, *id.* § 7-9-601(d); and Intervenor-Plaintiffs' vagueness challenges to Acts 240 and 274.

      **IT IS SO ORDERED** on this 30th day of June, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE