**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**LEAGUE OF WOMEN VOTERS OF ARKANSAS; SAVE AR DEMOCRACY; BONNIE HEATHER MILLER; DANIELLE QUESNELL; LEE EVANS; and AMY CRUZ** — **PLAINTIFFS**

**and**

**PROTECT AR RIGHTS; and FOR AR KIDS** — **INTERVENOR-PLAINTIFFS**

**V.** **CASE NO. 5:25-CV-5087**

**COLE JESTER, in his Official Capacity as Secretary of State of Arkansas** — **DEFENDANT**

# BENCH TRIAL OPINION AND ORDER

## TABLE OF CONTENTS


**I. BACKGROUND** ..... **1**
**II. FINDINGS OF FACT** ..... **2**
- **A. Parties and Witnesses** ..... **2**
- **B. Ballot Measures in Arkansas** ..... **4**
- **C. Recent Initiative Campaigns** ..... **10**
- **D. Residency and Domicile Requirements** ..... **14**
- **E. Pay-Per-Signature/Commission Ban** ..... **19**

**III. CONCLUSIONS OF LAW** ..... **21**
- **A. Mootness** ..... **21**
- **B. First Amendment Challenges** ..... **23**
  - *1. Residency Requirement* ..... 27
  - *2. Domicile Requirement* ..... 33
  - *3. Pay-Per-Signature/Commission Ban* ..... 37
- **C. Permanent Injunction Factors** ..... **43**

**IV. CONCLUSION** ..... **44**

## I. BACKGROUND

Under Article 5, § 1 of the Arkansas Constitution, the people of Arkansas:

> reserve to themselves the power to propose legislative measures, laws and amendments to the Constitution, and to enact or reject the same at the polls independent of the General Assembly; and also reserve the power, at their own option to approve or reject at the polls any entire act or any item of an appropriation bill.

Although the United States Constitution does not require states to permit direct democracy, where a state has such a process, "the circulation of [initiative and referendum] petition[s] involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Petition circulation is therefore "an area in which the importance of First Amendment protections is at its zenith." *Id.* at 425 (citation modified).

Plaintiffs and Intervenor-Plaintiffs brought First Amendment challenges to various Arkansas laws governing initiative and referendum petitions. The Court resolved the bulk of these challenges on summary judgment, *see* Doc. 135. Challenges to three of the laws survived summary judgment:

- Arkansas's residency requirement for canvassers, Ark. Code Ann. § 7-9-103(a)(6), (a)(8)(A), (d)(1)(A);
- Arkansas's domicile requirement for paid canvassers circulating statewide (as opposed to local) measures, *id.* § 103(a)(8), (d);
- Arkansas's prohibition on payment to canvassers "on a basis related to the number of signatures obtained," *id.* § 601(g).

These claims came before the Court for a two-day bench trial on July 28 and 29, 2026.

After trial, Defendant Arkansas Secretary of State Cole Jester filed a Motion to Dismiss for Lack of Jurisdiction (Doc. 159) and a Motion for Judgment on Partial Findings (Doc. 161). Plaintiffs and Intervenor-Plaintiffs filed responses in opposition to Defendant's

Motion to Dismiss. (Docs. 167–168). The parties also filed post-trial briefs as directed by the Court (Docs. 163–165). This case is fully submitted and ready for decision, and the Court now makes findings pursuant to Rule 52(a) and 52(c)[1] as follows.[2]

## II. FINDINGS OF FACT[3]

### A. Parties and Witnesses

1. Plaintiff League of Women Voters of Arkansas ("LWVAR") is a non-profit, nonpartisan civic organization that promotes active and informed participation in the democratic process.

2. Plaintiff Save AR Democracy ("SARD") is a ballot question committee that LWVAR formed to advocate for the passage of the Direct Democracy Reform Amendment of 2026.

3. Plaintiff Bonnie Miller served as president of LWVAR from 2019 until August of this year. She also served as chair of SARD. She testified as the representative of LWVAR and SARD. She is a resident of Fayetteville, Arkansas.

4. Plaintiff Danielle Quesnell is an Arkansan and a member of LWVAR and SARD.

---

[1] "In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . . It will be sufficient if the findings of fact and conclusions of law . . . appear in an opinion or memorandum of decision filed by the court." Fed. R. Civ. P. 52(a). "A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." Fed. R. Civ. P. 52(c).

[2] To the extent any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

[3] Additional background for this case can be found in the Court's previous Memorandum Opinion and Order (Doc. 135).

5. Plaintiff Amy Cruz is a professional canvasser. She has worked as a paid canvasser in a handful of states, although a disqualifying conviction has prevented her from working as a paid canvasser on ballot measures in Arkansas. *See* Doc. 135, p. 11. Ms. Cruz is a resident of Lexa, Arkansas. In the 2024 election cycle, she worked a paid, noncanvassing role in Arkansas.

6. Plaintiff Lee Evans is a professional canvasser and the owner of Evans Political Consulting ("EPC"). EPC provides campaign management and paid canvassing services. Mr. Evans is a resident of Fayetteville, Arkansas. He has worked as a paid canvasser in other states and in Arkansas for candidate petitions, although a disqualifying conviction has prevented him from working as a paid canvasser for ballot measures in Arkansas, *see id.*

7. Intervenor-Plaintiff Protect AR Rights is a ballot question committee sponsoring the Arkansas Ballot Measure Rights Amendment of 2026.

8. Intervenor-Plaintiff For AR Kids is a ballot question committee that sponsored the unsuccessful Arkansas Educational Rights Amendment of 2024 and the unsuccessful Arkansas Educational Rights Amendment of 2026.

9. Kellie Cobb, a witness for Plaintiffs, is a volunteer canvasser and resident of Fort Smith, Arkansas. She served as a volunteer canvasser and county leader on a ballot measure campaign in 2024.

10. Katie Fahey, a witness for Plaintiffs, is the executive director of The People, a non-profit, nonpartisan advocacy group that supports good governance initiatives. She is a resident of Michigan.

11. Bill Kopsky, a witness for Intervenor-Plaintiffs, is the executive director of the Arkansas Public Policy Panel, a non-profit community organizing and advocacy group that focuses on civil rights, election, education, environmental, and economic issues. He serves as treasurer for and is on the executive committees of both Intervenor-Plaintiffs. He testified as the representative for Intervenor-Plaintiffs.

12. Allison Guthrie, a witness for Intervenor-Plaintiffs, formerly served as a volunteer and paid canvasser in Arkansas. Ms. Guthrie was born and raised in Arkansas, but she moved out of state for graduate school two years ago and now lives in Illinois.

13. Defendant Cole Jester is the Secretary of State of Arkansas. He is sued in his official capacity.

14. Leslie Bellamy, a witness for Defendant, works in the Secretary of State's office as the director of elections. She has served in that position since 2016. She testified as the representative for Defendant.

### B. Ballot Measures in Arkansas

15. Arkansas passed a host of initiative and referendum petition reforms in 2013 in response to high rates of signature invalidity and "widespread instances of apparent fraud, forgery, and false statements in the signature-gathering process." Ark. Act 1413 of 2013, sec. 1(a)(6).

16. Arkansas enacted the residency requirement and pay-per-signature/commission ban in 2021. Ark. Act 951 of 2021, secs. 1, 7.

17. Arkansas enacted the domicile requirement for paid canvassers on statewide measures in 2025. Ark. Act 453 of 2025, secs. 1–2.

18. Leslie Bellamy began working in the Secretary's elections division in 2013; she became the director of elections in 2016.

19. Arkansas requires training on Arkansas law for paid canvassers but not volunteer canvassers; Arkansas also requires background checks for paid canvassers but not volunteer canvassers. (Doc. 158, pp. 457:17–458:6 (Bellamy)). Sponsors must submit a paid canvasser's names and residential address to the Secretary before the canvasser collects signatures, and a final list of all paid canvassers and signature cards for each after signature collection. Ark. Code Ann. § 7-9-601(a)(2)(C), (a)(3).

20. A ballot measure is divided into petition parts. Each petition part has ten signature lines. Pls.' Ex. 1, p. 11 ¶ 8; Pls.' Ex. 6.

21. Many sponsors and canvassing companies undertake their own quality assurance checks before submitting signatures to the Secretary for review. Sponsors and/or canvassing companies typically check that all the procedural requirements have been met and also strike out any signatures that are potentially fraudulent. (Doc. 155, p. 153:1–16 (Cruz); *id.* at p. 238:10–21 (Evans); *id.* at p. 290:1–11 (Fahey)). Some campaigns will also check the signatures against the voter rolls before submission. (Doc. 155, p. 153:17–20 (Cruz)). Ms. Bellamy saw strikethroughs in all petitions that were submitted for review. (Doc. 158, p. 490:5–14 (Bellamy)).

22. The Secretary's office reviews every petition part that a sponsor submits. (Doc. 158, p. 397:2–7 (Bellamy)).

23. A petition part will be invalidated and all the signatures contained therein not counted if any regulation was not followed. For example, canvassers must

complete a notarized affidavit on each petition part, and the Secretary will cull the petition part if the notarization is defective in any way, like, for example, if the notary stamped the affidavit but didn't sign it or if the notary is not in good standing. (Doc. 158, p. 401:20–22 (Bellamy)).

24. The Secretary's office reviews every signature on the remaining petition parts. Signatures are also individually culled if any regulation was not followed. For example, paid canvasser information must be filed with the Secretary before the canvasser collects any signatures; the Secretary's office checks signatures collected by paid canvassers to ensure the paid canvasser was on the paid list on the date that the signer signed the petition. *Id.* at p. 397:9–14.

25. In addition to a signature, signers of a petition must list their date of birth, residence address, city, county, and date of signing in their own handwriting. Pls.' Ex. 1, p. 11 ¶ 8; Pls.' Ex. 6. Signatures are invalidated if the signer did not complete this information in their own handwriting. (Doc. 158, pp. 404:24–405:5 (Bellamy)).

26. The Secretary's office also reviews each petition part for "transcription." Transcription is when the same handwriting appears in multiple lines of a petition. For ballot measures, all the signer's information must be written in the signer's own handwriting, so the Secretary's office invalidates signatures if any of the information on different lines appears to be in the same handwriting. Ms. Bellamy offered the example of "looking at a whole page, and every 'Fayetteville' looks the same." (Doc. 158, pp. 399:23–400:12). Each petition part must contain signatures of voters from the same county, but a well-meaning though ill-trained canvasser who filled in the county on each line to save signers' time would find all the

signatures invalidated for transcription, even if ten unique voters had in fact signed the petition part.

27. The Secretary's office reviews for transcription by petition part, so if the same handwriting appeared on different petition parts, it would be "very hard" for the Secretary's office to catch that. *Id.* at p. 400:10–19.

28. The remaining signatures are then subject to registered voter verification through a purpose-built computer program to ensure the signer is a registered voter, was a registered voter on the date they signed, and that their information matches between the petition and the Secretary's voter registration database. *Id.* at pp. 402:17–403:19.

29. The Secretary's office does not, however, check that a petition signature matches the signature on the signer's voter registration form; voter registration forms are available to the Secretary's office, but signatures are not incorporated into the registered voter verification program. *Id.* at p. 453:2–12.

30. The registered voter verification program reliably identifies duplicate signatures. *Id.* at pp. 400:24–401:5.

31. One of the most common reasons a signature is invalidated is because the signer is not registered to vote or was not registered to vote at the time they signed the petition. *Id.* at p. 452:20–24.

32. Candidate and new political party petitions are far less regulated than ballot petitions. Candidates and new political parties do not have to provide paid canvasser lists, their canvassers do not have to be Arkansas residents or pass background checks, and there are no restrictions on how candidates pay

canvassers. *Id.* at pp. 451:17–452:2; Doc. 155, p. 243:8–13 ("You could be in state, out of state, you could be a felon." (Evans)). In fact, a canvasser does not have to witness the signatures on a candidate or new political party petition; the form petitions published by the State Board of Election Commissioners do not even have a place for the canvasser's name. (Doc. 158, pp. 451:17–452:2 (Bellamy); Doc. 155, p. 243:14–16 ("I mean, you could put them up on community bulletin boards. There's nothing illegal about that." (Evans)); Pls.' Ex. 3, pp. 57–87).

33. Signers of candidate petitions only have to sign in their own handwriting; they do not have to fill out the rest of the information in their own handwriting. Accordingly, the Secretary's office does not review candidate petitions for transcription. (Doc. 158, p. 451:6–16 (Bellamy)).

34. The "most typical" canvasser "irregularities" the Secretary's office sees on ballot measure petitions are canvassers not signing the canvasser affidavit on the petition part and paid canvassers who are not on the paid canvasser list or were not on the list at the time the signature was collected. *Id.* at p. 407:3–10.

35. The Secretary's office also receives complaints about petitions and even voting in every election cycle. *Id.* at p. 409:10–13. With respect to the petition process, Ms. Bellamy commonly heard complaints "that a canvasser didn't tell them what the measure was really about or the canvasser was leaving the page unattended." *Id.* at p. 407:20–25. The office typically tries to report these complaints back to the petition sponsor so they can address the canvasser. *Id.* at p. 409:4–9. Ms. Bellamy was not aware of any instances of misrepresentations being referred to a prosecuting attorney. *Id.* at p. 441:12–23.

36. Ms. Bellamy noticed an uptick in complaints during the 2024 election cycle. Ms. Bellamy thought the uptick was due to the Arkansas Abortion Amendment that was being circulated, because “it was a hot topic” and “very controversial.” *Id.* at p. 409:14–20.

37. Criminal prosecutions are the most effective deterrent for violations of the law surrounding ballot petitions. *Id.* at p. 442:1–4.

38. The election division is not responsible for investigating or referring sponsors, canvassers, notaries, or signers for criminal prosecution related to the petition process. *Id.* at p. 411:4–8. The election division hands off complaints and suspected fraud or forgery to the legal division. *Id.* at pp. 426:16–20, 454:23–455:3. The Secretary did not produce a witness from the legal division or who was otherwise competent to testify about criminal investigation or prosecution decisions.

39. When the Secretary has “reasonable grounds to believe that one (1) or more signatures on a petition is forged, [he] shall report the suspected forgery and basis for suspecting forgery to . . . [t]he Division of Arkansas State Police.” Ark. Code Ann. § 7-9-103(e). To Ms. Bellamy’s knowledge, since at least 2020, the legal division has not referred any suspected forgeries to the Arkansas State Police for investigation. (Doc. 158, pp. 454:23–455:3).

40. The Secretary did not present any empirical information about invalidation, transcription, duplicate, or suspected fraud rates pre-2021.

41. The medical marijuana measure circulated in 2024 was submitted with 111,402 signatures. *Id.* at p. 470:9–14. The Secretary of State's review found 5,839 duplicate signatures (5.2%) and 1,416 transcriptions (1.3%). (Doc. 135, p. 16).

42. The casino authorization repeal measure circulated in 2024 was submitted with 162,181 signatures. (Doc. 158, p. 470:15–17 (Bellamy)). The Secretary's review found 387 duplicate signatures (0.2%) and 518 transcriptions (0.3%). (Doc. 135, p. 16).

**C. Recent Initiative Campaigns**

43. From 2013 through 2024 (6 elections cycles), 72 measures were approved for circulation and 10 of those measures appeared on the ballot, although votes were not counted by order of the Arkansas Supreme Court on 3 of the 10. (Doc. 100, ¶¶ 13–18).

44. LWVAR formed ballot question committees to sponsor initiative petitions in the 2020, 2024, and 2026 election cycles. (Doc. 155, pp. 29:3–8, 54:11–22, 61:5–19 (Miller)).

45. Only the 2020 petition was submitted to the Secretary with the requisite number of signatures, although the petition was ultimately found insufficient by the Secretary of State and the Arkansas Supreme Court because the sponsor's certification that paid canvassers had passed criminal background checks was defective. *Id.* at p. 40:8–22; *Miller v. Thurston*, 2020 Ark. 267 (2020).

46. The 2020 campaign used both volunteer and paid canvassers, and both resident and nonresident canvassers. (Doc. 155, pp. 39:9–40:7 (Miller)). The paid canvassers were paid by the signature. *Id.* at p. 39:19–22.

47. The 2024 and 2026 campaigns used only Arkansas resident, volunteer canvassers. *Id.* at pp. 57:19–59:10

48. LWVAR has never collected enough signatures to make the ballot without the use of paid canvassers. *Id.* at pp. 39:9–40:7.

49. For AR Kids circulated petitions in 2024 and 2026. (Doc. 158, pp. 309:25–310:12). In both cycles, it did not use paid canvassers, and in both cycles it failed to collect enough signatures. *Id.*

50. Collecting enough signatures to make the ballot is difficult if not impossible without the use of paid canvassers. *See* Doc. 155, p. 58:24–25 ("We believe it to be impossible with an all-volunteer group." (Miller)); Doc. 158, p. 373:15–18 ("[W]e do not believe it's possible to do a hundred percent volunteer campaign and reach the signature thresholds, given all of the hurdles the state of Arkansas places before signature collectors." (Kopsky)). There is no evidence that an all-volunteer campaign has ever gotten a measure on the ballot in Arkansas.

51. Volunteer canvassers have conflicting obligations, like paid work, that make them less consistently available for canvassing. (Doc. 155, p. 58:15–21 ("We all -- the vast majority of the people in our organization have full-time jobs and families, and this is something that we do because we believe in it, and it's something that we do outside of work and family time. . . . And so, with an all-volunteer crew, you don't have the same kind of consistency and canvassing." (Miller))).

52. SARD considered hiring paid canvassers for the 2026 campaign, but it was not able to raise sufficient funds. *Id.* at pp. 129:7–10, 131:18–24, 134:15–17.

53. For AR Kids was likewise interested in using paid canvassers but was also unable to raise sufficient funds in recent cycles. (Doc. 158, p. 311:13–17 (Kopsky)).

54. Protect AR Rights began its campaign in late 2025 using only volunteer canvassers, but it seemed unlikely that its volunteer workforce would be able to secure the requisite signatures. *Id.* at p. 312:25–10. It hired paid canvassers once it had secured enough funding to do so. *Id.* at pp. 312:11–313:1.

55. Under current conditions, a successful paid canvassing operation for a constitutional amendment in Arkansas costs upwards of a million dollars. *See* Doc. 155, p. 130:12-13 ("[W]e had anticipated signature collection costing somewhere between one and a half and 2 million." (Miller)); *id.* at pp. 227:19–228:1 ("So if we are looking at, you know, over 90,000 signatures, you're look at anywhere from $900,000 or more . . . . I think more of the recent ones have been closer to a million and above that for the bigger firms that aren't Arkansas-based . . . ." (Evans)); Doc. 158, p. 375:12–16 ("And so the bid, if my memory serves, was around 1.5 million, and we ended up, I believe, paying them 2 million because, again, the cost . . . was substantially higher than we anticipated." (Kopsky)).

56. Prior to the residency requirement and pay-per-signature ban, sponsors and canvassing companies "were getting a professional class of petitioner that had done this before." (Doc. 155, p. 228:12–18 (Evans)).

57. After the residency requirement and pay-per-signature ban, professional canvassers are less available, and the inexperienced canvassers that sponsors must now hire require "very extensive use of resources" by sponsors to get them

up to speed on the law and practice of canvassing. (Doc. 155, pp. 157:21–158:6 (Cruz)).

58. On average nationally, paid canvassers have about a 15% higher invalidation rate than volunteer canvassers. (Doc. 158, pp. 381:25–382:19 (Kopsky)). There is no evidence in the record that paid canvassers are more likely than volunteer canvassers to commit fraud or forgery, and Ms. Bellamy testified that some of the most common paid canvasser irregularities are a paid canvasser's omission from the sponsor's paid canvasser list, background check issues, and issues with paid canvasser signature cards. Doc. 158, pp. 407:6–15. The Court infers that much of the difference in invalidation rates is attributable to the "Byzantine maze of paperwork" that paid canvassers and the sponsors who use them must navigate, not due to higher rates of fraud or forgery, Doc. 155, p. 243:6–7 (Evans).

59. Protect AR Rights solicited bids for its paid canvassing operation from several national canvassing companies, but only two submitted final bids. (Doc. 158, p. 314:7–14 (Kopsky)).

60. Protect AR Rights ultimately hired FieldWorks to conduct its paid canvassing operation. FieldWorks's initial bid was approximately $1.5 million to collect approximately 120,000 signatures and provide some additional administrative services.[4] Protect AR Rights's goal was to collect 150,000 signatures, and it

[4] Arkansas law states: "It is unlawful for a person to pay or offer to pay a person, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition . . . ." Ark. Code Ann. § 7-9-601(g). Witnesses expressed concern that framing a quote for paid canvassing in terms of X dollars for Y signatures would violate the law, even if the canvassers were not actually paid on a per-signature basis. *See* Doc. 155, pp. 224:18–227:6 (Evans); Doc. 158, p. 352:1–14 (Kopsky)).

anticipated that its volunteer efforts would provide the other 30,000. (Doc. 158, pp. 374:2–375:16 (Kopsky)). FieldWorks hired between 400 and 500 paid canvassers. *Id.* at p. 313:14–17.

61. FieldWorks's bid was based on its projection that each paid canvasser would obtain about 45 signatures per eight-hour shift. The canvassers "ended up significantly underperforming on that, down to about 32 signatures per eight-hour shift," an approximately 30% reduction. *Id.* at p. 316:20–23.

62. To comply with Arkansas law, Protect AR Rights's paid canvassers were paid on an hourly, rather than per-signature, basis. *Id.* at p. 384:9–10.

63. Because the canvassers were not as effective as expected, Protect AR Rights ended up spending about 30% more than the initial bid, for a total cost of approximately $2 million. *Id.* at p. 319:10–16.

64. Even with the additional spend, Protect AR Rights did not reach its goal of 150,000 signatures; it turned in about 108,000. *Id.* at pp. 319:21–320:7. Volunteers collected approximately 35,000 signatures, outperforming the expected 30,000, and paid canvassers collected the remaining approximately 73,000, significantly underperforming the expected 120,000. *Id.*

65. The day after the bench trial, the Secretary of State declared all signatures on Protect AR Rights's petition invalid because the petition parts listed the wrong popular name: "The Ballot Measure Rights Amendment of 2026," rather than the Attorney-General-approved "The Arkansas Ballot Measure Rights Amendment." (Doc. 159-1).

**D. Residency and Domicile Requirements**

66. Less than 1% of Americans live in Arkansas.

67. The Secretary's office has no evidence that nonresidents are more likely to commit fraud than residents. (Doc. 158, p. 454:1–3 (Bellamy)).

68. The Secretary's office has no evidence that people domiciled in other states are more likely to commit fraud than Arkansans. *Id.* at p. 475:20–25.

69. The Secretary's office could not identify any instance of suspected fraud that Arkansas was unable to pursue because a canvasser was not an Arkansas resident. *Id.* at p. 480:6–21.

70. The Secretary's office is not aware of any instances in which Arkansas attempted to subpoena an out-of-state witness but was unable to get them to come to Arkansas to testify. *Id.* at p. 455:9–14.

71. In 2022, David Couch, counsel for Plaintiffs, complained to Ms. Bellamy that nonresidents were canvassing in violation of the recently enacted residency requirement. *Id.* at p. 425:17–23.

72. In 2024, the Secretary's office received complaints about out-of-state canvassers claiming they were residents of hotels in Arkansas. These complaints related to local, not statewide, petitions. *Id.* at pp. 487:1–488:14. The complaints triggered a joint performance review of the Legislature, and some individuals may have been referred for prosecution although Ms. Bellamy could not testify as to whether any prosecutions actually resulted. *Id.*

73. LWVAR is affiliated with the national League of Women Voters.

74. LWVAR meets regularly with Leagues in neighboring states. (Doc. 155, p. 60:3–6 (Miller)).

75. League members from neighboring states would canvass for LWVAR in Arkansas if they were allowed to do so. *Id.* at p. 60:2–8.

76. The People has 129 members in states that neighbor Arkansas. Ct.'s Ex. 1; Doc. 155, pp. 272:16–273:11 (Fahey). It partners with local organizations like LWVAR to support ballot petitions that align with its good governance agenda. (Doc. 155, pp. 274:9–275:6 (Fahey)).

77. In the 2026 election cycle, The People assisted with ballot measures in Missouri and Oklahoma. The People recruited 275 volunteers in Oklahoma and 1,958 in Missouri. Ct.'s Ex. 1. Of the Missouri volunteers, 588 live within 50 miles of the Arkansas border. *Id.*; Doc. 155, p. 284:6–9 (Fahey). A group of about 20 volunteers travelled between the two states to collect signatures and would have included Arkansas in their rotation if they had been allowed to canvass here. (Doc. 155, pp. 280:11–281:8 (Fahey)).

78. Ms. Cobb, a volunteer canvasser and canvassing organizer, regularly canvassed at the University of Arkansas–Fort Smith during the 2024 cycle. *Id.* at pp. 180:9–23, 183:1–4 (Cobb). Fort Smith, the third largest city in Arkansas, lies on the border with Oklahoma. While canvassing, Ms. Cobb had to turn away "at least a couple of people a week" who wanted to canvass and were in Fort Smith, for school or otherwise, but lived across the border in Oklahoma. *Id.* at p. 188:5–11. The residency requirement also affected the kind of people who could be canvassers: younger people with time to volunteer—namely students—were prevented from doing so by the residency requirement. *Id.* at p. 185:7–12.

79. Ms. Guthrie, a lifelong Arkansan who recently moved to Illinois, spent hundreds of hours canvassing, both volunteer and paid, and collected thousands of signatures during the 2024 election. *Id.* at p. 210:2–17 (Guthrie). If she were legally allowed to do so, she would canvass in Arkansas during her frequent return trips to the state. *Id.* at pp. 210:22–211:6. She has provided volunteer help with graphic design and social media posting for a campaign in Arkansas since moving to Illinois. *Id.* a pp. 218:21–219:7.

80. In states without residency and domicile restrictions, some campaigns and canvassing organizations prefer to use smaller teams of 40 to 60 experienced, professional canvassers who travel together, rather than recruiting hundreds of locals with no prior canvassing experience who may drop out after training or leave midcampaign. (Doc. 155, pp. 158:7–14, 177:11–22 (Cruz)). These teams can also provide helpful support and oversight for less experienced local canvassers. *Id.* at pp. 228:12–229:4 (Evans).

81. The residency and domicile requirements hindered the efficacy of Protect AR Rights's paid canvasser campaign, even though Protect AR Rights used FieldWorks, a reputable, national canvassing company.

82. The residency and domicile requirements delayed FieldWorks's deployment of paid canvassers. FieldWorks's usual practice is to "bring in a small, 10 to 20, crew of experienced canvassers from other states to immediately get launched out into the field, start collecting signatures while they're hiring local residents to do the bulk of the signature collection." (Doc. 158, p. 315:4–11 (Kopsky)). Because out-of-staters are not allowed to collect signatures for ballot measures in Arkansas,

there was a delay of about two weeks between Protect AR Rights hiring FieldWorks and FieldWorks actually deploying paid canvassers. *Id.*

83. The residency and domicile requirements restricted Protect AR Rights's access to experienced professional canvassers and ability to train first-time canvassers. Most of the canvassers FieldWorks hired in Arkansas had not canvassed before. *Id.* at p. 318:11. FieldWorks's training for canvassers would typically involve pairing a professional canvasser with a group of new hires to provide on-the-job training by allowing the new hires to watch how the professional canvasser collects signatures. *Id.* at p. 316:10–19. On Protect AR Rights's campaign, FieldWorks did bring in trainers, but because of the residency and domicile requirements, they were not able to provide the same on-the-job training. *Id.*

84. Mr. Evans has observed an increase in potentially fraudulent signatures during his quality assurance checks in recent years. He believes the increase is because the new regulations exclude "a professional class" of canvassers employed by national organizations that talk to each other so canvassers who "screwed up . . . could easily be blacklisted." (Doc. 155, pp. 244:13–2 (Evans)). By contrast, relying on new hires means "some of these people come out and get a few signatures, and then they disappear." *Id.*

85. Mr. Evans was once subpoenaed by North Carolina in relation to a campaign but, after speaking with counsel, did not respond. (Doc. 155, p. 258:5–19). The Court is not aware of any North Carolina law requiring canvassers to submit to the state's subpoena power.

86. While nonresidents and non-domiciliaries can, under Arkansas law, provide non-canvassing support to ballot measure sponsors, "collecting signatures is the absolute most important intention of a canvassing campaign," and the non-canvassing assistance out-of-staters could provide is in "small roles that didn't necessarily raise [the sponsors'] numbers" for which potential volunteers therefore understandably lack enthusiasm. *Id.* at p. 193:18–194:20 (Cobb).

### E. Pay-Per-Signature/Commission Ban

87. Nationwide, the most common method of payment for canvassers is per-signature. (Doc. 155, p. 156:18–21 (Cruz); *id.* at p. 222:20–23 (Evans)).

88. Even in states where pay-per-signature is not used, sponsors or canvassing companies may still incorporate number of signatures collected into their payment structure. For example, Ms. Cruz testified that even when she was paid hourly, she was paid hourly "with a stipulation" that she had to collect "9 to 13 signatures[ ] [p]er hour billed, not per hour worked." *Id.* at p. 166:2–9. Such an arrangement would not be permitted under Arkansas law.

89. Canvassers paid on a per-signature basis are typically only paid for signatures that pass their organization's quality assurance checks. *Id.* at pp. 151:20–25, 167:19–23; *id.* at pp. 260:16–261:8 (Evans).

90. Payment on a per-signature basis incentivizes canvassers to turn in signatures that will withstand validation. *Id.* at pp. 156:22–157:9 (Cruz); *id.* at p. 223:2–3 (Evans).

91. Ms. Bellamy testified that she saw a decrease in the number of transcriptions after the pay-per-signature/commission ban was enacted. (Doc. 158, p. 415:8–22). The Secretary's office did not supply any numbers to support Ms. Bellamy's observation

or elucidate the magnitude of the decrease. The Court notes that the Secretary's office reviews for transcription on the entire signature line, not just the signature itself, because Arkansas law requires initiative and referendum petition signers to complete the entire line in their own handwriting. But there are plausible non-fraud explanations for transcription, like a husband filling in information for his wife. *Id.* at p. 400:3–9. There is no evidence from which the Court can ascertain what percentage of transcriptions involve signatures themselves as opposed to other information in the signature line.

92. Neither party put on evidence about differences in validity, duplicate, suspected fraud, or suspected forgery rates between canvassers paid on an hourly versus per-signature basis.

93. The pay-per-signature ban makes it more difficult for sponsors to budget because payment on a per-signature basis makes labor costs more predictable. (Doc. 155, p. 223:7–14 (Evans)).

94. Sponsors and canvassing companies fear that even framing a quote for paid canvassing in terms of X dollars for Y signatures would violate the ban, even if the canvassers were not individually paid on a per-signature basis, because Arkansas law prohibits "a person" from "offer[ing] to pay a person, . . . or agree[ing] to receive payment, on a basis related to the number of signatures obtained," Arkansas Code § 7-9-601(g)(1). *See* Doc. 155, pp. 224:18–227:6 (Evans); Doc. 158, p. 352:1–14 (Kopsky).

95. Hourly payment requires sponsors or canvassing companies to devote more resources to oversight; canvassers paid per-signature have an incentive to collect signatures efficiently, but canvassers paid hourly do not. *Id.* at p. 225:3–6.

## III. CONCLUSIONS OF LAW

### A. Mootness

The Secretary moves to dismiss, arguing that all the claims in this litigation are moot because SARD and For AR Kids did not file the petitions they had been circulating and Protect AR Rights's petition was declared insufficient following the Secretary's review for reasons unrelated to any of the laws challenged in this litigation.

"Under Article III of the Constitution, [federal courts] may adjudicate only actual, ongoing cases or controversies. When the issues presented in a case are no longer live, the case is moot and is therefore no longer a 'Case' or 'Controversy' for purposes of Article III." *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021) (citation modified). There is an exception to mootness for cases that are capable of repetition yet evading review. "This exception will rescue an otherwise moot claim if (1) the challenged conduct is of too short a duration to be litigated fully prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 795 (8th Cir. 2016) (citation modified). "The question is 'whether the controversy was *capable* of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not.'" *Id.* (alteration in original) (quoting *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988)). "Election issues are among those most frequently saved from mootness by this exception." *Id.* (internal quotations and citation omitted).

Even assuming Plaintiffs' and Intervenor-Plaintiffs' claims are moot,[5] they have shown that this case is capable of repetition yet evading review. As this litigation demonstrates, election law challenges often cannot be fully litigated in the space of a single petition circulation cycle. Plaintiffs and Intervenor-Plaintiffs have demonstrated a reasonable expectation that they will be subject to the challenged laws again in the future.

LWVAR has circulated measures in three of the four most recent petition cycles. While Ms. Miller did not identify a particular measure that LWVAR intends to support or advance in the 2028 election cycle, she testified that LWVAR "plan[s] to do more [ballot campaigns] in the future." (Doc. 155, p. 128:15–22). LWVAR need not point to a particular issue to establish a reasonable expectation that it will sponsor a ballot measure, and therefore be subject to the challenged laws, in the future, especially given its history of consistent involvement in the petition process. *See Klahr*, 830 F.3d at 796 (applying mootness exception where challenger would "be harmed . . . if and when it chooses to support or oppose the qualification and passage of one or more particular ballot measures in future elections"); *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) ("[T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.").

Individual Plaintiffs Lee Evans and Amy Cruz live in Arkansas, have worked as professional canvassers for years (albeit in other states due to Arkansas's disqualifying offenses provision), and expressed intent to work as paid canvassers in Arkansas if

[5] *But see Miller v. Thurston*, 967 F.3d 727, 734 n.2 (2020) ("All things considered, we agree that the Secretary's insufficiency declaration does not moot this case.").

permitted by law to do so. *See* Doc. 135, pp. 23–25. They are not affiliated with LWVAR, SARD, For AR Kids, or Protect AR Rights, so their standing in no way depends on the success of any of these entities' campaigns.

For AR Kids circulated education-related amendments in 2024 and 2026 and is "committed to continue to advocate for those issues." (Doc. 158, pp. 311:21–312:5 (Kopsky)). While For AR Kids is also pursuing reform through ordinary legislative avenues, there remains a reasonable likelihood that resort to Arkansas's direct democracy process will be necessary to advance For AR Kids's desired reforms in the future. *Id.* Similarly, Protect AR Rights is "already discussing potential campaigns for the 2028 election and anticipate[s] working on campaigns in earnest after the November 2026 election, if necessary." (Doc. 168-5, ¶ 13 (Kopsky Dec.)).

Because this election case could not be fully litigated in a single petition cycle, and because Plaintiffs and Intervenor-Plaintiffs reasonably expect that they will be subjected to the same challenged laws again in the future, the capable-of-repetition-yet-evading-review exception applies and the case is not moot. Defendant's Motion to Dismiss (Doc. 159) is therefore **DENIED**.

### B. First Amendment Challenges

"The First Amendment, incorporated against the States under the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *SD Voice v. Noem*, 60 F.4th 1071, 1077 (8th Cir. 2023). While the U.S. Constitution does not guarantee direct democracy, "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22. Petition circulation is therefore "an area in which the importance of First Amendment protections is at its zenith." *Id.* at 425 (citation modified).

Canvassers, after all, are not pollsters. They are not disinterested observers trying to determine existing support for a given policy. Canvassers are engaged in political persuasion. *Id.* at 421. They seek signatures not just from those who already agree with a measure, but also from those who might be persuaded to support a measure, or at least support its inclusion on the ballot, if the sponsor "could get out their message." *Krislov v. Rednour*, 226 F.3d 851, 863 (7th Cir. 2000).

"States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191 (1999). "'[N]o litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions"; there is "no substitute for the hard judgments that must be made." *Id.* at 192 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). "But the First Amendment requires us to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas." *Id.*

When faced with a ballot-access law, courts must first determine whether the law implicates the First Amendment. A law implicates the First Amendment if it "affects the communication of ideas associated with the circulation of [a] petition." *Miller v. Thurston*, 967 F.3d at 738. If the law implicates the First Amendment, courts use the *Anderson*/*Burdick* sliding scale test[6] to assist in making those hard judgments. *SD Voice*, 60 F.4th at 1080. Under that test, courts "weigh the character and magnitude of the burden the State's rule imposes on First Amendment rights against the interest[s] the State contends justify that burden, and consider the extent to which the State's concerns make

[6] *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

the burden necessary." *Id.* (citation and internal quotation marks omitted). "Th[e] [Supreme] Court's precedents start with the basic precept that when 'the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.'" *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 146 S. Ct. 2404, 2416 (2026) (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014) (plurality opinion)).

Laws that impose a severe burden on the ability to engage in political speech are subject to strict scrutiny. *SD Voice*, 60 F.4th at 1080. "A severe burden is one that goes beyond the merely inconvenient." *Id.* (citation modified). "Under the strict scrutiny test, [the government] ha[s] the burden to prove that the [law] is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minn. v. White*, 536 U.S. 765, 774–75 (2002).

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226, 228–29 (1989)). Where a law's challenger proposes a less restrictive alternative, "[t]he government's burden is to show that [the] less restrictive alternative would be less effective." *Miller v. Ziegler*, 109 F.4th 1045, 1053 (8th Cir. 2024) (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004)) (cleaned up).

If the burden is not severe, the law is reviewed "to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *SD Voice*, 60 F.4th at

1080 (citation modified). Although this standard is more deferential than strict scrutiny, it is a more searching review than rational basis. *Contrast SD Voice*, 60 F.4th at 1080–81 (examining state's articulated reasons for enacting challenged law), and *id.* at 1081 (concluding that law was unconstitutional under lesser scrutiny where the state "merely relie[d] on a bare assertion of election integrity rather than evidence or a reasonable response connected to the" purported reason for the law), *with F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, [on rational-basis review] it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."), and *id.* ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

"Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). "This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence de novo, or to replace [the legislature's] factual predictions with our own. Rather, it is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).

Intervenor-Plaintiffs bring facial First Amendment challenges, and Plaintiffs do not specify whether their challenges are facial or as applied. In the First Amendment context, a law may be held facially unconstitutional "as overbroad if a substantial number of its

applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (citation omitted).

### *1. Residency Requirement*

Under Arkansas law, "[a] person shall not act as a canvasser unless he or she is a resident of this state." Ark. Code Ann. § 7-9-103(a)(6). "Canvasser" is defined as "a person who circulates an initiative or referendum petition or a part or parts of an initiative or referendum petition to obtain the signatures of petitioners thereto." *Id.* § 101(3). Arkansas law also separately requires that a paid canvasser be a resident of Arkansas and prohibits sponsors and their agents from knowingly hiring nonresidents. *Id.* § 103(a)(8)(A), (d)(1)(A). A sponsor who violates this requirement "is guilty of a violation and upon conviction shall be fined two thousand five hundred dollars ($2,500) for each paid canvasser hired in violation" of the residency requirement. *Id.* § 103(d)(2). Signatures collected in violation of these provisions are not to be counted. *Id.* § 103(g)(1).

The State asserts, without explanation, that the residency requirement does not implicate the First Amendment because it does not affect the communication of ideas. The Eighth Circuit has looked at a residency requirement for petition circulators once before. In *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001), the court did uphold North Dakota's residency requirement, but only after weighing the First Amendment burden.

"Speech is presumptively a national commodity. The Supreme Court has said as much in applying the First Amendment to the states." *Warren v. Fairfax Cnty.*, 196 F.3d 186, 198–99 (4th Cir. 1999) (Wilkinson, C.J., concurring) (citing *Gitlow v. New York,* 268 U.S. 652, 666 (1925)). Americans, protected one and all by the First Amendment, have

the right to speak about and advocate for political change in all fifty states, not just the state where they live.

The Supreme Court has recognized that a law can affect the communication of ideas not just by restricting what a sponsor can say, but also by restricting who the sponsor can recruit to say it. “The First Amendment protects [sponsors’] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.” *Meyer*, 486 U.S. at 424. The Supreme Court has held unconstitutional laws that exclude entire classes of canvassers. *Id.* (ban on paid petition circulators); *Buckley*, 525 U.S. at 193 (registered voter requirement). The residency requirement implicates the First Amendment by making 99% of Americans effectively unavailable as messengers for Plaintiffs’ and Intervenor-Plaintiffs’ ideas, thereby limiting their ability to select what they believe to be the most effective means for advocating for their petitions.

Thus the Court must examine the character and magnitude of the First Amendment burden. In *Jaeger*, the Eighth Circuit concluded that North Dakota’s residency requirement did not impose a severe burden on petition sponsors’ speech. 241 F.3d at 617. The challengers had argued that the residency requirement burdened their First Amendment rights “by making it more costly and time consuming to collect signatures,” but, the court noted, there was “no evidence in the record” to that effect. *Id.* The court also noted the high (70%) success rate in circulated petitions making the ballot, “demonstrat[ing] that no severe burden ha[d] been placed on those wishing to circulate petitions.” *Id.*

The same is not true here. The success rate for circulated initiative or referendum petitions making the ballot has, in recent years, been below 15%. And Plaintiffs and

Intervenor-Plaintiffs have put on evidence of the burden the residency requirement imposes: It prevents sponsors from working across state lines with national organization and organizations in neighboring states that would like to send volunteer canvassers to Arkansas; it prevents members of border communities like Fort Smith from canvassing in Arkansas despite their interest in and connection with the state, with the effect that younger people who might be more effective messengers are less available; and it prevents sponsors from hiring experienced, professional canvassers who could collect "[m]ore signatures for less money in less time." (Doc. 158, p. 388:15 (Kopsky)). In monetary terms, the cost of relying on inexperienced canvassers paid hourly may be as much as 30%, or half a million dollars in recent campaigns, and the residency requirement is a primary reason sponsors are forced to rely on inexperienced canvassers.[7]

This burden is severe. While the Eighth Circuit recognized that alternative speech remains available to nonresidents in the face of residency requirements for canvassers, *Jaeger*, 241 F.3d at 617, the Supreme Court has "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000). The fact that a law "leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." *Meyer*, 486 U.S. at 424. Here, the alternatives proposed by the State are less effective, less economical, and less impactful than canvassing, *see id.*; *see supra* ¶ 86, and many of the alternatives put forward (carrying supplies, providing water, transporting canvassers,

[7] The residency requirement and pay-per-signature ban were enacted in the same legislative session, so the Court cannot identify what portion of the increase in costs is attributable to one or the other.

performing quality assurance checks) are not speech at all. While these activities may allow nonresidents to support petitions, the First Amendment protects nonresidents' ability to support such political campaigns via *speech*, not via administrative duties. Because the burden is severe, strict scrutiny applies.

The residency requirement is also subject to strict scrutiny as a content-based restriction on speech because it "does not apply to those who circulate candidate petitions, only to those who circulate initiative or referendum proposals." *Buckley*, 525 U.S. at 209 (Thomas, J., concurring in judgment); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) ("[T]he category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election need bear the required markings.").[8]

[8] The Ninth Circuit rejected this argument in *Prete v. Bradbury*, 438 F.3d 949, 968 n.25 (9th Cir. 2006), but this Court finds its reasoning incomplete. There, the Ninth Circuit concluded that the pay-per-signature ban for initiative and referendum petitions was not content based, although it did not apply to other kinds of political petitions, because it "d[id] not regulate what can be said in an initiative or referendum petition." *Id.* But, as the Supreme Court has reasoned, a regulation may be content based because it regulates what can (or must) be said *or* because it applies to a "category of covered [speech]" that is "defined by [its] content." *McIntyre*, 514 U.S. at 345. Here, the residency requirement is content based for the latter reason, which the Ninth Circuit did not address. Moreover, "a speech regulation targeted at specific subject matter," here, changing state law by citizen petition, "is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).

The Court notes that not all regulations that are limited to initiative and referendum petitions are content based. Inherent differences between candidates, political parties, and initiatives mean some election regulations could not sensibly be applied to all types of ballot access petitions. Courts "distinguish between regulation of the circulation of petitions—which is 'core political speech'—and a state's general initiative regulations." *Biddulph v. Mortham*, 89 F.3d 1491, 1497 (11th Cir. 1996) (upholding single subject rule as general initiative regulation); *see Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354 (1997) (upholding laws "prohibit[ing] a candidate from appearing on the ballot as the candidate of more than one part"). Here, the law regulates petition circulation—an activity engaged in by initiative and referendum sponsors, candidates, and new political

The State claims the residency requirement is necessary to ensure canvassers are subject to the State's subpoena power should irregularities arise. North Dakota made the same argument in *Jaeger*. But there, the law followed an "incident in which over 17,000 signatures had to be invalidated. Two Utah residents who were involved in petition irregularities left the State, and the matter was never fully resolved." *Jaeger*, 241 F.3d at 616. Here, there was no such incident. Indeed, there is no evidence that Arkansas has ever suspected a nonresident canvasser of malfeasance but been unable to investigate because of their departure from the State. Arkansas has done nothing more than "posit the existence of the disease sought to be cured." *Turner Broad.*, 512 U.S. at 664 (citation omitted).

Plaintiffs and Intervenor-Plaintiffs also offer the less restrictive alternative of requiring canvassers to submit to Arkansas's subpoena power. "Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result." *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008); *see We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022); *Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir. 2013); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008). Here, the State has not responded to this proposed alternative at all, and there is

---

parties alike—but singles out initiative and referendum petitions. Laws singling out circulation and circulators of initiative or referendum petitions for differential treatment "defin[e] regulated speech by its function or purpose" and are therefore content based. *Reed*, 576 U.S. at 163.

no evidence from which the Court could conclude that such a requirement would be less effective at securing nonresident canvassers' presence in the state if needed.

The State appears to have abandoned the interest it previously asserted in ensuring petitions have grassroots support. (Doc. 90, pp. 24, 26–27; Doc. 165, ¶ 20). The Court notes

> that interest does not appear to be legitimate at all. A desire to fence out non-residents' political speech—and to prevent both residents and non-residents from associating for political purposes across [state] boundaries—simply cannot be reconciled with the First Amendment's purpose of ensuring "the widest possible dissemination of information from diverse and antagonistic sources."

*Lerman v. Bd. of Elections in N.Y.*, 232 F.3d 135, 152 (2d Cir. 2000) (quoting *Krislov,* 226 F.3d at 866). Moreover, because the First Amendment undoubtedly protects political donations across state lines, application of the residency requirement to volunteer canvassers is likely to harm, not help, grassroots campaigns: Moneyed out-of-staters can directly support signature collection because their donations can fund expensive, in-state paid canvassing drives, but out-of-staters with more time than money can only indirectly support signature collection through non-canvassing roles that have little or no impact on the number of signatures collected.

The Court has no trouble concluding here that the residency requirement is facially unconstitutional. "The lack of tailoring to the State's investigative [concerns] is categorical—present in every case"—as is the weakness of the State's evidence connecting residency to the State's asserted interest in fraud prevention. *Ams. for Prosperity*, 594 U.S. at 615; *see Sanderson v. Hanaway*, 163 F.4th 1101, 1106 (8th Cir. 2026) ("The [law] has, in effect, one application . . . . Because the statute does not apply differently to anyone within the category of those [regulated], we need only consider

whether that sole application violates the First Amendment."). The residency requirement fails strict scrutiny in all its applications, and it is therefore facially unconstitutional.

### ***2. Domicile Requirement***

Arkansas law also forbids a person from "act[ing] as a paid canvasser unless he or she is . . . [d]omiciled in the state if acting as a paid canvasser for a statewide initiative petition or statewide referendum petition" and a sponsor from "knowingly hir[ing] a person as a paid canvasser who . . . [i]s not domiciled in the state if acting as a paid canvasser for a statewide initiative petition or statewide referendum petition." Ark. Code Ann. § 7-9-103(a)(8), (d)(1). A sponsor or their agent who violates the domicile requirement "is guilty of a violation and upon conviction shall be fined two thousand five hundred dollars ($2,500) for each paid canvasser hired in violation of [the domicile requirement]." *Id.* § 103(d)(2).

The domicile requirement implicates the First Amendment for the same reasons as the residency requirement.

Like the residency requirement, the domicile requirement excludes most Americans from the pool of potential canvassers available to sponsors. While the domicile requirement is limited to paid canvassers, the burdens imposed on sponsors remain severe. Most professional canvassers are not Arkansas domiciliaries. With the majority of professional canvassers unavailable to Arkansas petition sponsors, sponsors are not free to hire the best, most experienced, or most reputable canvassers from around the nation. Instead, they must choose from an exponentially smaller pool of candidates, meaning paid canvassers in Arkansas are less experienced than sponsors would prefer, if they have any experience at all. Less skilled, less experienced canvassers are less effective and less efficient than more skilled, more experienced canvassers, which

increases the cost and decreases the efficacy of the sponsor's campaigns. Those less experienced canvassers also receive worse training because they cannot watch experienced professional canvassers at work. A sponsor's ability to "select what they believe to be the most effective means" for advancing their petition is sharply circumscribed by this requirement. *Meyer*, 486 U.S. at 424. Accordingly, strict scrutiny applies.

The domicile requirement is also subject to strict scrutiny as a content-based speech restriction to an even greater degree than the residency requirement because it discriminates between initiative and referendum petitions: The domicile requirement applies to statewide petitions, but not local petitions.

Arkansas claims this requirement is necessary to prevent evasion of the residency requirement and to make the required Arkansas State Police ("ASP") background check effective since ASP only has access to Arkansas criminal records.

As to the first point, Arkansas does not have a legitimate, let alone important, interest in effective enforcement of an unconstitutional restriction on speech, so this argument cannot justify the domicile requirement under any level of scrutiny.

As to the second point, the Court recognizes as important, and even compelling, the State's interest in preventing individuals with certain criminal convictions from canvassing. And the Court recognizes background checks as a perfectly appropriate method of furthering that interest. But a state's interest in ensuring the efficacy of a *particular method* of furthering an underlying interest is much weaker than the underlying interest itself. Especially here, where the particular method Arkansas claims an interest

in—an ASP background check—is so feeble that state law already imposes a second background check requirement.

When Arkansas initially enacted a background check requirement for paid canvassers, the law read: "a sponsor shall obtain, at its cost, from the Department of Arkansas State Police, a current state and federal criminal record search on every paid canvasser." Ark. Act 1219 of 2015, sec. 4, § 7-9-601(b)(1) (current version at Ark. Code Ann. § 7-9-601(b)(1)). The Arkansas Supreme Court found this law likely unconstitutional as impossible to comply with because the ASP can only conduct Arkansas criminal record searches; it cannot conduct federal criminal record searches. *Thurston v. Safe Surgery Ark.*, 2021 Ark. 55 (2021). The General Assembly promptly amended the law, which now reads: "a sponsor shall obtain, at the sponsor's cost, from the Division of Arkansas State Police, a current state criminal history and criminal record search on every paid canvasser." Ark. Code Ann. § 7-9-601(b)(1).

The amendment also added a second requirement: "the sponsor shall [i]nstruct the paid canvasser to provide sufficient information of the paid canvasser's identity to allow the sponsor to obtain the criminal history and criminal record of the paid canvasser . . . [and] [o]btain the criminal history and criminal record of the paid canvasser." *Id.* § 601(a)(2)(E)–(F). This requirement is, notably, not limited to Arkansas criminal history, and sponsors are accordingly not instructed to go through the ASP for this second background check. The State has offered no explanation for why a background check from the ASP, specifically, is required, despite its known limitations.

The exclusion of canvassers for candidates, new political parties, and local initiative petitions from the domicile requirement also casts doubt on how compelling this

interest is. After all, criminal canvassers are equally threatening to potential signers regardless of what petition they're carrying. But under Arkansas law, a canvasser carrying a local initiative petition can get by with a purportedly less effective ASP background check, and a canvasser carrying a candidate petition does not have to pass a background check at all. "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. at 780 (first alteration in original) (citation omitted).

Whatever interest Arkansas has in the efficacy of the less effective of the two background checks it requires, it is not "*compelling* enough to justify abridging core constitutional rights." *Republican Party of Minn. v. White*, 416 F.3d at 750. Limiting sponsors' pool of potential canvasser hires to less than 1% of Americans, and limiting 99% of Americans' ability to engage in political speech for pay in Arkansas, imposes outsized restrictions on core political speech that cannot be justified by Arkansas's asserted interest in propping up a background check that already provides limited utility.

Even assuming Arkansas has a compelling interest in requiring an effective background check, the domicile requirement is not narrowly tailored to achieve that interest. Arkansas can and does guard against criminal canvassers via the second background check requirement, a means of achieving its interest without burdening the core political speech of most Americans, and there is no evidence from which the Court can conclude that this requirement is ineffective at screening out canvassers with disqualifying convictions. The domicile requirement violates the First Amendment.

The domicile requirement is also facially unconstitutional. As with the residency requirement, the disclosure requirement applies to a fairly specific category of political activity. While the domicile requirement only applies to paid canvassers on statewide initiative and referendum petitions, it applies to all such paid canvassers (and the sponsors who use them) in the same way. The interests justifying the requirement, the burdens it imposes on speech, and the fit between the means chosen and the ends purportedly achieved do not differ between applications. "The lack of tailoring . . . is categorical—present in every case—as is the weakness of the State's interest." *Ams. for Prosperity*, 594 U.S. at 615. The domicile requirement fails strict scrutiny in all applications, and it is therefore facially unconstitutional.

### *3. Pay-Per-Signature/Commission Ban*

Finally, Arkansas law makes it "unlawful for a person to pay or offer to pay a person, or receive payment or agree to receive payment, on a basis related to the number of signatures obtained on a statewide initiative petition, statewide referendum petition, local initiative petition, or local referendum petition." Ark. Code Ann. § 7-9-601(g)(1). The law further provides that it "does not prohibit compensation for circulating petitions but only compensation for obtaining signatures when the compensation or compensation level is *impacted by or related to* the number of signatures obtained." *Id.* § 601(g)(2) (emphasis added). Signatures obtained in violation of the pay-per-signature ban are not counted, and a violation of the pay-per-signature ban is a Class A misdemeanor. *Id.* § 601(g)(3)–(4).

Defendant now asserts, again without explanation, that the pay-per-signature ban does not implicate the First Amendment. (Doc. 165, ¶ 27). This Court takes its cues from the Eighth Circuit's prior decision on a commission ban in *Jaeger*. Although the court did

not say whether the ban implicated the First Amendment or what level of scrutiny it was applying, it did look to the evidence to "conclude that the State ha[d] produced sufficient evidence that the regulation [was] necessary to insure the integrity of the initiative process," especially in light of the fact that the challengers "produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures." *Jaeger*, 241 F.3d at 618. The court's examination of the state's justification and the evidence supporting it suggests that the court was not applying the mere rational basis review applicable to laws that do not implicate the First Amendment.

The Eighth Circuit has held that the following petition regulations do not implicate the First Amendment: laws setting the number of signatures needed to get on the ballot, *Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997); *Wellwood v. Johnson*, 172 F.3d 1007 (8th Cir. 1999); laws requiring the counting of only registered voters' signatures, *Hoyle v. Priest*, 265 F.3d 699 (8th Cir. 2001); laws requiring state-authored summary statements be made available with the petition, *Mo. Roundtable for Life v. Carnahan*, 676 F.3d 665 (8th Cir. 2012); and laws requiring the in-person notarization of canvasser affidavits, *Miller v. Thurston*, 967 F.3d at 738. On the other hand, laws wholly prohibiting payment to canvassers, *Meyer*, 486 U.S. at 422, laws requiring that canvassers be registered voters, *Buckley*, 525 U.S. at 211, disclosure requirements, *id.* at 212–14; *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022), petition filing deadlines, *SD Voice*, 60 F.4th at 1079, and in-person signature requirements, *Miller v. Thurston*, 967 F.3d at 738, do implicate the First Amendment.

Generally, restrictions on political spending implicate the First Amendment. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299

(1981). Here, the pay-per-signature ban implicates the First Amendment because it restricts how sponsors pay for political speech, preventing them from using what they believe to be "the most effective . . . and perhaps economical avenue" of advancing their petitions. *Meyer*, 486 U.S. at 424. Moreover, Arkansas's law sweeps in canvassing companies' and sponsors' private speech because it prohibits any "person" from "offer[ing] to pay *a person*, . . . or agree[ing] to receive payment, on a basis related to the number of signatures obtained." Ark. Code Ann. § 7-9-601(g)(1) (emphasis added). The law is not limited to offers of payment to canvassers or potential canvassers, so canvassing companies and sponsors reasonably fear that they may violate the law if they make or accept an offer for paid canvassing services to collect X signatures for Y dollars. *See id.* § 101(11) ("'Sponsor' means *a person* who arranges for the circulation of an initiative or referendum petition . . . ." (emphasis added)). The ban thereby restricts even behind-the-scenes planning conversations about a campaign and its associated costs, which also implicates the First Amendment.

There is not, however, sufficient evidence for the Court to conclude that the burden imposed by the pay-per-signature ban is severe. Plaintiffs and Intervenor-Plaintiffs have not presented evidence about the proportion of professional canvassers who are unwilling to work on an hourly basis. Indeed, there is not a single example in the record of a canvasser who would accept work in Arkansas on a per-signature basis but would refuse work in Arkansas on an hourly basis. The Court is aware that other states have similar restrictions, which do not appear to have substantially limited the number of canvassers willing to work in those states. *See Person v. N.Y. State Bd. of Elections*, 467 F.3d 141, 143 (2d Cir. 2006); *Prete*, 438 F.3d at 964–65. And the more states with pay-per-signature

bans, the more canvassers and canvassing organizations may find themselves willing to work on an hourly basis. While, coupled with the residency and domicile requirements, the pay-per-signature ban likely contributed to the approximately 30% increase in the cost of Protect AR Rights's signature collection efforts, it is not clear what portion of this increase is attributable to one restriction as opposed to the others. Finally, while the ban makes budgeting and planning more difficult, that is not the kind of burden that is relevant to the First Amendment inquiry. *Dobrovolny*, 126 F.3d at 1113.

Because the pay-per-signature ban imposes a less than severe burden on speech, the Court would ordinarily review the ban to determine whether "it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *Miller v. Thurston*, 967 F.3d at 740. However, like the residency and domicile requirements, the pay-per-signature ban is limited to initiative and referendum petitions and therefore imposes a content-based restriction on speech because it defines the category of regulated speech by its content.

Arkansas asserts its interest in protecting the integrity of the initiative process against signature fraud. (Doc. 165, ¶ 29). In *Jaeger*, the Eighth Circuit noted that the commission ban there was passed in response to a campaign where "students were being paid 25¢/signature. There were reported irregularities—taking names out of the phone book, etc." 241 F.3d at 618. Weighing that evidence against the challenger's "bare assertions" that payment by the hour would burden sponsors' ability to collect signatures, the Eighth Circuit concluded that "when the state introduces evidence justifying the ban on commission payments as a necessary means to prevent fraud and abuse (as the state has in this case), initiative sponsors may not rest on bare assertions alone." *Id.*

Here, unlike in *Jaeger*, the State has provided no evidence connecting payment on a per-signature basis to even a single instance of fraud. Defendant has provided testimony that there was a decrease in transcriptions after the ban; as the Court noted, not all transcriptions can be fairly characterized as fraud, and there is no evidence from which the Court can determine what proportion of transcriptions reflect likely fraud or forgery. While it makes intuitive sense that canvassers paid per signature have an incentive to falsify signatures, there is no evidence actually connecting payment on a per-signature basis with petition fraud—in fact, unlike other cases where a pay-per-signature ban was upheld, there is no evidence of actual petition fraud in Arkansas's initiative process period.[9] *See Prete*, 438 F.3d at 969 (citing affidavit of criminal investigator who averred that paying circulators per signature leads to fraud, which was attached to reports of interviews with circulators who had actually committed such fraud). The Court will not rely on mere intuition when First Amendment rights are at stake.

Relatedly, the State's claim that the ban is directed at its important regulatory interest in combatting fraud is undermined by the ban's limited application to the initiative and referendum context. There is no reason to think that pay-per-signature incentivizes fraud on initiative and referendum petitions, but not on candidate or political party petitions. *Cf. Meyer*, 486 U.S. at 428 ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." (alteration in original) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790

[9] It makes sense that, despite high invalidation rates, there is little incidence of petition fraud in Arkansas. Unlike some states that only review a random sample of signatures, *see*, *e.g.*, *SD Voice*, 60 F.4th at 1801, Arkansas invests significant resources in reviewing every single petition part, so rogue canvassers cannot avoid scrutiny by random chance.

(1978))). Yet Arkansas law allows these other petitions to rely on this "uniquely problematic" form of payment. (Doc. 165, ¶ 29). While Arkansas is "not required to present 'elaborate, empirical verification of the weightiness of [its] asserted justifications,'" *Miller v. Thurston*, 967 F.3d at 740 (quoting *Timmons*, 520 U.S. at 364), its regulation of this problematic practice in one context but not another—absent any indication that fraud concerns differ between the two—tends to suggest that the General Assembly was not really concerned about fraud. *Republican Party of Minn. v. White*, 416 F.3d at 751 ("If some groups are exempted from a prohibition [purported to uphold a state interest], the rationale for regulation is fatally impeached." (alteration in original) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 67 n.27 (1976))).

The pay-per-signature ban "imposes a burden on political expression that the State has failed to justify" because Arkansas "failed to provide evidence connecting the [ban] to its asserted interest[ ]." *SD Voice*, 60 F.4th at 1082 (quoting *Buckley*, 525 U.S. at 195). While the weakness of the evidence on both sides makes this a close case, the Court must err on the side of protecting political speech. *281 Care Comm. v. Arneson*, 638 F.3d 621, 636 n.3 (8th Cir. 2011) (collecting cases) ("The breadth of the protection afforded to political speech under the First Amendment is difficult to overstate in light of recent Supreme Court precedent.").

Like the residency and domicile requirements, the pay-per-signature ban is facially unconstitutional. The ban applies in two contexts: actual payment to canvassers and conversations about payment to canvassers. In both contexts, the ban lacks the necessary fit between the means chosen and the ends justifying the imposition because Defendant failed to show that the ban does anything to advance the State's interest. That

defect "is categorical—present in every case—as is the weakness of the State's interest." *Ams. for Prosperity*, 594 U.S. at 615. The pay-per-signature/commission ban fails First Amendment scrutiny in all applications, and it is therefore facially unconstitutional.

### C. Permanent Injunction Factors

Plaintiffs and Intervenor-Plaintiffs seek to permanently enjoin the challenged laws. A plaintiff seeking a permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiffs and Intervenor-Plaintiffs have shown that the remaining challenged laws violate the First Amendment. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (citation omitted). The balance of equities also favors Plaintiffs and Intervenor-Plaintiffs because Arkansas has no interest in enforcing laws the violate the First Amendment. *Dakotans for Health*, 52 F.4th at 392. Finally, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled in part by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). A remedy in equity is warranted, and the Court will therefore permanently enjoin enforcement of the residency requirement, Ark. Code Ann. § 7-9-103(a)(6), (a)(8)(A), (d)(1); the domicile requirement, *id.* § 103(8)(B), (d)(1); and the pay-per-signature/commission ban, *id.* § 601(g).

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss (Doc. 159) and Motion for Judgment on Partial Findings (Doc. 161) are **DENIED**. Defendant's Motion to Stay (Doc. 59) is **MOOT**. The various Motions in Limine (Docs. 136, 138, 139 & 141), to the extent they were not resolved from the bench, *see* Doc. 154, are **MOOT**.

Judgment will enter contemporaneously with this Order.

**IT IS SO ORDERED** on this 21st day of August, 2025.

TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE